IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, FEDERATION OF
WOMEN'S CLUBS OVERSEAS, INC., NEW
MEXICO PUBLIC INTEREST RESEARCH
GROUP EDUCATION FUND, and
SOUTHWEST ORGANIZING PROJECT,

       Plaintiff,

vs.                                       No. CIV 08-0702 JB/WDS

MARY HERRERA, in her capacity as Secretary
of State,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Application for a Preliminary

Injunction, filed August 11, 2008 (Doc. 14).  The Court held hearings on August 19, 2008, and on

August 29, 2008.  The primary issue is whether the Plaintiffs have shown that they are entitled to

an injunction prohibiting the state of New Mexico from enforcing its voter-registration laws.  The

analysis of that issue largely turns on these four sub-issues: (i) whether New Mexico's regulation

of third-party voter-registration efforts is unconstitutional as a violation of the Plaintiffs' First

Amendment rights; (ii) whether the New Mexico voter-registration laws are unconstitutionally

vague or overbroad; (iii) whether New Mexico voter-registration laws violate the National Voter

Registration Act ("NVRA"), 42 U.S.C. §§ 1973 to 1973gg-10; and (iv) whether the New Mexico

laws violate the New Mexico Constitution.  Because the Court concludes that the Plaintiffs have not

shown that they are likely to succeed on the merits of any of their claims, and because the Plaintiffs

have not show that they meet the other requirements for extending relief, the Court will deny the

request for a preliminary injunction.

## FACTUAL BACKGROUND

The Plaintiffs are four organizations that regularly participate in voter-registration activities in the nation and, for some of the Plaintiffs, in the State of New Mexico.  In 2005, the New Mexico Legislature enacted legislation that restricted the voter-registration activities of third-party organizations.  As a result of New Mexico's laws, the Plaintiffs have allegedly severely curtailed their voter registration activities in New Mexico, although other third-party organizations have continued to register voters in impressive numbers.

### 1.   The Plaintiffs.

Each of the four Plaintiffs seeks, as part of its mission, to assist individuals in New Mexico and elsewhere to register to vote.  They rely upon voter-registration drives not only to promote participation in American democracy and to enhance the political power of their members and the communities that they serve, but also to recruit new members who support the issues and causes in which they believe.  The Plaintiffs rely principally on volunteers to conduct voter registration.  In connection with prior elections, the Plaintiffs have registered substantial numbers of citizens to vote in New Mexico and elsewhere.

### a.   American Association of People With Disabilities.

According to United States Census data, there are over 300,000 voting-age people with disabilities residing in New Mexico.  Only 37.9% of those individuals voted in 2000.  See Affidavit of James Dickson ¶ 29, at 10 (executed June 10, 2008)(Dickson Aff.); Declaration of Neal A. Potischman in Support of Plaintiffs' August 2008 Application for a Preliminary Injunction, ¶ 7, at 2 (filed August 11, 2008)("Potischman Decl.")(Doc. 15-2).

The American Association of People With Disabilities ("AAPD") is a nonpartisan advocacy

organization dedicated to ensuring the economic self-sufficiency and increasing the political power of the more than fifty-six million Americans with disabilities.  See Dickson Aff.  ¶ 3, at 1.  AAPD has approximately 86,500 active and inactive individual members nationwide, including in New Mexico.  See Dickson Aff. ¶ 4, at 1.  AAPD registers its members to vote by communicating with them directly.  See id. ¶ 9, at 3.

In addition, AAPD runs large-scale voter-registration programs through coalitions with state-based disability organizations.  See id.  AAPD encourages its members and coalition member groups to focus their voter-registration message on political issues that are central to that particular group's constituency, such as lobbying for accessible housing or audible traffic lights for the blind.  See id. ¶¶ 5, 15-16 & 20, at 1, 4-6.  It is unclear whether AAPD has registered voters in New Mexico.  At least, the Plaintiffs were not able cite a specific instance of AAPD registering voters in New Mexico. See Transcript of August 29, 2008 Hearing ("Aug. 29 Tr.")at 26:6-21 (Urias)(Doc. 47).

### b.    Federation of Women's Clubs Overseas, Inc.

The Federation of Women's Clubs Overseas, Inc. ("FAWCO") is an international network of seventy-eight independent American women's organizations located in thirty-nine countries.  See Affidavit of Lucy Stensland Laederich ¶ 6, at 1 (executed June 24, 2008); Potischman Decl. ¶ 8, at 2.  FAWCO serves as an informational resource for its member organizations, providing support for American women abroad.  See id. ¶ 9, at 2.  FAWCO assists its member organizations in registering their own members to vote and in conducting voter-registration drives.  See id. ¶¶ 10-11, at 2-3.

The members of FAWCO's constituent organizations typically assist Americans abroad to vote by volunteering to help them fill out the Federal Postcard Application Card ("FPAC"), which states must accept pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").  See id. ¶ 12, at 4.  FAWCO frequently addresses issues of importance to the

-3-

expatriate community while conducting voter-registration drives at locations that Americans living abroad are known to frequent.  See id. ¶¶ 11, 18, at 3, 6.  Before the Legislature enacted New Mexico's voter-registration law, FAWCO helped to register voters from all fifty states, including from New Mexico.  See id. ¶ 20, at 7.

**c.      New Mexico Public Research Group Education Fund.**

The New Mexico Public Interest Research Group Educational Fund ("NMPIRG Education Fund") is a nonpartisan, nonprofit organization that seeks to provide a voice on behalf of the New Mexico public interest, as opposed to special interests.  See Affidavit of Katryn E. Fraher ¶¶ 2, 5, at 1-2 (executed June 26, 2008)("Fraher Aff."); Potischman Decl. ¶ 3, at 2.  The NMPIRG Education Fund and its sister organization, the New Mexico Public Interest Research Group ("NMPIRG"), both conduct a series of issue-oriented campaigns in which students at the University of New Mexico in Albuquerque, New Mexico participate.  See Fraher Aff. ¶ 2, at 1.  One of the campaigns conducted by the NMPIRG Education Fund is the New Mexico Voters Project, a nonpartisan voter-registration campaign organized by the Student PIRGs, a national federation of the Student PIRG organizations in various states.  See id. ¶ 11, at 4.

The Plaintiffs have represented that since 2004, Students for NMPIRG is the sole organization that has conducted voter registration for the NMPIRG Education Fund.  See id. ¶ 4, at 1; Affidavit of Jamison Tessneer.¶ 6, at 2 (executed June 30, 2008)("Tessneer Aff."); Potischman Decl. ¶ 4, at 2 .  They have also represented that as part of the New Voters Project, Students for NMPIRG runs voter-registration drives that student volunteers conduct.  See Fraher Aff. ¶¶ 9, 11, at 3-4.  Students for NMPIRG explain facts about the voting process and why it is important to vote. See id. ¶¶ 7-8, 12-14, at 2-5.  Students for NMPIRG also tells prospective voters about their various issue-oriented campaigns to get them to volunteer for, and to join the organization.  See id.  At the

-4-

hearing on August 19, 2008, however, the Plaintiffs clarified that there is no formal organization called "Students for NMPIRG."  See Tr. 206: 22-207: 14. (Boyd).  Students participate in PIRG voter registration activity, but not through  any organization called "Students for NMPIRG."  See id. (Boyd).

### d.   SouthWest Organizing Project.

SouthWest Organizing Project ("SWOP") is a nonpartisan organization dedicated to empowering disenfranchised communities in New Mexico – primarily Latinos and other people of color, low-income communities, and young people – to realize racial and gender equality and social and economic justice.   See Affidavit of Robert Rodriguez ¶ 4, at 1 (executed June 20, 2008)("Rodriguez Aff."); Potischman Decl. ¶ 2, at 2.  SWOP has approximately 600 members across New Mexico.  See Rodriguez Aff. ¶ 3, at 1.  As part of its mission, SWOP undertakes large-scale volunteer-driven efforts to register New Mexico voters and has registered 30,000 New Mexico voters since 1983.  See id. ¶¶ 4, 7-10, at 1-3.  As part of past voter-registration efforts, SWOP employees and volunteers distributed nonpartisan educational materials, discussed the importance of voting, discussed SWOP's views on controversies at issue in the election, and enlisted new SWOP members.  See id. ¶¶ 14-19, at 3-5.

In advance of the 2004 presidential election, SWOP registered approximately 5,000 people to vote in New Mexico.  See id. ¶ 9, at 2.  SWOP had difficulty obtaining forms in 2004, the year before the Legislature passed § 1-4-49.  See Rodriguez Aff. ¶ 33, at 10.

### 2.   Voter and Voter Registration Fraud.

The desire to make a positive impact on the civil and political landscape usually motivates the efforts of third-party voter registration agents such as the Plaintiffs.  When organizations such as the Plaintiffs fail in their goal of increasing voter participation, that failure often has a deleterious

impact on participatory democracy.   Unfortunately, the recent past demonstrates that those beneficent motivations are either too frequently thwarted or sometimes entirely absent.  As a result, third-party voter registration has at times become a vehicle for voter fraud and voter registration fraud.

New Mexico is, unfortunately, not immune from voter fraud and voter registration fraud. In 1999, members of the Libertarian Party fraudulently registered eight hundred already registered voters as Libertarians.   See Affidavit of Denise Lamb ¶¶ 4, 5, at 1-2 (executed August 13, 2008)("Lamb Aff."); Declaration of Scott Fuqua in Opposition to Plaintiff's August 2008 Application for Preliminary Injunction ¶ 2, at 2 (filed August 15, 2008)("Fuqua Dec..")(Doc. 23-2). After the 2000 general election, members of the Democratic Party in New Mexico discovered approximately two hundred completed voter registration forms that members of the party had gathered but never submitted to the appropriate election official.   See id. ¶ 6, at 2.   On past occasions, New Mexico citizens, believing that they have been registered to vote by the actions of a third-party voter registration agent, have been turned away at the polls because that agent failed to submit the voter's completed registration form.

In the 2004 election, the failure of a third-party registration organization to submit completed voter registration forms resulted in sixty or seventy young voters being turned away at the polls. See Lamb Aff. ¶ 7, at 2.  Also in 2004, the Association of Community Organizations for Reform Now ("ACORN") allegedly registered a fourteen-year old boy to vote in Bernalillo County.  See id. ¶ 8, at 2-3.  Such developments pose a serious threat to democratic processes in the state and have motivated the New Mexico Legislature to seek ways to protect the eminently important integrity of

voting and voter registration.[1]  The process by which the laws challenged in this case came into being is illustrative of the attention that the New Mexico Legislature has given these issues.

      a.      **Legislative Action**.

During the 2005 regular legislative session, Sen. Linda Lopez introduced Senate Bill 678 (SB 678).  The Senate Rules Committee combined SB 678 with SB 680, SB 718, and SB 735, and SB 678 was referred to the Senate Judiciary Committee.  Section 17 of SB 678, later codified as N.M. Stat. § 1-4-49, detailed the rights and responsibilities of third-party registration agents in registering voters throughout the state.  The Senate Judiciary Committee did not make any amendments to § 17 of the bill, but after making substantial changes to other portions, the Senate Judiciary Committee substituted its own bill for the Senate Rules Committee's bill.

The Senate passed the Senate Judiciary Committee's version of SB 678 and sent it to the House for consideration.  The House Voters and Election Committee ("HVEC") made additional amendments to the bill that had the effect of softening some of its consequences.  HVEC's changes included the addition of provisions that made conviction of third-party registration agents who violated the registration laws more difficult and the criminal penalties for such violations less severe.  See House Voters and Election Committee Rep. at 1 (March 17, 2005)(available at http://legis.state.nm.us/Sessions/05%20Regular/bills/senate/SB0678VE1.pdf).  Specifically, the HVEC required that a person "willfully" violate the third-party registration law to be guilty of

---

[1]New Mexico is not alone in recognizing the need to insure the uniformity and legitimacy of elections.  In September 19, 2005, the Commission on Federal Election Reform, co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker, III, issued a non-partisan report, which states: "[E]ffective voter registration and voter identification are bedrocks of a modern election system.  By assuring uniformity to both voter registration and voter identification . . . access to elections and ballot integrity will both be enhanced."  Carter-Baker Commission on Federal Election Reform at 9 (September 19, 2005).

violating registration laws and reduced the penalty for such violation from a fourth degree felony to a petty misdemeanor.  See HVEC Rep. at 1.  The HVEC amendments to SB 678 passed the committee by an 8 to 5 party-line vote.  See HVEC Rep. at 4.

Thus, in March 2005, in that form, and after passing through the Senate Judiciary Committee and the HVEC, SB 678 passed the Senate by a 24-17 vote and the House by a 39-26 vote.  SB 678 came as part of an attempt at election reform that included amendments to laws regarding voter registration, voter identification, and paper records of voter's ballots.  See New Mexico Legislative w e b s i t e : http://Legis.state.nm.us/lcs/_session.asp?chamber=S&type=++&number=678&Submit=Search& year=05.

The statute is intended to curb voter registration fraud through three principal mechanisms that make it more difficult to register new voters, and to communicate and associate with would-be voters. Section 1-4-49 – and the rules promulgated thereunder – provide various protections against voter registration fraud.  The entire challenged law – consisting of N.M.S.A. 1978, § 1-4-49 (2008), the regulations implementing the statute, 1.10.25.7-10 N.M.A.C. (2008), and the requirements that the New Mexico officials have imposed pursuant to the statute and the regulation – restricts voter-registration activity in several ways besides the three explicit ways mandated by the statute.

### b.   **Election Reform Task Force.**

Between the First and Second Session of the Forty-Seventh Legislature, the thirty-four member Election Reform Task Force was created to address the changes made to election laws as a result of the passage of SB 678.  Because of the complex nature of the changes,

> the election reform task force was created to review the provisions and implementation of the new law, review the Election Code to ensure that any obsolete language that conflicts with federal law was adequately addressed and, if necessary,

recommend legislation for the 2006 legislative session to address any implementation problems or other unintended consequences of the new law.

New Mexico Legislative Council Service, Election Reform Task Force, 2005 Interim Final Report at 2 (March 2006) (available at http://legis.state.nm.us//lcs/fileExists/interimReports/2005interrreports/ERT05.pdf) ("Interim Final Report").

During its second meeting, the Election Reform Task Force discussed third-party registration and potential issues with the new laws. Ultimately, the Task Force's sole recommendation relating to third-party registration was to amend N.M.Stat. § 1-4-49 to "require third-party registration organizations to provide the names and address of their officers and provide for penalties for violations of the registration process." 2005 Interim Final Report at 47.

### 3. <u>The Challenged Law.</u>

As discussed above, in 2005 the New Mexico Legislature responded to various well-publicized incidents of voter registration fraud by passing N.M.S.A. 1978, § 1-4-49, which was later supplemented by certain administrative regulations and other de facto requirements. The entire challenged law – consisting of N.M.S.A. 1978, § 1-4-49 (2008), the regulations implementing the statute, 1.10.25.7-10 N.M.A.C. (2008), and the requirements that the New Mexico officials have imposed pursuant to the statute and the regulation – restricts third party voter registration in various ways, and places affirmative requirements upon parties wishing to engage in third party voter registration. These restrictions and requirements apply to all individuals and organizations except state or federal agencies. Accordingly, political parties acting as third-party registration agents must comply with the same requirements as other groups. <u>See</u> N.M.S.A. 1978, § 1-4-49A.

The main provisions that the Plaintiffs have challenged in this case include: (i) a requirement

that registration agents complete a pre-registration process and provide personal information; (ii) a limitation on the number of registration forms an organization or individual may receive; (iii) a requirement that third-party registration agents return completed registration forms to the county clerk or Secretary of State within forty-eight hours; and (iv) criminal and civil penalties for parties who do not comply with third-party registration laws.  These provisions, among others, are the aspects of the law that the Plaintiffs challenge in this case.

**a.      Pre-Registration, Disclosure, and Training Requirements.**

First, an organization that employs registration agents who register third parties to vote must pre-register with the Secretary of State and must provide the Secretary of State with certain information.  <u>See</u> N.M.S.A. 1978, § 1-4-49.  Specifically, the statute requires that organizations or individuals who intend to assist others in registering to vote must first themselves register as third-party voter registration agents with the New Mexico Secretary of State.  In that registration process, the third-party agent provides identifying information to the Secretary of State and receives a registration number.  That registration number is to be placed on each completed voter registration card that the agent submits to the proper election official.  <u>See</u> N.M.S.A. 1978, § 1-4-49(A). Specifically, the statutes states: "Registration agents who either register or assist persons to register to vote" on behalf of non-governmental organizations must themselves pre-register with the Secretary of State.  N.M.S.A. 1978, § 1-4-49(A).  Neither the statute nor any of the regulations implementing it define what it means to "assist persons to register to vote," and it is therefore not clear from the statute whether assistance encompasses (i) mere distribution of voter-registration forms; (ii) distribution and collection of such forms; (iii) distribution and collection, plus help in completing forms; or (iv) some other combination of these activities.

This pre-registration requirement is designed to aid the State in holding accountable third-

party registration agents who engage in fraudulent conduct by providing a means of tracing a fraudulent registration care to the person or organization that submitted it.

Section 1.10.25.8 of the New Mexico Administrative Code requires that individuals complete the required pre-registration process before registering any individual to vote. See id. § 1.10.25.8 N.M.A.C. An individual's pre-registration form must identify the name and address of the organization for which he or she is working, as well as the individual's own name, address, date of birth, and Social Security number. See id. §§ 1.10.25.9(a)-(g). The form must also include a signed, sworn statement by the individual that he or she will obey all state laws and rules regarding the registration of voters. See id. § 1.10.25.9(i).

Except for the date of birth and Social Security number, the registration form is a public record. See id. 1.10.25.9(k). The statute does not on its face require the disclosure of the registration agent's Social Security number, but the regulations and the registration form require this information. See 1.10.25.9(G) NMAC; New Mexico "Voter Registration Agent Identification Form," Potischman Decl. ¶ 6, at 1.

In addition to the pre-registration process described above, certain New Mexico County Clerks have advised registration agents that they must participate in a mandatory, state-run training class before they can complete the pre-registration process. Many County Clerks require third-party registration agents to attend a short training session before being certified to register others to vote. Although the training requirement does not appear on the face of the statute or the regulations, see N.M.S.A. 1978, § 1-4-39; §§ 1.10.25.8 to 1.10.25.10 NMAC, training is a de facto requirement in many parts of the state, including in Albuquerque, see Rodriguez Aff. ¶ 31, at 9; Fraher Aff. ¶ 18, at 7-8; Tessneer Aff. ¶ 9, at 2-3.

In Bernalillo County, the Clerk has set aside afternoon hours on Tuesday and Thursday of

each week for such training sessions.  See Affidavit of Mary Toulouse Oliver ¶ 5, at 1 (executed August 13, 2008)("Oliver Aff."); Fuqua Decl. ¶ 3, at 2.  Training is not, however limited to those hours.  The Bernalillo and Santa Fe County Clerks, and the Secretary of State's Office, are available for training sessions after hours, including weekends, and at locations other than the Clerks' offices.  See Lamb Aff. ¶ 11, at 4; Oliver Aff. ¶ 5, at 1-2; Affidavit of Larry Dominguez ¶ 5, at 1 (executed August 13, 2008)("Dominguez Aff."); Fuqua Decl. ¶ 3, at 2.  Arranging a training session at a mutually agreeable time and place requires only a call to the appropriate County Clerk or to the Secretary of State.  One Plaintiff organization has arranged such sessions with the Bernalillo County Clerk.  See Fraher Aff. ¶ 19, at 8-9.

The training sessions run from fifteen minutes to an hour, depending on the size of the group being trained and the number of questions posed to the state and county official providing the training.  See Lamb Aff. ¶ 11, at 4; Oliver Aff. ¶ 6, at 2.  Trainees are given informational pamphlets and a list of telephone numbers they can call if they have additional questions.  See Lamb Aff. ¶ 11, at 4.

### b.      Fifty-Certificate Limit.

In addition, the challenged law limits access to voter-registration forms, and vests discretion with the Secretary of State and local officials regarding exceptions to the access limits.   The applicable limit is fifty forms. The reason for the fifty-form limit is principally financial: the State must pay the printing costs for voter registration forms and thus cannot afford to provide them in unlimited number to anyone making such a request.  Moreover, election officials must ensure that they keep a supply of registration forms sufficient to meet demand.

The fifty-form limit is not statutory.  Rather, sections 1.10.25.8(c) and 1.10.25.10(b) of the New Mexico Administrative Code provide that registration forms are to be distributed in quantities

of fifty per organization or individual.  See §§ 1.10.25.8(c), 1.10.25.10(b) NMAC.  These two regulations thus limit to fifty the number of blank voter registration forms an organization or individual may obtain at any one time.  A traceable number accompanies the New Mexico voter-registration forms distributed to each organization or individual so that election officials may retain a record of each form.  See id. § 1.10.25.8(c); State of New Mexico Voter Registration Application; Potischman Decl. ¶ 5, at 1.

Despite the form limit that the regulations impose, both the Secretary of State and each of the County Clerks have regulatory discretion to deviate upward from the fifty-form limit.  See §§ 1.10.25.8(c); 1.10.25.10(b) N.M.A.C.  Specifically, the County Clerk and the Secretary of State retain "discretion to increase these quantities for special events or circumstances." See §§ 1.10.25.8(c); 1.10.25.10(b) N.M.A.C.  Beyond the reference to "special events or circumstances," neither the statute nor the implementing regulations otherwise specifies the criteria that the County Clerk or the Secretary of State should apply in determining whether to exercise such discretion. See N.M.S.A. 1978 § 1-4-49A; 1.10.25.8(c); 1.10.25.10(b) N.M.A.C.

### c.    Forty-Eight Hour Return Requirement.

Next, the statute requires third-party registration agents to either mail or personally deliver to the appropriate election official a completed voter registration form within forty-eight hours of completion.  See NMSA 1978, § 1-4-49B. Specifically, § 1-4-49B provides:

> Organizations employing registration agents or using volunteer registration agents shall deliver or mail a certificate of registration to the Secretary of State or County Clerk within forty-eight hours of its completion by the person registering to vote or deliver it the next business day if the appropriate office is closed for that forty-eight hour period.

Id. § 1-4-49B.  The statute supplies no exception for exigent or other special circumstances that might make return of a form within forty-eight hours impracticable or for organizations that receive

forms from applicants more than forty-eight hours after completion.  See id.  Moreover, the challenged law also provides an unforgiving deadline that can fall months before the deadline for registering to vote in an election, also known as the "book closing date."  This year, New Mexico's book-closing date is October 7, 2008.

The forty-eight hour requirement helps ensure that the voter registration cards collected by the third-party registration agent are submitted to the appropriate election official and the voter is placed on the voting rolls.

### d. **Criminal and Civil Penalties.**

Finally, the statute provides for its enforcement with fines and criminal penalties.  See N.M.S.A. 1978, § 1-4-49E.  The criminal and civil penalties for noncompliance include imprisonment and fines up to $5,000.00, both on individuals and on organizations that sponsor registration efforts.

An individual who intentionally violates the provisions of § 1-4-49 may be fined $250.00 for each violation, up to a total fine no greater than $5,000.00.  Section 1-4-49D of the New Mexico Statutes provides that "[a] person who intentionally violates the provisions [of the challenged statute] is guilty of a petty misdemeanor," and shall have his or her status as a third-party registration agent revoked.  N.M.S.A. 1978, § 1-4-49D.  The statute does not specify what constitutes an "intentional" violation, nor does it carve out any defense based on good-faith conduct. Id. § 1-4-49D.  The violation is subject to prosecution as a petty misdemeanor, the lowest level of criminal culpability in the New Mexico criminal system.   The penalties for a petty misdemeanor include imprisonment for up to six months and fines up to $500.00.  See id. § 31-19-1.

The statute also provides for an assessment of civil penalties, including fines of "[$250.00] for each violation, not to exceed [$5,000.00]."  Id. § 1-4-49E.  If the Secretary of State "reasonably

-14-

believes" that an individual or organization has "committed a violation of the provisions [of the challenged statute].," then the Secretary of State refers the matter to the Attorney General or a district attorney, "who may institute a civil action in district court for a violation of the provisions of this section or to prevent a violation of the provisions of this section." Id. § 1-4-49E.  Moreover, if the individual who has intentionally violated § 1-4-49 is either a director of a third-party registration organization, or has decision-making authority in the organization's voter registration activities, the organization may also be held accountable for the violation.  For example, if a person who violates the statute is "an employee of an organization and has decision-making authority regarding the organization's voter registration activities or is an officer of the organization," then the organization itself is liable for civil penalties.  See id. § 1-4-49D.

### 4.    The Impact of New Mexico's Voter-Registration Law on Each Plaintiff and the Alleged Irreparable Harm.

The Plaintiffs contend that the challenged law's requirements have devastated them, because those requirements allegedly render impossible the kinds of community-based voter-registration drives that these organizations previously conducted and would like to conduct this year.  In advance of the 2008 general election, each of the Plaintiffs either has suspended voter-registration activities in New Mexico altogether or has substantially reduced those activities, registering many fewer New Mexico voters than they otherwise could absent the burden that the challenged law imposes.  On the other hand, the statute and the regulations, either on their face or in their application, do not appear to have effected other third-party organizations' voter-registration efforts.

### a.    American Association of People With Disabilities.

As a result of the challenged law, AAPD has decided not to establish a voter-registration coalition of disability organizations in New Mexico in 2008.  See Dickson Aff. ¶ 21, at 6.  AAPD

officers do not want to run the risk of legal liability for AAPD volunteers, nor do they wish to expose affiliated disability-rights organizations and their volunteers to risk for civil and criminal penalties for any mistakes made in the course of registering individuals to vote.  See id. ¶ 22, at 7. AAPD believes that the risk of making errors under the law while trying to register disabled voters is particularly acute because of the disabilities of some of the registrants involved.  See id.; id. ¶ 14, at 14.

Moreover, because of the lack of adequate transportation for many disabled citizens, AAPD believes that it is impracticable for all of its potential affiliated registration volunteers to attend in-person training and ensure that each and every completed voter-registration form is submitted within forty-eight hours of completion.  See id. ¶¶ 23-24, at 7-8.  Finally, AAPD maintains that the reality that the challenged law treats as public records the certifying information of third-party registrants – including their names and organizational affiliations, § 1.10.25.9(k) NMAC – is particularly burdensome for AAPD and its coalition groups, because many volunteers do not wish to be identified as disabled or to publicly associate with a disability-rights organization.  See id. ¶ 25, at 8.

### b.    Federation of Women's Clubs Overseas, Inc.

Upon learning of New Mexico's third-party registration statute, FAWCO sent out an e-mail alert advising its volunteers not to assist any New Mexico residents to register to vote because of potential liability under the challenged law.  See Laederich Aff.  ¶ 21, at 7.  Many of the members of FAWCO's member organizations have thus declined to register any New Mexico voters and will not do so unless the law is changed.  See id. ¶ 22, at 7.  The principal problem for FAWCO's members is that it is impossible for FAWCO volunteers living abroad to travel to New Mexico to be trained and certified to register New Mexico voters.  See id. ¶ 23, at 8.  FAWCO is unwilling to

subject its volunteers to potential civil and criminal penalties for helping to register New Mexico voters abroad.  See id. ¶¶ 23, 25, 27-28, at 8-9.  FAWCO is aware of no exception to the New Mexico law that would permit uncertified persons operating abroad to help register New Mexico voters using the FPCA.  See id. ¶ 23, at 8.

**c.      New Mexico Public Interest Research Group Education Fund.**

The Plaintiffs maintain that the challenged law has caused Students for NMPIRG and the NMPIRG Education Fund to engage in less voter-registration activity and to register fewer voters than they otherwise would have.  See Fraher Aff. ¶ 15, at 5; Tessneer Aff. ¶¶ 7-8, at 2.  The Plaintiffs contend that the most significant burden is that the law's pre-registration and training requirements make it difficult to use the casual volunteers upon which they would otherwise rely for voter-registration drives.  See Fraher Aff. ¶ 16, at 6; Tessneer Aff. ¶ 11, at 3-4.  Moreover, fear of the civil and criminal penalties associated with the failure to return registration forms within forty-eight hours has reduced the number of volunteers willing to participate in voter-registration drives.  See Fraher Aff. ¶ 25-26, at 11; Tessneer Aff. ¶¶ 17-19, at 6.

The Plaintiffs assert that, apart from the number of volunteers, the time and resources that volunteers devote to meeting the forty-eight hour return requirement, and complying with the fifty-form limit, significantly detract from time and energy that could be focused on communicating with, associating with, and registering more voters.  See Fraher Aff. ¶¶ 21-24, at 9-10; Tessneer Aff. ¶¶ 14-16, at 5.  The County Clerk's office[2] has told NMPIRG not to use the federal voter-registration form as a substitute for the restricted New Mexico voter-registration forms.  See Fraher Aff. ¶ 21,

_____

[2] NMPIRG does not specify which County Clerk's office gave this instruction.  The context of their statements suggests that they are talking about the Bernalillo County Clerk's office.  See Fraher Aff. ¶ 5, at 2.

-17-

at 9-10; Tessner Aff. ¶ 15, at 5.

      **d.**     **SouthWest Organizing Project.**

Since the New Mexico Legislature enacted New Mexico's voter-registration law, SWOP has significantly reduced its volunteer-based voter-registration activity. See Rodriguez Aff. ¶ 23, at 6. SWOP did not undertake any organized voter-registration drives in 2005, and registered less than 100 people in 2006, a substantial reduction from the 5,000 people that SWOP registered in 2004, before the Legislature enacted the legislation. See id. ¶¶ 24-25, at 6-7. SWOP has no plans to undertake a full-scale voter-registration drive in New Mexico in 2008. See id. ¶¶ 26-27, at 7. The Plaintiffs contend that, but for the requirements and penalties that the challenged law imposes, SWOP would be undertaking large-scale efforts to register voters – and simultaneously broadcasting its organizational message – in New Mexico in 2008. See id. ¶¶ 39-40, at 11-12.

The Plaintiffs state that the principal reasons that SWOP has cut back on its registration activities are: (i) without volunteers, it is impossible for SWOP to undertake an organized voter-registration effort, see id. ¶ 28, at 8; (ii) the challenged law's training requirement is inconvenient and intimidating for volunteers and inhibits spontaneous registration, see id. ¶¶ 25, 30 & 32, at 6-9; (iii) the penalties associated with the law reduce the willingness of volunteers to participate in voter-registration drives, see id. ¶¶ 28, 32, at 8-9; (iv) the restricted availability of voter-registration forms has made volunteer-driven registration drives vastly more complicated; and (v) the requirement that forms be returned within forty-eight hours would force SWOP to direct additional resources to ensure quality control within a compressed time period, see id. ¶ 37, at 11. SWOP Executive Director Robert Rodriguez was told during his training session that SWOP could not use the federal form to register voters. See id. ¶ 34, at 10. Rodriguez does not feel comfortable encouraging SWOP workers or volunteers to register voters, because of what he perceives to be an unreasonable amount

-18-

of risk involved, both for those individuals and for the organization.  See id. ¶ 29, at 8.

### e.      Overall Impact and Impact on Other Organizations.

Third-party registration agents, including many of the Plaintiffs' organizations, have continuously operated since the New Mexico Legislature passed § 1-4-49 in 2005.  Other third-party registration agents have also concluded successful voter registration drives.  For example, ACORN registered its 65,000th voter of the 2008 election cycle on August 12, 2008.  See Oliver Aff. ¶ 8, at 2.

The 65,000 voters registered by ACORN represents a number thirteen times greater than the highest aspirational number any of the Plaintiff organizations hope to register in this election cycle.  See Fraher Aff. ¶ 15(c), at 6.  The Bernalillo County Clerk, recognizing the scale of ACORN's effort in the 2008 election cycle, has a standing agreement with ACORN to provide its registration agents with one hundred forms at a time.  See Oliver Aff. ¶ 7, at 2.

The Defendant is not aware of any County Clerk to date rejecting a reasonable request to exceed the fifty-form limit.  See Lamb Aff. ¶ 10, at 10; Dominguez Aff. ¶ 7, at 2.  There have been no civil or criminal actions instituted under § 1-4-49 since its passage in 2005.  See Rodriguez Aff. ¶¶ 25, 26, at 7; Fraher Aff. ¶¶ 15(a), (b), at 5-6.

### PROCEDURAL BACKGROUND

The Plaintiffs brought this action in the Second Judicial District Court of Bernalillo County pursuant to 42 U.S.C. § 1983.  Subsequently, the Defendant removed the case to federal court pursuant to 28 U.S.C. § 1441. See Notice of Removal ¶ 1, at 1 (filed July 29, 2008)(Doc. 1).  The Plaintiffs move the Court, pursuant to rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction preventing the Defendant from enforcing the New Mexico law regulating voter-registration efforts, NMSA 1978, § 1-4-49, the administrative regulations implementing this

legislation, see § 1.10.25.7-10 NMAC, and other de facto requirements that New Mexico officials have put in place with respect to voter registration.  In support of their Application, the Plaintiffs submitted the Declaration of Neal A Potishman, to which they attached various affidavits and an expert report.  The Plaintiffs requested oral argument on this Application.  The Court held hearings on the Application for Preliminary Injunction on August 19, 2008 and August 29, 2008.  The parties did not call live witnesses at either hearing.

At the all-day hearing on August 19, 2008, both sides urged the Court to rule quickly, because the book-closing deadline for voter registration was on October 7, 2008.  The book-closing deadline is the last day on which voters may register and be eligible to vote in the next election.  Also, both sides indicated that they might appeal the Court's adverse ruling.  The Plaintiffs argued that the  modified standard for granting a preliminary injunction should apply, under which a moving party's burden of demonstrating a likelihood of prevailing on the merits might be less demanding because the first, third, and fourth factors of the four required showings needed to obtain a preliminary injunction, weigh strongly in favor of granting the injunction.  See Transcript of August 19, 2008 Hearing ("Aug. 19 Tr.") at 42: 18-43: 3 (Boyd);[3] Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 354-55 (10th Cir.

---

[3] Specifically, the Plaintiffs' argued

No.  I would think it would apply that if we can show – if the harm is to the First Amendment interests and we show – we show strongly that the public interest, as both historically expressed and expressed by Congress in the NVRA, is heavily in favor of ending this restriction on voter registrations, and if it does significantly interfere with core political speech, and that if you balance the harms, the harms to the Plaintiffs is far greater than it is to the defendants, we would say that probability of success on the merits should diminish in that case under the formula your Honor described as has been articulated in the Tenth Circuit.

Aug. 19 Tr. at 42: 18 (Boyd).

1986)(explaining that a "preliminary injunction is appropriate when (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest."). The parties also addressed the merits, devoting most of their time to the First Amendment and NVRA preemption issues.

During the hearing on August 19, 2008, the parties made various concessions.  First, the Plaintiffs agreed that the United States Constitution does not compel a State to allow third-party registration, although the Plaintiffs contended that, once a State has allowed for third-party voter registration, it cannot arbitrarily restrict that activity.  See id., at 55: 1-58: 4 (Boyd).  The Plaintiffs also agreed that the State has a compelling interest in assuring that completed voter-registration forms are completed, and that the individuals on those forms become registered.  See id., at 178: 9-13 (Boyd)("[W]e agree with Mr. Fuqua that it is – the State has a compelling interest in making sure that completed registration forms are turned in, and that the people who are on those forms . . . do in fact become registered.").  At the same time, the Defendant conceded that the First Amendment provides protection to the speech related to voter registration.  See id., at 67:22-24 (Fuqua).  The Defendant also conceded that, to the extent that this case implicates First Amendment rights, rational-basis review is not the appropriate standard for deciding this case.  See id., at 93:10-13 (Fuqua).  Moreover, the Defendant conceded that, if any First Amendment rights are implicated by the voter-registration law, the standard from Anderson v. Celebrezze, 460 U.S. 780 (1983), applies.  See Aug. 19 Tr. at 97: 17 (Fuqua).   Finally, the Defendant agreed that the fifty-form limit would not prevent a number of people from getting the forms and giving them to one person to actually do the registering.  See Aug. 19 Tr. at 147: 1. With respect to the scope of activity that § 1-4-49

regulates, the Defendant conceded at oral argument that a third-party agent could intentionally lie, deceive, or provide fraudulent information, and the law would not in anyway penalize the third-party agent for that speech.  See Aug. 19 Tr. at 73-74 (Fuqua).

After the August 19, 2008, hearing, both sides filed supplemental briefs.  In their supplemental memorandum, the Plaintiffs reiterated their contentions at the hearing that § 1-4-49 reaches not only conduct, but speech.  See Supplemental Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, at 3 (filed August 28, 2008)(Doc. 42)("Supplemental Memo."). The Plaintiffs also argued that the New Mexico law impacts First Amendment rights of free speech and association.  In her supplemental brief, the Defendant argued that § 1-4-49 impacts only conduct and does not affect rights of free speech or association.  See Response to Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction at 2-10 (filed August 28, 2008)(Doc. 43)("Supplemental Response") .

On August 29, 2008, the Court held a second hearing on the Application for Preliminary Injunction.  At that hearing, the parties argued about the applicability of Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620 (1980), and Meyers v. Grant, 486 U.S. 414 (1988).  The parties also argued whether the NVRA preempts the New Mexico voter-registration law.  Moreover, the Plaintiffs discussed which of the Plaintiffs had attempted to register voters and appeared unsure whether AAPD had conducted voter-registration activity in New Mexico.  See Aug. 29 Tr. at 25: 11.

**LAW REGARDING PRELIMINARY INJUNCTIONS**

The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch,

451 U.S. 390, 395 (1981).  See Keirman v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2001)("'In issuing a preliminary injunction, a court is preliminarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc. , 805 F.2d 351, 355 (10th Cir. 1986)).  The Tenth Circuit has emphasized that "'a preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal.'"  Nova Health Sys. v. Edmonton, 460 F.3d 1295, 1298 (10th Cir 2006)(quoting Schrier v. Univ. Of Colo., 427 F. 3d 1253, 1258 (10th Cir. 2005))(brackets omitted).

A plaintiff must make four required showings to obtain a preliminary injunction:

A preliminary injunction is appropriate when (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest.

Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 354-55.  See Wyandette Nat'l v. Sebelius, 443 F.3d 1247, 1254-55 (10th Cir. 2006) (quoting Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163,1171 (10th Cir. 1998));  ACLU v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999).    If the moving party demonstrates that the first, third, and fourth factors "tip strongly in his favor, the test is modified," and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation." Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc. , 455 F.3d 1107, 1113 (10th Cir. 2006) (quotation marks omitted).  There are, however,

three types of specifically disfavored preliminary injunctions [for which] a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued": (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford

-23-

the movant all the relief that it could recover at the conclusion of a full trial on the merits.

O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), aff'd 546 U.S. 418 (2006).  Courts in the Tenth Circuit "must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  Id.  "[M]ovants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard.  Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ."  Id. at 976.[4]

## 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a federal statutory remedy for state violations of the United States Constitution.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts demonstrating two elements: (i) the plaintiff was deprived of a right that federal law protects; and (ii) the defendant of deprived of that right did so under color of state law.  See Meade v. Grubbs, 841 F.2d 1512, 1526 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, (1970)).  "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of [42 U.S.C.] § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)(quoting Blum v. Yaretsky, 457 U.S.

---

[4] At the first hearing, the Court asked the Plaintiffs' counsel if the Plaintiffs agreed the usual rules and requirements for a preliminary injunctions applied to this case.  See Aug. 19 Tr. at 41: 19. The Plaintiffs contended that a modified special preliminary injunction rule might apply to their case if they made a showing that the first, third, and fourth factors of the four showings necessary to obtaining a preliminary injunction weighed heavily in favor of the injunction.  See Aug. 19 Tr. at 42:18.  Because the Plaintiffs have not made a clear and unequivocal showing of those three elements, they are not entitled to the modified likelihood-of-success-on-the-merits standard.

991, 1002 (1982)).

## RELEVANT LAW REGARDING THE RIGHT TO VOTE

The elective franchise is one of the fundamental rights guaranteed in the American system of government.  Voting rights are necessary for the "preservation of other basic civil and political rights."  Reynolds v. Sims, 377 U.S. 533, 562 (1964).  See Ripon Soc. v. National Republican Party, 525 F.2d 548, 559 (D.C. Cir. 1975).   Concomitantly, "[a]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and some sort of order, rather than chaos, is to accompany the democratic processes."  Burdick v. Takushi, 504 U.S. 428, 433 (1992). See Timmons v. Twin Cities Area New Parties, 520 U.S. 351, 358 (1997)(holding "that States may, inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and-campaign-related disorder").

In the district court's decision in Crawford v. Marion County Election Board, the United States Court for the District Court for the District of Indiana  upheld an Indiana voter-identification requirement that required voters to produce valid photographic identification at the polls before being allowed to vote, finding there was a "compelling interest in ascertaining an individual's identity before allowing the person to vote . . . [and] in preventing voter fraud."  Indiana Democratic Party v. Rokita, 2006 U.S. Dist. LEXIS 20321, at 131 (D.Ind. 2006).  The Supreme Court also considered the Indiana law and upheld the law, identifying powerful state interests supporting it that were "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process."  Crawford v. Marion County Election Board, 128 S.Ct. 1610, 1617 (2008).  The Supreme Court acknowledged the "legitimacy [and] importance of the State's interest in counting only the votes of eligible voters," id. at 1619, and also the interest in protecting public confidence in the electoral system.  Regarding the latter, the Supreme Court noted that "public confidence in

-25-

the integrity of the electoral process has independent significance, because it encourages citizen

participation in the democratic process." Id. at 1620.

The Supreme Court in Crawford v. Marion County Election Bd. also applied the test from

Anderson v. Celebrezze.  See Crawford v. Marion County Election Board, 128 S. Ct. at 1616.  A

fractured Supreme Court upheld the law.  In his opinion for three Justices announcing the decision

of the Court, Justice Stevens applied the Anderson v. Celebrezze test and called it a balancing test.

Id. at 1616 ("In later election cases we have followed Anderson's balancing approach.")(emphasis

added).  Justice Stevens also spoke to the government's legitimate interest in taking measures to

avoid voter fraud:

> There is no question about the legitimacy or importance of the State's interest in
> counting only the votes of eligible voters. Moreover, the interest in orderly
> administration and accurate recordkeeping provides a sufficient justification for
> carefully identifying all voters participating in the election process. While the most
> effective method of preventing election fraud may well be debatable, the propriety
> of doing so is perfectly clear.

Id.  In sum, Crawford v. Marion County Election Bd., as the most recent Supreme Court opinion on

election laws, applied the test in Anderson v. Celebrezze and recognized the legitimacy of a state

taking measures preventing voter fraud.

Justice Scalia, joined by Justices Thomas and Alito, filed a separate concurrence in which

he argued that Anderson v. Celebrezze is not a balancing test.  See id. at 1624 (Scalia, J. concurring).

Instead, Justice Scalia contended that later Supreme Court decisions had clarified that the Anderson

test calls for a "two-track approach."  Id.  Under that approach, a Court should first determine the

severity of the burden that an election law places on First Amendment rights.  If the burden is

severe, the Court will apply strict-scrutiny.  Id.  On the other hand, for non-severe, non-

discriminatory burdens, a Court will apply a "deferential 'important regulatory interests' standard.

Id.

## RELEVANT LAW REGARDING THE FIRST AMENDMENT

The federal courts have not had a great number of opportunities in which to pass on the constitutionality of state voter-registration laws.  Accordingly, the federal courts have not had frequent opportunities to decide what the standard of scrutiny for such laws appropriately should be.  The Court's first task is thus to determine the appropriate standard of scrutiny under the First Amendment.

### 1.     The First-Amendment Right.

The Plaintiffs concede that a third party (non-governmental agency or official) does not have a constitutional right -- under the First Amendment or otherwise -- to register voters.  See Aug. 19 Tr. at 55: 1-58: 4 (Boyd).  In other words, the Constitution does not compel a state to provide for third-party registration.  See id. at 55.[5] As a matter of logic, it would appear that, if New Mexico could constitutionally require all citizens to register only with a government official -- thus eliminating entirely all the incidental political speech that occurs contemporaneous with third-party registration – a state could impose whatever restrictions on the third-party registration it wants.  In other words, the greater power – to eliminate all third-party registration – includes the lesser power – to regulate extensively third-party registration.

That a state can, consistent with the First Amendment, eliminate all third-party registration implies the lesser power to regulate is further supported by the fact that the New Mexico statute does

---

[5] It may be, however, that under the NVRA, the state must provide for third-party registration.  See 42 U.S.C. § 1973gg-4 (b) ("The chief State election official of a State shall make the forms described in subsection (a) of this section available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.") (emphasis added).  The Court need not decide that question, because New Mexico makes such provision.

not regulate, abridge, limit, or penalize speech in any way.  For example, New Mexico does not require a third-party registrar to say anything to a prospective voter.  It does not mandate any particular speech or statement or information.  On the flip side, the New Mexico statute does not preclude any speech.  Indeed, the State conceded at oral argument that a third-party agent could intentionally lie, deceive, or provide fraudulent information, and the law would not in anyway penalize the third-party agent for that speech.  See Aug. 19 Tr. at 73-74 (Fuqua). The New Mexico law is not only content-neutral regulation, but it is totally unconcerned with content.  New Mexico does not care what third-party agents say while they are engaged in registering voters.

Thus, New Mexico's statute does not directly impair or regulate speech.  Again, the fact that New Mexico could, consistent with the First Amendment, eliminate all third-party regulation, and the fact that New Mexico does not care what is said during a third-party registration suggest that the First Amendment is not invoked at all and that there is no unconstitutional abridgment pf speech.

The Plaintiffs contend that the request to register invariably leads to core political speech. The State does not dispute that the incidental speech is likely core political speech and protected. While the parties have not explicitly argued the First-Amendment forum cases, the Plaintiffs' argument is essentially that the State must provide third-parties the forum of voter registration so that there is a possibility of political dialogue.  The Court does not believe that the cases have gone that far, but there is some language in the cases that suggest that the First Amendment may cover this incidental speech.  In Anderson v. Celebrezze, the majority opinion stated:

> We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and is some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730 . . . (1974).  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects

> – at least to some degree – the individual's right to vote and his right to associate
> with others for political ends.

Anderson v. Celebrezze, 460 U.S. at 788 (emphasis added).  Thus, while it may not be entirely logical to find that there is no constitutional right to third-party registration, and that the registration law does not regulate speech at all, but then find that the registration law must be scrutinized through First Amendment lens, Anderson v. Celebrezze's broad language suggests that a district court – this district court – must use the Anderson test to review New Mexico's voter registration laws.[6] Accordingly, the Court will use the Anderson test in this case to review New Mexico's third-party voter registration law.

### 2.    Level of Scrutiny.

While the Court believes that it is bound to apply the standard in Anderson v. Celebrezze, that conclusion does not dictate precisely what that standard and its application will look like in a particular case.  Before examining the standards in Anderson v. Celebrezze, it is important to place it in the spectrum of constitutional standards.

Briefly, under strict scrutiny, the government must assert a significant and compelling

---

[6] In its response, the Defendant appeared to concede that the Court must use the Anderson test.  See Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Defendant's Memo.") at 10-11 (filed August 15, 2008)(Doc. 23) (arguing that "there is widespread acknowledgment that the Anderson test is most Appropriate" for analyzing state election laws.).  At the oral argument, however, the Defendant began to suggest that the rational-basis test should apply.  See Aug. 19 Tr. at 75: 4 (Fuqua).  The Plaintiffs in their brief, at one part suggested that strict-scrutiny applied, see Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' Memo.") at 12 (filed August 11, 2008)(Doc. 15)("The challenged law is subject to scrutiny not only because it restricts Plaintiffs' right to free speech, but also because it restricts Plaintiffs' core right of association."), but elsewhere conceded that the Anderson test applied.  See id., at 16 ("State election laws that burden First Amendment rights are subject to the balancing test first laid out in Anderson v. Celebrezze.").  At oral argument, the Plaintiffs appeared to concede that the Anderson test applied, but wanted it to operate in practice like strict scrutiny or wanted the Court to employ the strict-scrutiny end of the Anderson spectrum.  See Aug. 19 Tr. at 86: 19 (Boyd).

government interest, and the court must decide whether the legislation is sufficiently narrowly tailored to serve that interest.  See Perry Educ. Ass'n. v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).  Under intermediate scrutiny, the government need articulate only an important or substantial governmental interest, and the court must determine if the means chosen to enforce that interest is no greater than is essential to the furtherance of that interest.  See United States v. O'Brien, 391 U.S. 367, 376-377 (1968).  Finally, under rational-basis review, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. See Williams v. Lee Optical of Oklahoma, 348 U.S. 483, 487-88 (1955).  Few statutes survive strict scrutiny.  Most statutes survive rational-basis review. Intermediate review turns on how the individual justice or judge balances the competing intents and burdens.

As a general matter, state election laws that burden First Amendment rights are subject to the balancing test first laid out in Anderson v. Celebrezze, 460 U.S. 780, 788-90 (1983).  While Crawford v. Marion County Election Board dealt with the right to franchise, not the First Amendment, the Supreme Court arguably reaffirmed the Anderson test in Crawford v. Marion County Election Board.  The Supreme Court seems to be using a similar lens to examine the constitutionality of all election laws, whether the challenge is made under the First Amendment or under some other constitutional provision.  See Crawford v. Marion County Election Board, 128 S. Ct. at 1616 ("In later election cases we have followed Anderson's balancing approach.").[7]

_____

[7] Notably, the Court supported this proposition by citing Norman v. Reed, 502 U.S. 279 (1992) – a case that dealt not with a right to vote, but with "the constitutional right of citizens to create and develop new political parties. . . [, which] derives from the First and Fourteenth Amendments."  Norman v. Reed, 502 U.S. at 288.  See Crawford v. Marion County Election Board., 128 at 1616 (citing Norman v. Reed, 502 U.S. at 288).  Thus, the Court will apply the Anderson analysis to New Mexico's voter-registration law even when the asserted right derives from

In Anderson v. Celebrezze, the Supreme Court set forth the standard for evaluating constitutional challenges to state-election laws and, specifically, for deciding whether a state-election law violates the First Amendment:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson v. Celebrezze, 460 U.S. at 789 (citation omitted). The Supreme Court gave some guidance whether its Anderson v. Celebrezze test was closer to strict scrutiny or to rational-basis scrutiny. The Supreme Court stated: "[T]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminating restrictions." Id. at 788 (footnote omitted). The Supreme Court included a footnote after the statement, noting: "We have upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." Id. at 788 n.9.

The Supreme Court eschewed any litmus test or standard – such as strict scrutiny or rational basis – that automatically dictated the result in the case. "Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." Anderson v. Celebrezze, 460 U.S. at 789 (quoting Storer v. Brown, 415 U.S. at 730). "The results of this evaluation will not be automatic; as we have

_____

some other source other than the right to vote.

-31-

recognized, there is 'no substitute for the hard judgments that must be made." <u>Anderson v. Celebrezze</u>, 460 U.S. at 789 (quoting <u>Storer v. Brown</u>, 415 U.S. at 730).  Thus, a district court, to be faithful to the Supreme Court's language and standard in <u>Anderson v. Celebrezze</u>, must be careful not to transform the <u>Anderson</u> test into a de facto form of strict scrutiny or rational basis test, but must carefully and faithfully apply the two stages that the <u>Anderson</u> test requires.[8]

While there appears to be some confusion among federal courts in choosing and applying the standard for analyzing state election laws, there is nonetheless widespread acknowledgment that the <u>Anderson</u> test is most appropriate.  <u>See</u> <u>Crawford v. Marion County Election Bd.</u>, 128 S.Ct. at 1616; <u>Norman v. Reed</u>, 502 U.S. 279, 288-89 (1992); <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S. 208, 213-14 (1986); <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 358-59 (1997); <u>Burdick v. Takushi</u>, 504 U.S. at 433 (noting that, "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.").  While the Defendant suggests that there seems to be little difference between the intermediate scrutiny test and the <u>Anderson</u> balancing test, that difference may turn on the strictness of the application of the test rather than on the articulation of the test.[9]  As the district court stated in <u>Association of Community Organizations for Reform Now v. Cox</u>, 2006 U.S. Dist. LEXIS 87080 (N.D. Ill., Sept. 28, 2006): "The Eleventh Circuit has described the <u>Anderson</u> test as a 'balancing

---

[9] At oral argument, the Defendant conceded that it was not helpful to talk about intermediate scrutiny when the Supreme Court had articulated the <u>Anderson</u> test.  The Court agrees.  The Court believes that it is bound by the <u>Anderson</u> rule, and while there may be similarities between the <u>Anderson</u> test and intermediate scrutiny, the Court believes that it is better and most consistent with the Supreme Court's language in <u>Anderson</u> to analyze § 1-4-49 and the resulting regulations and de facto rules rather than using strict, intermediate, or rational basis scrutiny.

test' that may range from strict scrutiny to a rational basis analysis depending on the circumstances of the case."  2006 U.S.Dist. LEXIS 87080, at *17 (citing Fulani v. Krivanek, 973 F.2d 1539, 1543 (11th Cir. 1992)).

As one commentator has observed, "[i]t is by now well understood that burdens on the right to vote and affiliated right to associate for political change need not trigger strict scrutiny.  Rather, constitutional challenges to electoral mechanics are resolved using a nominal balancing test, under which the level of scrutiny purportedly varies with the 'character and magnitude' of the associated burden."  C. Elmendorf, Structuring Judicial Review of Electoral Mechanics: Explanations and Opportunities, 156 U.Pa.L.Rev. 313, 394 (2007).

### 3. Permissible Regulation of Speech.

A state may constitutionally regulate the time, place, and manner of an organizations' speech, even if such regulation makes spontaneous speech difficult or impossible.  The federal courts have upheld laws that require groups to obtain permits or licenses before gathering, marching, or protesting in public.  See, e.g., Cox v. New Hampshire, 312 U.S. 569, 576 (1941)(upholding a New Hampshire law criminalizing parades or marches conducted without a permit); Poulos v. New Hampshire, 345 U.S. 395, 408 (1953)(upholding the same law against a challenge by a group holding a religious meeting in a public park); Stonewall Union v. City of Columbus, 931 F.2d 1130, 1137 (6th Cir. 1991) (upholding an ordinance requiring groups to pay a fee and to obtain a permit before conducting a parade).  When the limitation on expressive activity is content-neutral, the law is subject to intermediate, not strict, scrutiny.  See Turner Broadcasting Sys., Inc. v. FTC, 512 U.S. 622, 635, 662 (1994)("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny.").

In Meyer v. Grant, 486 U.S. 414 (1988), the challenged law made it a felony to pay

individuals to circulate petitions regarding proposed constitutional amendments.  Collecting those signatures was an important mechanism for "garner[ing] the number of signatures necessary to place [a] matter on the ballot" and for making political issues "the focus of statewide discussion."  Id. at 423.  The Supreme Court applied strict scrutiny to that law because it restricted political expression in two ways:

> First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

Id. at 422-23 (footnote omitted).

The Supreme Court's decision in Village of Schaumberg v. Citizens for a Better Environment, dealt with an ordinance that prohibited door-to-door financial solicitations by any group that could not demonstrate that seventy-five percent of its income was donated to a charitable cause.  The Supreme Court struck the ordinance down as overbroad, but did not employ a strict-scrutiny test in doing so.  Instead, the Supreme Court held that "[t]he Village may serve its legitimate interests, but it must do so by narrowly drawn regulation designed to serve those interests without unnecessarily interfering with First Amendment freedoms."  Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. at 637.  The Plaintiffs have correctly argued that Village of Schaumburg v. Citizens for a Better Environment rested, at least partly, on the notion that the charitable organization at issue – an organization focused on the dissemination of information and advocacy for certain policies – engaged in solicitation that was so intertwined with First Amendment speech that the solicitation and the speech could not be separated.  See id. at 630-33.  Thus, the ordinance at issue was subject to closer scrutiny than typical commercial speech.  See id. at 632.

**4.      Right of Association.**

-34-

An organization's attempt to broaden the base of public participation in and support for its activities is conduct "undeniably central to the exercise of the right of association." Tashjian v. Republican Party, 479 U.S. at 214-15.   Indeed, "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." NAACP v. Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958).  See NAACP v. Button, 371 U.S. 415, 430 (1963); Bates v. Little Rock, 361 U.S. 516, 522-23 (1960).

In Elrod v. Burns, 427 U.S. 347 (1976), the petitioners sought to enjoin the newly elected Democratic sheriff of Cook County, Illinois from firing them based on their political party affiliation.  The petitioners in Elrod v. Burns faced termination because they were Republicans.  In declaring such a patronage system unconstitutional, the Supreme Court noted that threatening one's job on the basis of political belief infringes on that person's freedom to associate with the political party of his or her choosing.  See id. at 359 ("The threat of dismissal for failure to provide [support for a political party] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise.").  After reaching this conclusion, the Supreme Court briefly discussed the appropriateness of injunctive relief for the petitioners, leading to the language that the chilling of the First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." Id. at 373.

### 5.    Voter-Registration Statutes.

Some courts have stated that, because the speech and association related to voter registration is the kind of core political speech and association that is characteristically intertwined with voter-registration drives, laws that restrict those drives are subject to scrutiny under the First Amendment. See League of Women Voters of Fla. v. Cobb, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006); Ass'n

of Cmty. Orgs. for Reform Now v. Cox, 2006 U.S. Dist. LEXIS 87080 at *16; Project Vote v.

Blackwell, 455 F.Supp.2d 694, 700 (N.D. Ohio 2006).

Only two federal courts have examined third-party voter registration statutes.  In League of

Women Voters v. Cobb, 447 F.Supp.2d 1314 (S.D.Fla. 2006), the court rejected both the strict-

scrutiny test that the plaintiffs urged and the rational-basis test that the defendant urged:

> According to Plaintiffs, because the Third-Party Voter Registration Law burdens
> their core political speech, the Court must subject the Law to strict scrutiny.
> Contrawise, Defendants argue that the Anderson test is only utilized in ballot access
> cases, and that the Court should instead apply a rational basis test. Having carefully
> considered both parties' arguments, the Court finds that  the Law is most
> appropriately viewed as an election regulation, and thus will apply the Anderson test.

447 F.Supp.2d at 1332 n.21 (citations omitted).

Florida already had a law providing for fines and criminal penalties for those who, among

other things, "obstruct or delay the delivery of a voter registration form or election ballot." Fla. Stat.

Ann. § 104.0651(4).  The existence of this statute was significant to the League of Women Voters

court:

> Next, Defendants have not addressed why the Third-Party Voter Registration Law's
> civil penalties scheme is necessary given that Florida law already imposes criminal
> penalties on those who "knowingly destroy, mutilate, or deface a voter registration
> form or an election ballot or obstruct or delay the delivery of a voter registration
> form or election ballot."  The criminal law allows for both jail and monetary fines,
> and addresses Defendant's core concerns of holding organizations accountable and
> preventing fraud.

447 F.Supp.2d at 1338 (citations omitted).  The State of Florida did not make an attempt to justify

the penalties, arguing instead that there was significant discretion in applying the fines and an

opportunity to contest the application of any fine.  See id.  Also, significantly, the League of Women

Voters court did not discuss whether a ten-day deadline was burdensome; rather, the court focused

instead on the severity of the fines imposed.  See id. at 1338-39.  Consequently, League of Women

<u>Voters</u> does not stand for the proposition that a forty-eight hour deadline is unconstitutional.

The Florida law at issue in <u>League of Women Voters</u> set out three categories of fines: (i) a fine of $250.00 for each application turned in to an election official beyond the ten-day deadline; (ii) a fine of $500.00 for each application turned in to an election official after the date on which a voter must submit an application to be eligible to vote in the next upcoming election; and (iii) a fine of $5,000.00 for each application collected by a third-party registration agent but never submitted to the appropriate election official.  <u>See</u> Fla. Stat. Ann. § 97.0575(3)(a)-(c).  Moreover, the Florida law did not provide for any aggregate limit on the specified fines.

The Southern District of Florida, examining Florida's third-party voter registration law in the wake of <u>League of Women Voters</u>, rejected an application for a preliminary injunction against Florida's amended law.  <u>See</u> <u>League of Women Voters v. Browning</u>, 2008 WL 3200654 (S.D.Fla., Aug. 6, 2008). One of the bases on which the plaintiffs' challenge rested was the strict liability imposed on violators of the law, excepting only situations in which the failure to submit a completed voter-registration form results from force majeure or impossibility of performance.  <u>Id</u>. at *5.  The court rejected this argument and refused to declare the amended Florida law unconstitutional.  <u>Id</u>. at *26.

In <u>Project Vote v. Blackwell</u>, 455 F.Supp.2d 694, 701-702 (N.D. Ga. 2006), the United States District Court for the Northern District of Georgia rejected the strict-scrutiny approach in favor of intermediate scrutiny:

> Based on its limited review, the Court is inclined to believe that the appropriate level of scrutiny to be applied at this juncture of the proceedings is intermediate scrutiny. The Court reaches this conclusion because it finds that, while the interests impacted by the regulations are critical First Amendment rights, the burden imposed upon them by the regulations -- the burden imposed upon them by the regulations – though substantial (and, as will be discussed below, unnecessary) – are not likely properly characterized as "severe."  Thus, the question is whether the burdens imposed by the

challenged regulations are justified in light of the articulated interests – specifically, do the regulations address a legitimate and important state interest, and do the regulations serve that interest in a way that is no greater than necessary in light of the importance of the interest.

Project Vote v. Blackwell, 455 F.Supp. 2d at 701-02.

**6.      Vagueness and Overbreadth.**

Under certain circumstances, the Supreme Court has found laws impinging on First Amendment rights void as vague or overbroad. Vague and overbroad laws are subject to facial invalidation.

A law may be subject to a challenge for vagueness in two types of circumstances: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999). At the same time, the Supreme Court has also noted that, "while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'" Hill v. Colorado, 530 U.S. at 732 (citations omitted) (brackets in original). Thus, a court need not indulge in speculation on the theoretical ambiguities latent in words when their plain meaning will suffice to apprise those bound by them of the duties they create.

Chicago v. Morales, 527 U.S. 41, 56-57 (1999), which the Plaintiffs cite, illustrates the manner in which the Supreme Court approaches vagueness challenges. In Chicago v. Morales, the Supreme Court  invalidated an anti-loitering ordinance on vagueness grounds. The ordinance created a criminal offense for loitering punishable by a fine of up to $500, a maximum of six-months

-38-

imprisonment, and 120 hours of community service.  See id. at 47.  The ordinance defined loitering as "remain[ing] in any one place with no apparent purpose."  Id.  The Supreme Court observed: "It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose.'"  Id. at 56-57.  In effect, the drafters of the ordinance took a term that, by itself, was readily understandable, and rendered that term so vague that a reasonable person could not accurately articulate what activity was permissible and what activity was not.  See id. at 56.

The overbreadth doctrine, though related to vagueness, operates in a different manner. Specifically, a law will be considered overbroad if, in its imprecision, it seeks to punish constitutionally protected conduct.   See Coates v. Cincinnatti, 402 U.S. 611, 614 (1971) (invalidating a law that prohibited assembling and engaging in "annoying" behavior in certain public places).  The overbreadth doctrine applies only when First Amendment rights are in question.  See Broderick v. Oklahoma, 413 U.S. 601, 612-13 (1973) (summarizing the cases in which the Supreme Court has sustained facial challenges to laws as overbroad). Moreover, the doctrine is considered a drastic departure from normal procedure, and is thus not lightly entertained.  See id. at 613.

**RELEVANT LAW REGARDING THE NVRA**

The Plaintiffs contend that the NVRA preempts § 1-4-49 and its implementing regulations and de facto rules. Specifically, the Plaintiffs argue that: (i) the New Mexico Law interferes with the NVRA's stated purpose of increasing voter registration; (ii) the 48-hour requirement for returning registration forms is incompatible with the NVRA's mandate that states accept forms submitted within the more permissive time-frames of the federal statute; (iii) by severely restricting third-party voter registration activity, the New Mexico law contravenes Congress' stated desire (in the language of the NVRA) to encourage third-party voter registration; and (iv) at a minimum, § 1-

4-49 cannot apply to the federal forms .

1.      **The NVRA's Operative Provisions**.

The NVRA has four stated objectives :

1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. § 1973gg(b).  It is evident from this section that the NVRA is concerned not only with enhancing voter registration and participation, but also with protecting the overall integrity of the electoral process and the accuracy of voter registration rolls.

The operative provisions of the NVRA require that states make the federal voter-registration forms "available for distribution," 42 U.S.C. § 1973gg-4(b), that the states accept and use those forms, see id. § 1973gg-4(a), and that any state-created voter-registration forms (which would be available in addition to the federal form) conform to certain statutory requirements, see id. §§ 1973gg-4(a)(2), 1973gg-7(b).  The state-made forms must include on their face certain information. See 42 U.S.C. § 1973gg-7(b).  More important to the Plaintiffs' preemption argument, state-made forms

may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

42 U.S.C. § 1973gg-7(b)(1).  Finally, the NVRA requires that the state ensure the registration of

eligible voters whose submitted form is postmarked or physically accepted "no later than the lesser of 30 days, or the period provided by State law, before the date of the election." Id. § 1973gg-6(a)(1).

    **2.**    **Preemption**.

Pursuant to the Supremacy Clause of the United States Constitution, state laws that are incompatible with duly passed federal laws must give way. See U.S. CONST. art. VI ("[The] Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made under the Authority of the United States, shall be the Supreme Law of the Land."). In other words, federal law preempts conflicting state law. The Supreme Court has summarized the situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. National Solid Waste Management Association, 505 U.S. 88, 98 (1992) (citations omitted). Thus, preemption typically comes in two varieties: express and implied; and implied preemption in turn may be found where a federal regulatory scheme is so pervasive as to occupy the entire field (field preemption), and where compliance with both the federal scheme and state law is physically impossible, or where state law thwarts the purposes of the federal scheme (conflict preemption). See id.

When faced with express preemption – where, in other words, a statute expressly states that it preempts certain areas of state law – a court must determine the scope of the preemption. That

task entails scrutinizing the preempting words in light of two presumptions.  First:

> In all pre-emption cases, and particularly in those in which Congress has "legislated. . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc., v. Lohr, 518 U.S. 470, 485 (1996)(citations and quotation marks omitted).

Second: "The purpose of Congress is the ultimate touchstone in every pre-emption case."  Id. (citations and quotation marks omitted).  A court determines Congress' intent primarily from the text and the statutory framework, although the structure and statute as a whole are relevant as well.  Id.

The Supreme Court has also stated that, with respect to implied preemption, "there cannot be [] any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress."  Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  While the Supreme Court has used various words to describe circumstances where implicit preemption occurs, such as "conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference," none of these phrases "provides an infallible constitutional test or an exclusive constitutional yardstick."  Id.  Instead, "[i]n the final analysis, there can be no one crystal clear distinctly marked formula. [The court's] primary function is to determine whether, under the circumstances of [a] particular case, [a] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id.  Thus, a court does not have a clear-cut test to determine whether a federal law implicitly preempts state law. Instead, a court must examine the allegedly conflicting laws to determine whether there is some type of field or conflict preemption.  See Gade v. National Solid Waste Management Association, 505 U.S. at 98.

## RELEVANT LAW REGARDING THE NEW MEXICO CONSTITUTION

The Plaintiffs contend that § 1-4-49 violates at least three provisions of the New Mexico Constitution: (i) Article II, § 17, which is analogous to the First Amendment of the Federal Constitution; (ii) Article II, § 8, which provides that, "[a]ll elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage;" and (iii) Article VII, § 1, which requires that "[t]he legislature . . . enact such laws as will secure the purity of elections."

Normally, the Eleventh Amendment of the U.S. Constitution bars federal courts from hearing state law claims against a state. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 121 (1983). That principle, however, gives way when the state, as a defendant, removes a case to federal court. See Lapides v. Board of Regents of the University System of Georgia, 535 U.S. 613, 620-21 (2002). Specifically, when a state voluntarily invokes the jurisdiction of a federal court by removal, the state waives its Eleventh Amendment immunity for pendant state-law claims. This Court therefore has jurisdiction and will discuss the New Mexico constitutional claims.

The Supreme Court of New Mexico has found that it has the power to "provide more liberty than is mandated by the United States Constitution." State v. Gomez, 1997-NMSC-6 ¶ 17, 122 N.M. 777, 782. When analyzing the extent to which the New Mexico Constitution provides more protection of rights than the United States Constitution, New Mexico courts engage in a so-called interstitial analysis. State v. Gomez, ¶ 19, 122 N.M. 777, 783. The Plaintiffs have urged the Court to find that, under the interstitial analysis, the New Mexico Constitution provides heightened protections for the rights that they purport to vindicate. To apply the interstitial approach,

> the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.

State v. Gomez, ¶ 19, 122 N.M. 777, 783 (citations omitted).

1.      **N.M. CONST. art. II, § 17.**

Article II, § 17 of the New Mexico Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."  Assuming that United States Constitution does not protect the asserted right, which would render the state constitutional question moot, a court applying the interstitial analysis has two options: to hold that the state constitutional analysis mirrors that of the United States Constitution; or, alternatively, that the court should deviate in some way from the United States Constitution.  A court is justified in such deviation where federal analysis is flawed, or where structural differences between federal and state government, or special state characteristics, dictate.

No New Mexico case law suggests that the federal analysis of content-neutral laws that impact speech is flawed.  In fact, the New Mexico courts have held that such content-neutral laws are treated the same under both the federal and state constitutions.  See State v. Randleman, 2003-NMCA-150, ¶ 58, 134 N.M. 744, 760.  See Temple Baptist Church, Inc. v. City of Albuquerque, 98 N.M. 138, 146, 646 P.2d 565, 573 (1982) (applying federal analysis and citing federal case law in discussion content neutral regulation of speech).

The Plaintiffs cite State v. Randleman for the proposition that "New Mexico Courts 'have interpreted the state constitution to provide broader protection than the First Amendment.'"  Plaintiffs' Memorandum at 41 (citation omitted).  That proposition is true, in a sense. As the New Mexico Court of Appeals explained in State v. Randleman, however, the "'applicable precedents have determined that the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions . . . .'"  State v. Randleman, 2003-NMCA-150, ¶ 58, 134 N.M.

744, 760 (citations omitted).

There is no realistic contention that § 1-4-49, and its attendant regulations and de facto policies, amounts to content-based regulation.  § 1-4-49 is wholly unconcerned with the content of speech.  Thus, this court will adhere to the principle articulated in State v. Randleman that the federal and state constitutional protections are the same.  In other words, the determination reached regarding the United States Constitution will dispose of the state constitutional claim under Article II, § 17 of the New Mexico Constitution.

**2.      The "Free Elections Clause."**

Two Provisions of the New Mexico Constitution raised in this case speak directly to voting and elections: Article II, § 8 and Article VII, § 1.  The first, in full, states: "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." N.M. CONST. art. II, § 8.  The Plaintiffs cite the only New Mexico case to discuss this provision for the proposition that "'no election can be free and equal . . . if any substantial number of persons entitled to vote are denied the right to do so.'" Plaintiffs' Memorandum, at 42 (quoting Gunaji v. Macias, 2001-NMSC-28 ¶ 28, 130 N.M. 734, 742) (ellipsis in original).  Such a proposition is perhaps beyond dispute.  Even so, it does not offer much guidance for deciding the issues in this case.

Gunaji v. Macias involved a dispute arising out of an election in which an incorrect ballot face was being used in one of the voting machines.  See Gunaji v. Macias, 2001-NMSC-28 ¶ 2, 130 N.M. 734, 736.  The guiding principle in Gunaji v. Macias, according to the Supreme Court of New Mexico, was that "an election is only 'free and equal' if the ballot allows the voter to choose between the lawful candidates for that office."  Gunaji v. Macias, 2001-NMSC-28 ¶ 29, 130 N.M. at 742.  In articulating this concept, the Supreme Court of New Mexico noted that, at the time,

Kentucky had the most developed jurisprudence on constitutional provisions such as the "free and equal clause," and cited three cases from that jurisdiction.  See Gunaji v. Macias, 2001-NMSC-28 ¶ 28, 130 N.M. at 742 See Ocean Munds-Dry, Note, Why Gunaji v. Macias Matters to Candidates and Voters: Its Impact on New Mexico Election Law, 33 N.M. L. REV. 431, 433 (2003).  All three Kentucky cases involved ballot errors similar to the ones in Gunaji v. Macias.  Under Gunaji v. Macias, therefore, the "free elections" clause appears to be primarily concerned with the integrity of the voting process and the administration of elections.

### 3.       N.M. CONST. art. VII, § 1.

The other state constitutional provision at issue in this case, article VII, § 1, contains two clauses. The first clause deals mainly with voter eligibility, while the second, which is the focus of this case:

> The legislature shall have the power to require the registration of the qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration, and not more than two judges of election shall belong to the same political party at the time of their appointment.

N.M. CONST. art. VII, § 1.  On its face, this provision is a grant of power to the Legislature, as well as instructions to enact laws that will ensure the proper administration of elections.  New Mexico cases that discuss the openness, secrecy, and purity of elections support this reading of the clause.  See Kiene v. Atwood, 93 N.M. 657, 662, 604 P.2d 123, 128 (1979)("The purity of the election demands that illegal votes be purged."), Calkins v. Stearley, 140 N.M. 802, 808, 149 P.3d 118, 124 (N.M. App. 2006)("It is probably better that individual voters and candidates should suffer in a given instance than that the doors to fraud and imposition may open and the secrecy and purity and security of elections be destroyed.")(internal quotation marks omitted).

In light of the language and the case law interpreting article VII, § 1, the proper view of the provision is that it speaks to the Legislature's powers and responsibilities regarding elections. It may be viewed as an admonition to the Legislature to pass laws that protect the integrity of the election process, even where doing so at times works against individuals in a given instance.

## ANALYSIS

The Plaintiffs contend that the freedom to communicate with would-be voters about political issues and ideas, to assist them in registering to vote, and to organize them into social and political coalitions all lie at the core of American democracy. The Plaintiffs argue that, because of the inextricable linkages between voter-registration drives and the freedom of speech and association, the United States Constitution, the NVRA, and the New Mexico Constitution, each vigorously protects the rights of citizens to conduct voter-registration drives. The Plaintiffs maintain that each of the material requirements in the challenged state law unconstitutionally infringes on the rights of free speech and free association, and violates the NVRA.

The Plaintiffs request that the Court enjoin further enforcement of the challenged law. The Plaintiffs contend that they have made each of the required showings necessary to obtain a preliminary injunction. After careful consideration of the evidence and the available case law, however, the Court concludes that the Plaintiffs have failed to demonstrate that they are entitled to injunctive relief, because they cannot meet the elements for such relief. The Plaintiffs fail on each count. The Court will deny the Plaintiffs' petition for a preliminary injunction.

## I.     THE PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

The Plaintiffs contend that they are likely to succeed on the merits of their application for a preliminary injunction because the challenged law violates their rights under (i) the First

Amendment to the United States Constitution; (ii) the NVRA; and (iii) the New Mexico Constitution. The Plaintiffs contend that New Mexico's voter-registration law severely and impermissibly burdens their rights to speak and to associate by limiting their ability to conduct voter-registration drives. The Plaintiffs contend that § 1-4-49 violates both the United States and New Mexico Constitutions, and is preempted by the NVRA. Specifically, the Plaintiffs contend that, because the law imposes burdens that violate the United States Constitution, the NVRA, and the New Mexico Constitution, the Court should enjoin its enforcement. These contentions fail. As a result, the Plaintiffs are not likely to prevail on the merits of their claims and are not entitled to injunctive relief from the Court.

A. **IT IS UNLIKELY THAT THE COURT WILL FIND THAT THE CHALLENGED LAW, § 1-4-49, VIOLATES THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION.**

While New Mexico's voter-registration laws may have some impact on the Plaintiffs' potential speech, the burden is not severe. Moreover, the laws are important to promote recognized state interests. Accordingly, it is unlikely that the Court will conclude that § 1-4-49 is unconstitutional.

1. **The Challenged Law is not Subject to Strict Scrutiny.**

The Plaintiffs contend that the challenged law imposes a severe burden on core political speech and the right to association. At one point in their brief, the Plaintiffs contend that § 1-4-49 is subject to strict scrutiny. See Plaintiffs' Memo. at 12. Elsewhere, the Plaintiffs apparently concede that the Court must perform an Anderson balancing test. What the Plaintiffs appear to be arguing is that the Anderson test is performed through the lens of strict scrutiny. See Aug. 19 Tr. at 86: 19 (Boyd). The Plaintiffs have not offered authority for this proposition, and the Court has, in its independent research, found no authority for this proposition.

In its Memorandum in Opposition, the Defendant contends that the Court should apply either intermediate scrutiny or the <u>Anderson</u> balancing test in its analysis.  <u>See</u> Defendant's Memo. at 12. The Defendant urges the Court to apply either the intermediate scrutiny tested that the district court adopted in <u>Project Vote v. Blackwell</u> or the <u>Anderson</u> balancing test that the district court employed in <u>League of Women Voters v. Cobb</u>.  The Defendant maintains that, ultimately, either analysis requires an examination of the severity of the burden the challenged law places on speech weighed against the interest asserted by the State in support of the law.  The Defendant asserts that, the more severe the restriction, the more compelling the State's interests must be.[10]  At the oral argument, and in the Defendant's supplemental briefing, however, the Defendant suggests that there is no First Amendment right implicated by § 1-4-49, and that the Court should use a rational-basis test.

The challenged law is subject to <u>Anderson</u> balancing and not to the strict scrutiny that the Plaintiffs urge.   The Plaintiffs cite five cases in support of their strict scrutiny argument.  The two Supreme Court cases that the Plaintiffs cite, <u>Meyer v. Grant</u>, and <u>Village of Schaumburg v. Citizens for a Better Environment</u>, are inapplicable.  In contrast to the law in <u>Meyer v. Grant</u>, § 1-4-49 does not directly limit the number of voices with which the Plaintiffs may speak.  <u>Village of Schaumburg</u>

---

[10] Another reason to maintain the distinction between "intermediate scrutiny" and "balancing" under <u>Anderson v. Celebrezze</u> is that, under the traditional tiers of scrutiny, the government bears the burden of justifying the challenged action or laws under strict and intermediate scrutiny, whereas the plaintiff bears the burden of persuasion under the rational-basis test.  <u>See</u> ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 9.1, at 645-46 (2002) (discussing the levels of scrutiny and their respective burdens of proof); <u>United States v. Virginia</u>, 518 U.S. 515, 533 (1996)(explaining that under immediate scrutiny, "the burden of justification. . . rests entirely on the state");   Given the importance of burdens of persuasion, this distinction is more than academic. This issue seems to be at the heart of the debate between Justice Stevens' and Justice Scalia's separate opinions in <u>Crawford v Marion County Election Board</u>.  Even so, it is an issue that the Court need not address in this case, because even if the Court assigns the burden of proof under <u>Anderson v. Celebrezze</u> to the government, the Defendant has demonstrated that § 1-4-49 is justified in light of the demonstrated interests that it is designed to further.

v. Citizens for a Better Environment prohibited certain charities from making door-to-door

solicitations – and the Plaintiffs have not faced any similar prohibition on their ability to go door-to-

door to register new voters and discuss the political issues most important to their respective

missions.

It is true that a person cannot act as a third-party registrar until he or she has completed

training.  The training requirement is not, however, unreasonably burdensome on the Plaintiffs'

speech.  As the Plaintiffs admit, the Plaintiffs can engage in the political speech they seek to protect

regardless whether they are registering voters.  Nothing prohibits them from engaging others in

conversations concerning the issues of the day, political change, and the reasons why it is important

to vote.  See Fraher Aff. ¶ 20, at 9.  The Plaintiffs could even use the opening line upon which they

rely to initiate political dialogue: "Have you registered to vote?"

Section 1-4-49 also has no effect analogous to the effect of the Colorado law at issue in

Meyer v. Grant on the effort to collect petition signatures.  Voter registration is, or at least can be,

non-partisan.  It is unlikely that the Plaintiffs would refuse to register a potential voter because he

or she intended to register with a political party to which the Plaintiffs were philosophically

opposed.   Unlike in Meyer v. Grant, the laws presently being challenged place only minor

procedural hurdles in the path of those who wish to engage in third-party voter registration.  Meyer

v. Grant, on the other hand, involved a ban on the ability to pay individuals to circulate petitions for

initiative proposals. See Meyers v. Grant, 486 U.S. at 422[11]

---

[11] It may be true that the laws in Meyers v. Grant and in this case can both be characterized abstractly as effective deterrents to the volunteer activity upon which organizations such as the Plaintiffs often rely.  Thus, in Meyers v. Grant, the law limited the pool of petition circulators available to interested organizations to those willing to work for free.  Similarly, here, the laws in place may diminish the Plaintiffs' pool of potential volunteers to those willing to bear some nominal risk of being subject to civil or criminal penalties for non-compliance with § 1-4-49.  That analysis,

The Plaintiffs also rely on Village of Schaumburg v. Citizens for a Better Environment, which involved an ordinance that prohibited door-to-door solicitation by charities who did not use at least seventy-five percent of their receipts for charitable purposes.  See Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. at 622.  The Plaintiffs' reliance on Village of Schaumburg v. Citizens for a Better Environment is misplaced.  First, the ordinance at issue in Village of Schaumburg v. Citizens for a Better Environment prohibited an activity that was closely intertwined with core political speech, while § 1-4-49 does not effectuate any ban on third-party voter registration.  Moreover, § 1-4-49 is drawn narrowly enough to allow minimally diligent volunteer-based organizations the ability to carry out voter registration and issue advocacy.  This is in contrast to the ordinance that the Village of Schaumburg had, which heavy-handedly proscribed significant First-Amendment activity.

The Plaintiffs cite both League of Women Voters v. Cobb and Project Vote v. Blackwell in support of their argument that the Court should apply strict scrutiny to § 1-4-49, but neither of those courts did so.  Also, a significant difference between New Mexico's law and the one the district struck down in League of Women Voters is that the Florida law did not apply to political parties, but only to other groups.  See League of Women Voters v. Cobb, 447 F.Supp.2d at 1335.

Thus, a review of the available authority suggests that strict scrutiny is improper in this case. Instead, the Court will rely on the balancing approach of Anderson v. Celebrezze.  In Crawford v. Marion County Election Bd., some tension arguably lingers concerning the proper application of Anderson v. Celebrezze. Specifically, Justice Stevens, in his opinion in Crawford v. Marion County Election Bd. applied the test in a sliding scale fashion, whereas three Justices in concurrence

---

however, does not overcome the fact that the requirements at issue in this case are slight in comparison to those at issue in Meyers v. Grant.

advocated a "two-track approach" that "calls for application of a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." 128 S. Ct. at 1624 (Scalia, J. concurring). The Court need not resolve that tension in this case because, even under Justice Stevens' more rigorous approach, the Plaintiffs have not demonstrated such severe burdens on First Amendment rights as to warrant strict scrutiny. As such, the result would be the same under either test.

a.    <u>**Right to Speech.**</u>

The Plaintiffs assert that their voter-registration drives involve the communication and expression of political ideas – core political speech that lies at the heart of the First Amendment. When the Plaintiffs go out into their communities and offer to register citizens to vote, they inevitably spark conversations concerning issues of the day, political change, and the reasons why it is important to register and to vote. The Plaintiffs discuss with potential registrants the importance of political participation in general and also their views on particular controversies at issue in the election and the importance of joining groups engaged in the meaningful political action. <u>See</u>, <u>e.g.</u>, Fraher Aff. ¶¶ 13-14, at 4-5; Rodriguez Aff. ¶¶ 15-18, at 4-5. The Plaintiffs maintain that regulation of voter registration thus must be undertaken with due regard for the fact that voter-canvassing activity is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," and that without such activity "the flow of such information would likely cease." <u>Village of Schaumburg v. Citizens for a Better Env't</u>, 444 U.S. at 632 (discussing the speech intertwined with charitable solicitation). <u>See Hernandez v. Woodard</u>, 714 F.Supp. 963, 973 (N.D. Ill. 1989)("Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [registering voters] impair their ability effectively to organize and make their

-52-

voices heard.").

While the Court concludes that <u>Anderson v. Celebrezze</u> requires it to examine § 1-4-49 through the First Amendment analysis, the Court also believes the First Amendment interest is not strongly implicated by § 1-4-49.  While the first prong of the <u>Anderson</u> test does not allow the Court to weigh the "character and magnitude" of the First Amendment rights involved, but rather focuses on the magnitude of the asserted injury to First Amendment rights.  It should be noted that the speech here is incidental to the activity being regulated.

The Plaintiffs face no possibility of punishment, however, because of the content of their speech.  Moreover, contrary to the Plaintiffs' assertions, § 1-4-49 does not constitute a severe restriction on the Plaintiffs' core expressive conduct.  Therefore, any burdens that the New Mexico law might place on the Plaintiffs' rights to free speech are insufficient to warrant strict scrutiny.

**b.      <u>Right of Association.</u>**

The Plaintiffs contend that the challenged law is subject to scrutiny not only because it restricts the Plaintiffs' right to free speech, but also because it restricts the Plaintiffs' core right to association.  Organized voter-registration activities necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register.  Some Plaintiffs actively solicit new members through their registration drives, either directly or indirectly through follow-up activity with new registrants.  <u>See</u>, <u>e.g.</u>, Fraher Aff. ¶¶ 8, 14, at 3, 5; Rodriguez Aff. ¶¶ 19-20, at 5.

The facts of this case, however, are not analogous to <u>Elrod v. Burns</u>.  In contrast to the petitioners in <u>Elrod v. Burns</u>, no person or group can be penalized under § 1-4-49 because of affiliation with a particular political party.  The Plaintiffs are free to associate with whomever they choose.  Where that is the case, the burden on associational rights is minimal.

c.   **What § 1-4-49 Does.**

The New Mexico Legislature passed § 1-4-49 because of the importance of the franchise, not despite the importance.     Section 1-4-49 is a content-neutral limitation on expressive activity. Section 1-4-49 places reasonable limits on the manner in which the Plaintiffs conduct their association.  Section 1-4-49 does not prohibit the Plaintiffs from helping others register to vote.  At most, the law requires compliance with incidental administrative procedures and workmanlike promptness in registering voters.  Thus, the Plaintiffs' First Amendment interests in the case, while they exist, are not directly implicated.  While the first prong of the Anderson test does allow the Court to weigh the "character and magnitude" of the First Amendment rights implicated, but rather focuses on the character and magnitude of the asserted injury, the speech here is incidental to the activity being regulated.

2.   **The Challenged Law is not Unconstitutional As Applied.**

The Plaintiffs contend that the challenged law has already burdened, and continues to interfere on a daily basis with, the Plaintiffs' constitutionally protected rights under the First Amendment.  The Plaintiffs assert that the mere existence of the harsh rules and criminal and civil penalties for their violation has caused the Plaintiffs either to engage in less protected speech and association or to refrain from speaking and associating at all – causing them present injury that must be remedied.  See League of Women Voters of Fla. v. Cobb, 447 F.Supp.2d 1314, 1338-39 (S.D. Fla. 2006)(holding that a challenge is appropriate where "the threat of fines has rationally chilled Plaintiff's exercise of free speech and association, as well as that of Plaintiffs' volunteers").  The Plaintiffs contend that the Court should declare the law unconstitutional and inapplicable to them.

a.   **§ 1-4-49 Does Not Impose as Severe a Restriction on the Plaintiffs' Speech Rights as the Plaintiffs Contend.**

-54-

The Plaintiffs argue that interactive communication concerning political change, of the sort that the Plaintiffs engage in as part of their voter drives, is core political speech.  As the Plaintiffs acknowledge, however, they are able to engage in the interactive communication concerning political change separate and apart from helping a person register to vote.  The act of aiding in a future voter's registration is not itself, or at least does not have to be, political speech.  The speech surrounding that act is often political, and § 1-4-49 has no direct effect on that speech.  Even if the Plaintiffs entirely cease their voter registration activity, they are still free to engage citizens in whatever political discussion they please.

Additionally, the decision to cease or to reduce voter registration activities is an affirmative, volitional act.  § 1-4-49 does not compel the decision to cease or reduce voter registration activities.  As the affidavits of the Plaintiffs indicate, the Plaintiffs have undertaken voter registration drives since the passage of § 1-4-49 in 2005.  None of them have been prosecuted or subject to any penalty under the law.

Moreover, the Plaintiffs are not the only organizations attempting to register people to vote in New Mexico.  ACORN has managed to register 65,000 new voters in the still on-going 2008 election cycle alone.  This activity does not evidence that § 1-4-49 severely restricts third-party voter registration activity.

That the Plaintiffs' voter registration activities have not been subject to prosecution is important for two reasons.  First, it demonstrates that the Plaintiffs can, in spite of § 1-4-49, continue to register voters, despite their contention that their conduct is "severely restricted."  Second, it demonstrates that the Plaintiffs' fear of prosecution or penalty under § 1-4-49 is not reasonable.

The latter point is important in light of the Plaintiffs' professed intentions to either halt or greatly reduce their voter registration activity.  It is not enough, from a constitutional standpoint, for

the Plaintiffs to make that assertion, or even to proceed to alter their behavior.  The law does not give the Plaintiffs so much control over the outcome of a constitutional analysis.  Rather, the Plaintiffs must demonstrate that it is reasonable, in light of the challenged law, to so alter their behavior.  They are unable to do so in this case.

In light of the fact that the Plaintiffs have conducted voter registration drives since the passage of the law, and that other organizations have continued to thrive in spite of the regulations, it appears that the New Mexico law has operated legitimately, permitting organizations to exercise their First Amendment rights.

In the end, the Court concludes that New Mexico's laws impose modest requirements.  It is not difficult to abide with New Mexico's obligations and requirements.  In the end, § 1-4-49 is not a severe restriction on the Plaintiffs' First Amendment rights.  The Court concludes that the burdens are not constitutionally significant.

> **(i)     The Pre-Registration, Disclosure, and Training Requirements of § 1-4-49 are not Unduly Burdensome on the Plaintiffs' First Amendment Rights.**

The Plaintiffs' first attack the law's pre-registration, disclosure, and training requirements, making three arguments: (i) training and pre-registration impose logistical barriers to speech; (ii) the requirements prevent spontaneous speech; and (iii) the requirements compel the disclosure of private information.  None of these arguments is sufficient to show a "severe burden" on the Plaintiffs' speech interests.

The Plaintiffs contend that training and pre-registration take significant amounts of time and that training sessions are typically scheduled during limited hours on weekdays.  The Plaintiffs assert that they are burdened by training sessions which are infrequent and conducted at inconvenient locations.  These assertions do not withstand scrutiny.

-56-

Both the Secretary of State and the County Clerks in New Mexico are willing to make extensive accommodations for third-party voter registration groups and have made such accommodations. The Federation of Women's Clubs Overseas, Inc. and the SouthWest Organizing Project assert that they intend to register voters outside of Santa Fe or Bernalillo County,[12] and the Court does not believe that it is free to ignore the aspirations of these organizations. Nevertheless, the Secretary of State's office is both willing and able to conduct remote training sessions for people living outside of New Mexico's population center. See Dominguez Aff. ¶ 5, at 1. Officials from the Bernalillo County Clerk's office have already conducted two training sessions on the campus of the University of New Mexico this year. See Fraher Aff. ¶ 19, at 8-9. Those sessions were not conducted in the Clerk's office and were not held during the specified afternoon hours of which the Plaintiffs complain. There is no evidence any County Clerk has turned down a request to train at remote locations. The Plaintiffs did not introduce evidence of such requests. At the hearing, the Defendant indicated that training could be done by Internet or over the telephone. See Aug. 19 Tr. at 137: 13 (Fuqua). That FAWCO is registering voters overseas is no certain hardship; FAWCO simply has not requested any special accomodations. See Aug. 29 Tr. at 36: 17 (Rogers). There is nothing in the record to suggest such a request would be denied.

These on-campus training sessions are not extraordinary. Election officials are willing to work with any group that requests a training session to schedule the session for a mutually agreeable time and place. See Lamb Aff. ¶ 11, at 4; Oliver Aff. ¶ 5, at 1-2. Moreover, the training sessions are not the arduous, intimidating ordeals that the Plaintiffs describe. The sessions take anywhere

---

[12] In her affidavit in support of her motion to intervene, Rhoda Coakley, the Chaves County Clerk stated that she, and presumably other county clerks and the Secretary of State, would be happy to schedule additional sessions for interested persons. See Affidavit of Rhoda Coakley ¶ 3, at 1 (executed August 25, 2008).

from fifteen minutes to an hour, and provide the trainees with informational pamphlets as well as contact information for the appropriate election official should the trainees have any further questions.  See Lamb Aff. ¶ 11, at 4; Oliver Aff. ¶ 5, at 1-2.

Given the flexibility with which the Secretary and the County Clerks have been willing to provide the necessary training, such training does not amount to in insurmountable, or even difficult to overcome burden.

The Plaintiffs next argue that the pre-registration and training requirements prevent the Plaintiffs from conducting spontaneous voter-registration drives, thus infringing on this vital category of core political speech and activity.  This argument fails for three reasons.

First, § 1-4-49 does not prohibit or infringe upon the Plaintiffs' ability to engage in the political speech that surrounds their voter-registration efforts. That speech does not depend on, but rather coincides with, voter-registration efforts.  The Court is not prepared to find that assisting an individual in completing a voter-registration form can never itself be an expressive act protected by the First Amendment.  Nevertheless, the Court does not believe that § 1-4-49 abridges the speech that is coincidental to the registration process.

Second, while the Plaintiffs have used spontaneous voter-registration drives in the past, it does not necessarily follow that they are entitled to do so such that any burden on spontaneous registration drives is a violation of the Plaintiffs' First Amendment rights.  The Plaintiffs are entitled to spontaneously engage whomever they choose in speech of a political nature. Section 1-4-49 has no detrimental impact on their ability to do so; it merely limits the Plaintiffs' ability to use registration as an opening line.  And even then, the limitation is slight.  If New Mexico law prohibited third-party voter registration all together, the Plaintiffs would still be able to initiate contact with individuals with discussions about registering to vote.  As it is, the Plaintiffs can engage

in third-party voter registration as long as they adhere to the procedures of § 1-4-49 , the regulations, and the de facto rules.

Moreover, it is not § 1-4-49 that prevents or curtails spontaneous registration drives; it is the manner in which the Plaintiffs choose to conduct their business.  If the Plaintiffs will ensure that a sufficient number of their members have registered with the Secretary of State and attended one of the short training offered by a number of New Mexico election officials, they will be prepared to register voters at any time they wish.  The Plaintiffs' refusal to obtain adequate preparation is not an infringement of their rights of free speech and association.

The Plaintiffs next contend that § 1-4-49 discourages participation in the Plaintiffs' voter registration efforts because it requires third-party voter registration agents to identify, in a public document, their membership in the Plaintiff organization.  More specifically, the Plaintiff AAPD asserts that many of its volunteers do not wish to be publicly tied to the organization.  The identification of a group's members is principally important only as it identifies those members of the organization who are either officers or have decision-making authority with regard to the group's voter registration activities.  See NMSA 1978, § 1-4-49D.  To the extent the officers of AAPD are publicly known to hold their respective positions within the organization, § 1-4-49 places no additional burden on them.

**(ii)     The Fifty-Form Limit Does Not Significantly Inhibit the Plaintiffs' Voter-Registration Efforts.**

The Plaintiffs contend that the fifty-form limit in §§ 1.10.25.8(C) and 1.10.25.10(B) of the New Mexico Administrative Code, along with the grant of standardless discretion to the Secretary of State and County Clerks, constitute a severe burden on the Plaintiffs' speech and associational rights.  The fifty-form limit, however, presents no such unreasonable difficulty to the Plaintiffs or

-59-

to any other similar organization.

The Plaintiffs first argue that the existence of the limitation makes large-scale voter registration drives impractical, and forces the Plaintiffs to either limit their drives and thus their speech, or take time from a successful drive to obtain additional forms. This argument fails for four reasons. First, the fifty-form limit is not absolute. Special dispensation is made for groups who need additional forms, and no election official has refused any reasonable request for additional forms. See Lamb Aff. ¶ 10, at 3; Oliver Aff. ¶ 7, at 2; Dominguez Aff. ¶ 7, at 2.

Second, the Plaintiffs are free to use the federal voter-registration form available online pursuant to the NVRA, so long as each form submitted to the State includes the third-party registration agent's identification number. The State of New Mexico does not limit the number of federal voter registration forms they can download from the Internet. The Plaintiffs can download as many of these as they want.

Third, the Plaintiffs' concerns regarding large-scale voter-registration drives are not reasonable or realistic. None of the Plaintiffs have ever registered more than 1,000 voters in any given election cycle, and the largest aspirational number of voter registrations that the Plaintiffs identified for the 2008 election cycle is 5,000. See Fraher Aff. ¶ 15(c), at 6; Rodriguez Aff. ¶ 9, at 2. Because both registered individuals and organizations can obtain registration forms from the Secretary of State, see 1.10.25.8(C) N.M.A.C., even if the fifty-form limit were strictly applied to the Plaintiffs, it is unlikely that it would significantly interfere with their stated voter registration goals for this election cycle.

Fourth, at the hearing, the Defendant conceded that the fifty-form limit could be mitigated by a number of people getting the forms and giving them to one person to actually do the registering. See Aug. 19 Tr. at 147: 1. The law does not prevent the transfer of blank forms to others, so

-60-

volunteers can give the forms to others to facilitate voter drives.

There is also some question whether the burden imposed by the fifty-form limit is greater than any burden than the Plaintiffs have faced in the past.  To the extent that SWOP's and others' difficulties obtaining forms in 2004, before the Legislature passed § 1-4-49, stemmed from "inconsistent and unclear rules with respect to obtaining forms," Rodriguez Aff. ¶ 33, at 10, the challenged regulations, by providing consistency and clarity, should lessen this burden.

The Plaintiffs next argue that §§ 1.10.25.8(C) and 1.10.25.10(B) NMAC are unconstitutional because they give discretion to the Secretary of State and the County Clerks, respectively, to deviate from the fifty-form limit, but provide no guidance as to how this discretion should be exercised.  The Plaintiffs then cite several Supreme Court opinions for the proposition that statutes implicating First Amendment interests which vest local officials with unfettered discretionary power to permit or curtail speech are unconstitutional.  This line of case law is inapposite in this case.

First, the Plaintiffs stretch the application of the challenged provisions in asserting that they vest the Secretary of State and the County Clerks with unfettered discretionary power to permit or curtail speech.  Unlike the ordinances and laws challenged in the cases that the Plaintiffs cite, §§ 1.10.25.8(C) and 1.10.25.10(B) do not directly permit or curtail speech.  Compare, e.g., City of Chicago v. Morales, 527 U.S. 41, 61 (1999)(striking down an anti-loitering ordinance in part because it gave excessive discretion to police in determining what activities constituted loitering).  Moreover, even assuming that the provision of blank voter registration cards is a speech act, the discretion granted by the provisions challenged by the Plaintiffs cannot be used to curtail speech; the discretion can be exercised only to increase the number of forms available.

Furthermore, the challenged provisions do not provide unfettered discretion, but instead give some guidance to the Secretary of State and the County Clerk in its application.  Additional forms

may be provided "for special events or circumstances." §§ 1.10.25.8(C) and 1.10.25.10(B) NMAC. A large-scale voter-registration drive by reputable organization such as any of the Plaintiffs likely constitutes either a special event or a special circumstance under these regulations. Should the Plaintiffs request additional forms, they are likely to receive them.

(iii)  **The Forty-Eight Hour Deadline Does Not Unduly Burden The Plaintiffs' Speech.**

The Plaintiffs allege that requiring them to submit voter registration forms within forty-eight hours of completion significantly increases the cost that the Plaintiffs incur per registration. It is unclear from the record before the Court, however, how that cost increase occurs. In any event, such costs are minimal, and take the form of either personally visiting an election official's office or using the United States mail.

The Plaintiffs point to League of Women Voters v. Cobb, in Florida, as an example of a federal court striking down a deadline on the submission by third-party voter-registration agents of completed voter-registration forms. There are, however, two significant differences between the law at issue in League of Women Voters v. Cobb and the New Mexico law before the Court. First, the statute at issue in League of Women Voters v. Cobb did not apply even-handedly to all organizations that engaged in third-party voter registration. Instead, the Florida law exempted political parties. See League of Women Voters v. Cobb, 447 F.Supp.2d at 1322. Thus, the Florida law was discriminatory. See id. at 1332-36. There is no contention that the New Mexico law is discriminatory. The severity of the fines at issue is the second important distinction between the statute in League of Women Voters v Cobb and the New Mexico statute at issue in this case. New Mexico's penalties are substantially less severe than those at issue in League of Women Voters v. Cobb. A violation of § 1-4-49 is punishable by a "civil penalty of two hundred fifty dollars ($250)

-62-

for each violation, not to exceed five thousand dollars ($5,000)[;]" N.M.S.A. 1978, § 1-4-49D, and

by a potential petty misdemeanor conviction and revocation of the ability to engage in third-party

voter registration, see N.M.S.A. 1978, § 1-4-49E.   The Plaintiffs contend that these fines are

oppressive, but the Plaintiffs do not face the "threat of crippling fines" that confronted the Florida

organizations.  League of Women Voters v. Cobb, 447 F.Supp.2d at 1339.  The Florida statute at

issue in League of Women Voters v. Cobb had no cap on fines, and held the individual collecting

the voter registration application, the entity's registering agent, and anyone responsible for the day-

to-day operations of the entity jointly and severally liable for the civil penalties.  See id. at 1322.

It is illuminating to see the Plaintiffs' candid explanation why a forty-eight hour deadline

is difficult for them to meet: because they want to take the time to enter the names and addresses of

the voters they register in their databases for future political and civic undertakings.  See Fraher Aff.

¶ 23, at 10 ("Before returning voter registration forms, Students for NMPIRG members must count

them, review them, enter the information into our database, and return.  Complying with the 48-hour

deadline gives us less time to review forms.").  While it is understandable that an organization such

as NMPIRG would want to build its database in such a manner, it is not constitutionally entitled to

do so.  See Zemel v. Rusk, 381 U.S. 1, 17 (1965)("The right to speak and publish does not carry

with it the unrestrained right to gather information.").  To the extent compliance with the forty-eight

hour requirement is difficult for the Plaintiffs because of internal policies such as that which

Students for NMPIRG describes, that difficulty is of no constitutional importance.

Finally, the Plaintiffs argue that the forty-eight hour deadline, combined with the penalties

provided in § 1-4-49, make it difficult to recruit volunteers because prospective volunteers are afraid

that they may, through their own negligence, accidentally misplace completed voter registration

forms.  See Fraher Aff. ¶ 25, at 11; Tessneer Aff. ¶ 18, at 6.  This argument is also of no

constitutional significance.  The same fear would grip the same volunteers if § 1-4-49 required that forms be submitted by book closing rather than within forty-eight hours of their completion.  A third-party registration agent who misplaced or forgot about completed voter registration forms would still face potential penalty.  This fact highlights the reason for the forty-eight hour deadline – if the forms are not returned, the affected voters are disenfranchised.  The fear that they will not be able to competently register voters is not a sufficient basis on which to sustain the Plaintiffs' challenge to § 1-4-49.

All that  § 1-4-49 requires is that the registering agent place the voter-registration forms in mail.  FAWCO can do that as easily as the agents in Albuquerque.  While a forty-eight hour deadline places some more burden than a ten-day or a lengthier time, the burden is not severe.  While some courts have expressed concerns with deadlines even more liberal than the one at issue in this case, there must be some deadline to getting the forms in to the state entities.  These are not severe penalties.

### (iv)    The Civil and Criminal Penalties for Violations of § 1-4-49 are Appropriate.

Government has few ways to enforce with its laws other than civil and criminal penalties.  While some courts have expressed concern about the harshness of penalties, these are not harsh.  Indeed, it is difficult to imagine less stringent punishment that would have any teeth.

The penalties assessed for violations of § 1-4-49 are minimal.  No individual fine may exceed $250.00, and no individual or organization can be fined more than $5,000.00 in the aggregate.  Additionally, the only criminal penalty available is prosecution for a petty misdemeanor, the lowest level of criminal culpability.  The Court does not believe that these penalties, in the context of the Anderson balancing test, are constitutionally chilling.

The Plaintiffs contend that the penalties under § 1-4-49 are particularly susceptible because they are strict liability penalties.  While the New Mexico state courts have not construed § 1-4-49, it is not clear that the statute is a strict liability statute.  Section 1-4-49 D provides, in part, that "[a] person who intentionally violates the provisions of this section is guilty of a petty misdemeanor . . . ."  The use of the word "intentionally" in this statute suggests that an individual or organization may only be criminally prosecuted for taking action intended to violate the statute.  See People v. Whitney, 228 Mich.App. 230, 254-56, 578 N.W.2d 329, 340-41 (Mich. App. 1998)(holding that a statute providing for a fine of up to $1,000 for a public official who "intentionally violates" the Michigan Open Meetings Act required three elements: "(1) the defendant is a member of a public body; (2) the defendant actually violated the OMA in some fashion; and (3) the defendant intended to violate the OMA.").

The civil penalties described in § 1-4-49E apply to non-intentional conduct.  This fact alone, however, is insufficient to render those penalties unconstitutional.  They remain subject to the Anderson balancing test, and application of that test weighs in favor of the State.  The Plaintiffs' principal concern appears to be that their members will be subject to a civil penalty for inadvertently failing to submit completed registration forms to the appropriate election official within forty-eight hours of the forms' completion.  Given the ultimate consequences of failing to submit completed forms, i.e., the disenfranchisement of potential voters, such liability is not only sensible and fair, but necessary.  See Report of Matthew A. Barreto at 5-6 (dated August, 14, 2008).

The Plaintiffs next argue that the challenged law allows the Secretary of State to exercise standardless, and potentially discriminatory, discretion regarding the referral of civil enforcement actions.  This argument reflects a misreading of the pertinent provision.  The law states that, "[i]f the secretary of state reasonably believes that a person committed a violation of the provisions of

this section, the secretary of state shall refer the matter to the attorney general or a district attorney for enforcement."  N.M.S.A. 1978, § 1-4-49E.  Thus, the Secretary of State has no discretion in making a referral for enforcement; the phrase "reasonably believes" is a limitation on the cases that may be referred, not a grant of discretion to refer whomever the Secretary of State chooses.  To the extent that there is any discretion involved in the enforcement of § 1-4-49, it is prosecutorial discretion, which is legitimate.  See Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Finally, the Plaintiffs erroneously contend that New Mexico law already punishes the conduct at issue in § 1-4-49.  Citing N.M.S.A. 1978, § 1-20-9, the Plaintiffs call the penalties in § 1-4-49 "entirely superfluous."  Section 1-4-49 reaches different conduct than does § 1-20-9, which deals only with the falsification of election documents.  Section 1-20-9 would not, for example, apply to a third-party voter registration agent who failed to submit a complete and accurate voter registration form.  Section 1-4-49 would and is thus not redundant of other law.  Moreover, while the Plaintiffs do not admit that § 1-4-49 is not rendered superfluous by § 1-20-9 or that the penalties in § 1-4-49 are constitutional, the Plaintiffs make no argument that § 1-20-9 would be unconstitutional as applied to them.  Ultimately, the available facts do no support the Plaintiffs' assertions regarding the severity of the burden that § 1-4-49 places on their voter-registration activity.  ACORN, as one example, continues to register large numbers of voters.  The New Mexico chapter of the League of Conversation Voters, formerly headed by current Bernalillo County Clerk Maggie Toulouse Oliver, also felt no burdensome impact from the requirements of § 1-4-49, registering as many voters after the passage of the law as before it.  See Oliver Aff. ¶ 3, at 1.  The

empirical evidence thus suggests that the Plaintiffs' contentions regarding the burdensome effect of § 1-4-49 on their protected speech interests is overstated.  The Legislature created common-sense obligations and requirements.

> **b.    The Law Serves New Mexico's Legitimate Interest in a Manner No More Burdensome Than Necessary in Light of the Magnitude of that Interest.**

In their unsuccessful motion to intervene, Nazarena Martinez, Justine Fox-Young, Rhoda Coakley, and the Republican National Party of New Mexico, state that there is no question that ascertaining an individual's identity before allowing the person to vote and preventing voter fraud are compelling legal interests.  See Crawford v. Marion County Election Bd., 128 S. Ct. at 1618. The Court need not agree with that reading of Crawford v. Marion County Election Bd. or that New Mexico's interests are compelling.  It is sufficient that the Court finds that New Mexico's interests are legitimate and important.

The state interest animating the passage of § 1-4-49 is weighty: the protection of New Mexico's electoral system.  The state interests that the Supreme Court identified in Crawford v. Marion County Election Board, along with the interest of ensuring that New Mexico voters are not disenfranchised, justify § 1-4-49.  These strong interests outweigh the interests of the third-party registration agents.

The Plaintiffs attempt to characterize New Mexico's interest more narrowly than the Court believes is fair or accurate.  First, the Plaintiffs argue that there is no justification for requiring pre-registration in advance of returning voter-registration certificates.  Nevertheless, the restrictions challenged constitute both a safeguard against fraud and the appearance of fraud in the registration and election process.  Moreover, the pre-registration requirement provides a mechanism – by way of the identification number – with which the State can trace problematic forms.  This tracing ability

is a valuable means of assuring that those engaged in third-party voter registration are held accountable for mistakes or more serious misfeasance.

Section 1-4-49 serves New Mexico's important state interest in the integrity of its electoral process in a manner no more burdensome than necessary. The Plaintiffs suggest that a law requiring agent registration contemporaneous with the return of forms would be significantly less burdensome. The Plaintiffs do not, however, offer a sound explanation why contemporaneous registration would be less burdensome that pre-registering.

In either case, the third-party agent must complete the same form and provide it to the same election official. Moreover, there is a justification for requiring pre-registration: the State keeps a finite supply of voter registration forms and cannot afford to provide them to organizations or individuals who are unlikely to use them for their intended purpose. Pre-registration provides some assurance that the third-party registration agent will use the forms to register additional voters.

Next, the Plaintiffs contend that there is no justification for the training performed by the County Clerks and by the Secretary of State. There is, however, justification for such training. The training provides third-party registration agents with important information about the voter registration process. It helps ensure that those agents competently perform the task they have set out for themselves. See Dominguez Aff. ¶ 6, at 2; Oliver Aff. ¶ 6, at 2. This competent registration, in turn, ensures that the putative voters signed up by the third-party agent are registered to vote and thereby allowed to participate in the election process. When individuals or organizations engage in third-party voter registration perform incompetently, affected citizens lose access to a most fundamental right to vote. That the state might require minimal training to aid in preventing such an occurrences is appropriate.

Third, the Plaintiffs note that state agencies are given ten days, not forty-eight hours, in

which to transmit a completed voter registration form to the appropriate election official, see N.M.S.A. 1978, § 1-4-49D, and argue that the State can provide no justification for the differential treatment.  There is, however, justification for this requirement.  State agencies that routinely receive completed voter registration forms have been, in essence, thoroughly vetted as voter registration agents.  Many organizations that seek to assist in voter registration have not, and many have proven incompetent in completing the task.  See Lamb Aff. ¶¶ 3-8, at 1-3.

Finally, the Plaintiffs contend that the fines applicable under § 1-4-49 are not necessary to serve a state interest.  First, this argument assumes, or at least suggests, the application of a strict-scrutiny standard, which is inappropriate in this case.  The question is instead whether the State's interest in levying the fines outweighs whatever burden the fine may represent to a violator's free speech rights.  The burden is minimal or nonexistent; the State's interests are not.

The New Mexico Legislature did not pass § 1-4-49 in reaction to hypothetical or imaginary harm to the State's electoral system.  The few examples provided by the State serve to illustrate the possible harm.  As Crawford v. Marion County Election Bd. indicates, the prevention of voter fraud is a paramount state interest.  So, too, is guarding against the disenfranchisement of a state's citizens.

If third-party registration agents engage in voter registration fraud, they have harmed the electoral system.  If third-party voter registration agents fail to submit completed voter registration forms, they will ultimately decrease voter participation because the voter who was unexpectedly turned away at the polls is unlikely to return.  See Barreto Report at 4, 5.  Moreover the voters most likely to be affected by such conduct are the voters whom the Plaintiffs profess to empower: young voters, the elderly, and minorities.  See id. at 5.  Ultimately, New Mexico's interests in passing § 1-4-49  are both to protect the electoral system from fraud and to guarantee participation in New

Mexico's democratic system.

Section 1-4-49 is properly constructed to meet these interests and is thus constitutional under Anderson v. Celebrezze. The first step under Anderson is considering the "character and magnitude of the asserted injury" to the Plaintiffs' First Amendment rights. Anderson v. Celebrezze, 460 U.S. at 789. This step is not a consideration of the character and magnitude of the First Amendment right, but of the injury to the First Amendment rights. See id. There is no doubt that the speech surrounding the Plaintiffs' voter registration efforts is significant and worthy of constitutional protection. The Court must instead focus on the injury to that speech, which the Plaintiffs allege.

As discussed above, that injury is constitutionally insignificant. First, § 1-4-49 has no direct impact on the Plaintiffs' ability to discuss political and civic issues with whomever they choose. Second, compliance with § 1-4-49 requires minimal effort on the Plaintiffs' part; indeed, it requires only that the Plaintiffs competently perform the task they have set out to accomplish. To avoid penalty under § 1-4-49, the Plaintiffs must: (i) fill out a short registration form and submit it to the Secretary of State; it consists of a single page including a declaration that the agent will abide by New Mexico election law; (ii) ensure that their third-party voter-registration agent number appears on every completed voter-registration form that they submit to either the Secretary of State or a County Clerk; and (iii) place in the mail or personally deliver, within forty-eight hours, each completed registration certificate. None of these requirements place a substantial burden on the Plaintiffs' voter-registration efforts. The success of similar organizations, in this and in previous election cycles, suggests that the Plaintiffs' assertions of injury are overstated.

The second step in the Anderson analysis is the identification and evaluation of "the precise interests put forward by the State" to justify the challenged law. Anderson v. Celebrezze, 460 U.S. at 789. Those interests are maintaining the integrity of the electoral system and protecting the

election franchise of New Mexico citizens, interests of paramount importance.  The potential harm to those interests that § 1-4-49 addresses is not hypothetical.

The final step in the Anderson analysis is weighing the "legitimacy and strength" of the State's interests in light of "the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson v. Celebrezze, 460 U.S. at 789.  The Defendant has demonstrated the legitimacy and strength of the State's interests that § 1-4-49 implicates.  And, as the past conduct of third-party voter-registration organizations have shown, the protection of those interests supports the regulation of third-party voter registration activity.  Consequently, application of the Anderson test to § 1-4-49 and to Title 1, Chapter 10, Part 25 of the New Mexico Administrative Code supports the conclusion that the challenged laws are constitutional as applied to the Plaintiffs.

Given that the Plaintiff's "as applied" challenge fails, the facial challenge is much less tenable.  Nonetheless, the Court will address the main aspects of that challenge below.

## 2.      The Challenged Law is not Facially Invalid.

In recent Supreme Court cases, especially in Crawford v. Marion County Election Bd., the Supreme Court has indicated that facial challenges are not favored and are very difficult to establish. Marc E. Isserles, Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement, 48 AM. U. L. REV. 359, 361 (2008)("As the Supreme Court has made clear on numerous occasions, facial challenges are appropriate, if at all, only in exceptional circumstances.").  Nevertheless, the Court will examine the Plaintiffs' contentions to determine the likelihood of their success of those claims.

The Plaintiffs contend that the unconstitutionality of the law is not limited to the manner in which the Secretary of State has applied it to the Plaintiffs.  Rather, the Plaintiffs contend that the

law is also invalid on its face, because "in all its applications [it] directly restricts protected First Amendment activity." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 968 & n.13 (1984). See id. at 967-68 (noting that, where law restricts "protected First Amendment activity, and where the defect in the statute is that the means chose to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack."). The Plaintiffs maintain that, because there is no way that the Secretary of State can simultaneously enforce the law and adhere to the Constitution, the law is facially invalid and the Court should strike the law as unconstitutional. The Plaintiffs contend that a facial challenge here would be appropriate because the law does not have a "plainly legitimate sweep," Wash. State Grange v. Wash. State Republican Party, 128 S.Ct. 1184, 1190 (2008), and because, at a minimum, "a substantial number of its applications are unconstitutionally," id. at 1190 n.6.

Plaintiffs making facial attacks on statutes such as § 1-4-49 "bear a heavy burden of persuasion." Crawford v. Marion County Election Bd., 128 S. Ct. at 1621. This is because they must show that the statute is invalid in all its applications, and has little or no legitimate sweep. See id. The Plaintiffs here have not met that burden.

A closer examination of the State's interests and the risks attendant to a more lax regime add clarity to the appropriateness and constitutional nature of § 1-4-49 . The first interest that the Defendant advances is that the elimination § 1-4-49 puts the registration ballots and the New Mexico voters at the risk of fraud. The Defendant contends that the obvious result of the elimination of the registration and identification requirements will be more opportunity for identity theft, less accountability, and more opportunity for mischief related to voter registration fraud and other crimes. No legitimate purpose would be served by less oversight and accountability.

The elimination of the modest identification requirements, as the Plaintiffs propose, will further erode public confidence in the election process and discourage voters from voting in future elections.  People being turned away at the polls because their registration forms were not turned in discourages voters from participating in the political process.  It may particularly discourage the people on the margin of society, and young voters – many of whom the Plaintiffs seek to register.

Finally, while the Court could rewrite New Mexico's law and perhaps draft a statute that is less restrictive and allows more of the activity in which the Plaintiffs want to engage, the Court has to be mindful that any invocation of the First Amendment, regardless of how noble, including the Plaintiffs' attempt, usurps at least to some degree the legislative and democratic process, and the will of the Legislature, by seeking to eliminate its collective judgment. Strict Scrutiny might well require a better match between § 1-4-49's goals and the means used.  Under Anderson, however, even as explained by Justice Stevens in Crawford v. Marion County Election Bd., the law gives state entities more latitude to decide how to best meet its goal.

> a. **The Fifty-Form Limit.**

It is unreasonable to expect a County Clerk to give his or her office's entire cache of voter registration forms to any single individual or organization.  It is not reasonable, from an economic standpoint or otherwise, to require the state to give one person unlimited forms.  Some limit is appropriate, and, as a practical matter, needed.  There will be instances in which exceeding the fifty-form limit will be prudent and desirable.

In recognition of the fact that there will be instances in which exceeding the fifty-form limit will be prudent and desirable, the County Clerks and the Secretary of State have discretion to exceed that limit when the circumstances justify it.  There is nothing facially unconstitutional or unreasonable about the state regulating the amount one person can take at a time.

-73-

### b.    The Forty-Eight Hour Submission Deadline Requirement.

The requirement that the voter-registration card be turned into the appropriate election official is an essential step in the civic and political empowerment of the people that the Plaintiffs seek to enfranchise.  While the Court must decide whether New Mexico's deadline is too restrictive, there must be some deadline.  There is nothing on the face of the statute that suggests that a forty-eight hour deadline is unconstitutional.  If this regulations fails, it must be because of how it operates, not because it is a patently unreasonable restriction on protected speech.

### c.    Fines and Criminal Penalties.

The State's interest is in maintaining the integrity of the electoral system.  The law provides for its enforcement with reasonable fines and criminal penalties.  The New Mexico Legislature intended these provisions to ensure that the individuals and organizations responsible for voter registration conform their conduct to ensure the integrity of New Mexico's electoral system, and that those engaging in conduct that ultimately leads to the disenfranchisement of New Mexico citizens, are held accountable for their conduct. Without some state-sanctioned penalty, it is difficult to hold violators accountable.  Thus, given the legitimate interests motivating § 1-4-49  and the minimal burdens that it places upon any party wishing to engage in third-party voter registration, it cannot be said that the statute is facially unconstitutional.

### 3.    Section 1-4-49  is Neither Unconstitutionally Vague nor Overbroad.

Related to the facial challenge are the Plaintiff's contentions that the law is vague and overbroad.  Again, however, a party raising such a challenge bears a heavy burden.

To show that a provision is vague, the Plaintiffs must prove that the reach of § 1-4-49's terms is not discernible.  In attempting to do so, they have focused heavily on the terms "assist" and "intentionally."  The Plaintiffs argue that where the statute lacks a definition for either of these

terms, it is impossible to know when one of them applies.  Under such circumstances, they contend, would-be volunteers are deterred from participating in voter registration.

Neither of the terms in question have been interpreted with respect to § 1-4-49.  Even so, both have plain import and are frequently used in legislation.  The Plaintiffs' ability to hypothesize about possible ambiguities does not avoid that fact.

With respect to overbreadth: the law has a wide legitimate sweep, because it reaches conduct properly subject to restriction.  Significantly, the law is silent on speech content, and leaves associational conduct and other First Amendment conduct largely untouched.  In sum,  § 1-4-49's terms are discernible and reach only that conduct properly subject to restriction.

**4.      The NVRA Does not Conflict with § 1-4-49  or any of its Implementing Regulations or De Facto Rules.**

The Plaintiffs argue that the NVRA preempts § 1-4-49.  Although they cite several provisions of the federal act, upon closer scrutiny, none is at odds with the New Mexico law either in letter or in spirit.  In other words, the NVRA neither explicitly nor implicitly preempts § 1-4-49. Rather, the two sets of laws are fully compatible.

**a.      § 1-4-49  Does not Interfere with the NVRA's Purposes.**

The Plaintiffs contend that the New Mexico law impedes the NVRA's stated purpose of increasing voter registration and encouraging third-party voter registration.  That conclusion, however, is based on only a partial reading of the NVRA.  While it is true that the NVRA expresses a generalized purpose of increasing voter participation and expresses approval of third-party voter registration, it also outlines other purposes.  See 42 U.S.C. § 1973gg(b). Namely, it is concerned with protecting the overall integrity of the electoral process and the accuracy of voter registration rolls.  Id.  The New Mexico law is compatible with those stated interests, given that the laws are

born out of a desire to protect the process of voter registration from fraud and error.  The prevention

of voter fraud and voter registration fraud is indispensable to the integrity of the electoral process

and the accuracy of voter registration rolls.  Nothing in the federal act suggests that those interests

must be subordinated to the interest of increasing voter turn-out.

Moreover, § 1-4-49's arguable negative impact on voter registration is debatable,

considering the fact that compliance with it helps to insure that voter registration forms are properly

completed, turned in, and recorded.  The effect of compliance is  to prevent the loss of voters whose

forms were mishandled.  Section 1-4-49's intent is to make certain every registered voter is able to

vote, not to depress voter turnout.

Finally, the New Mexico law does not purport to discourage third-party voter registration.

Rather, New Mexico allows it under certain conditions.  No provision of the NVRA suggests that

organizations engaged in third-party voting registration must be allowed to proceed unfettered.  In

fact, such a situation would arguably be at odds with the NVRA, because the Act expresses a

concern for preserving the integrity of the voter-registration process.  Thus, with respect to their

purposes, the NVRA and § 1-4-49 are compatible.

> **b.    The Forty-Eight-Hour Requirement for Returning Registration Forms is not Incompatible with the NVRA's Mandate that States Accept Forms Submitted Within the More Permissive Time-Frames of the Federal Statute.**

The Plaintiffs next argue that the forty-eight-hour turnaround requirement violates the

NVRA's explicit time lines for accepting voter registration forms.  Under the NVRA, states must

accept and assure the registration of forms physically received or postmarked  "no later than the

lesser of 30 days, or the period provided by State law, before the date of the election."  42 U.S.C.

§ 1973gg-6(a) (1).  In reality, this provision has no impact on New Mexico's forty-eight-hour

requirement, which deals with when the agent must submit filled-out voter applications.

New Mexico law requires that:

Organizations employing registration agents or using volunteer registration agents shall deliver or mail a certificate of registration to the Secretary of State or County Clerk within forty-eight hours of its completion by the person registering to vote or deliver it the next business day if the appropriate office is closed for that forty-eight hour period.

N.M.S.A. 1978, § 1-4-49B.  The consequences of violating § 1-4-49B include civil and criminal penalties for the registering agent.  Notably and properly absent from the New Mexico law is any suggestion that voter registration forms not returned within the prescribed forty-eight-hour period will be rejected as late.  If that were the case, § 1-4-49B would run contrary to the NVRA.  As New Mexico lawmakers surely recognized, disenfranchising innocent (and probably unknowing) voters for the sake of enforcing a deadline on third-party registering agents is too high a cost and unreasonable.  Accordingly, because the NVRA and § 1-4-49B can operate simultaneously and harmoniously, there is no federal preemption of the forty-eight-hour requirement.

       **c.**       **Forms**

The final point that the Plaintiffs make regarding preemption is that, by requiring third-party registering agents to place their identifying number on voter registration forms, § 1-4-49 violates NVRA's mandate that states

may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

42 U.S.C. § 1973gg-7(b)(1).  At least, they argue, this section prevents New Mexico from requiring voter-registration agents to place their number on the federal voter-registration form.  Their argument in that regard is based on the fact that the federal form reflects the components that

Congress intended it to contain, and any addition to that is disallowed.

First, it is a stretch to read 42 U.S.C. § 1973gg-7(b)(1) as prohibiting anything in § 1-4-49. Section 1973gg-7(b)(1) is not an absolute proscription on requiring information beyond that which explicitly appears in the federal law.  It is true that the NVRA prohibits states from asking for certain information, and it requires that states include certain components in their voter registration forms. None of those requirements and prohibitions, however, speak to the command of § 1-4-49 that third-party voter registering agents place their identifying number on the form.

Section 1973gg-7(b)(1) prevents states only from requiring information beyond what is necessary to (a) "Assess the eligibility of the applicant," and (b) "Administer voter registration and other parts of the election process."  42 U.S.C. § 1973gg-7(b)(1).  New Mexico requires the registering agent's identifying number to enable more effective administration of the voter registration process.  Specifically, the state uses the numbers to prevent voter registration fraud, and to monitor the competence of voter registering agents and their use of state resources.  The identification requirement therefore falls within the language and intent of the NVRA.  Nothing in the NVRA or in the federal form says that a state cannot ask for information necessary to the administration of its voter registration if the federal form does not contain a box for that information.

The requirement that registering agents include their identification number on submitted registration forms therefore conforms with the NVRA, whether the requirement applies to the state forms or the federal forms.  And because all aspects of § 1-4-49 and its regulations and rules can be implemented without contravening the NVRA, the Court cannot say that the NVRA preempts the New Mexico law.

**5.      Section 1-4-49  Does Not Violate the New Mexico State Constitution**.

The Plaintiffs' final contention is that § 1-4-49, its regulations, and its de facto rules violate

the New Mexico Constitution.  They cite three specific provisions: (i) Article II, § 17, which is New

Mexico's Free Speech provision; (i) Article II, § 8, the "Free Elections Clause;" and (iii) Article VII

§ 1, which, among other things, calls on the legislature to ensure the secrecy and purity of the

election process.  Section 1-4-49 does not run counter to any of these provisions of the New Mexico

Constitution.

### a.        N.M. CONST. art. II, § 17.

Article II, § 17 is analogous to the Free Speech Clause of the United States Constitution, but,

as the Plaintiffs argue, it is framed in affirmative rather than prohibitive terms.  Compare N.M.

CONST. art. II, § 17 ("Every person may freely speak, write and publish his sentiments on all

subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or

abridge the liberty of speech or of the press.") with U.S. CONST. amend. I ("Congress shall make no

law . . . abridging the freedom of speech; or of the press, or the right of the people peaceably to

assemble.").  The Plaintiffs contend that the difference in language and structure warrants a different

reading of the state constitution than that of the federal.  Specifically, the Plaintiffs ask that the Court

interpret Article II, § 17 to provide greater protection of free speech than the United States

Constitution.

The Court's research reveals that New Mexico state case law contradicts this contention.

At least where analogous provisions are concerned, New Mexico follows the "interstitial"

framework for deciding whether to depart from the United States Constitution to provide greater

protections against government.  See State v. Gomez, 1997-NMSC-6 ¶¶ 17-19, 122 N.M. 777, 782-

83.  State v. Gomez was a Fourth Amendment case, but its interstitial analysis presumably applies

to any state constitutional question.  See Id.

Even so, it is unnecessary for the Court to engage in the interstitial analysis concerning

Article II, § 17 because the New Mexico courts have already decided that "applicable precedents have determined that the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions. . . ." <u>State v. Randleman</u>, 2003-NMCA-150, ¶ 58, 134 N.M. 744, 760 (citations omitted). There is no contention that the burdens which § 1-4-49 places on speech are content or viewpoint-based.  At a minimum, therefore, the Court will follow applicable federal precedents to determine the outcome of this claim.  Because Plaintiffs' claims fail under the United States Constitution in that regard, they therefore fail under the New Mexico Constitution.

### b.    The "Free Elections Clause."

Article II, § 8 of the New Mexico Constitution requires that elections be free and open.  The Plaintiffs argue that, by causing them to curtail their third-party voter registration activity, the State has violated this command.  The only analysis available on this clause, however, suggests that this constitutional provision has nothing to do with the burdens that §1-4-49 creates.  Article II speaks to the administrations of elections, not voter registration.  <u>See</u> <u>Gunaji v. Macias</u>, 2001-NMSC-28 ¶ 29, 130 N.M. 734, 742 ("[A]n election is only 'free and equal' if the ballot allows the voter to choose between the lawful candidates for that office.") ; Ocean Munds-Dry, Note, <u>Why Gunaji v. Macias Matters to Candidates and Voters: Its impact on New Mexico Election Law</u>, 33 N.M. L. REV. at 433 (noting that the Supreme Court of New Mexico relied on ballot error cases from another jurisdiction to inform its interpretation of the clause).

Because the Free and Open Elections Clause concerns avoiding errors and fraud in the administration of elections, it is attenuated at best to argue that it somehow restricts the state's ability to regulate third-party voter registration.  Even if the clause does speak to voter registration, it supports the notion that the New Mexico Legislature can pass a law such as § 1-4-49, which is designed to preserve the integrity of the voting process generally.  Thus, § 1-4-49  does not violate

-80-

Article II, § 8 of the New Mexico Constitution.

c.     **N.M. CONST. art. VII, § 1.**

The last constitutional provision pertinent to this case is Article VII, § 1, which states that:

> The legislature shall have the power to require the registration of the qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration, and not more than two judges of election shall belong to the same political party at the time of their appointment.

N.M. CONST. art. VII, § 1.  New Mexico has no case law on this specific provision, although some of the language appears in cases.  See Kiene v. Atwood, 93 N.M. at 662, 604 P.2d at 128 ("The purity of the election demands that illegal votes be purged."), Calkins v. Stearley, 140 N.M. at 808, 149 P.3d at 124 ("It is probably better that individual voters and candidates should suffer in a given instance than that the doors to fraud and imposition may open and the secrecy and purity and security of elections be destroyed.") (internal quotations omitted).  In light of Article VII, § 1's text and the cases discussing the clause, it appears that this constitutional provision is a grant of power to the legislature and an admonishment not to allow elections to be corrupted.  This clause does not speak to third-party voter registration, and even if it did, it would support, rather than invalidate § 1-4-49 .  Accordingly, § 1-4-49 , its regulations, and the de facto rules at issue in this case do not violate the New Mexico Constitution.

While the Court would have liked to have more time to work on this motion, the Court is aware that both sides may want to appeal an adverse ruling, and that the Plaintiffs, if an injunction is issued, might want to register voters.  The Court has attempted to balance the need for a timely decision with as thorough an examination of the issues as possible.  Based on the record before the Court, and based on the examination it was able to conduct, the Court does not believe that the

Plaintiffs have shown clearly and substantially that they are likely to succeed on the merits.

## II.  THE PLAINTIFFS HAVE NOT SHOWN THAT THEY FACE A THREAT OF IRREPARABLE INJURY.

The Plaintiffs contend that they will suffer irreparable injury absent an injunction from the Court prohibiting the enforcement of § 1-4-49.  The Plaintiffs quote from Elrod v. Burns, 427 U.S. 347 (1976), for the proposition that the chilling of the Plaintiffs' speech by § 1-4-49 "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. at 373.  Elrod v. Burns, however, is inapposite to this case.  In Elrod v. Burns, individuals facing dismissal or threat of dismissal for not affiliating with the Democratic Party were able to show irreparable harm because they faced losing their employment for exercising their First and Fourteenth Amendment rights.  See id., at 349-50.  The Supreme Court characterized the harm in Elrod v. Burns as "the loss of First Amendment freedoms."  See id., at 373.  The Plaintiffs cannot demonstrate that they have lost any First Amendment freedoms, for a minimal – or any – period of time.  At worst, the Plaintiffs must fulfill some simple administrative requirements and monitor the performance of their volunteers to carry out voter-registration activities.  This is no "loss of First Amendment freedoms," as that phrase was understood in Elrod v. Burns.

Analysis of the irreparable harm prong must begin with a recognition that the Legislature enacted § 1-4-49 in 2005, that the Plaintiffs filed their lawsuit on July 24, 2008, that the Plaintiffs did not seek a temporary restraining order, and did not file the application for a preliminary injunction until August, 11, 2008.  The delay in seeking relief from New Mexico's law considerably undercuts their allegation of irreparable harm.  This problem is multiplied by the fact that some of the Plaintiffs have managed to register voters after the Legislature enacted § 1-4-49, and other third-party agents continue to successfully register voters.

Nonetheless, the Plaintiffs contend that, to the extent that the Secretary of State continues to enforce New Mexico's voter-registration law, they will be irreparably injured.  The Plaintiffs contend that the burdens imposed by the voter-registration law have shut down or limited each Plaintiffs' voter-registration drives, reducing the speech and association that are part of those drives. While New Mexico's voter-registration laws may be the stated reason for the cessation of voter-registration activities, the Court is skeptical that is the reason.[13]  And, even if it is, the Court does not believe it to be a reasonable response to the New Mexico law.

Contrary to the Plaintiffs' assertions, compliance with the law is not unreasonably difficult and helps maintain the integrity of our electoral system.  To avoid penalty, the Plaintiffs must register with the Secretary of State, attend a short training session, and promptly submit completed voter registration cards.  If the Plaintiffs are capable of meeting these minimal requirements, § 1-4-49 will have no adverse effect on their rights of speech and association.

To the extent that the Plaintiffs have curbed or, in some cases, halted altogether their voter registration efforts, they have done so by choice, not because the challenged law forces them to give up those activities.  The Plaintiffs are free to continue voter registration activities so long as they do so competently.  Moreover, the law that the Plaintiffs challenge was enacted and effective in 2005. The Plaintiffs have conducted voter registration drives regulated by § 1-4-49.  The Plaintiffs' ability to register votes for at least a while under the law undercuts the Plaintiffs' contention that they face

---

[13] Some of the proposed intervenors suggested that the Plaintiffs discontinued registration – not because of New Mexico's voter-registration laws – but because ACORN was having tremendous success, rendering the Plaintiffs' efforts unnecessary. See Aug. 29 Tr. at 33: 8 (Rogers). The Court need not decide that issue on the motion for preliminary injunction, although it may need further exploration if the case proceeds.  It is sufficient here for the Court to decide that it is objectively unreasonable for the Plaintiff to cease voter-registration efforts in light of the minimal burden New Mexico's voter registration statute imposes.

imminent harm of irreparable damage.  Finally, the Plaintiffs have no reasonable apprehension of penalty or prosecution under § 1-4-49.

In sum, the Plaintiffs have not shown clearly and unequivocally that they will suffer irreparable harm if the Court does not enjoin enforcement of New Mexico's voter-registration laws.

III.    **THE THREATENED DAMAGE TO THE PLAINTIFFS ABSENT AN INJUNCTION DOES NOT OUTWEIGH THE THREATENED DAMAGE TO THE STATE IF AN <u>INJUNCTION ISSUES.</u>**

An analysis of this prong begins with the recognition that the book-closing date for voter registration is rapidly approaching in New Mexico.  Even if the Court were to grant an injunction, and even though the Plaintiffs have promised to begin large-scale voter-registration drives, the Court is skeptical that the Plaintiffs will have sufficient initiative to do so or will be able to do so.  In contrast, to enjoin the law on the eve of book-closing could have an dramatic effect on all the organizations that are complying with the law and the State of New Mexico.  Changing the rules under which so many have operated for the last three years so close to the book-closing date could cause unintended mischief.

The Plaintiffs assert that the State of New Mexico has no interest that could be legitimately harmed if the State is enjoined from enforcing an unconstitutional statute.  This assertion turns on a determination that the statute is unconstitutional.  The Court does not believe that the New Mexico law is unconstitutional.

In any case, the harm to the State of not enforcing § 1-4-49 is neither minimal nor hypothetical.  It is because such harm has been done in the past that the legislature passed § 1-4-49.  As set forth in Denise Lamb's affidavit, there are multiple past instances of conduct by third-party voter registration groups that led to the disenfranchisement of New Mexico citizens.  <u>See</u> Lamb Aff. ¶¶ 3-8, at 1-3.

The State's interest in protecting the elective franchise is paramount.  See Crawford v. Marion County Election Bd., 128 S.Ct. at 1617.  Weighing this harm against the fact that the Plaintiffs are free to engage in the behavior of their choice indicates that injunctive relief would be inappropriate in this case.  The time to register voters is also short, and while some of the Plaintiffs indicated that they intended to immediately begin voter-registration efforts if the Court entered an injunction, the time to do so is coming to an end, and the Court is reluctant to change the rules under which all parties have been operating for the past three years so close to the book-closing date.

## IV.    THE REQUESTED INJUNCTION WOULD BE ADVERSE TO THE PUBLIC INTEREST.

The public interest in this case is aligned with the State's interest – ensuring the integrity of the electoral process and making sure that all registration forms are timely recorded.  Past incidents demonstrate that, absent § 1-4-49, voter-registration fraud and the disenfranchisement of New Mexico citizens are not only possible, but likely.  An injunction from the Court prohibiting the enforcement of § 1-4-49 is thus adverse to the public interest.  Any injunction would also upset the status quo that has existed for three years on the eve of the book-closing date.  The Court is reluctant to enter such extraordinary relief without a clear and unequivocal showing of entitlement to the requested relief.  That showing is lacking here.

**IT IS ORDERED** that the Plaintiffs' Application for a Preliminary Injunction is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

-85-

Wendy R. Weiser
Myrna Perez
Brennan Center for Justice
   at NYU School of Law
New York, New York

-- and --

Daniel F. Kolb
Anna Thea Bridge
David J. Lisson
Rosanna Garza Lipscomb
Sharon Katz
Davis Polk & Wardwell
New York, New York

-- and --

Neal A. Potischman
Davis Polk & Wardwell
Menlo Park, California

-- and --

John W. Boyd
David H. Urias
Freedman Boyd Hollander Goldberg
   & Ives P.A.
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

Scott Fuquā
   Assistant Attorney General
Litigation Division
Office of the New Mexico
   Attorney General
Santa Fe, New Mexico

   *Attorneys for the Defendant*