IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, FEDERATION OF
WOMEN'S CLUBS OVERSEAS, INC.,
NEW MEXICO PUBLIC INTEREST
RESEARCH GROUP EDUCATION FUND,
and SOUTHWEST ORGANIZING PROJECT,

         Plaintiffs,

vs.                                     No. CIV 08-00702 JOB

MARY HERRERA, in her capacity as Secretary
of State,

         Defendant.

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

    1.     This action is brought to redress ongoing violations of Plaintiffs' First

Amendment, statutory, state constitutional, and procedural due process rights, which result from

New Mexico's unduly burdensome restrictions of third-party organizations' voter registration

activities.  Plaintiffs' rights are burdened by the substance of the law contained in NMSA 1978, §

1-4-49, and administrative regulations, 1.10.25.7-10 NMAC, as well as the manner in which

New Mexico officials have implemented the law (collectively "New Mexico's voter-registration

law" or the "challenged law").

    2.     The act of voting and helping others to vote are the elemental activities that

sustain a democracy and undergird our nation's foundational ideals.  Voting is a right that is far

from universally exercised or even valued in our country, and thus a person's voluntary endeavor

to undertake the steps necessary to register to vote—or to assist others in registering to vote—is

in itself a political and philosophical statement, signaling that he or she values the democratic

process and believes in the capacity of popular will to shape the composition and direction of the government.

3.      Plaintiffs are nonprofit organizations that rely almost entirely on volunteers to conduct voter-registration activities.  By engaging in these activities, Plaintiffs express their faith in democracy and the importance of civic participation as well as their belief that politically underrepresented groups should be empowered; in fact, helping fellow citizens register to vote is the most effective and credible means of expressing these messages.  Voter registration is also a unique opportunity to persuade others of the importance of civic participation, as well as to discuss pressing issues of the day and to associate with fellow citizens to spread these messages and bring about political change.  Accordingly, Plaintiffs' voter-registration activities not only serve to expand the franchise and empower underrepresented communities, but also consist of and are inextricably intertwined with constitutionally protected expressive conduct, core political speech, and expressive association.

4.      New Mexico's voter registration law, as presently implemented, imposes restrictions on Plaintiffs' ability to help register citizens to vote.  The challenged law requires each of Plaintiffs' volunteers, before they "assist" with voter registration, to pre-register with the State, disclose their address and Social Security number, publicly identify the organization for which they are volunteering, and attend mandatory in-person "training."  It limits organizations and individual volunteers to obtaining fifty state registration forms at a time, thus hampering their ability to conduct large-scale registration drives.  And if a volunteer assists with the completion of a registration form, she becomes responsible for delivering or mailing that form to the Secretary of State or County Clerk within a mere forty-eight hours—regardless of whether the potential voter has possession of the form and wishes to deliver the form for himself.

Violation of any of these restrictions exposes Plaintiffs and their volunteers to criminal and civil penalties.

5.      As nonprofit organizations that use volunteers to assist people to register to vote, Plaintiffs do not have the resources to comply with the State's various and onerous restrictions, and cannot afford the risk that their volunteers may unknowingly subject them to significant fiscal and criminal penalties.  As a result, Plaintiffs have been forced to cease or seriously curtail their voter-registration activities.  The challenged law thus undermines not only Plaintiffs' speech and associational rights, but also the interests of the communities they serve.

6.      Rather than protecting the interests of those communities or the integrity of the electoral process, which Defendant claims is the purpose of the law, the challenged law, as currently written and enforced, makes it far less likely that underrepresented communities will be encouraged to register to vote, and far less likely that they will be assisted in their efforts to do so.  The challenged law does nothing to deter voter-registration fraud:  New Mexico has in place various other mechanisms that effectively and fully combat fraud, and in any event, unscrupulous voter-registration agents who wish to engage in fraudulent voter registration will simply print out the federal form and mail it in with false information.  The challenged law does nothing to ensure that registration forms are filled out correctly; it simply makes volunteers with Plaintiffs' organizations less willing to assist.  And it certainly does nothing to ensure that registration forms are delivered; if anything, it has the opposite effect.  The forty-eight hour deadline merely encourages registration agents who fail to deliver forms within that tight deadline to withhold the forms in order to avoid criminal punishment.  Indeed, the State never knows whether unreturned forms are merely blank "extra" forms, or completed forms a voter registration agent has failed to return.  And the threat of civil and criminal penalties, coupled

with the time-consuming pre-registration, disclosure, and training requirements, ensure that potential voters will find far fewer individuals willing to assist them with mailing completed forms.

7.     Defendant appears to recognize the pernicious consequences of the challenged law, and thus has assured Plaintiffs and this Court that accommodations and exceptions can be made—in other words, that the malformed law on the books can be made better in practice. Defendant, however, disavows any *obligation* to provide accommodations.  Plaintiffs therefore have no guarantee that the law will be enforced in a manner that reduces its heavy burden on voter-registration activities.

8.     In sum, the challenged law undermines, without adequate justification, Plaintiffs' federal and state constitutional rights of free speech and expressive association.  The challenged law is also inconsistent with and preempted by the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.* ("NVRA"), and inconsistent with the New Mexico Constitution's requirement of "free and open" elections.  In addition, the ad-hoc training requirements imposed by County Clerks violate the New Mexico Constitution's non-delegation doctrine and Plaintiffs' rights to procedural due process.  This Court should declare that the challenged law as written, interpreted, and enforced by Defendant violates the First and Fourteenth Amendments to the United States Constitution, the NVRA, and the New Mexico Constitution.  This Court should also enjoin the enforcement of the challenged law.

## II.  JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter and parties hereto.  This case arises under the United States Constitution, the NVRA, and the New Mexico Constitution.

10.     Venue is proper in this district.  Defendant removed this case to this Court pursuant to 28 U.S.C. § 1441(a), and there is no dispute that this is the proper venue.

4

## III.  PARTIES

**A.**     <u>**Plaintiffs**</u>

<u>American Association of People With Disabilities</u>

11.     Plaintiff American Association of People With Disabilities ("AAPD") is a 26

U.S.C. § 501(c)(3) nonpartisan nonprofit organization incorporated and headquartered in

Washington, D.C.  AAPD, the largest national nonprofit cross-disability membership

organization in the United States, is dedicated to ensuring economic self-sufficiency and political

empowerment for the more than 56 million Americans with disabilities, including individuals in

New Mexico.  AAPD accomplishes this mission by, among other things, encouraging voter

registration and participation among the disabled.  AAPD registers its own members to vote and

also runs comprehensive, large-scale voter-registration programs by establishing coalitions of

state-specific disability organizations and training those organizations to register voters.

<u>Federation of Women's Clubs Overseas, Inc.</u>

12.     Plaintiff Federation of Women's Clubs Overseas, Inc. ("FAWCO"), a 26 U.S.C.

§ 501(c)(3) nonpartisan nonprofit organization incorporated in New York, is an international

confederation of independent American women's organizations located overseas.  FAWCO

currently has seventy-five member organizations located throughout the world; the over 15,000

constituent members of FAWCO's membership organizations are active in Africa, Asia, Asia-

Pacific, the Caribbean, Europe, the Middle East, North America, and South America.  FAWCO's

mission is to serve as a resource and channel of information among its members; to provide a

voice for American women abroad; to support the rights of all Americans worldwide; and to

contribute actively to the global community with a specific focus on education, the natural and

human environment, multicultural understanding, and international goodwill.  FAWCO, which is

entirely volunteer-run, assists its member organizations in registering their own members to vote

from abroad and in conducting voter-registration drives for American citizens, including citizens
of New Mexico, in the foreign countries in which they operate.

New Mexico Public Interest Research Group Education Fund

13.     Plaintiff New Mexico Public Interest Research Group Education Fund
("NMPIRG Education Fund") is a nonpartisan nonprofit 26 U.S.C. § 501(c)(3) charitable
organization incorporated in New Mexico and headquartered in Albuquerque.  The NMPIRG
Education Fund educates the public on important policy issues and seeks to offer New Mexicans
opportunities for civic participation.  Students for New Mexico Public Interest Research Group
("Students for NMPIRG") is a student group at the University of New Mexico ("UNM") that
participates in certain issue-oriented campaigns conducted by both the NMPIRG Education Fund
and New Mexico Public Interest Research Group ("NMPIRG"), which is a 26 U.S.C. § 501(c)(4)
organization.  One of the NMPIRG Education Fund campaigns in which Students for NMPIRG
participates is the "New Voters Project" run by the Student PIRGS (a national federation of the
Student PIRG organizations in various states), the goal of which is to register new voters.

SouthWest Organizing Project

14.     Plaintiff SouthWest Organizing Project ("SWOP") is a 26 U.S.C. § 501(c)(3)
nonpartisan nonprofit organization incorporated in New Mexico and headquartered in
Albuquerque.  SWOP's mission is to empower the New Mexico communities that it serves—
including Latinos and other people of color, low-income individuals, and young people—to
realize racial and gender equality and social and economic justice.   SWOP accomplishes its
mission by educating, organizing, developing leadership in these communities, and registering
community members to vote.  SWOP has approximately 600 members, primarily low-to-
moderate income people of color, across New Mexico.  Since 1983, SWOP has registered over

6

30,000 people in New Mexico to vote.  SWOP's voter-registration drives have been largely

volunteer-driven.

**B.**     <u>**Defendant**</u>

<u>Secretary of State Mary Herrera</u>

15.     Defendant Mary Herrera ("Defendant") is the duly elected Secretary of State of

New Mexico.  Under section 1-2-1 of the New Mexico Statutes, NMSA 1978, § 1-2-1,

Defendant is the chief election officer of the State and is required to "obtain and maintain

uniformity in the application and operation" of the Election Code of New Mexico, "make rules

and regulations . . . necessary to carry out the purposes of the Election Code," and "bring such

actions as deemed necessary and proper for the enforcement" of New Mexico's election laws.

Under section 1-2-2 of the New Mexico Statutes, NMSA 1978, § 1-2-2, the Secretary of State is

required to supervise all elections, to administer the Election Code, and to instruct County Clerks

regarding the conduct of elections.  Moreover, section 1.10.25.10 of the New Mexico

Administrative Code provides that the "secretary of state may designate county clerks as agents

in registration of third-party registration agents."  § 1.10.25.10 NMAC (2009).  Based on

information and belief, the New Mexico Secretary of State has, pursuant to this regulation,

purported to designate County Clerks as agents to register third-parties who assist with voter

registration.  Accordingly, all relief that Plaintiffs seek herein is appropriately sought from

Defendant.

## IV.  FACTS

**A.**     <u>**The Challenged Law**</u>

<u>Provisions of the Law and Regulations</u>

16.     In 2005, New Mexico enacted the challenged statute, NMSA 1978, § 1-4-49,

allegedly to prevent voter fraud and ensure the proper completion and submission of voter

registration forms.  Since 2005, administrative regulation 1.10.25.7-10 NMAC was promulgated, adding to the procedures and requirements already contained in the statute.  New Mexico County Clerks, purportedly acting as agents of the Defendant, have subsequently implemented the law and imposed additional requirements for third-party organizations that assist with registration.

17.     The Office of the New Mexico Attorney General has informed former counsel for Plaintiffs that all of the challenged law's restrictions apply even if registration agents only use the federal mail-in registration form (as prescribed in the NVRA) rather than state certificates of registration to register voters in New Mexico.

(a)     *Pre-Registration Requirements*

18.     Section 1-4-49(a) of the New Mexico Statutes provides that registration agents who are acting on behalf of a nongovernmental organization to "assist persons to register to vote" shall themselves pre-register with the Secretary of State, and that the organization shall also pre-register and provide the Secretary of State with certain information.  NMSA 1978, § 1-4-49(a) (2008).  The challenged law fails to define what is meant by "assist persons to register to vote."

(b)     *Disclosure Requirements*

19.     Section 1.10.25.8 of the New Mexico Administrative Code requires that individuals complete this pre-registration process prior to registering another individual to vote. 1.10.25.8 NMAC (2008).  Each prospective registration agent must submit a form identifying the name and address of the organization for which he or she is working, and the agent's own name, address, date of birth, and Social Security number.  1.10.25.9(a)-(g) NMAC.  The form must also include a signed, sworn statement by the agent that he or she will obey all state laws and rules regarding the registration of voters.  1.10.25.9(i) NMAC.  Except for the date of birth and Social Security number, the form is a public record.  1.10.25.9(k) NMAC.  Although the statute and

8

rules do not require the disclosure of the registration agent's Social Security number, the pre-registration form does require this information.

(c)     *Fifty-Certificate Limit*

20.     Sections 1.10.25.8(c) and 1.10.25.10(b) of the New Mexico Administrative Code provide that registration forms are to be distributed in quantities of fifty per organization or individual.  1.10.25.8(c) NMAC, 1.10.25.10(b) NMAC.  The County Clerk and the Secretary of State retain "discretion to increase these quantities for special events or circumstances."  *Id.*  Neither the statute nor the implementing regulations specifies criteria that the County Clerk or the Secretary of State shall apply in exercising such discretion.  *See id.*; *see also* NMSA 1978, § 1-4-49(a).  The forms distributed to each organization or individual are accompanied by a traceable number so that election officials may retain a record of each form.  1.10.25.8(c) NMAC.

(d)     *Forty-Eight-Hour Return Requirement*

21.     Section 1-4-49(b) of the New Mexico Statutes provides that "[o]rganizations employing registration agents or using volunteer registration agents shall deliver or mail a certificate of registration to the Secretary of State or County Clerk within forty-eight hours of its completion by the person registering to vote or deliver it the next business day if the appropriate office is closed for that forty-eight-hour period."  NMSA 1978, § 1-4-49(b).  The provision makes no exception for exigent or other special circumstances that make return of a form within forty-eight hours impracticable or even impossible in any particular circumstance.  *See id.*  It makes no exception for organizations that may receive a certificate from a prospective registrant two or more days after the registrant completed the certificate.  *See id.*  And it makes no exception for organizations that provide registration advice but do not take possession of the completed forms.  *See id.*

(e)   *Criminal and Civil Penalties*

22.     Section 1-4-49(d) of the New Mexico Statutes provides that "[a] person who intentionally violates the provisions" of the challenged statute "is guilty of a petty misdemeanor."  NMSA 1978, § 1-4-49(d).  The penalties for a petty misdemeanor include imprisonment for up to six months and fines up to $500.  *See id.* § 31-19-1.  The statute does not specify what constitutes an "intentional" violation, nor does it carve out any defense based on good-faith conduct.  *See id.* § 1-4-49(d).

23.     The statute provides for an assessment of civil penalties, including fines of "[$250] for each violation, not to exceed [$5,000]," on any person who the Secretary of State "reasonably believes" has "committed a violation of the provisions [of the challenged statute]." Id. § 1-4-49(e).  The statute also provides that if a person who violates the statute is "an employee of an organization and has decision-making authority regarding the organization's voter-registration activities or is an officer of the organization," the organization itself is strictly liable for civil penalties.  *Id.* § 1-4-49(d).

(f)   *Unpublished Training Requirement*

24.     Although the training requirement does not appear on the face of the statute or the administrative regulations, County Clerks have imposed mandatory, in-person trainings.  *See* NMSA 1978, § 1-4-49 *et seq.*; 1.10.25.9 NMAC *et seq.*  Representatives of NMPIRG and SWOP have reported that training is a *de facto* requirement in many parts of New Mexico, particularly in Albuquerque.  The County Clerks, in requiring ad-hoc training, are purportedly acting as agents of the Secretary of State.  *See* § 1.10.25.10 NMAC (2009) (the "secretary of state may designate county clerks as agents in registration of third-party registration agents.").

25.     Upon information and belief, people attending these trainings have reported that the County Clerks have used the trainings as a mechanism to communicate the severity of the

10

law and potential consequences for non-compliance.  As a result, these trainings have at least on occasion served to discourage third-party registration activities.

**B.**    **Plaintiffs' Voter-Registration Activities and Procedures**

26.    Conducting voter registration drives is an integral part of Plaintiffs' activities. Plaintiffs' voter-registration activities constitute expressive conduct, are inextricably intertwined with core political speech, and enable Plaintiffs to associate with its members and volunteers as well as with potential voters.

American Association of People With Disabilities

27.    AAPD has been registering Americans with disabilities to vote nationwide since 1995.  AAPD research indicates that people with disabilities represent a very large segment of those Americans who are not registered to vote.  For example, according to United States Census data, there are over 300,000 voting-age people with disabilities residing in New Mexico, but only 37.9% of those individuals voted in 2000.  Although state agencies have a legal responsibility to offer voter registration, AAPD's analysis shows that agencies are not abiding by their legal obligations.  Voter registration is therefore a crucial component of AAPD's work.

28.    AAPD registers voters in two ways:  First, AAPD registers its own members by communicating with them directly and providing them registration forms through the mail and at various disability events, meetings, and conferences.  Second, AAPD runs comprehensive, large-scale voter-registration programs by establishing coalitions of state-specific disability organizations, many of whose members are also AAPD members, and training those organizations to register voters.  AAPD dedicates considerable resources to establishing these voter-registration coalitions, training coalition members in voter registration, and undertaking other voter-registration activities.

29.     The specific approach to each local AAPD-coalition-based voter-registration program is based on the resources and needs of the organizations involved.  Some coalition members use voter-registration drives to increase their own membership or the membership of AAPD.  This depends on the particular coalition.

30.     Often, coalition organizations mail voter-registration forms to nonregistered members or clients, calling before and after the mailing to explain the voter-registration process and answer questions, provide assistance, and make sure the form is returned.  Each coalition decides independently whether registration forms are sent back to the organization or directly to the State.  This is a question of resources (*e.g.*, whether the organization can afford to pay for postage).

31.     Coalition members engage in voter registration through disability conferences, meetings, events, and routine contact with their clients.  AAPD trains coalition members to incorporate voter registration into all of their activities.  These activities provide a unique and uniquely effective opportunity for AAPD to associate with its members in a common cause to promote democracy and the political empowerment of disabled individuals.

32.     AAPD and coalition members provide a range of assistance with completion of forms.  AAPD often needs to provide more assistance than would organizations registering nondisabled voters.  For example, some blind and physically handicapped voters cannot fill out voter-registration forms by themselves; in such cases, volunteers physically complete the forms for the registrants.  Sometimes volunteers will travel to a member or client's home to assist with completion of the form.  Other times, they provide assistance by answering questions over the telephone.  In providing these services, AAPD and its coalition members demonstrate their faith in American democracy, in the value of expanding the franchise, and in civic participation

generally, as well as their belief in the importance of empowering individuals with physical disabilities.  Through its voter-registration activities, AAPD also associates with potential voters in order to advance shared ideals.

33.     AAPD engages in nonpartisan voter-education programs.  For example, AAPD operates a voter-project list-serve that provides voting-related information, including voter-registration and election information, to members who have requested such information.  AAPD currently provides voting information to its members in New Mexico via e-mail updates and in its quarterly newsletter.  AAPD's voter-education programs are far less effective and credible if AAPD is not able to help individuals register to vote—to put its principles into action.  And voter-registration activities are the most effective way to facilitate such messages from AAPD.  Accordingly, AAPD's speech is inextricably intertwined with voter-registration activities.

34.     AAPD's newsletter, which is distributed nationwide to approximately 86,500 individual AAPD members (including members in New Mexico), almost always discusses the importance of voter registration, voter turnout, and how to make voting accessible to disabled citizens.  Past newsletters have contained, for example, information about polling-place access (and how to report polling-place inaccessibility to state election officials), updates regarding AAPD's Disability Vote Project (which aims to increase voter registration and participation among people with disabilities), and AAPD political-action alerts for members.  Each newsletter also contains an AAPD membership form.

35.     AAPD generates e-mail communications, such as e-mail alerts about particular disability issues, to individuals (including both AAPD members and nonmembers) on various e-mail lists.  AAPD also receives calls, including from individuals in New Mexico, regarding state

election legislation, voter registration, and how to make voting accessible to disabled citizens. These calls are inextricably intertwined with AAPD's voter-registration activities.

36.     AAPD works to educate organizations that serve the disabled community.  AAPD has undertaken this initiative for organizations in New Mexico.  For example, in 2003 and 2004, AAPD helped prepare voter-registration and election information for The Arc of New Mexico, American Council of the Blind of New Mexico, United Cerebral Palsy, and Independent Living Centers in New Mexico.  In this way, AAPD associates with those organizations to advance shared beliefs and political ideas.

37.     Finally, AAPD engages in training sessions regarding voter registration, turnout, and accessibility.  AAPD representatives generally advise representatives from disability-rights organizations to tie their voter-registration and get-out-the-vote efforts to the issues that are specific to the disabled community that they serve.  AAPD training sessions frequently involve discussion of important issues for the group and how to link those issues to the act of registering to vote and to voting itself.  Individual organizations develop their own approaches depending on the issues that are important to their constituencies.  In addition, AAPD voter-registration drives often spark conversations regarding issues that are important to the disabled—such as accessible housing and audible traffic lights.  Such conversations are inextricably intertwined with AAPD's voter-registration activities.

Federation of Women's Clubs Overseas

38.     FAWCO has been involved in registering overseas citizens to vote since 1975, and in greater volume since the passage of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") in 1986, which requires the Department of Defense to administer a program for helping Americans overseas to vote.  FAWCO facilitates voter-registration activities through an annual conference, regular voting-related updates to its member organizations, and

14

the activities of FAWCO-trained women.  FAWCO has helped to register voters from nearly

every state in the union, including New Mexico, and frequently addresses issues of importance to

the expatriate community while conducting voter-registration drives at locations abroad that

American citizens are known to frequent.  These voter-registration drives and activities are

symbolic speech, inextricably intertwined with efforts to associate with FAWCO's own members

as well as with potential voters.

39.     FAWCO helps United States citizens living abroad to register to vote by training

the members of its constituent organizations how to register voters.  This training generally

occurs during a four-day conference that FAWCO holds in each federal election year.  In

addition, FAWCO provides information to volunteers who have expressed an interest in voting

issues (primarily through e-mail correspondence throughout the year) and organizes voter-

registration sessions at regional meetings and annual conferences.  The individual members of

FAWCO's constituent organizations, many of whom have been trained by FAWCO, conduct

voter-registration drives around the world in locations such as American embassies and schools.

Voter registration often prompts conversations with potential voters regarding, for example, civic

engagement for overseas citizens or contemporary political issues.  And FAWCO frequently

addresses issues of importance to the expatriate community—including federal, state, and local

taxes levied on those living abroad—while conducting voter registration.  These conversations

are most effective and credible when tied with action intended to advance shared purposes.

40.     FAWCO principally trains its member organizations to assist Americans living

abroad to vote using the Federal Post Card Application ("FPCA"), which states must accept

pursuant to the UOCAVA.  The FPCA is printed and distributed by the Federal Voting

Assistance Program for use by American citizens living abroad who are eligible to vote under the

UOCAVA, and it is used by American citizens both to register to vote in their home states in the United States and also to obtain absentee ballots from those states to allow them to vote from abroad.

41.     The FPCA is difficult to fill out; each state has different requirements for registration.  As part of FAWCO volunteers' voter-registration activities, FAWCO volunteers help voters to navigate the complicated FPCA-registration process.  Although some FAWCO volunteers systematically collect and mail all FPCAs that they help registrants complete to ensure that the FPCAs are returned properly, other FAWCO volunteers leave it to the individual registrant to mail his or her FPCA to the correct entity.

42.     FAWCO has assisted thousands of American citizens in registering to vote, and has provided information to thousands more.  FAWCO has historically assisted in the registration of American overseas from all fifty states.  In advance of the 2004 presidential election, at least some of the overseas voters that FAWCO registered to vote were citizens of New Mexico.

43.     Upon learning of the challenged law, the Chair of FAWCO's Voting from Overseas Committee advised all of FAWCO's volunteers who register voters overseas to not assist any New Mexico residents to register to vote because of potential civil and criminal liability under New Mexico law.  Many of the members of FAWCO's member organizations have thus declined to register any New Mexico voters and will not do so unless the law is changed.  The principal problem for FAWCO's members is that it is impossible for most FAWCO members living abroad to travel to New Mexico to be trained and certified to register New Mexico voters.  In addition, the challenged law is vague and fails to specify when one has "assisted" voter registration sufficient to cause the law to apply.  FAWCO is unwilling to subject

its volunteers and itself to potential civil and criminal penalties for helping to register New

Mexico voters.

<u>New Mexico Public Interest Research Group Education Fund</u>

44.     The NMPIRG Education Fund engages in voter registration through its

participation in the New Voters Project, which is run by the Student PIRGS, a national federation

of the Student PIRG organizations in various states.  As part of its participation in this national

nonpartisan effort, the NMPIRG Education Fund provides funding and guidance to Students for

NMPIRG, a student group on the UNM campus in Albuquerque, to conduct voter registration on

its behalf.  Since 2004, Students for NMPIRG is the only group that has conducted voter-

registration drives on behalf of the NMPIRG Education Fund.

45.     Students for NMPIRG presently has approximately 1,500 student members in its

mailing database and a core group of twenty to thirty members.  The mission of Students for

NMPIRG is to engage and empower students regarding issues of their concern, including the

environment, poverty, consumer rights, and democracy, with an emphasis on voter registration.

Each semester, through a series of campaigns, student volunteers recruit additional members,

educate students about issues important to the organization, and register people to vote.

NMPIRG's speech is most effective and credible when presented alongside efforts to assist with

registration, and thus is inextricably intertwined with voter-registration activities.

46.     Students for NMPIRG, with the help of a paid organizer funded by the NMPIRG

Education Fund, conducts voter-registration activities principally by tabling and canvassing on

the UNM campus.  Tabling involves setting up tables in public places, such as the UNM Student

Union, and engaging students passing by in an effort to get them to vote.  Canvassing consists of

sending out individual canvassers with clipboards into public places, such as the UNM campus

walkways, to communicate with passersby (primarily fellow students).  Certain events, such as

freshman orientation each year, are particularly conducive to voter-registration efforts.  These efforts are symbolic demonstrations of the volunteers' belief in democracy and civic participation, as well as the importance of encouraging and helping students to vote.

47.     In addition to tabling and canvassing, Students for NMPIRG also registers voters for the NMPIRG Education Fund in classes, particularly large freshman classes.  If the professor agrees to allow voter registration in class, students talk to the class about civic responsibility and why it is important to register to vote, then try to register as many students as possible.  After the class has been addressed, students who would like to register to vote or fill out Students for NMPIRG General Interest Cards raise their hands, at which point voter-registration forms and General Interest Cards are collected.  The voter-registration activities are expressive conduct, and are also inextricably intertwined with the message about civic responsibility that Students for NMPIRG is conveying to students.

48.     To conduct its tabling, canvassing, and classroom voter-registration activities, Students for NMPIRG relies on the recruitment of casual volunteers to assist its core organizers.  Although student volunteers cannot always devote large blocks of their time to voter-registration activities, many students are amenable to contributing hours sporadically to Students for NMPIRG's campaigns, sometimes on weekends.

49.     Since New Mexico's voter-registration law was enacted, Students for NMPIRG has reduced its voter-registration activities on behalf of the NMPIRG Education Fund, primarily because the law's certification and training requirements and strict civil penalties make it very difficult to recruit casual volunteers, who are essential to the organization's work.  As a result, the number of voters that Students for NMPIRG has been able to register for the NMPIRG Education Fund has fallen since enactment of the challenged law.  For instance, in 2006,

Students for NMPIRG registered approximately 1,000 students, failing to meet their modest goal of registering 1,400 students—despite the fact that the student body of the Albuquerque UNM campus totals approximately 26,000.  The organization expects its voter-registration efforts to be similarly hampered by the challenged law in 2009 and 2010.

SouthWest Organizing Project

50.     SWOP began conducting voter-registration drives in New Mexico in 1983 and 1984 (in advance of the 1984 presidential election).  Prior to enactment of the challenged law, SWOP's voter-registration drives tended to comprise approximately 20 percent of SWOP's staff's working hours during election years.

51.     SWOP currently has thirteen full-time employees, four permanent part-time employees, and other paid part-time workers who assist SWOP periodically throughout the year. SWOP staff consists primarily of people of color, predominately Latinos.  Approximately 100 of SWOP's members volunteer their time to SWOP throughout the year.  Volunteer work is crucial to SWOP's success, and volunteers represent a valuable asset for SWOP in that they increase the organization's capacity to provide services to the communities that SWOP serves.  Volunteers are critical to SWOP's ability to undertake organized voter-registration drives.

52.     Since 1983, SWOP has registered thousands of people in New Mexico to vote.  In 2000, SWOP registered hundreds of voters in New Mexico.  In 2003, SWOP began to register voters on a larger scale.  In 2004, SWOP registered thousands of people to vote and engaged in voter mobilization as well, all in New Mexico.  Of the voters registered by SWOP in 2004, approximately 80 percent were in Bernalillo County, approximately 10 percent were in Santa Fe County, and approximately 10 percent were in Eddy County.

53.     Registering voters is central to achieving SWOP's organizational mission of empowering communities because the communities that SWOP serves—which include minority,

impoverished, and young New Mexico residents—have low voter-registration and voter-participation levels. SWOP's voter-registration activities are symbolic expressions of these beliefs put into action.

54.     In 2004, apart from SWOP's regular employees, SWOP relied on approximately 100 unpaid volunteers for its voter-registration drives in Albuquerque, Santa Fe, and Carlsbad, New Mexico. All SWOP canvassers received a thirty-minute training, which the Executive Director of SWOP personally oversaw, on how to complete the voter-registration form. Without the help of SWOP volunteers, SWOP would likely not have been able to undertake an organized voter-registration drive in 2004.

55.     In 2004, SWOP targeted its members and individuals in the SWOP database who were not found on the county and state voter rolls for voter registration by calling them and visiting their homes and asking them to register to vote. SWOP also targeted local high schools and college campuses to register students. SWOP workers also brought voter-registration forms whenever they were doing community outreach at either public or private events. Also, SWOP workers brought clipboards or set up tables at various venues, including public-assistance agencies, local shopping centers, laundromats, and high schools. Although most of the voter registration undertaken by SWOP workers and volunteers in 2004 was structured, some was more sporadic and impromptu.

56.     SWOP's typical procedure when approaching potential registrants has been to give them nonpartisan educational materials on various issues, a voters' guide, a SWOP newsletter, and a SWOP card or leaflet with SWOP's phone number for voters to call if they do not receive a voter-identification card within thirty days. SWOP representatives often discuss how civic engagement is critical to having a healthy democracy. This includes discussion of the

importance of community involvement, including the importance of voting itself.  These discussions are most effective and credible when presented alongside efforts to assist with registration, and thus is inextricably intertwined with SWOP's voter-registration activities.

57.     For example, in registering high-school students in the past, SWOP representatives have given class presentations regarding the importance of voting and of registering to vote (including the historical context of the right to vote), discussed other SWOP programs, and engaged in dialogue with the students regarding voting logistics and issues.

58.     In registering voters door-to-door, SWOP representatives have discussed the organization and how the prospective voter first became involved with SWOP, voting as a strategy toward community empowerment, and election logistics and process.  Often, asking someone to register to vote leads to conversations about civic engagement and community empowerment.  Frequently, local issues (*e.g.*, traffic, youth issues, the education system) are discussed in the course of registering voters.  Although registering voters in public places generally involves shorter interaction time, similar public-policy issues are discussed in that context as well.

59.     When SWOP reaches out to those already in the SWOP database, SWOP representatives ask those individuals if they would like to become SWOP members at the same time that they ask them to register to vote.  New registrants are often told they will be contacted and encouraged to vote and are added to SWOP's database.  As a result, they receive the SWOP newsletter, which includes a membership form and additional information about the organization.  New registrants are also often given a copy of the current SWOP newsletter when they register to vote.  These conversations and newsletter communications are inextricably intertwined with SWOP's voter-registration activities.

60.     SWOP enters registrants' information into a central database, which contains information going back fifteen years, including contact information for SWOP's members and donors, those whom SWOP has registered to vote, and people who have signed SWOP petitions, purchased items from SWOP, or attended SWOP events.  The approximately 12,000 individuals in the SWOP database receive SWOP's newsletter, which SWOP publishes two to four times per year.  The information in the database is also used for SWOP's get-out-the-vote efforts.  In 2004, for example, SWOP undertook a get-out-the-vote campaign with its entire membership and database entrants, including new registrants.  Through these efforts SWOP associates with potential voters in order to advance shared beliefs.

61.     In 2004, SWOP tried to get completed registration applications to the County Clerk's office as soon as possible after completion.  Although voter-registration forms were not always submitted within forty-eight hours of completion, voter-registration forms have always been submitted by SWOP before the voter-registration deadline.

62.     SWOP has taken various quality-control measures to prevent late, incomplete, incorrect, or lost submissions.  For example, in 2004, a full-time SWOP Field Organizer reviewed every voter-registration application gathered in Albuquerque before it was submitted to the Bernalillo County Clerk's office.  This included checking the date on each form to ensure that forms were being returned to SWOP from its employees and volunteers in a timely fashion. SWOP staff also made random spot-check telephone calls to ensure the accuracy of the collected forms.

63.     Although SWOP has, in the past, submitted completed applications by mail, the organization prefers to deliver completed voter-registration forms in person to the County Clerk's office because SWOP believes that in-person delivery involves less risk of error and loss

and results in faster registration.  In 2004, a SWOP staff member delivered the forms from SWOP's registration drives in Bernalillo County to the County Clerk's office approximately every other day, usually in person.  Although SWOP attempted to return forms promptly, the organization did not always return all forms to the County Clerk within forty-eight hours of completion.  For instance, sometimes SWOP would register voters in Bernalillo County who were from other counties in New Mexico, in which case the forms were mailed directly to the relevant County's Clerk's office.

64.     Since the challenged law was enacted, SWOP has significantly reduced its voter-registration activity, primarily because of a dramatic decrease in the number of workers and volunteers who are willing to register voters.  In 2006, for example, SWOP did not undertake any organized voter-registration drives, although the organization did register a handful of voters, probably less than 100, representing a massive reduction from the organization's voter-registration results for 2004.  SWOP did not undertake a full-scale voter-registration drive in New Mexico in 2008 because of the burdens of New Mexico's voter-registration law.  The likelihood of SWOP undertaking voter-registration initiatives for 2008 would increase greatly if the requirements of the law—especially the training and pre-registration requirements—were repealed or invalidated.

C.      **Impact of the Challenged Law on Plaintiffs' Voter-Registration Activity**

65.     New Mexico's voter-registration law, as implemented by Defendant, impedes the ability of Plaintiffs to conduct voter-registration drives and directly hampers their speech and association rights in New Mexico.  The challenged law specifically targets the voter-registration activities of third-party organizations.

<u>Pre-Registration, Training, and Disclosure Requirements</u>

66.     Requiring a registration agent to pre-register in person at a County Clerk's office, attend training, and disclose extensive personal information discourages participation, prevents spontaneous registration drives, and makes it difficult to hire workers and use volunteers.

67.     The pre-registration, training, and disclosure requirements have, for example, reduced the NMPIRG Education Fund's ability to recruit casual volunteers and have prevented the spontaneous volunteer efforts that are central to its operations.  Students for NMPIRG rarely has more than a fraction of their volunteers certified to register others to vote at any given time. Most of their volunteers on any given day are casual volunteers who are not certified and cannot directly register votes.  Although the organization still tries to use these volunteers by asking them to walk around campus and bring prospective voters back to a table where a certified student can help students to fill out voter registration forms, this is an inefficient and ineffectual method of voter registration.  In the absence of the pre-registration and training requirements, NMPIRG's volunteer voter-registration drives would be vastly more productive and more eligible citizens would be registered to vote.

68.     Similarly, SWOP currently has four full-time employees and one part-time employee who are certified to register voters in New Mexico.  This is in stark contrast to the 100-plus employees and volunteers who engaged in voter registration on behalf of SWOP in multiple counties in New Mexico in 2004.  SWOP cannot organize large drives and registration efforts without volunteers.  SWOP is similarly prevented by the training and pre-registration requirements from facilitating spontaneous and informal voter registration via networks of casual members, friends, and family.

69.     The training requirement is particularly burdensome on Plaintiffs because training is typically given only at the County Clerk's office.  The times of the training sessions are

limited and often inconvenient for Plaintiffs' workers and volunteers.  Moreover, the training

sessions can take up to an hour and are generally during business hours.  While Defendant has

assured Plaintiffs and this Court, in the midst of this ongoing litigation, that accommodations can

and have been made, the challenged law does not require any such accommodations.

70.     For members of Students for NMPIRG, it is difficult to walk to the downtown

training location from the UNM campus in Albuquerque, and the bus ride can take as long as

thirty minutes each way.  Students who have cars are reluctant to drive downtown to register

because there is limited street parking at the Bernalillo County Clerk's office, and many student

volunteers do not wish to pay for parking to attend training.  Students often cannot attend

training due to their class schedules and the training requirement is particularly burdensome for

students with jobs.

71.     Because disabled people often lack adequate transportation, it is also very difficult

for AAPD's coalition groups to send all of their volunteers to centralized in-person training

sessions.

72.     Similarly, it is not realistic for SWOP to rely on volunteers, many of whom have

limited resources and must work during the day time, to attend certification training sessions—

especially in rural communities that may be located a substantial distance from the county seat.

73.     The training session itself is also intimidating, further limiting Plaintiffs' ability to

recruit volunteers.  An instructor at the Bernalillo County Clerk's office told a student from

Students for NMPIRG that if an individual did not comply with the requirements of the

challenged law, she would be guilty of a felony.  SWOP staff members were told that if their

specific individual voter-registration numbers did not match up with the specific serial numbers

on the forms that they were given, there would be penalties and that "really bad things would happen."

74.     SWOP was planning to undertake a significant voter-registration program in 2006.  After attending the training, SWOP leadership abandoned those plans, in part because of the intimidating nature of the training, and also because of the inconvenient time and place of the training, which SWOP's employees and volunteers would have to attend before they could assist in SWOP's efforts to register voters.

75.     The disclosure requirements present particular barriers for AAPD and AAPD-coalition groups.  Many AAPD volunteers do not wish to be identified as disabled or publicly associate with a disability-rights organization.  This is especially true of individuals with psychiatric disorders or progressive diseases, some of whom wish to keep their disabilities confidential because they fear discrimination.  These individuals are deterred from acting as third-party registration agents because of the challenged law.  In addition, some potential voters may be unwilling to register to vote with a member of a disability-rights organization if they believe that that organizational affiliation could be traced to them via the public forms used during the pre-registration process.

76.     Plaintiff FAWCO has recommended that its volunteers not assist in registering any New Mexico citizens living abroad to vote principally because it is impossible for any organization operating overseas to comply with the challenged law's certification and training requirements.  FAWCO volunteers who help Americans living abroad to register to vote can neither (i) appear at the office of one of the New Mexico County Clerks to be certified nor (ii) attend a training in advance of the certification, as is required.  FAWCO volunteers are located in foreign countries, and they cannot be certified without bearing an unreasonable expense to fly to

New Mexico.  Such an expense would be particularly hard to justify given that, unlike volunteers

who reside in a state within the United States, FAWCO volunteers must be familiar with the laws

not only of New Mexico but also of the other forty-nine states and five territories.

77.     Defendant and the County Clerks have assured this Court, while this litigation has

been ongoing, that they are willing to accommodate Plaintiffs by making the *ad hoc* training

requirement less burdensome.  But Defendant and the County Clerks claim the authority to

exercise complete and unrestrained discretion in deciding which accommodations to provide, and

when to stop providing them.  Plaintiffs should not be forced to invest significant resources for

voter-registration activities that would be subject to the whims of Defendant and the various

County Clerks.

Fifty-Certificate Limit

78.     Limiting the number of registration certificates that may be distributed to any

individual or organization dramatically weakens Plaintiffs' registration activities.

79.     In the fall of 2005, Students for NMPIRG would routinely run out of forms at

registration drives and would suspend operations until fifty completed forms could be reviewed

and returned to the County Clerk's office.  This process took up to an hour.  Moreover, during

the same time frame, employees of the Bernalillo County Clerk's office indicated to Students of

NMPIRG volunteers that forms could not be picked up or returned on behalf of others.  Thus,

every single student was forced to go back to the County Clerk's office in downtown

Albuquerque when he or she ran out of forms.

80.     Since the fall of 2006, the Bernalillo County Clerk's office has allowed certain

members of Students for NMPIRG to take out as many as 200 forms at a time and to return

forms on behalf of others.  But this decision only underscores the arbitrary nature of the

challenged law; nothing prevents the Bernalillo County Clerk's office from deciding to exercise

27

its unbridled discretion and deny Students for NMPIRG's request for additional forms, as it did in 2005, thereby reinstituting the more severe burdens to its registration efforts.  There is no way to know in advance whether the County Clerks will grant requests for more than fifty forms, or on what basis they will grant such requests.

81.    Plaintiff SWOP has been similarly burdened by the fifty-form limit.  The Executive Director of SWOP was given only fifty registration certificates upon his completion of the training.  SWOP has had difficulty obtaining sufficient quantities of forms in the past.  The fifty-form limit would present a barrier were SWOP to attempt to engage in large-scale voter registration.  In addition, the logistics of keeping specific forms linked to each SWOP registration agent would present an administrative challenge were there to be as many SWOP-affiliated registration agents as SWOP would need to run a drive.

82.    Because of the challenged law, SWOP can no longer give out voter-registration forms for people to send in on their own but must instead collect the forms.  SWOP workers and volunteers can no longer carry voter-registration forms with them to visits and events to seek out prospective voters and encourage and assist them to register to vote, as they have in the past.

83.    The Executive Director of SWOP asked, during the training that he attended at the Bernalillo County Clerk's office, whether SWOP could use the federal form to register voters. He was told that the federal form was not allowed and that SWOP had to use the state forms to register voters in New Mexico.

84.    In 2006, voting-rights advocates met with then-New Mexico Secretary of State Rebecca Vigil-Giron and members of her staff to discuss their concerns about the challenged law.  They explained their concerns that the law and rules run afoul of constitutionally protected rights to free speech, violate the NVRA, 42 U.S.C. § 1973gg *et seq.*, and interfere with efforts to

increase the political participation of low-income and minority citizens.  The Secretary of State was not receptive to their concerns.

85.    As part of these discussions, voting-rights advocates stated that certain organizations might use federal voter-registration forms to alleviate the burden caused by the restrictions associated with using the New Mexico voter-registration forms.  The Secretary of State's office indicated that New Mexico election officials would "red flag" applications submitted on the federal form and subject those applications to "extra scrutiny."

86.    Plaintiffs therefore cannot avoid the burdens imposed by the fifty-certificate limit by relying exclusively on the federal voter registration form.  Defendant has threatened to rigorously scrutinize federal forms that are submitted, and there is a heightened risk that federal forms will be erroneously rejected.  In order to effectively register the communities they serve, Plaintiffs must be able to use the New Mexico state registration forms.

Forty-Eight-Hour Return Requirement

87.    The requirement that Plaintiffs return completed registration certificates within forty-eight hours has substantially burdened Plaintiffs' voter-registration activities by dramatically increasing their risk and cost.

88.    AAPD-coalition groups are unable to mail voter-registration forms to clients because there is no way of ensuring that forms will be returned to them or to the County Clerk within forty-eight hours.  It is unrealistic to expect some disabled people to mail the forms back that quickly, particularly if the organization involved requests that the form be mailed back to the coalition first for quality-control purposes.  For example, transportation is difficult for many disabled people; citizens who are blind must sometimes wait days or weeks for a reader to read

their mail; and people with hand limitations sometimes must wait for assistance to open envelopes.

89.    SWOP similarly would have to direct significant additional resources to ensure that quality control would be completed within the forty-eight hours mandated by the law if it were to undertake a voter-registration initiative this year.

90.    Students for NMPIRG's members have missed class and skipped other activities to turn in voter-registration forms within the mandated deadline.  Complying with the forty-eight-hour return requirement cuts into the organization's other activities, such as training new volunteers or participating in phone banks.  It also forces the organization to devote a substantial amount of time to performing the clerical tasks necessary to comply with the law instead of working on the organization's campaigns.  This requirement has, in turn, resulted in the loss of volunteers.

Penalties

91.    The challenged law's severe criminal and civil penalties burden Plaintiffs' voter-registration activities and constitute a severe threat to individuals who work and volunteer for Plaintiffs.  The penalties have made it more difficult for Plaintiffs to conduct their voter-registration activities and have caused some Plaintiffs to cease such activities altogether.  The ongoing threat of enforcement by Defendant of the challenged law's criminal and civil penalties has had, and continues to have, a chilling effect on Plaintiffs' speech and association.

92.    FAWCO has advised its volunteers not to register New Mexico residents living abroad because of the civil and criminal penalties.  FAWCO relies on volunteers dispersed throughout many countries, who are associated with many different membership organizations. FAWCO cannot, with its limited budget and lack of paid full-time employees, monitor the voter-registration activities of each of FAWCO's local clubs and their countless volunteers on a daily,

or even weekly, basis.  Moreover, the New Mexico law potentially exposes FAWCO to fines of $250 for each violation, up to $5,000.  These fines would drain an unacceptable portion of the organization's annual budget of approximately $45,000.  FAWCO leadership believes that it is impossible for any organization operating internationally to comply with the challenged law's certification requirements, its restrictions on voter-registration forms, or its forty-eight-hour return requirement.  FAWCO is unaware of any exception for organizations operating abroad or for registration using the FPCA, and it is unwilling to subject its volunteers and member organizations to potential civil and criminal fines.

93.     A principal reason why SWOP has cut back on voter-registration activities is that the penalties make it much more difficult to use volunteers.  SWOP leadership does not feel comfortable encouraging its employees and volunteers to register voters, thereby subjecting them to civil and criminal liability, because of the unreasonable amount of risk involved.  In addition, SWOP leadership fears that penalties could impact SWOP's budget or its volunteer board of directors.  As a result, SWOP is not undertaking a full-scale voter-registration initiative in New Mexico this year.

94.     The civil and criminal penalties associated with any failure to return forms within forty-eight hours have caused Students for NMPIRG to lose volunteers.  Students literally have been brought to tears because of stress associated with trying to comply with the forty-eight hour return requirement.  Students for NMPIRG believes that the possibility of penalties—criminal penalties in particular—cast a shadow on the entire process of voter registration, and that the organization would have had more volunteers, and more enthusiastic and productive volunteers, if not for the criminal and civil penalties threatened by the challenged law.  Moreover, Students for NMPIRG believes that the application of even a single $250 penalty or a criminal penalty

against one of its members would have the effect of permanently stopping many of its members from ever registering voters again.

95.     AAPD and AAPD-coalition groups are particularly susceptible to fines because errors and mistakes are more likely when dealing with disabled registrants.  Risks of errors in connection with registering voters can be higher; for example, when AAPD engages in voter registration, there could be a greater rate of incomplete registration forms or duplicate forms submitted.  Moreover, many of the organizations with which AAPD works are under-funded and cannot risk diverting resources to pay fines.  Because of the requirements of the challenged law, AAPD has decided that it cannot establish a coalition to run comprehensive voter registration of disabled New Mexicans, despite interest by Centers for Independent Living and the Statewide Independent Living Council in New Mexico.  Additionally, as a result of New Mexico's burdensome law, AAPD decided not to establish a voter-registration program in the State in 2008, despite the organization's desire to do so.  If the challenged law remains in place, AAPD voter-registration efforts in New Mexico will continue to be frustrated.

**D.     Inadequate Justification for the Challenged Law**

96.     The challenged law was promulgated purportedly to address voter fraud and to ensure the proper completion and submission of voter registration forms.  Neither proposed reason for the challenged law justifies the onerous burdens imposed on Plaintiffs' voter-registration activities.

97.     First, there is no evidence suggesting that voter fraud is a substantial, widespread problem in New Mexico.  And in any event, there are already laws and mechanisms in place designed to address the issues that purportedly justify the challenged law.

98.     Second, although the State has an interest in the proper completion and submission of voter registration forms, the burdens imposed by the challenged law do not serve

32

such interests.  For example, the forty-eight-hour registration form return requirement is
unnecessary to ensure that forms are actually turned in by the registration deadline.

## V. CAUSES OF ACTION

### Count I—Violation of the First and Fourteenth Amendments
to the United States Constitution

99.     Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth
herein.

Plaintiffs' Expressive Conduct

100.    The First Amendment to the United States Constitution, made applicable to the
states via the Fourteenth Amendment, protects expressive conduct from infringement by state
laws.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

101.    The act of helping citizens to register is, in itself, expressive conduct protected
under the First Amendment.  By registering voters, Plaintiffs make a meaningful and
unmistakable statement about the importance of voting in a democratic society and the
significance of the democratic process.  When third-party organizations—like Plaintiffs here—
engage in voter-registration drives, the organizations are sending a message about the ability of
people and organizations to initiate collective action.  In fact, helping a voter to register is the
most effective way to express these messages.  Therefore, by registering voters, these third-party
organizations are engaging in protected free symbolic speech and expressive conduct.

102.    By hindering Plaintiffs' ability to help potential voters register—to put their
principles into action—the challenged law undermines Plaintiffs' ability to effectively and
credibly communicate their belief in democracy and in the political empowerment of
underrepresented communities.  The challenged law particularly burdens the voter-registration
activities of volunteer-based organizations, such as Plaintiffs, who lack the financial resources

necessary to employ paid registration agents and compensate them for complying with the various burdens imposed by the challenged law, and to accept the risk of civil and criminal penalties. The challenged law, therefore, significantly disadvantages Plaintiffs in their mission to credibly advocate for the empowerment of underrepresented groups and the expansion of the franchise.

Plaintiffs' Core Political Speech

103.    The First Amendment, as applied to the states through the Fourteenth Amendment, protects against laws that restrict core political speech and that burden conduct characteristically intertwined with that speech. *Schaumburg v. Citizens for Better Env't*, 444 U.S. 620, 632 (1980); *Meyer v. Grant*, 486 U.S. 414, 423 (1988).

104.    Plaintiffs' voter-registration activities are characteristically and inextricably intertwined with core political speech. When Plaintiffs engage with their target communities and offer to register citizens to vote, such activity typically results in conversations about the importance of voting and the legitimacy of the democratic process. Plaintiffs' views are not universally shared, and thus Plaintiffs work to persuade potential voters of their views—just as a circulator of initiative petitions works to convince fellow citizens of her views. *See Meyer v. Grant*, 486 U.S. 414 (1988). Plaintiffs cannot effectively persuade their fellow citizens to register to vote if they are prevented from helping with registration.

105.    Moreover, when Plaintiffs assist with voter registration, they typically discuss the issues of the day, political change, and the importance of registration and exercise of the franchise. Because Plaintiffs are acting to register voters, their accompanying core political speech regarding the importance of participation in the democratic process is made credible in a

34

way not otherwise demonstrable.  Voter-registration drives are thus characteristically intertwined with, and are the most effective avenue for facilitating, Plaintiffs' core political speech.

106.    Furthermore, by conducting voter registration drives, Plaintiffs are able to enlist volunteers to assist in registering others, and these volunteers support and expand Plaintiffs' communication of its beliefs and principles.  Voter registration is the most effective avenue for recruiting volunteers to spread, on Plaintiffs' behalf, messages regarding the importance of democracy, civic participation, and expanding the franchise.

107.    The challenged law severely and unjustifiably burdens Plaintiffs' core political speech.  By deterring Plaintiffs from engaging in voter-registration activities, the challenged law severely curtails the core political speech that is characteristically intertwined with those activities.  The challenged law also strips Plaintiffs of the most effective avenue for credibly communicating its political beliefs.  And the challenged law undermines Plaintiffs' ability to recruit volunteers to communicate political messages on Plaintiffs' behalf.

Expressive Association

108.    The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits states from abridging either a partisan or nonpartisan organization's freedom to engage in association for the advancement of beliefs and ideas.  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

109.    The challenged law, regulations, and *de facto* requirements impose significant burdens on the freedom of Plaintiffs' organizations to associate with (i) potential voters, (ii) its own members who engage in voter registration activities, and (iii) prospective volunteers.

110.    Voters who register through third-party organizations choose to associate themselves with these organizations.  In the registration process itself, each completed

registration form is traceable (through an identification number) to the organization that assisted with registration, which memorializes the affiliation between the voter and the organization. Moreover, in providing their contact information to third-party organizations, voters are creating an avenue for communication and future association with these groups.

111.    By imposing a forty-eight-hour window within which Plaintiffs must submit completed registration forms, the challenged law restricts Plaintiffs from associating with voters who may not be able to return the forms that quickly and limits Plaintiffs' future communication with voters by hindering Plaintiffs' ability to collect and enter voter contact information within such a compressed time frame.

112.    The forty-eight-hour window within which Plaintiffs must turn in completed forms, combined with the pre-registration and disclosure requirements, the *de facto* training requirements, the fifty-certificate limit, and the criminal and civil penalties associated with violation of the challenged law, also impede Plaintiffs from associating with current and prospective volunteers in voter registration activities because of both the onerous burdens in meeting such requirements and the fear of potential liability for engaging in voter registration assistance.

113.    Furthermore, the New Mexico law's requirement in NMSA 1978, § 1-4-49.A(2), which compels disclosure of the name, address, and date of birth of each member of Plaintiffs' organizations who registers persons, constitutes an effective restraint on freedom of association, especially for the volunteers and members of AAPD.  Given the history of discrimination and retaliation against disabled persons and those who affiliate with disabled persons, such a disclosure requirement unduly burdens AAPD members and hinders AAPD's efforts to associate with prospective volunteers who desire to protect their anonymity.

The Challenged Law is Unjustifiably Burdensome

114.    A person's First Amendment rights can be burdened only to the extent necessary to service significant and legitimate state interests.  *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  There is no adequate justification for the specific burdens imposed on Plaintiffs' speech and associational rights.

115.    None of the burdens imposed by the challenged law can be justified as necessary to combat voter-registration fraud.  New Mexico already has in place systems that are designed to prevent (and have the effect of preventing) the registration process from becoming a mechanism for fraudulent voting.  The County Clerks apply rigorous and thorough checks to verify that applications for registration entitle applicants to be registered.  A statewide on-line database allows County Clerks' staff, as part of their entry of a registrant onto the voter rolls, to determine what other county the registrant was previously registered in (if any) and verify the registrant's Social Security number, address, name, and date of birth.  If any of these elements is incorrect or does not match, an error report is generated.  Further, the State and each county are notified from the Vital Statistics Office of the deaths of registrants such that the names and Social Security numbers of people who have died are pulled from the voter rolls.

116.    The particular burdens imposed by the pre-registration and disclosure requirements, as applied to individuals who assist with voter registration, cannot be justified. The challenged law already requires third-party organizations to pre-register with the Secretary of State.  There is no justification for the additional requirement that each individual volunteer also pre-register and disclose his or her affiliations.

117.    There is no adequate justification for the burdens imposed by the challenged law's fifty-certificate limit.  Defendant's only legitimate reason for the limit is to save New Mexico on

reprinting fees.  But that minimal interest cannot justify the severe burdens that the fifty-certificate limit imposes on Plaintiffs' speech and associational rights.  And the challenged law's grant of unbridled discretion to the Defendant and her purported agents to lift the limit "for special events or circumstances" lacks any justification.

118.    New Mexico has no legitimate interest in demanding a return of completed voter registration forms within forty-eight hours.  The State's only legitimate interest is in requiring the forms to be returned with enough time for the State to input and review the registration information.  By imposing an artificially short forty-eight-hour return requirement, the challenged law burdens Plaintiffs' speech and associational rights without advancing any legitimate state interests.  Furthermore, organizations are bound by the forty-eight-hour rule even if they provide advice about the form (for example, over the telephone, or in a newsletter) but do not physically collect any of the completed forms.  There is no legitimate reason for applying the forty-eight-hour return requirement—or any return requirement—on an organization that does not collect the completed forms, but instead leaves it to the registrants to deliver the forms themselves.

119.    If Defendant were to determine that any of Plaintiffs' voter-registration activities were fraudulent or deficient, Defendant would be justified in prospectively limiting Plaintiffs' ability to engage in those activities.  But there is no adequate justification for the challenged law's threat of criminal and civil penalty.  And there is no adequate justification for the challenged law's lack of a good-faith defense against criminal prosecution, or for its strict-liability standard for civil fines.

120.    There is no justification for the challenged law's in-person training requirement.  There is no adequate support for Defendant's speculation that third-party organizations

generally, or Plaintiffs in particular, would be likely to give potential voters inaccurate or misleading advice.  And while Defendant may have a legitimate interest in providing registration-related information to organizations engaged in voter-registration activities, that information can be mailed or made available online; Defendant has no interest in requiring each individual volunteer to submit to mandatory in-person training.

Overbreadth

121.    The First Amendment, as applied to the states through the Fourteenth Amendment, invalidates overbroad state laws that apply to protected speech or expression.  A state law is overbroad when its enactment "reaches a substantial amount of constitutionally protected conduct."  *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982).

122.    The challenged law is unconstitutionally overbroad on its face because it chills substantially more speech than is necessary to promote any legitimate state interests.  In addition to the overbroad provisions discussed in paragraphs 115-120, the challenged law is overbroad because (i) there is no legitimate state interest in requiring individuals to pre-register with the State, disclose their affiliations, and submit to mandatory in-person training, when those individuals are only collecting completed registration forms and delivering them to Defendant or the County Clerks, and (ii) there is no legitimate state interest in subjecting individuals to the forty-eight hour requirement when they assist a prospective voter with filling out a form but do not take custody of the completed form.

123.    The law is unconstitutional in an overwhelming number of its applications, and has no plainly legitimate sweep.

### Count II—Violation of the First and Fourteenth Amendments
### to the United States Constitution: Void for Vagueness

124.    Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth

herein.

125.    The First and Fourteenth Amendments protect people from unconstitutionally

vague laws that impose penalties without providing a meaningful standard to determine what

activities are included under the law and that encourage arbitrary and discriminatory

enforcement.  Statutes restrictive of or purporting to place limits on First Amendment freedoms

"must be narrowly drawn to meet the precise evil the legislature seeks to curb and the conduct

proscribed must be defined specifically so that the person or persons affected remain secure and

unrestrained in their rights to engage in activities not encompassed by the legislation."  *Baggett*

*v. Bullitt*, 377 U.S. 360, 372 n.10 (1964) (citation, internal quotation marks and alterations

omitted).

126.    The challenged law, in its application to any person who "assist[s] persons to

register," is unconstitutionally vague because it does not provide an individual of ordinary

intelligence any meaningful guidance as to what activities are subject to the burdensome pre-

registration and training requirements, or the threat of civil and criminal punishment, and (ii) it

encourages arbitrary and discriminatory enforcement.

127.    Any person who "assist[s] persons to register" is subject to the statutory,

regulatory, and *de facto* restrictions.  Because these restrictions severely limit Plaintiffs' ability

to engage in core political speech and association, it is crucial for Plaintiffs to be able to

determine which, if any, of their registration-related activities are exempt—and which must

be curtailed or altogether suspended.

128.   Yet the word "assist," which is not defined anywhere in the statute or regulations, offers insufficient guidance to satisfy First Amendment scrutiny.  It is unclear whether it covers several of Plaintiffs' constitutionally protected activities, such as (i) encouraging individuals to register, (ii) giving a potential voter a car ride to a voter registration drive or the county seat, lending him bus fare, or informing him that a registration drive is taking place nearby, (iii) distributing forms, or directing voters to the on-line federal form without taking part in the physical completion and return of the forms, (iv) assisting voters in completing forms, whether by reading the form aloud to an individual with a visual impairment, translating the form, answering questions over the telephone, or sending out newsletters containing registration-related advice, (v) giving a potential voter the Secretary of State's mailing address, or (vi) collecting and mailing the forms without offering substantive advice.

129.   The vagueness of the statutory language encourages arbitrary and discriminatory enforcement.  Individuals and organizations engaged in any registration-related activities are forced either to comply with New Mexico's burdensome restrictions or else expose themselves to the threat of civil and criminal penalties imposed after the fact.

### Count III—Violation of the National Voter Registration Act of 1993

130.   Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

131.   It is well established that Congress has the power to preempt state law, and that state law is naturally preempted to the extent of any conflict with a federal statute.  *See* U.S. CONST. Art. VI, cl. 2; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  State law is preempted whenever, "under the circumstances of [a] particular case, [the challenged state

law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 372 (internal quotations and citations omitted).

132.    The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "enhance[] the participation of eligible citizens as voters."  42 U.S.C. § 1973gg(b).

133.    The NVRA specifies that the "chief State election official of a State shall make [voter-registration application] forms . . . available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."  42 U.S.C. § 1973gg-4(b).

134.    The NVRA further provides that states must "accept and use the mail voter registration application form prescribed by the Federal Election Commission."  42 U.S.C. § 1973gg-4(a)(1).

135.    The NVRA's legislative history demonstrates that state compliance with NVRA's criteria governing mail registration forms is mandatory.  *See* H.R. Rep. 103-9, at 9-10 ("If a State chooses to develop and use its own form, that form must comply with the same criteria that applies to the Federal form promulgated by the Federal Election Commission.").

136.    The NVRA's legislative history demonstrates that the regulation of private registration agents is inconsistent with the NVRA if the regulation reduces the number of ultimate registered voters, and evidences the intent of Congress to encourage the use of third-party registration agents.  Third-party voter registration drives "go to the voter" and thus "relieve[] the voter of the need to appear in person at one central registration office."  S. Rep. 103-6, at 12.

137.   Congress recognized that such drives provide a "convenient" method of voter registration that cannot be replicated by agency efforts alone.  S. Rep. 103-6, at 12.

138.   The NVRA's legislative history demonstrates that Congress did not consider the risk of third-party fraud a serious threat to electoral integrity, and that it considered the suppression of voter turnout a more worrisome evil than voter registration fraud.

139.   The NVRA's legislative history demonstrates that Congress itself thought that the NVRA "balances the legitimate administrative concerns of the election administrators and the objectives of this legislation." S. Rep. 103-6, at 3.

140.   New Mexico's voter-registration law and implementing regulations, NMSA 1978, § 1-4-49 and 1.10.25.7-10 NMAC, and other *de facto* requirements imposed by Defendant and/or the County Clerks, violate the NVRA, 42 U.S.C. § 1973gg, *et seq*., and to the extent they are inconsistent with the NVRA, are subject to preemption.

141.   The challenged voter registration law obstructs private registration agents' attempts to broadly disseminate and process voter forms, and thus contradicts the purpose of § 1973gg-4(b), namely that the state must make NVRA-compliant forms available for "distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."

142.   The challenged law also obstructs private registration agents' ability to register voters in contravention of Congress's goals as outlined by the NVRA's legislative history.

143.   The challenged law's requirement that individuals pre-register with the State and attend training before registering voters on behalf of Plaintiffs violates the NVRA.

144.   The challenged law's restriction limiting the number of voter-registration forms that are distributed to third party registration agents to fifty, and further limitation on distribution

of such forms only to individuals who have first pre-registered with the state of New Mexico violates the NVRA.

145.    The challenged law's requirement that organizations deliver or mail certificates of registration to the Secretary of State or County Clerk within 48 hours of their completion violates the NVRA.

146.    The challenged law's prohibition on the use of, and the placing of "red flags" on, the federal voter-registration form violates the NVRA.

**Count IV—Violation of Article II, § 8
of the New Mexico State Constitution**

147.    Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

148.    Article II § 8 of the New Mexico Constitution requires that "[a]ll elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."   The New Mexico Supreme Court has interpreted the Free and Open Elections clause to mean that "no election can be free and equal . . . if any substantial number of persons entitled to vote are denied the right to do so." *Gunaji v. Macias*, 130 N.M. 734, 742 (N.M. 2001).

149.    New Mexico's voter-registration law and implementing regulations, NMSA 1978, § 1-4-49 and 1.10.25.7-10 NMAC, and other *de facto* requirements imposed by Defendant and/or the County Clerks, impose severe financial and administrative burdens on Plaintiffs.  They require that individuals pre-register with the State and attend training before registering voters on behalf of Plaintiffs.  They limit the number of registration certificates the County Clerk may provide to each individual and require that Plaintiffs return each card within forty-eight hours of its completion.  They impose civil and criminal penalties for any violation of these requirements.

150.    The challenged law limits Plaintiffs' ability to participate in free and open elections.  It dramatically curtails Plaintiffs' ability to speak, engage in expressive conduct, and associate with those whose participation in the political process they wish to encourage. Plaintiffs communicate fewer political messages and refrain from engaging in certain associational activities important to advancing their missions and beliefs as a direct result of the statute's rigid requirements and harsh penalties.  As a result of the chilling effect and severe burdens on speech and association imposed by the challenged law, the overall quantum of political speech and association undertaken in New Mexico has been dramatically reduced.  The public receives less information about current political issues and has fewer opportunities to associate with Plaintiffs and others in meaningful efforts to affect governmental decision-making about those issues.

### Count V—Violation of Article II, § 17 of the New Mexico State Constitution

151.    Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

152.    Article II § 17 of the New Mexico Constitution protects freedom of speech.

153.    New Mexico's voter-registration law and regulations unduly chill and burden Plaintiffs speech and association in violation Article II, § 17 of the New Mexico Constitution.

154.    The challenged law severely burdens Plaintiffs' core political speech.  It dramatically curtails their ability to speak and associate with those whose participation in the political process they wish to encourage.

155.    The challenged law is overbroad on its face because it chills substantially more speech than is necessary.

156.     The challenged law is unconstitutionally vague because it does not provide an individual of ordinary intelligence guidance with regard to what is prohibited.

157.     The challenged law is not narrowly tailored to serve any compelling interest that justifies the severe and unduly discretionary burdens it imposes on Plaintiffs' constitutionally protected speech and associational activities.

### Count VI—Violation of New Mexico Constitutional Principle of Non-Delegation

158.     Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

159.     New Mexico state constitutional law, under the principle of non-delegation, recognizes that because "only the Secretary of State is an expert in the area of voting or elections," he or she may not delegate the important powers of developing standards for elections.  *Cobb v. New Mexico Canvassing Bd.*, 140 N.M. 77, 90 (N.M. 2006).

160.     Local County Clerks have advised that registration agents must participate in training before they can complete the pre-registration process.  The County Clerks, in requiring ad-hoc training, are purportedly acting as agents of the Secretary of State.  *See* § 1.10.25.10 NMAC (2009) (the "secretary of state may designate county clerks as agents in registration of third-party registration agents.").

161.     These ad-hoc trainings are not required by New Mexico's voter-registration law or the implementing regulations, NMSA 1978, § 1-4-49 and 1.10.25.7-10 NMAC.

162.     The County Clerks are not empowered either by the voter-registration law or regulations, or any other state statute or regulation to conduct *ad hoc*, mandatory training sessions for individuals who wish to conduct third-party voter registration.

163.    Defendant is tasked with the responsibility to set election policy for New Mexico. That authority to set policies cannot be delegated to County Clerks.  The *ad hoc* training requirement therefore violates New Mexico State constitutional principle of Non-Delegation.

### Count VII—Violation of Procedural Due Process under the Fourteenth Amendment to the United States Constitution

164.    Plaintiffs incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

165.    An individual is entitled to the protection of procedural due process under the Fourteenth Amendment when the government deprives a person of life, liberty, or property. When the legislature delegates authority to governmental officials who are granted the discretion to apply policies that have the effect of depriving these protected rights, there must be notice and opportunity to be heard.  *Londoner v. Denver*, 210 U.S. 373, 385-386 (1908).

166.    Defendant has purportedly authorized the numerous County Clerks to set ad-hoc policies for third-party registration—including the ad-hoc training requirement—and to exercise unconstrained discretion in exempting organizations from the strictures of the challenged law. By sanctioning the County Clerks' erratic and unpredictable treatment of Plaintiffs' voter-registration activities, Defendant has violated and is violating Plaintiffs' right to procedural due process.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

A.    This Court enter a declaratory judgment pursuant to the New Mexico Declaratory Judgment Act, NMSA 1978, § 44-6-1 *et seq.*, and/or the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring NMSA 1978, § 1-4-49, 1.10.25.7-10 NMAC, and other *de facto* requirements imposed by Defendant

and/or the County Clerks to be in violation of the First and Fourteenth

Amendments of the United States Constitution;

B.  This Court enter a declaratory judgment pursuant to the New Mexico Declaratory

Judgment Act, NMSA 1978, § 44-6-1 *et seq.*, and/or the Federal Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, declaring NMSA 1978, § 1-4-49,

1.10.25.7-10 NMAC, and other *de facto* requirements imposed by Defendant

and/or the County Clerks to be in violation of and preempted by the NVRA, 42

U.S.C. § 1973gg *et seq.*;

C.  This Court enter a declaratory judgment pursuant to the New Mexico Declaratory

Judgment Act, NMSA 1978, § 44-6-1 *et seq.*, and/or the Federal Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, declaring NMSA 1978, § 1-4-49,

1.10.25.7-10 NMAC, and other *de facto* requirements imposed by Defendant

and/or the County Clerks to be in violation of Article II, §§ 8 and 17 of the New

Mexico Constitution;

D.  This Court enter a preliminary and permanent injunction pursuant to 42 U.S.C.

§ 1983, 42 U.S.C. § 1973gg-9(b), restraining and enjoining Defendant from

prosecuting Plaintiffs for their voter-registration activities and from enforcing

those provisions of NMSA 1978, § 1-4-49, 1.10.25.7-10 NMAC, and other *de*

*facto* requirements imposed by Defendant and/or the County Clerks that violate

the Constitution and laws of the United States and the New Mexico Constitution;

E.  This Court award Plaintiffs nominal damages;

F.  This Court grant Plaintiffs their reasonable attorneys' fees and costs pursuant to

42 U.S.C. § 1973gg(c), 42 U.S.C. § 1983, and 42 U.S.C. § 1988(b); and

48

G.    This Court grant Plaintiffs such other and further relief as may be just and

equitable.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A

s/ Edward Ricco

By_____
   Edward Ricco
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
ericco@rodey.com

Edward D. Hassi
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
thassi@omm.com

Charles E. Borden
Guy G. Brenner
O'Melveny & Myers LLP
1625 Eye Street N.W.
Washington, DC 20006-4001
Telephone: (202) 383-5300
cborden@omm.com
gbrenner@omm.com

*Attorneys for Plaintiffs*

I certify that on August 14, 2009, I filed the foregoing
electronically through the CM/ECF system, which
caused parties or counsel in this matter to be served
by electronic means as more fully reflected on the
Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

s/ Edward Ricco

By_____
   Edward Ricco

49