**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, FEDERATION OF AMERICAN WOMEN'S CLUBS OVERSEAS, INC., NEW MEXICO PUBLIC INTEREST RESEARCH GROUP EDUCATION FUND, and SOUTHWEST ORGANIZING PROJECT, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. CIV 08-00702 JOB |
| v. | ) ) ) | |
| MARY HERRERA, in her capacity as Secretary of State, | ) ) ) | |
| Defendant. | ) ) | |

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A

Edward Ricco
P.O. Box 1888
Albuquerque, NM 87103

Edward D. Hassi
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Charles E. Borden
Guy G. Brenner
O'Melveny & Myers LLP
1625 Eye Street N.W.
Washington, DC 20006-4001

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

STANDARD OF REVIEW .................................................................................. 2

ARGUMENT ....................................................................................................... 5

I.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT NEW
      MEXICO'S THIRD-PARTY VOTER REGISTRATION LAW PLACES
      UNJUSTIFIED BURDENS ON THEIR FIRST AMENDMENT RIGHTS ........ 5

      A.    Plaintiffs' Voter Registration Activity Plainly Implicates Their
            First Amendment Rights of Expressive Conduct, Core Political
            Speech, and Freedom of Association ....................................................... 7

            1.    Expressive Conduct .................................................................... 7

            2.    Core Political Speech ............................................................... 11

            3.    Expressive Association ............................................................. 14

      B.    The Merits of Plaintiffs' First Amendment Claims Turn on Factual
            Matters Not Suitable For Resolution on a Motion to Dismiss ............... 16

            1.    The Challenged Law Severely Burdens Plaintiffs' Voter-
                  Registration Activities .............................................................. 17

            2.    There is No Adequate Justification For The Precise
                  Burdens Imposed By The Challenged Law ............................... 20

      C.    The Challenged Law Is Unconstitutionally Vague and Overbroad ........ 23

II.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE
      CHALLENGED LAW IS PREEMPTED BECAUSE IT CREATES AN
      OBSTACLE TO EFFECTUATING CONGRESS'S GOALS IN
      ENACTING THE NATIONAL VOTER REGISTRATION ACT ................... 25

III.  PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE
      CHALLENGED LAW VIOLATES ARTICLE II, § 8 OF THE NEW
      MEXICO CONSTITUTION ........................................................................... 28

IV.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE
      STANDARDLESS AD-HOC TRAINING REQUIREMENT IMPOSED
      BY INDIVIDUAL COUNTY CLERKS CONSTITUTES A VIOLATION
      OF NEW MEXICO'S CONSTITUTIONAL PRINCIPLE OF NON-
      DELEGATION ............................................................................................... 31

V.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT COUNTY
      CLERKS' AD-HOC TRAINING REQUIREMENTS IMPOSED
      WITHOUT ANY PROCESS VIOLATE THE DUE PROCESS CLAUSE ....... 34

CONCLUSION .................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Food Employees Union v. Logan Valley Plaza,*
　391 U.S. 308 (1968)..................................................................................................... 9

*Anderson v. Celebrezze,*
　460 U.S. 780 (1983).................................................................................................5, 21

*Ashcroft v. Iqbal,*
　129 S. Ct. 1937 (2009) ................................................................................................ 4

*Attorney Gen. of Okla. v. Tyson Foods, Inc.,*
　565 F.3d 769 (10th Cir. 2009) ................................................................................... 3

*Baggett v. Bullitt,*
　377 U.S. 360 n.10 (1964) .......................................................................................... 23

*Barnes v. Glen Theatre, Inc.,*
　501 U.S. 560 (1991).................................................................................................... 9

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,*
　562 F.3d 1067 (10th Cir. 2009) ................................................................................. 3

*Bi-Metallic Co. v. Colo. State Bd. of Equalization,*
　239 U.S. 441 (1915).................................................................................................. 34

*Bird v. Pioneers Hosp.,*
　121 F. Supp. 2d 1321  (D. Colo. 2000).................................................................... 26

*Boy Scouts of Am. v. Dale,*
　530 U.S. 640 (2000).................................................................................................. 16

*Brown v. Louisiana,*
　383 U.S. 131 (1966).................................................................................................... 8

*Buckley v. Am. Constitutional Law Found., Inc.,*
　525 U.S. 182 (1999).................................................................................................. 10

*Buckley v. Valeo,*
　424 U.S. 1 (1976) ....................................................................................................... 9

*Christensen v. Park City Mun. Corp.,*
　554 F.3d 1271 (10th Cir. 2009) ................................................................................. 4

*Cobb v. New Mexico Canvassing Board,*
　140 P.3d 498 (N.M. 2006) ....................................................................................31, 32

*Conn. Judicial Selection Comm'n v. Larson,*
　745 F. Supp. 88 (D. Conn. 1989)............................................................................. 34

*Crawford v. Marion County Election Board,*
　128 S. Ct. 1610 (2008) .......................................................................................19, 20, 21

## TABLE OF CONTENTS
(continued)

Page

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ...............................................................................................25, 26

*Dixon v. Maryland,*
  878 F.2d 776 (4th Cir. 1989) ....................................................................................... 10

*Duran v. Carris,*
  238 F.3d 1268 (10th Cir. 2001) ..................................................................................... 4

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
  505 U.S. 88 (1992) ....................................................................................................... 25

*Greater Yellowstone Coalit. v. Flowers,*
  321 F.3d 1250 (10th Cir. 2003) ..................................................................................... 3

*Gunaji v. Macias,*
  31 P.3d 1008 (N.M. 2001) ......................................................................................29, 30

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ..................................................................................... 7

*Hoffman Estates v. Flipside, Hoffman Estates,*
  455 U.S. 489 (1982) ..................................................................................................... 24

*Krislov v. Rednour,*
  226 F.3d 851 (7th Cir. 2000) ....................................................................................... 12

*Kusper v. Pontikes,*
  414 U.S. 51 (1973) ....................................................................................................... 14

*Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergovernmental
  Affairs,*
  No. 07-CV-2243, 2007 WL 4591845 (E.D.N.Y. Dec. 26, 2007) .................................. 3

*League of Women Voters v. Cobb,*
  447 F. Supp. 2d 1314 (S.D. Fla. 2006) ....................................................................... 18

*Meyer v. Grant,*
  486 U.S. 414, 426 (1988) .....................................................................................passim

*NAACP v. Alabama ex rel. Patterson,*
  357 U.S. 449 (1958) ..................................................................................................... 15

*NAACP v. Button,*
  371 U.S. 415 (1963) ..................................................................................................... 15

*Park Univ. Enters., Inc. v. Am. Cas. Co.,*
  442 F.3d 1239 (10th Cir. 2006) ..................................................................................... 4

*Perkins v. Lucas,*
  246 S.W. 150 (Ky. 1922) ........................................................................................28, 29

**TABLE OF CONTENTS**
(continued)

Page

*Preminger v. Peake*,
   536 F.3d 1000 (9th Cir. 2008) ................................................................. 11

*Project Vote v. Blackwell*,
   455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................. 13

*Ray v. Atl. Richfield Co.*,
   435 U.S. 151 (1977) ................................................................................ 27

*Resolution Trust Corp. v. Cruce*,
   972 F.2d 1195 (10th Cir. 1992) ................................................................ 3

*Ridge at Red Hawk, LLC v. Schneider*,
   493 F.3d 1174 (10th Cir. 2007) ................................................................ 4

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) .......................................................... 4, 17

*Schacht v. United States*,
   398 U.S. 58 (1970) ................................................................................... 8

*Schaumberg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ..................................................................... 11, 21, 22

*Spence v. Washington*,
   418 U.S. 405 (1974) ........................................................................... 10, 14

*Tashjian v. Republican Party*,
   479 U.S. 208 (1986) ........................................................................... 14, 15

*Temple Baptist Church, Inc. v. City of Albuquerque*,
   646 P.2d 565 (1982) ................................................................................. 5

*Texas v. Johnson*,
   491 U.S. 397 (1989) ............................................................................. 8, 11

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) ................................................................................. 8

*Toledo Area AFL-CIO Council v. Pizza*,
   154 F.3d 307 (6th Cir. 1998) ................................................................. 12

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ................................................................. 3

*United States v. Grace*,
   461 U.S. 171 (1983) ................................................................................. 9

*Wash. Ass'n of Churches v. Reed*,
   492 F. Supp. 2d 1264 (W.D. Wash. 2006) ............................................ 26

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) .................................................................................... 1

# TABLE OF CONTENTS
(continued)

Page

*Wilderness Soc'y v. Kane County,*
   560 F. Supp. 2d 1147 (D. Utah 2008) ......................................................................... 26

*Workers World Party v. Vigil-Goron,*
   693 F. Supp. 989 n. 2 (D. N.M. 1988) ....................................................................... 33

**Constitutions**

U.S. Constitution, First Amendment ..................................................................... passim

U.S. Constitution, Fourteenth Amendment ................................................................ 5, 34

New Mexico Constitution, Article II, Section 8 ...................................................... passim

New Mexico Constitution, Article II, Section 17 ............................................................. 5

**Codes**

42 U.S.C. § 1973gg ........................................................................................................ 25

42 U.S.C. § 1973gg-4 .................................................................................................... 27

N.M. Stat. Ann. § 1-2-1.A ........................................................................................ 31, 32

N.M. Stat. Ann. § 1-2-2.D .................................................................................. 31, 32, 33

N.M. Stat. Ann. § 1-4-49 ................................................................................................. 1

N.M. Stat. Ann. § 1-12-9 ............................................................................................... 21

N.M. Stat. Ann. § 1-20-3 ............................................................................................... 21

N.M. Stat. Ann. § 1-20-8 ............................................................................................... 21

N.M. Stat. Ann. § 1-20-9 ............................................................................................... 21

N.M. Stat. Ann. § 1-20-15 ............................................................................................. 21

N.M. Stat. Ann. § 1-20-22 ............................................................................................. 21

N.M. Stat. Ann. § 3-8-75 ............................................................................................... 21

N.M. Stat. Ann. § 3-8-79 ............................................................................................... 21

1.10.25.7-10 NMAC ......................................................................................................... 1

1.10.25.9 NMAC ........................................................................................................... 24

**Other**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 2

139 Cong. Rec. E17-03, (1993) (Statement of Rep. Swift) ........................................... 27

139 Cong. Rec. S5739-01, S5742 (1993) (Statement of Rep. Ford) ............................. 27

S. Rep. 103-6 ............................................................................................................ 26, 27

**TABLE OF CONTENTS**
(continued)

**Page**

Pete Seeger & Bob Reiser, *Everybody Says Freedom: A History of the Civil Rights Movement in Songs and Pictures* (1989) .................................................................. 10

## INTRODUCTION

Plaintiffs are nonprofit organizations that firmly believe in the capacity of voters to shape the composition and direction of their government, as well as in the U.S. Supreme Court's stirring reminder that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). And because this faith in the practical and philosophical value of civic participation is, unfortunately, far from universally shared, Plaintiffs have engaged in extensive volunteer-run voter-registration activities in politically underrepresented communities.

These voter-registration activities are undeniably an important means by which to facilitate expansion of the franchise. But they have more than merely practical significance. Like the Freedom Summer in Mississippi forty-five years ago, Plaintiffs' strenuous efforts are intended, and plainly understood, as a symbolic affirmation of their faith in democracy and their belief that underrepresented groups should be empowered. Indeed, Plaintiffs' voter-registration drives are the most effective means by which to express these messages, as well as a unique avenue for political discussion and association.

New Mexico has nonetheless imposed a rash of restrictions on Plaintiffs' ability to help fellow citizens register to vote—through N.M. Stat. Ann. 1978, § 1-4-49; its implementing regulations, 1.10.25.7-10 NMAC; and the *ad-hoc* manner in which Defendant has allowed the law to be enforced (collectively the "challenged law"). As Plaintiffs' First Amended Complaint ("Complaint") amply alleges, these burdens not only severely hamper Plaintiffs' voter-registration activities, but also lack any adequate justification.

These allegations suffice to state a claim that the challenged law is both unconstitutional and contrary to federal legislation. Specifically, the Complaint has adequately alleged that the challenged law violates Plaintiffs' constitutional rights to free speech and expressive association; is preempted by the unmistakable purposes of the federal National Voter Registration Act; runs afoul of various provisions in the New Mexico constitution; and is irreconcilable with the elemental demands of procedural due process.

Defendant, however, has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). But Defendant has failed to offer any adequate basis for such relief. Her principal argument is that this Court's prior denial of Plaintiffs' preliminary injunction motion compels a dismissal for failure to state a claim. But Defendant's argument overlooks the difference between a preliminary injunction motion (which is an extraordinary remedy requiring the court to make predictions about the plaintiff's likelihood of success) and a Rule 12(b)(6) motion to dismiss (which is a request to dismiss a case *before* discovery has taken place, and thus permits only an assessment of whether a complaint is sufficient on its face). This Court should reject Defendant's attempt to conflate these dramatically different standards of review. And because Defendant offers little else to support the Motion to Dismiss, the Motion should be denied.

## STANDARD OF REVIEW

Noticeably absent from Defendant's Motion to Dismiss is *any* reference to the appropriate standard. Instead, Defendant makes repeated reference to the Court's conclusions in its order denying Plaintiffs' preliminary injunction request. (*See* Def.'s Mot. to Dismiss at 1, 3, 12, 14, 20.) Defendant thus fails to acknowledge that the two proceedings are governed by

standards that are significantly different, and leaves the erroneous impression that the Court's prior findings permit it to dispose of the Complaint. *See, e.g.*, *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) ("'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))); *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergovernmental Affairs*, No. 07-CV-2243, 2007 WL 4591845, at *13 (E.D.N.Y. Dec. 26, 2007) ("[T]he standard on a motion to dismiss is quite different from the standard for granting a preliminary injunction.").

A preliminary injunction motion is a request for an "extraordinary remedy," *Greater Yellowstone Coalit. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003); namely, to restrict the parties from altering the status quo until the merits of their dispute may be resolved, *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070-71 (10th Cir. 2009). The court's inquiry on such a motion requires, among other things, an actual review of the likelihood of the movant's success on the merits, which necessitates an assessment of the facts underlying the movant's claims. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354-55 (10th Cir. 1986).

By contrast, a motion to dismiss requires merely that a court determine whether the complaint states a claim upon which relief may be granted, while accepting all facts pled in the complaint as true and granting all reasonable inferences from the pleadings in favor of the

plaintiff.  *See Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).[1]

Thus, a motion to dismiss does not ask the Court to analyze the plaintiff's likelihood of success

on the merits; rather, the Court must only find a reason to believe that Plaintiffs have a

"reasonable likelihood of mustering factual support for the[ir] claims," *Ridge at Red Hawk, LLC*

*v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), and that their claims are "'plausible,'"

*Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1276 (10th Cir. 2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In adjudicating a motion to dismiss, a court may

neither grant the motion because it believes it unlikely that Plaintiffs' allegations can be proven,

*Robbins v. Oklahoma*, 519 F.3d 1242, 1246 (10th Cir. 2008), nor may it "weigh potential

evidence that the parties might present at trial" in assessing the motion's merit.  *Duran v. Carris*,

238 F.3d 1268, 1270 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*,

173 F.3d 1226, 1236 (10th Cir. 1999)).   In short, Plaintiffs' burden at this stage is significantly

lighter than the previous proceeding, and where, as here, Plaintiffs have pled facts sufficient to

support their claims, the Court must deny Defendant's Motion.

---

[1]  This standard remains intact even after the Supreme Court's recent decisions on the pleading
requirements of Fed R. Civ. P. 8.  *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1276 (10th
Cir. 2009) ("Even after *Twombly*, the factual allegations need only contain enough allegations of fact 'to
state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007)); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility
when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged.").

**ARGUMENT**

I.   **PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT NEW MEXICO'S THIRD-PARTY VOTER REGISTRATION LAW PLACES UNJUSTIFIED BURDENS ON THEIR FIRST AMENDMENT RIGHTS**

Plaintiffs have pled sufficient factual allegations to state a claim that the challenged law violates their First Amendment rights.  As Defendant concedes, election law regulations that burden First Amendment rights are evaluated under the three-part framework of *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).[2]  A court must consider (1) "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (2) "the precise interests put forward by the State as justifications for the burden imposed by its rule"; and (3) not only "the legitimacy and strength of those interests," but also, importantly, "the extent to which those interests make it necessary to burden the plaintiff's rights."  (Def.'s Mot. to Dismiss at 4 (quoting *Anderson*, 460 U.S. at 789).)[3]  Under *Anderson*, there is no *de minimis* amount of First Amendment rights that may be burdened without the government first justifying its actions, *see Meyer v. Grant*, 486 U.S. 414, 426 (1988), and therefore the State may burden a party's First Amendment rights only to the extent necessary

---

[2]  Because the challenged law burdens fundamental rights, Plaintiffs believe that their First Amendment claims should be subject to strict scrutiny rather than the *Anderson* test.  However, because of Defendant's assertion that *Anderson* controls and because Plaintiffs have pled valid First Amendment claims under even the more relaxed *Anderson* standard, Plaintiffs utilize the *Anderson* framework for the purpose of this opposition while reserving the right to renew their argument regarding strict scrutiny in the future.

[3]  Because Plaintiffs' free speech and associational rights under the New Mexico Constitution, Article II, § 17, are co-extensive with their rights under the U.S. Constitution, *see Temple Baptist Church, Inc. v. City of Albuquerque*, 646 P.2d 565, 573 (1982), this Court should analyze both Plaintiffs' United States and New Mexico free speech and associational rights claims under the *Anderson* standard.

to serve legitimate state interests.[4]  Accordingly, for Plaintiffs' First Amendment claims to survive Defendant's Motion to Dismiss, they need to allege only that their First Amendment rights were burdened by the challenged law and that those burdens cannot be justified by a legitimate state interest.

As set forth in the Complaint, Plaintiffs' volunteer voter registration activities implicate the First Amendment in many ways.  Specifically, volunteer voter registration drives involve expressive conduct, are intertwined with core political speech regarding the importance of participating in the democratic process, and impact Plaintiffs' ability to associate with potential new members and potential registrants.  Each of these First Amendment rights are well established in Supreme Court and Tenth Circuit case law, and therefore subject to the *Anderson* framework.  Plaintiffs further allege, in great detail, that the challenged law severely burdens their ability to conduct volunteer voter registration activities and in fact has resulted in Plaintiffs ceasing such efforts.  Finally, Plaintiffs allege the numerous ways in which the challenged law is vague and overbroad.  Plaintiffs have thus clearly stated a valid First Amendment claim.

In response, Defendant largely argues that the burdens imposed by the challenged law are minimal or non-existent and that the State's interests are substantial and therefore capable of justifying the burdens.  But these are factual determinations that cannot be weighed on a Motion to Dismiss.  Put simply, the State cannot just assert that its interests are important and that the burdens are minimal; if so, protection against restrictions on First Amendment rights would be

---

[4]  Even if the State had the power to ban third-party voter registration entirely, it does not follow that the State may unduly burden expressive conduct, core political speech, and expressive association that are linked with third-party voter registration.  "Having decided to confer the right, the State was obligated to do so in a manner consistent with the Constitution because … this case involves core political speech." *Meyer,* 486 U.S. at 420 (internal quotations omitted).

meaningless.  *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1197 (10th Cir. 2003) ("The

burden of proof is on the government to 'demonstrate that the recited harms are real, not merely

conjectural, and that the regulation will in fact alleviate these harms in a direct and material

way.'" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994))).  Since Plaintiffs

have sufficiently pled that the challenged law abridges First Amendment rights, Defendant's

Motion to Dismiss those claims should be denied.

  A.  **Plaintiffs' Voter Registration Activity Plainly Implicates Their First Amendment Rights of Expressive Conduct, Core Political Speech, and Freedom of Association.**

  Volunteer voter registration drives of the type engaged in by Plaintiffs represent a

paradigmatic example of conduct implicating First Amendment rights.  Not only do Plaintiffs'

drives constitute expressive conduct subject to constitutional protection, but such activities are

also—like petition gathering—inherently intertwined with protected political speech, such that

the activity cannot be regulated without affecting the related speech interests as well.  Moreover,

volunteer voter registration drives impact associational rights under the First Amendment by

providing the participating organizations with a platform to associate both with potential new

members and with potential new registrants.  Regulating Plaintiffs' voter registration activity

therefore cannot help but impact Plaintiffs' First Amendment rights.

  1.  *Expressive Conduct*

  Plaintiffs have repeatedly alleged that they have engaged in expressive conduct protected

by the First Amendment, by conducting volunteer voter registration drives.  (*See* Am. Compl. ¶¶

2, 3, 26, 31, 32, 33, 38, 45, 46, 47, 53, 100-02.)  The First Amendment protects political

expression manifested through conduct, as well as speech, for the Supreme Court has recognized

that conduct itself can serve as a powerful means for broadcasting the thoughts and ideas of people or groups. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Volunteer voter registration activity, steeped as it is in the history of pivotal civil rights movements and central to the ongoing debate about the roles and responsibilities of civic engagement, fits squarely within the protected category of such inherently expressive conduct.

To determine whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, courts look to whether there was (1) intent to convey a particularized message; and (2) a great likelihood that the message would be understood by those who viewed it. *Id.* The requirement that the person engaging in the expressive conduct intend to convey a particularized message signifies simply that the person is attempting to express a point of view, as exemplified by the breadth of activities deemed by the Supreme Court to constitute expressive conduct:

- burning a flag to express general displeasure with the policies of a presidential administration, *see id.* at 405-06;

- wearing black armbands to protest American military activity, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 505 (1969);

- conducting a sit-in to protest segregation, *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966);

- wearing American military uniforms in a dramatic presentation to criticize involvement in Vietnam, *Schacht v. United States*, 398 U.S. 58 (1970);

- picketing about a wide variety of causes, *see, e. g., Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 313-14 (1968); *United States v. Grace*, 461 U.S. 171, 176 (1983);

- contributing money to a political campaign, *Buckley v. Valeo*, 424 U.S. 1, 19 (1976); and

- dancing in the nude to express an erotic message, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565 (1991).

Plaintiffs have met both prongs of the expressive conduct standard and have accordingly stated an expressive conduct claim.  Plaintiffs' public endeavors to assist people with voter registration are intended to convey a clear message that Plaintiffs believe in civic participation and are willing to expend the resources to broaden the electorate to include underserved communities, and anyone who observes Plaintiffs' efforts is likely to understand this message. (*See* Am. Compl. ¶¶ 3, 11-14, 26-28, 31-34, 36-39, 45-47, 53, 56-58, 60, 101, 102.)  Indeed, Defendant concedes that "[t]he efforts of third party voter registration agents such as Plaintiffs are typically motivated by the desire to positively impact on our civil and political landscape." (Def.'s Mot. to Dismiss at 1.)

But Defendant asserts that Plaintiffs' voter registration activity cannot constitute expressive conduct because such activity is (a) "ministerial" and ministerial acts cannot constitute expressive conduct and (b) not truly communicative in nature.  (Def.'s Mot. to Dismiss at 5, 6.)  Neither of these assertions has merit.  First, ministerial acts can convey a message based on their context.  Simple, routine deeds—such as lighting a match to start a fire, wearing certain clothing, sitting down, holding a sign, dancing, giving money—are nevertheless imbued with

First Amendment protection when done in a setting or manner in which the message becomes apparent. *See Spence v. Washington*, 418 U.S. 405, 411 (1974) (noting that context is what infuses particular conduct with an expressive element). Expressive conduct need not be targeted at any particular audience, for the flag burner, the protester, the nude dancer, the political contributor, and indeed the voter registration volunteer do not pre-determine who will be a witness to the promulgation of their ideas. *See id.* at 409 (finding that a flag with a peace symbol displayed outside an apartment window was protected expressive conduct even though the "stipulated facts fail to show that any member of the general public viewed the flag").

Second, far from lacking communicative force, efforts to register people to vote communicate a powerful political message rooted in the epic struggles to expand democratic participation. From experiences like the Mississippi Freedom Summer of 1964, when many young volunteers risked, and in a handful of cases, sacrificed their lives to register black voters, voter registration's symbolic value became emblazoned in the public consciousness. *See* Pete Seeger & Bob Reiser, *Everybody Says Freedom: A History of the Civil Rights Movement in Songs and Pictures* 121 (1989) (Voter registration "became the base of the civil rights movement —affirming that you are a citizen, that government is for you and by you, and that you can hold anyone you elect accountable to you"). The potency of the message expressed through voter registration endures because "the choice not to register implicates political thought and expression"; for some not registering is a "form of private and public protest" and for others it is a reflection of their disenchantment and skepticism that "the political process is responsive to their needs." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182,  195-97 (1999). *See also Dixon v. Maryland*, 878 F.2d 776, 782 (4th Cir. 1989) (holding that a person has a right not

to vote as an expression of dissatisfaction with the choices given).  Given that voter registration

is a uniquely communicative avenue, the only way to counter the message of those who oppose

the democratic process is to participate in and persuade others to engage in voter registration.  *Cf.*

*Johnson*, 491 U.S. at 419-20 ("We can imagine no more appropriate response to burning a flag

than waving one's own, no better way to counter a flag burner's message than by saluting the

flag that burns . . .").  In short, to participate in voter registration activity is to take a position and

express a point of view in the continual debate of whether to engage or disengage from the

political process—conduct worthy of First Amendment protection.  *See Preminger v. Peake*, 536

F.3d 1000, 1007 (9th Cir. 2008) (observing that "voter registration is speech protected by the

First Amendment").

### 2. *Core Political Speech*

Plaintiffs also have alleged that their volunteer voter registration activities are so

intertwined with their political speech regarding the importance of registering to vote that one

cannot be regulated without affecting the other.  (Am. Compl. ¶¶ 3, 26, 33-35, 37, 38, 45, 47, 56,

59, 103-07.)  The Supreme Court has made clear that certain acts are so intertwined with speech

that it is impossible for the government to regulate the conduct without burdening the speech.

*See Meyer*, 486 U.S. at 422; *Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 632

(1980).  For example, in *Meyer*, the Court struck down a law restricting petition-circulating

activity in part because the Court found that the restriction necessarily burdened the speech

associated with the petition-circulating activity (*i.e.*, urging people to sign the petition).  486 U.S.

at 422.  The same holds true for volunteer voter registration drives, and therefore they are

entitled to comparable First Amendment protection.

In *Meyer* and *Schaumberg*, the Supreme Court found that certain activities, such as circulating a petition or soliciting charitable contributions, necessarily "involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id*. (quoting *Schaumberg*, 444 U.S. at 632). The Court recognized that, as a practical matter, it was impossible to regulate such activities without affecting the associated speech and vice versa, and therefore held in *Schaumberg* that a legislature must give "due regard" to "the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id*. at 422 n.5; *see also Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000) (stating that "circulating nominating petitions [for political candidates] necessarily entails political speech"); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998).

Assisting and promoting voter registration shares the same attributes as circulating a petition or soliciting charitable contributions. Each activity is an endeavor that "of necessity involve[s] both the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421. When talking to potential voters, Plaintiffs do not merely discuss the mechanics of filling out the voter registration forms, but often must first convince people that registration is worth their time and effort. Persuading people to register to vote is quintessentially First Amendment-protected activity, and is intrinsically tied to the voter registration process. "The interactive nature of voter registration drives is obvious: they convey

the message that participation in the political process through voting is important to a democratic society." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707 (N.D. Ohio 2006).

Defendant's insistence—that the challenged law does not burden Plaintiffs' speech because they are "free to engage whoever they choose in such conversations separate and apart from helping a person register to vote"—rests on the idea that Plaintiffs' voter registration activity can be de-coupled from speech made during such activity.  (Def.'s Mot. to Dismiss at 6.) But this assertion is untrue factually and meritless as a legal argument.

As a factual matter, when Plaintiffs distribute, assist with the completion of, and gather voter registration forms, they communicate to the prospective registrant that the act of registration is significant enough to merit the time and resources of such volunteers in a way that speaks more forcefully than abstractly discussing voter registration.  (*See* Am. Compl. ¶¶ 3, 31, 33, 39, 45, 56, 101-07 (noting that the context of voter registration is a uniquely effective avenue to convey Plaintiffs' message about civic participation and engage with prospective voters).) One cannot effectively advocate for the importance of registering to vote without facilitating the voter registration process itself, much as it would be ineffectual to go door-to-door to discuss the possibility of contributing to a charitable cause without providing the means to do so, or to assert the political salience of signing a petition without offering the petition itself for signature.  Nor is it sufficient to assert that volunteers may spontaneously hand out voter registration forms without providing assistance; Plaintiffs' message would ring hollow if the moment a voter asks for help with the registration form just offered, the volunteer were compelled to turn the voter away. Consequently, Plaintiffs have stated a claim that their political speech is intertwined with voter registration activity.

Additionally, the Supreme Court has repudiated Defendant's argument that Plaintiffs' First Amendment rights are not implicated because they may communicate their message in other settings. In *Meyer* the Supreme Court squarely held that the notion that organizations "remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection." 486 U.S. at 424. *See also Spence*, 418 U.S. at 411 ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place" (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939))). Neither Defendant nor this Court may second-guess Plaintiffs' assertion that voter registration activity provides the best means to carry out their mission by interacting with voters, for "[t]he First Amendment protects [organizations'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424.

### 3.     *Expressive Association*

Finally, Plaintiffs have alleged that their volunteer voter registration activity implicates their freedom of association, both with respect to their ability to associate with prospective members and volunteers and with respect to their ability to affiliate with voters. (Am. Compl. ¶¶ 3, 5, 8, 26, 31, 32, 36, 38, 60, 65, 75, 91, 92, 94, 108-13, 114, 117, 118, 127). The "freedom to associate with others for the common advancement of political beliefs and ideas" is a core activity protected by the First Amendment. *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). As with speech, there is no *de minimis* amount of association that falls outside the bounds of First Amendment protection. *See Tashjian v. Republican Party*, 479 U.S. 208, 215 (1986) (noting that "the act of formal enrollment or public affiliation with the Party is merely one element in the

continuum of participation in Party affairs, and need not be in any sense the most important.").

Moreover, the First Amendment provides protection from indirect as well as direct restrictions

on the right to associate. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958)

(holding that legislation that "would have the practical effect of discouraging the exercise of

constitutionally protected political rights" is constitutionally suspect) (quotation and citation

omitted).

     In the Complaint, Plaintiffs have alleged two types of associational interests that are

impinged on by the challenged law: (1) associating with prospective members and volunteers;

and (2) associating with voters.[5]  That Plaintiffs have a constitutionally protected right to affiliate

with their own members and prospective members to advocate for and engage in voter

registration activity is beyond dispute. *NAACP v. Button*, 371 U.S. 415, 431 (1963).  Voter

registration activity serves as the best mechanism to recruit new members and volunteers (Am.

Compl. ¶¶ 3, 26, 31, 32, 36, 38, 39, 59, 60, 67, 106), and Plaintiffs are entitled to choose the

method by which to associate with such individuals.  *See Meyer*, 486 U.S. at 424.[6]  It is also clear

that Plaintiffs have the right to associate, even loosely, with voters.  *See Tashjian*, 479 U.S. at

215 (deeming even the fleeting association of an independent voter's anonymous ballot cast in a

party primary to be a sufficient affiliation with the Republican Party to warrant First Amendment

protection).  Registering to vote through third-party organizations, like casting a ballot in a party

---

[5]  Notably, Defendant does not contest that these are legitimate interests that Plaintiffs have pled.

[6]  Although *Meyer* dealt with core political speech intertwined with conduct, it equally applies to associational rights as there is no hierarchy among the types of protected First Amendment activity.  *See Patterson*, 357 U.S. at 461 ("In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action.").

primary, serves to affiliate a person with an organization, and yields the most fruitful means by which Plaintiffs interact with voters.  That association is plainly entitled to First Amendment protection.

Defendant asserts that Plaintiffs' voter registration activity does not implicate associational interests because they can still associate with prospective members and voters outside the voter registration context.  Defendant, however, fails to appreciate that freedom of association not only encompasses the right to associate with others, but also the right to choose *how* one associates with others.  *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.").

### B.   The Merits of Plaintiffs' First Amendment Claims Turn on Factual Matters Not Suitable For Resolution on a Motion to Dismiss.

In light of Plaintiffs' allegations that their voter registration activities implicate First Amendment rights, Plaintiffs state valid First Amendment claims if they alleged that (1) the challenged law severely burdens their voter-registration activities, and (2) the State has failed to identify and substantiate any legitimate interests that would justify those precise burdens.  The Complaint satisfies both requirements.  It reveals how several aspects of the challenged law, both individually and collectively, have hampered and even halted Plaintiffs' voter-registration activities.  And the Complaint demonstrates that neither of the State's purported rationales for the challenged law (protecting against voter fraud and ensuring that completed forms are returned) provides sufficient justification for *any* burdens on Plaintiffs' voter-registration activities at all, much less the massive burdens that the law in fact imposes.

Defendant disagrees with those allegations, but factual disputes such as these cannot be resolved in a motion to dismiss. *See supra* at Standard of Review (explaining that, on a motion to dismiss, Plaintiffs' well-pleaded factual allegations must be accepted as true).[7] Given the Complaint's extensive factual allegations, and the standard of review requiring acceptance of those facts, Defendant's Motion to Dismiss should be denied.

        **1.**      ***The Challenged Law Severely Burdens Plaintiffs' Voter-Registration Activities.***

Accepting the factual allegations in the Complaint as true, as this Court must, *Robbins*, 519 F.3d at 1247, it is clear that the challenged law severely burdens Plaintiffs' First Amendment rights. The Complaint establishes that Plaintiffs' voter-registration activities are both symbolic speech and inextricably intertwined with core political speech and expressive association, *see supra* at § I.A, and that any burden on Plaintiffs' voter-registration activities is therefore a direct and indirect burden on Plaintiffs' First Amendment rights. And as the Complaint alleges, the challenged law severely burdens Plaintiffs' voter-registration activities as a factual matter. Plaintiffs are "nonprofit organizations that use volunteers to assist people to register to vote" and "do not have the resources to comply with the State's various and onerous restrictions, and cannot afford the risk that their volunteers may unknowingly subject them to significant fiscal and criminal penalties." (Am. Compl. ¶ 5.) As a result of the challenged law, "Plaintiffs have been forced to cease or seriously curtail their voter-registration activities." (*Id.*) These

---

[7] Without regard for the applicable standard of review, Defendant's arguments repeatedly rely on conclusory statements that Plaintiffs' factual allegations are false. (*See, e.g.*, Def.'s Mot. to Dismiss at 12 (arguing, despite Plaintiffs' factual allegation that compliance with the challenged law has proven to be a severe burden, that compliance "requires minimal effort"); *id.* at 17 ("Plaintiffs argue that [the challenged law] curtails their ability to 'associate with those whose participation in the political process they wish to encourage.' . . . This assertion is simply false.").) As noted above, at this stage of the proceedings, the Court is required to accept Plaintiffs' allegations as true.

allegations alone establish that Plaintiffs' First Amendment rights have been severely burdened by the challenged law.

But the Complaint does not stop there.  It offers over nine pages of additional allegations detailing the ways in which the various components of the challenged law hamper Plaintiffs' voter-registration activities.  (*See id.* ¶¶ 65-95.)  More specifically, the Complaint alleges that the challenged law imposes severe burdens through pre-registration, training, and disclosure requirements, (*id.* ¶¶ 67-77); the fifty-certificate limit, (*id.* ¶¶ 78-86); the forty-eight hour return requirement, (*id.* ¶¶ 87-90); and the threat of criminal and civil penalties, (*id.* ¶¶ 91-95).

Despite these overwhelming factual allegations of severe burdens and the deferential motion to dismiss standard, Defendant contends in conclusory fashion that Plaintiffs' First Amendment rights were not burdened at all.  Defendant offers two principal legal arguments for this remarkable claim, but neither survives scrutiny.  First, Defendant suggests that the burden question is one that can be answered purely in the abstract, without consideration of the actual effect on Defendants' activities.  Thus Defendant ignores Plaintiffs' factual allegations that the challenged law *in fact* undermines their voter-registration activities, and instead argues that the forty-eight hour return requirement—and the criminal and civil penalties that enforce it—are not burdensome simply because Defendant sees "two significant differences" between the challenged law and a law that was struck down as unconstitutional in *League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006).

This argument is flatly inconsistent with the Supreme Court's precedents, which have established that the burden inquiry is not theoretical, but factual.  Thus in *Meyer* the Supreme Court asked whether the law in question *in fact* limited the plaintiffs' speech, and whether it

-18-

rendered that speech less effective.  486 U.S. at 423-24.  Likewise the *Anderson* Court found that

a filing deadline placed a "particular burden" on plaintiffs because it compelled independent-

minded voters to collect signatures far in advance of an election, at which point "[v]olunteers are

more difficult to recruit and retain, media publicity and campaign contributions are more difficult

to secure, and voters are less interested in the campaign."  460 U.S. at 792.  And in *Crawford v.

Marion County Election Board*, which arrived at the Supreme Court on a grant of summary

judgment—*after* discovery had been taken—the Court asked whether "the deposition evidence in

the District Court" might "provide any concrete evidence of the burden imposed on voters." 128

S. Ct. 1610, 1622 (2008).[8]

        Second, Defendant argues in the alternative that any severe burdens imposed by the

challenged law are legally irrelevant because the challenged law is "content-neutral."  (Def.'s

Mot. to Dismiss at 7.)  In making this contention, Defendant relies not on cases scrutinizing

election-related laws under the *Anderson* framework, but instead on cases involving "time, place,

manner" restrictions on the use of public spaces such as highways and public parks.  (*See id.* at

6-7 (citing, *e.g., Cox v. New Hampshire*, 312 U.S. 569, 576 (1941)).)  But those decisions have

no bearing here.  The question in this case is not whether Plaintiffs should be allowed to take

over a public street or park to engage in voter-registration activities, but whether Plaintiffs are

impermissibly burdened in their constitutionally protected voter registration activities.

Unsurprisingly, *Anderson* demands more when the regulation goes beyond simply regulating the

use of public spaces and strikes directly at an activity protected by the First Amendment.  Yet

under Defendant's argument, a law would survive *Anderson* scrutiny, regardless of its burdens

---

[8]  Defendant's argument is also meritless on its own terms:  A statute is not constitutional simply because
it can be distinguished in "two" ways from a law that was struck down.

and regardless of its utter lack of justifications, so long as it is not content-based; indeed, under

Defendant's reasoning, even a poll tax—neutrally applied—would be constitutional.  But of

course, Defendant's reasoning is irreconcilable with longstanding precedent holding otherwise.

*See Crawford*, 128 S. Ct. at 1615 (plurality opinion) (noting that the Court had struck down a

$1.50 poll tax as unconstitutional in *Harper v. Virginia Board  of Elections*, 383 U.S. 663 (1966),

because even a "slight" burden is unconstitutional if not "justified by relevant and legitimate

state interests").[9]

2.   ***There is No Adequate Justification For The Precise Burdens Imposed By The Challenged Law.***

Not only does the Complaint allege that Plaintiffs' voter-registration activities are

severely burdened, but it also alleges in detail that those precise burdens are not justified by any

legitimate and factually substantiated state interest.  Both of these allegations are highly factual,

and neither can be rejected on a motion to dismiss.

As the Supreme Court has made clear, "[h]owever slight [a] burden may appear, . . . it

must be justified by relevant and legitimate state interests sufficiently weighty to justify the

---

[9]  Defendant's remaining arguments do not require extended discussion.  First, Defendant contends that the burdens are insignificant because Plaintiffs might have other, less effective avenues to express their political and philosophical messages.  (*See* Def.'s Mot. to Dismiss at 5-7.)  But as the Court explained in *Meyer*, the fact that a challenged law "leaves open more burdensome avenues of communication, does not relieve its burden on First Amendment expression."  486 U.S. at 424 (internal quotation marks omitted).  *Meyer* controls here.  The challenged law hampers Plaintiffs' voter-registration activities, and as the Complaint alleges, "helping fellow citizens register to vote is the most effective and credible means of expressing" Plaintiffs' "faith in democracy and the importance of civic participation" and "their belief that politically underrepresented groups should be empowered" (Am. Compl. ¶ 3), as well as the most effective means to persuade potential voters that voting is worthwhile, (*id.* ¶ 104; *see also id.* ¶¶ 101, 106, 107).

Second, Defendant casually asserts that "[t]his Court has already determined that the alleged injury is insignificant," and that "there is no reason to revisit that determination."  (Def.'s Mot. to Dismiss at 12.)  This argument is plainly meritless.  As explained *supra* in the Standard of Review, the Court has had no prior occasion to consider whether the Complaint's *factual allegations* are insufficient.

limitation." *Crawford*, 128 S. Ct. at 1616 (plurality opinion) (citation and internal quotation

marks omitted)); *see also Anderson*, 460 U.S. at 789-90.  That is because "[b]road prophylactic

rules in the area of free expression are suspect.  Precision of regulation must be the touchstone."

*Schaumberg*, 444 U.S. at 637 (citation and internal quotation marks omitted).  Moreover,

because Plaintiffs' bring an as-applied challenge, Defendant must identify legitimate interests in

applying the laws *against Plaintiffs*—which Defendant concedes are "reputable organization[s],"

(Def.'s Mot. to Dismiss at 11), and which perform their voter-registration activities with integrity

and skill.  Furthermore, Defendant must offer "evidence" to substantiate claims of interest, and

may not resort to mere "speculation."  *Meyer*, 486 U.S. at 426.

> Defendant cannot meet that standard—not on a motion to dismiss, and not at all.

Although Defendant cites deterring voter registration fraud and the failure to submit completed

registration forms as the reasons justifying the challenged law, (*see* Def.'s Mot. to Dismiss at

12), there is no evidence that either is a substantial problem in New Mexico, (*see* Am. Compl. ¶¶

6, 97, 98).  And even if Defendant were able to point to evidence, all that would do is create a

factual dispute that cannot be resolved in a motion to dismiss.  That is especially so because New

Mexico already had in place a litany of safeguards against voter registration fraud, and there is

no evidence that these safeguards were not entirely effective.  (*See id.* ¶ 115 ("New Mexico

already has in place systems that are designed to prevent (and have the effect of preventing) the

registration process from becoming a mechanism for fraudulent voting."))[10]

---

[10]  Existing State laws that provide a safeguard against voter fraud include N.M. Stat. Ann. §§ 1-12-9 (fraudulent and double voting), 1-20-3 (registration offenses), 1-20-8 (false voting), 1-20-9 (falsifying election documents), 1-20-15 (conspiracy to violate Election Code), 1-20-22 (violation of Election Code), 3-8-75 (false voting; falsifying election documents; false swearing), 3-8-79 (conspiracy to violate Municipal Election Code).

Furthermore, in addition to failing to adequately substantiate the rationale for the challenged law as a whole, Plaintiffs also have alleged that Defendant cannot provide justifications for specific burdens the law imposes.  To take but one example, Plaintiffs allege that "there is no legitimate interest in demanding a return of completed registration forms within forty-eight hours." (*Id.* ¶ 118.)  Although the State has an obvious interest in ensuring that forms are delivered, that interest would be adequately addressed through a law requiring return of the forms sufficiently in advance of the book closing date.  *See Schaumberg*, 444 U.S. at 636 (law's stated intent to prevent fraud "could be sufficiently served by measures less destructive of First Amendment interests").  Indeed, that interest would be *better* served by a less restrictive law, for the forty-eight-hour return requirement "does nothing to ensure that registration forms are delivered; if anything, it has the opposite effect," because "it merely encourages registration agents who fail to deliver forms within that tight deadline to withhold the forms in order avoid punishment."  (Am. Compl. ¶ 6.)[11]  Defendant's proffered justifications for the challenged law's various other burdensome provisions are equally unsubstantiated.  (*See id.* ¶¶ 6, 115-20).

---

[11]  Defendant now argues that the forty-eight-hour return requirement applies only when a registration agent "has taken physical custody of a completed voter registration form."  (Def.'s Mot. to Dismiss at 10.) Unsurprisingly, Defendant does not quote the language of the statute, as there is nothing in the text that would limit the forty-eight-hour requirement in this manner.  That Defendant has continually been required to adopt atextual and varying constructions of the challenged law is further evidence of the law's improper scope.

**C.      The Challenged Law Is Unconstitutionally Vague and Overbroad.**

The challenged law is also unconstitutionally vague and overbroad on its face.[12]  First,

the challenged law is unconstitutionally vague because, in its application to any person who

"assist[s] persons to register," it fails to provide an individual of ordinary intelligence any

meaningful guidance as to what activities are subject to the burdensome pre-registration and

training requirements, or the threat of civil and criminal punishment, and thus it encourages

arbitrary and discriminatory enforcement.[13]  Statutes restrictive of or purporting to place limits

on First Amendment freedoms "must be narrowly drawn to meet the precise evil the legislature

seeks to curb and the conduct proscribed must be defined specifically so that the person or

persons affected remain secure and unrestrained in their rights to engage in activities not

encompassed by the legislation." *Baggett v. Bullitt*, 377 U.S. 360, 373 n.10 (1964) (citation,

---

[12]  Although this Court rejected Plaintiffs' vagueness and overbreadth arguments on legal grounds for purposes of Plaintiffs' preliminary injunction request, and although these arguments— in contrast to Plaintiffs' as-applied First Amendment claims—are concededly legal in nature, this Court should nevertheless deny the Motion to Dismiss these claims.  Plaintiffs' as-applied First Amendment claims cannot be dismissed at this stage, and consideration of those highly factual claims might shed additional light on the scope of the challenged law (thus affecting the overbreadth analysis), as well as the confusion in applying it (thus affecting the vagueness inquiry).

[13]  Although Defendant contends that the meaning of "assist," which is not defined anywhere in the statute or regulations of the challenged law, is self-evident, (*see* Def.'s Mot. to Dismiss at 14), the term's meaning is not clear.  Indeed, a fair reading of the term covers several of Plaintiffs' constitutionally protected activities, such as (i) encouraging individuals to register, (ii) giving a potential voter a car ride to a voter registration drive or the county seat, lending him bus fare, or informing him that a registration drive is taking place nearby, (iii) distributing forms, or directing voters to the on-line federal form without taking part in the physical completion and return of the forms, (iv) assisting voters in completing forms, whether by reading the form aloud to an individual with a visual impairment, translating the form, answering questions over the telephone, or sending out newsletters containing registration-related advice, (v) giving a potential voter the Secretary of State's mailing address, and (vi) collecting and mailing the forms without offering substantive advice.   Individuals and organizations engaged in any registration-related activities are forced either to comply with New Mexico's burdensome restrictions or expose themselves to the threat of civil and criminal penalties imposed after the fact.

internal quotation marks and alterations omitted).  The challenged law falls well short of this standard.[14]

Second, the challenged law is overbroad because it "reaches a substantial amount of constitutionally protected conduct."  *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982).  Among other things, the challenged law impermissibly requires public disclosure of each prospective registration agent's affiliations, (*see* Am. Compl. ¶ 122), even though, as Defendant concedes, the State's only significant interest is in requiring disclosure of senior officers within an organization.  And the challenged law, as a textual matter, subjects individuals to the forty-eight hour requirement when they merely assist a prospective voter with filling out a form but do not take custody of the completed form.[15]

---

[14]  Indeed, the ambiguity of the challenged law is apparent from the numerous "clarifications" made by Defendant throughout the course of the litigation about the meaning of the challenged law; interpretations that are not evident from face of the statute or regulations and are often inconsistent.  For example, despite Defendant's addition of a "physical custody" requirement to the definition of "assist," discussed *supra* at note 13, Defendant explains later in the Motion to Dismiss that Plaintiffs have "assisted" for purposes of Section 1-4-49(A) if they "provide substantive assistance to a voter in completing a voter registration form," regardless of whether they take control of the registration form.  (Def.'s Mot. to Dismiss at 14.)  Similarly, Defendant provides conflicting explanations of whose registration number should appear on the form, stating both that "the person who turns in the form needs to be the person whose number is on the form" and that "it doesn't really matter who's handing the form[] to the county clerk or the Secretary of State so long as . . . it can be traced back to the person who is responsible for filling out the forms in the first place."  (Tr. of Prelim. Inj. Hr'g at 145-46 (emphasis added).)  Additionally, the Secretary of State's regulation provides that registration agents are to be informed that completed forms "must be delivered" within forty-eight hours, § 1.10.25.9(J) NMAC, yet the Motion to Dismiss states that placing forms in the mail is sufficient.  (Def.'s Mot. to Dismiss at 16.)  The issue of whether registration agents may use the federal voter registration form is perhaps the most unclear: the Bernalillo County Clerk's office has stated that use of the federal form is impermissible; the Secretary of State told Plaintiffs that election officials would "red flag" applications submitted on the federal form; and Defendant now states that that "Plaintiffs are obviously not limited by the State of New Mexico in the number of federal voter registration forms they download from the Internet." (Am. Compl. ¶¶ 83, 85; Def.'s Mot. to Dismiss at 10.)

[15]  Defendant says that the plain text of the challenged law is in that sense "nonsensical," (Def.'s Mot. to Dismiss at 10), but unless this Court issues an injunction affirming the statute on the condition that this interpretation (which has been embraced by no state court) be given effect, Defendant will be entirely free to adopt the more obvious (even if "nonsensical" as a policy matter) interpretation of the statute's text.

II.   **PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE CHALLENGED
      LAW IS PREEMPTED BECAUSE IT CREATES AN OBSTACLE TO
      EFFECTUATING CONGRESS'S GOALS IN ENACTING THE NATIONAL
      VOTER REGISTRATION ACT**

Plaintiffs have also pled sufficient facts to state a claim that the challenged law is

preempted by the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg *et seq.* (the

"NVRA").  In enacting the NVRA, Congress created a comprehensive statutory and regulatory

apparatus designed to liberalize voter registration laws and facilitate eligible voter registration—

including by ensuring a robust and substantial role for third-party organizations in the

registration process.  42 U.S.C. § 1973gg(b)(1) (providing that purpose of the NVRA was "to

establish procedures that will increase the number of eligible citizens who register to vote in

elections for Federal office").  The challenged law strikes against that core purpose of the

NVRA, and is therefore preempted.

The Supreme Court has consistently held that state laws that disrupt a well-developed

federal regulatory regime and frustrate the regime's purpose are preempted pursuant "obstacle"

preemption.  *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)

(holding that preemption is appropriate where the challenged state law "stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress") (internal

quotations and citations omitted).  Accordingly, by imposing burdens on Plaintiffs' volunteer

voter registration drives and by effectively precluding such activity from occurring, the

challenged law impedes Congress's goal of increasing eligible voters' access to voter

registration, and therefore should be preempted.

Obstacle preemption is a species of conflict preemption.  *See Gade v. Nat'l Solid Wastes*

*Mgmt.  Ass'n*, 505 U.S. 88, 98 (1992).  In contrast to direct conflict preemption, where it is

physically impossible to comply with both state and federal law, obstacle preemption occurs when a state law acts as an obstacle to the effectuation of congressional intent. *See Crosby*, 530 U.S. at 373. In determining whether a state law is an obstacle to its federal counterpart, a court should first examine "the federal statute as a whole and identify[] its purpose and intended effects" and then determine whether the state law in question effectively frustrates the federal statute's objectives. *Id.* Courts have found obstacle preemption to be applicable in examining numerous state and local laws, including state laws that interfere with congressional goals in the area of election law. *See Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1269–70 (W.D. Wash. 2006) (granting plaintiffs preliminary injunction after concluding that state law requirement that a person's name be matched to either the Social Security Administration or Department of Licensing database before allowing the person to register to vote was likely preempted because it stood as an obstacle to achieving the purposes and objectives of the Help America Vote Act).[16]

The challenged law poses an obstacle to the purposes and objectives of the NVRA. The NVRA's legislative history outlines a robust and substantial role for third-party registration drives in fulfilling the purposes of the statute, and makes clear that the goal of the NVRA was to remove barriers such as state registration and certification that impeded the general availability of registration opportunities to potential voters. *See, e.g.*, S. Rep. 103-6, at 12 (third-party voter

---

[16] *See also Bird v. Pioneers Hosp.*, 121 F. Supp. 2d 1321 (D. Colo. 2000) (holding that state law's notice requirement before bringing a certain type of tort claim was an obstacle to the accomplishment of Congress' objectives in enacting the Emergency Medical and Active Labor Act); *Wilderness Soc'y v. Kane County*, 560 F. Supp. 2d 1147 (D. Utah 2008) (concluding that county's actions in posting county road signs and removing federal agency road closure signs on federal land were preempted because they created an obstacle to the accomplishment and execution of Congress's land management objectives for the areas in question).

-26-

registration drives "go to the voter" and thus "relieve[] the voter of the need to appear in person at one central registration office.") and  139 Cong. Rec. E17-03, (1993) (Statement of Rep. Swift) ("[t]his is a bill which will break down those formal last barriers to full citizen participation in our democratic society.").  Congress recognized that such drives provide a "convenient" method of voter registration that cannot be replicated by agency efforts alone, with the goal of "reconnect[ing] the citizens with their Government, to give them an easier way to be registered to vote so if they want to vote they can vote."  S. Rep. 103-6, at 12, Conference Report, 139 Cong. Rec. S5739-01, S5742 (1993) (Statement of Rep. Ford).  Thus, the effects of the restrictions the challenged law imposes on Plaintiffs' third-party voter registration activities, as set forth in the Complaint (Am. Compl. ¶¶ 141–46), unquestionably demonstrate that the challenged law is a significant obstacle to achieving the purposes and goals of the NVRA.

Defendant's argument that Plaintiffs' claims fail because they cannot show direct conflict between the challenged law and the NVRA is simply incorrect.  (Def.'s Mot. to Dismiss at 15.) As noted above, under obstacle preemption, a state law can be preempted even where it does not directly conflict with a federal statute.  *See*, *e.g.*, *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 158 (1977) ("A conflict will be found where compliance with both federal and state regulations is a physical impossibility . . . , *or* where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (emphasis added) (internal citations and quotations omitted).  Here, the challenged law's restrictions on Plaintiffs' registration activities are wholly inconsistent with the NVRA's goals and objectives, and present

a significant obstacle to effectuating congressional intent.[17]  The cumulative effect of these requirements and practices—to significantly limit and discourage Plaintiffs from participating in the electoral process, thereby frustrating the NVRA's goals—is starkly at odds with Congress's purpose in enacting the NVRA, and stands as an impermissible obstacle to achieving that objective.[18]

## III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE CHALLENGED LAW VIOLATES ARTICLE II, § 8 OF THE NEW MEXICO CONSTITUTION

Defendant's argument that Plaintiffs' Complaint fails to state a claim under the free and open elections clause of the New Mexico Constitution is similarly unfounded.  Article II, § 8 of the New Mexico Constitution requires that all state elections "shall be free and open" and that "no power . . . shall at any time interfere to prevent the free exercise of the right of suffrage," thereby guaranteeing equal access to the election process for all parties.  Moreover, the clause's guarantee extends beyond the act of merely casting a ballot, and extends to other parts of the election process, such as voter registration.  *See, e.g., Perkins v. Lucas,* 246 S.W. 150 (Ky. 1922) (discussing the comparable Kentucky Constitution's requirement of "free and equal" elections in

---

[17]  Defendant's argument against the NVRA's preemption of the challenged law also focuses only on the fifty-form limitation and the forty-eight hour deadline to return completed forms.  (Def.'s Mot. to Dismiss at 15-16.)  Tellingly absent from her brief is any discussion of the registration and training requirements imposed in connection with the law, not to mention the significant criminal and civil penalties for registration agents who violate the law.

[18]  In addition, Plaintiffs in fact make a number of specific allegations of direct conflict between the challenged law and the NVRA.  For example, Plaintiffs allege that, in implementing the federal law, state actors have prohibited or "red flagged" the use of federal voter registration forms.  (*See* Am. Compl. ¶¶ 83, 85-86, 146.)  Such rejection and/or active discouragement and bias against the use of federal forms results in direct contravention of the NVRA's dictate that states must "accept and use the mail voter registration application form prescribed by the Federal Election Commission."  42 U.S.C. § 1973gg-4(a)(1).

reviewing a voter registration law).[19]  Because the challenged law disproportionately restricts the activities of groups such as Plaintiffs, which engage in volunteer voter registration drives, the challenged law violates the free and open elections clause of the New Mexico Constitution.

For an election to be considered free and open (or equal), laws that impact the electorate's ability to participate in election process, such as through voter registration, must "be reasonable, uniform, and impartial, and must not deny nor abridge the constitutional right of suffrage, nor unnecessarily impede the right." *See id.* at 154.  As a result, any law that has a disproportionate effect on a particular group or subset of the voting population's ability to participate in the election process or unnecessarily impedes their access to exercise the franchise abridges Art. II, § 8's guarantee and should be struck down as unconstitutional. *See Gunaji v. Macias*, 31 P.3d 1008, 1016 (N.M. 2001).  As alleged in the Complaint, the challenged law violates the "free and open" elections clause because it fails to meet the factors set out in *Perkins*.  The challenged voter registration law is not uniform and impartial because its training requirements, forty-eight hour filing requirement, and potential for criminal penalties disproportionately harms those groups, like Plaintiffs, who rely primarily on volunteers to engage in voter registration activities.[20]  (Am. Compl. ¶¶ 4–6, 149–50.) As further alleged in the Complaint, the penalties for non-compliance imposed by the challenged law present insurmountable obstacles for Plaintiffs' volunteer-staffed organizations, and therefore restrict

---

[19]  The New Mexico Supreme Court has noted that Kentucky has uniquely well-developed jurisprudence on the constitutional requirement that elections be free and equal, a similar requirement to Art. II, § 8, and has looked to Kentucky case law in interpreting that section of the New Mexico Constitution.  *See, e.g.*, *Gunaji v. Macias*, 31 P.3d 1008, 1015-16 (N.M. 2001) (citing with approval several Kentucky cases in discussing Art. II, § 8).

[20]  Groups like ACORN, which have sufficient resources to pay individuals to register voters, attend the requisite trainings, and have the administrative support to comply with the forty-eight hour filing requirement are not similarly disadvantaged.

their free and open access to the election process.  (*Id.* ¶¶ 5, 150)  The challenged law is also

unnecessary and unreasonable for the reasons discussed in Section I.B.2, *supra*, because it does

not work to serve the State's interests in preventing voter registration fraud.[21]  Defendant has

placed before Plaintiffs an impermissible barrier to their access to the electoral system and

unconstitutionally limited their participation in the election process.

Defendant, however, argues that Plaintiffs have failed to state a claim under the free and

open elections clause, asserting (a) that the constitutional protections of Art. II, § 8 do not protect

Plaintiffs' voter registration activity and (b) that Plaintiffs impermissibly conflate their First

Amendment rights with those protected by Art. II, § 8.  (Def.'s Mot. to Dismiss at 15–16.)  Both

of these arguments lack merit.  As to the first, Defendant admits that Plaintiffs' voter registration

efforts are essential for a properly functioning participatory democracy (*Id.* at 1), and that

broader, election-related activity is included within the scope of Art. II, § 8's protection.  *See*

*Perkins* and *Gunaji*, *supra*.  As to the second, the fact that the challenged law also violates the

Plaintiffs' First Amendment rights in no way forecloses a finding that Plaintiffs' rights under the

free and open election clause have also been impinged.

---

[21]  Moreover, the potential voters served by Plaintiffs are traditionally disenfranchised groups (the disabled, the poor, the uneducated, and those living abroad) who frequently require assistance in accessing the election process.  *See Gunaji,* 31 P.3d at 1016 ("no election can be free and equal…if any substantial number of persons entitled to vote are denied the right to do so.").  The impact of the law on Plaintiffs' activities has the effect of impeding and denying the right of these disenfranchised groups to exercise their right of suffrage and thereby raises significant concerns about whether New Mexico's elections are in fact open and free.

IV.     **PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE STANDARDLESS**
        ***AD-HOC* TRAINING REQUIREMENT IMPOSED BY INDIVIDUAL COUNTY**
        **CLERKS CONSTITUTES A VIOLATION OF NEW MEXICO'S**
        **CONSTITUTIONAL PRINCIPLE OF NON-DELEGATION**

Plaintiffs have adequately alleged that the *ad-hoc* training requirements imposed by New

Mexico's County Clerks on third-party voter registration agents, which have neither basis in the

statutes or regulations of the challenged law, violate New Mexico's constitutional non-delegation

doctrine.  As articulated in *Cobb v. New Mexico Canvassing Board,* 140 P.3d 498 (N.M. 2006),

the New Mexico Constitution—unlike its federal counterpart—severely limits the New Mexico

Legislature's ability to delegate its authority to executive branch officials.  Such delegations

must be clearly circumscribed and delegations involving discretionary power may only be

entrusted to experts in the designated policy area.  *Id.* at 510-11.  Moreover, executive agencies

may only exercise the authority that has been properly delegated to them.  *See id.* at 509-11.

The New Mexico Supreme Court has made plain that the Legislature, in delegating its

power, "may not vest unbridled or arbitrary authority in an administrative body, . . . and must

provide reasonable standards to guide it."  *Id.* at 509-10.  For a legislative delegation to be

constitutional, it must be sufficiently defined "so that it may be known whether [the

administrator] has kept within it in compliance with the legislative will."  *Id.* at 510 (quoting

*State ex rel. Schwartz v. Johnson,* 907 P.2d 1001, 1006 (N.M. 1995)).  Although the New

Mexico Supreme Court will tolerate grants of rulemaking authority to executive agencies, they

must be "with[in] defined limits, and subject to review," *id.* (quoting *State v. Spears*, 259 P.2d

356, 360 (N.M. 1953)), and must be directed at "experts" in order for such rulemaking actions to

be entitled to judicial "deference."  *Id.* at 510-11.

No judicial deference is appropriate here.  As an initial matter, the Legislature did not

delegate to the County Clerks the authority to impose training requirements on third-party voter

registration agents.  Nor could it have for the County Clerks are not "experts" in voting-related

matters.[22]  Moreover, as Defendant readily concedes, "[s]uch training is not required by either

Section 1-4-49 or the rules promulgated thereunder by the Secretary of State."  (Def.'s Mot. to

Dismiss at 3.)  Thus, the County Clerks' exercise of legislative power lacks grounding in either

legislative process and is essentially devoid of any limits.

Defendant argues that the non-delegation doctrine does not apply here because the

training requirements implicate the delegation of authority "from one executive agent to

another."  (*Id.* at 19.)[23]  She is mistaken.  First, this silent and boundless "re-delegation" of

authority is in direct conflict with the Legislature's delegation of authority to the Secretary of

State as the "chief election officer."  N.M. Stat. Ann. § 1-2-1.A; *see also Cobb,* 140 P.3d at 511

(noting the Secretary is an "expert in the area of voting or elections.").  Specifically, the

Legislature directed that the Secretary of State, in exercising her delegated authority, "shall . . .

obtain and maintain *uniformity* in the application, operation and interpretation of the Election

Code."  N.M. Stat. Ann. § 1-2-1.A(1) (emphasis added).  The Secretary's decision to grant thirty-

three different County Clerks the unbridled discretion to concoct training programs that

---

[22]  The Secretary of State is recognized as an election law expert, *see* N.M. Stat. Ann. § 1-2-1.A; *see also Cobb,* 140 P.3d at 511, but the Legislature has made clear through its laws that the County Clerks are not experts in the field and require guidance from the Secretary of State, *see, e.g.,* N.M. Stat. Ann. § 1-2-2.D (Secretary of State must "advise county clerks…as to the proper methods of performing their duties prescribed by the Election Code").

[23]  Defendant also seems to suggest that her nominal supervision of county clerks somehow justifies the unconstitutional delegation of authority.  (Def.'s Mot. to Dismiss at 19.)  Her general supervision of County Clerks cannot shield her from the consequences of having improperly delegated authority any more than the legislature's general ability to revise statutes immunizes delegations of legislative authority from constitutional scrutiny.

admittedly have *no basis* in statute or regulation, without *any* guidance from her office, conflicts

with this restriction on her delegated authority. *See Workers World Party v. Vigil-Goron,* 693 F.

Supp. 989, 992 n.2 (D. N.M. 1988) (questioning the constitutionality of Secretary of State's

failure to provide county clerks with specific instructions concerning the method of counting

signatures given the "lack of uniform results inherently possible" from such a practice); (Am.

Compl. ¶ 24 ("Representatives of NMPIRG and SWOP have reported that training is a *de facto*

requirement in *many* parts of New Mexico, particularly in Albuquerque.") (emphasis added)).

Moreover, while the Legislature has acknowledged the role County Clerks should play in the

administration of election-related matters, it expressly instructed the Secretary of State to "advise

county clerks . . . as to the proper methods of performing their duties prescribed by the Election

Code." N.M. Stat. Ann. § 1-2-2.D. The absence of any instructions to the County Clerks on the

training requirement similarly violates the scope of the Secretary's powers.

 Second, it is axiomatic that if the Legislature could not directly delegate authority to a

particular entity, its authority cannot be indirectly delegated to that entity. As noted above, the

"authority" exercised by the County Clerks is defective because they are not experts and the

delegation is not defined. Accordingly, the Secretary of State's "re-delegation" to the County

Clerks would be improper even if it did not violate the terms of her own grant of legislative

authority.[24]

---

[24] Defendant also attempts to minimize her delegation here as "hardly excessive." (Def.'s Mot. to Dismiss at 19.) Even if Defendant's characterization were true, an impermissible delegation is impermissible regardless of the amount of authority being delegated; there is no *de minimis* amount of authority that can be delegated in violation of the New Mexico Constitution. Moreover, the delegation here *is* excessive because it is unwritten and therefore lacks *any* parameters. This blatant affront to non-delegation principles begs the question of what prevents the Country Clerks from imposing other *ad-hoc* requirements on third-party registration agents.

V.   **PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT COUNTY CLERKS' *AD-HOC* TRAINING REQUIREMENTS IMPOSED WITHOUT ANY PROCESS VIOLATE THE DUE PROCESS CLAUSE**

Finally, the Complaint alleges that Defendant has violated Plaintiffs' procedural due process rights under the Fourteenth Amendment by purportedly authorizing County Clerks to set *ad-hoc* policies for third-party registration not found anywhere in the relevant statute or regulations—including the *ad-hoc* training requirement—*without any process whatsoever.*  (*See* Am. Compl. ¶¶ 24, 165-66.)  Defendant's attempt to dismiss this claim lack merit.

Defendant's *only* argument for dismissal is that "Plaintiffs do not describe the process that they believe they are due," and therefore have failed to describe how their rights have been violated.  (Def.'s Mot. to Dismiss at 19-20.)  But the irreducible requirements of due process are well-established.  The Constitution demands that at least *some* process—at a minimum, the procedural protection of the ordinarily legislative process—be provided before government action may infringe upon a liberty interest.[25]  *See Bi-Metallic Co. v. Colo. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (noting that legislative action does not require individualized notice and opportunity to be heard, but only if "proper state machinery has been used"); *see also Conn. Judicial Selection Comm'n v. Larson*, 745 F. Supp. 88, 98 (D. Conn.

---

[25]  As the Complaint alleges, Plaintiffs' liberty interests, including their First Amendment rights, are exceptionally affected by the training requirement because they—unlike many other third-party voter registration agents—rely on the time and energy of unpaid volunteers to engage in voter registration activities and thereby engage in symbolic and core political speech on Plaintiffs' behalf.  (*See, e.g.*, Am. Compl. ¶ 64 ("The likelihood of SWOP undertaking voter-registration initiatives for 2008 would increase greatly if the requirements of the law—especially the training and pre-registration requirements—were repealed or invalidated."); *id.* ¶ 66 ("Requiring a registration agent to . . . attend training . . . prevents spontaneous registration drives, and makes it difficult to hire workers and use volunteers."); *id.* ¶ 67 ("The . . . training . . . requirements have, for example, reduced the NMPIRG Education Fund's ability to recruit casual volunteers and have prevented the spontaneous volunteer efforts that are central to its operations."); *id.* ¶ 73 ("The training session itself is also intimidating, further limiting Plaintiffs' ability to recruit volunteers.").)

1989) (Cabranes, J.) (citing *United States v. Locke*, 471 U.S. 84, 108 (1985), noting that "in context of legislation, due process is *not* right to be heard individually, but rather right to legislative process").  But the New Mexico legislature has not authorized the County Clerks' adoption of *ad-hoc* policies, (*see supra* Section IV), and Defendant has failed to provide Plaintiffs any other process.[26]  Accordingly, Defendant's conduct violates the most basic requirements of due process and her Motion to Dismiss must be denied.

## CONCLUSION

For the foregoing reasons, each count of Plaintiffs' Complaint sets forth a claim upon which relief may be granted.  Accordingly, Defendant's Motion to Dismiss should be denied in its entirety.

Respectfully Submitted,
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A

s/ Edward Ricco
By_____
Edward Ricco
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
ericco@rodey.com

Edward D. Hassi
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
thassi@omm.com

Charles E. Borden
Guy G. Brenner

---

[26]  Defendant has not disputed the applicability of due process protections in this case.  (*See* Def.'s Mot. to Dismiss at 19-20.)

O'Melveny & Myers LLP
1625 Eye Street N.W.
Washington, DC 20006-4001
Telephone: (202) 383-5300
cborden@omm.com
gbrenner@omm.com

*Attorneys for Plaintiffs*

I certify that on September 16, 2009, I filed the foregoing electronically through the CM/ECF system, which caused parties or counsel in this matter to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

     s/ Edward Ricco

By_____

  Edward Ricco