## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES, FEDERATION OF
AMERICAN WOMEN'S CLUBS
OVERSEAS, INC., NEW MEXICO PUBLIC
INTEREST RESEARCH GROUP
EDUCATION FUND, and SOUTHWEST
ORGANIZING PROJECT,

       Plaintiffs,

vs.                                   No. CIV 08-0702 JB/WDS

MARY HERRERA, in her capacity as
Secretary of State,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss, filed August 21, 2009 (Doc. 78).  The Court held a hearing on October 13, 2009.  Plaintiffs American Association of People with Disabilities, Federation of Women's Clubs Overseas, Inc., New Mexico Public Interest Research Group Education Fund, and Southwest Organizing Project challenge four aspects of New Mexico's third-party voter-registration law: (i) a requirement that third-party registration agents complete a pre-registration process and provide personal information; (ii) a limitation on the number of registration forms an organization or individual may receive; (iii) a requirement that third-party registration agents return completed registration forms to the County Clerk or Secretary of State within forty-eight hours; and (iv) criminal and civil penalties for parties who do not comply with third-party registration laws.  The primary issues are: (i) whether the Court's prior denial of a preliminary injunction compels the Court to dismiss Plaintiffs' action for failure to state claims for which relief can be granted;  (ii) what standard of review -- strict

scrutiny, rational basis, or something else -- applies to evaluating the constitutionality of New Mexico's third-party voter-registration law, NMSA 1978, § 1-4-49; (iii) whether the Plaintiffs have sufficiently pled that NMSA § 1-4-49 imposes an undue burden on the Plaintiffs' First-Amendment rights (Count I); (iv) whether the Plaintiffs have sufficiently pled that § 1-4-49 is unconstitutionally overbroad or void for vagueness (Count II); (v) whether the Plaintiffs have sufficiently pled that the National Voter Registration Act ("NVRA"), 42 U.S.C. §§ 1973gg-1 to 1973gg-10 preempts NMSA 1978, § 1-4-49 (Count III); (v) whether § 1-4-49 violates Article II, Section 8 (Count IV) and Article II, Section 17 of the New Mexico Constitution (Count V); (vi) whether the Plaintiffs' have sufficiently alleged the training requirement imposed by the County Clerks violates New Mexico's constitutional principle of non-delegation (Count VI); and (vii) whether the training requirement violates the due-process clause of the United States Constitution (Count VII). Because the Court finds that the Plaintiffs have plead sufficient facts to establish that the New Mexico voter-registration law implicates their First-Amendment rights and have adequately alleged that the State has burdened those rights, and have also alleged sufficient facts to establish that the voter-registration law burdens their rights under Article II, Section 17 of the New Mexico Constitution, the Court will deny the Secretary's motion as to Count I and Count V. As a matter of law, the Court finds that § 1-4-49 is not void for vagueness or unconstitutionally overbroad, and therefore grants the Secretary's motion to dismiss Count II. The Court also finds that the NVRA does not preempt New Mexico's third-party voter-registration law, nor do the laws violate Article II, Section 8 of the New Mexico Constitution, and therefore the Court also dismisses Count III and Count IV. Finally, the Court finds that the New Mexico Election Code includes a requirement that County Clerks train and educate registration agents, and therefore the Court will dismiss the Plaintiffs' claims that the training requirement violates the New Mexico constitutional principle of

non-delegation and the due-process clause, and therefore dismisses Count VI and Count VII.  The

Court, therefore, will deny the Secretary's motion in part and grant it in part.

## FACTUAL BACKGROUND

The Plaintiffs are four nonprofit organizations that engage in volunteer-run voter-registration

activities in what the Plaintiffs contend are politically under-represented communities.  See

Amended Complaint for Declaratory and Injunctive Relief ¶¶ 11-14, at 5-7, filed August 14, 2009

(Doc. 75)("Am. Complaint").   In 2005, the New Mexico Legislature enacted legislation that

restricted the voter-registration activities of third-party organizations.  See Am. Complaint ¶ 16, at

7-8.  The legislation has imposed restrictions on the Plaintiffs' ability to help fellow citizens register

to vote -- through NMSA 1978, § 1-1-49; its implementing regulations, 1.10.25.7-10 NMAC; and

the manner in which the Secretary has allowed the law to be enforced.  See Am. Complaint ¶¶16-25,

at 7-11.  These restrictions and requirements apply to all individuals and organizations except state

or federal agencies.  The Plaintiffs challenge all of these laws.

More background on the lawsuit is set forth in the Court's earlier Memorandum Opinion and

Order.  See American Assoc. of People with Disabilities, et al. v. Herrera, 580 F. Supp. 2d 1195

(D.N.M. 2008)(Browning, J.).

## PROCEDURAL BACKGROUND

In their First Amended Complaint, the Plaintiffs repeatedly allege that they have engaged

in expressive conduct, which the First Amendment protects, by conducting volunteer

voter-registration drives.  See Am. Complaint ¶¶ 2, 3, 26, 31, 32, 33, 38, 45, 46, 47, 53, 100-02, at

2, 11-14, 17-20, 33.   The Plaintiffs allege that they intend to convey a message with their

voter-registration efforts and that anyone who observe the Plaintiffs' efforts is likely to understand

this message.  See Am. Complaint ¶¶ 3, 11-14, 26-28, 31-34, 36-39, 45-47, 53, 56-58, 60, 101, 102,

at 2, 5-6, 11-12, 14-15, 17-22, 33.  The Plaintiffs have alleged that their volunteer voter-registration activities are so intertwined with their political speech regarding the importance of registering to vote that one cannot be regulated without affecting the other.  See Am. Complaint ¶¶ 3, 26, 33-35, 37, 38, 45, 47, 56, 59, 103-07, at 2, 11-12, 14-15, 17-22, 34-35.

The Plaintiffs' first claim alleges that the challenged laws impose burdens that severely and unjustifiably hamper the Plaintiffs' voter-registration activities.  See Am. Complaint ¶ 102, at 33-34.  The Plaintiffs also contend that these burdens lack any adequate justification.  See id. ¶ 114, at 37.  The Plaintiffs contend that their voter-registration activities constitute core political speech and expressive association.  See Am. Complaint ¶¶ 103-113, at 34-36.  They identify two separate acts of speech at issue: (i) the speech act intertwined with registering someone to vote; and (ii) the incidental speech that takes place when registering voters.  See Am. Complaint ¶ 3, at 2.

They also contend that §1-4-49 is overbroad  on its face and void for vagueness.  See id. ¶¶ 121-129, at 39-41.  In its Memorandum Opinion and Order denying the Plaintiffs' motion for a preliminary injunction, the Court did not agree with the Plaintiffs' argument that  § 1-4-49 is vague and overbroad.  See Memorandum Opinion and Order, filed September 17, 2008 (Doc. 49).

The Plaintiffs argue that New Mexico's third-party voter-registration law and implementing regulations and requirements violate the NVRA, and to the extent that they are inconsistent with the NVRA, are subject to preemption.  See Am. Complaint ¶ 140, at 43.  Additionally, the Plaintiffs argue that § 1-4-49 violates Article II, Section 8 of the New Mexico Constitution, which requires that "[a]ll elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage," by imposing severe financial and administrative burdens on the Plaintiffs.  Am. Complaint ¶ 149, at 44.  They also contend that § 1-4-49 violates Article II, Section 17 of the New Mexico Constitution, which protects free speech.

In addition to challenging the New Mexico third-party voter-registration law, the Plaintiffs also allege that the training the County Clerks require of third-party registration agents is a violation of the New Mexico constitutional principle of non-delegation. See Am. Complaint ¶¶ 158-163, at 46-49. The Plaintiffs further contend that the training requirement is irreconcilable with the demands of procedural due process. See Am. Complaint ¶¶ 164-166, at 47.

The Secretary has moved to dismiss the Plaintiffs' Amended Complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure. She contends that § 1-4-49 is a reasonably restricted means of accomplishing an important state interest, namely safeguarding the integrity of the elective franchise. See Motion at 6. She contends, using the test that the Supreme Court articulated in Anderson v. Celebrezze, 460 U.S. 780 (1983), for evaluating constitutional challenges to state election laws, that the factors weigh in favor of the constitutionality of the New Mexico third-party voter-registration law because it does not impose as severe a restriction on the Plaintiffs' speech rights as the Plaintiffs contend, and the law serves New Mexico's legitimate interest in a manner no more burdensome than necessary in light of the magnitude of that interest. See Motion at 5. She further contends that § 1-4-49 is not in conflict with the NVRA because it merely regulates the conduct of a third-party registration agent, and does not prohibit or limit the use of federal voter registration forms that the State must accept under the NVRA. See Motion at 15.

The Secretary also argues that the Plaintiffs have confused alleged restrictions on free speech with interference with free and open elections, and that the right to free and open elections does not extend to the right to register voters -- thus the Plaintiffs' claim under Article II, Section 8 of the New Mexico Constitution must fail. See Motion at 16. Additionally, she argues that the Plaintiffs have not pled a sufficient separate cause of action under Article II, Section 17 of the New Mexico Constitution. See Motion at 17-18.

With regard to the training requirement, the Secretary argues that the County Clerks are her agents and that there is no prohibition against delegating authority from one executive agent to another.  See Motion at 19.  Moreover the Secretary argues that the Plaintiffs do not adequately describe what process they believe they are due, nor do they describe the manner in which the County Clerks exercise of discretion has allegedly violated their rights, and thus the Plaintiffs have failed to state a claim.  See id.

The Plaintiffs' filed their Opposition to Defendant's Motion to Dismiss on October 16, 2009.  See Doc. 81 ("Pl. Opp.").  The Plaintiffs argue that they have adequately alleged that the voter-registration law places unjustified burdens on their message: that the Plaintiffs believe in civic participation and are willing to expend the resources to broaden the electorate to include underserved communities.  See Pl. Opp. at 9.  They argue that anyone that has observed the Plaintiffs' efforts would understand their intended message.  See id.  The Plaintiffs argue that the merits of the First Amendment claims turn on factual matters not suitable for resolution on a motion to dismiss.  See Pl. Opp. at 16.  The Plaintiffs argue that they have pled a sufficient preemption claim because New Mexico's third-party voter-registration law strikes against the core purpose of the NVRA -- to liberalize voter-registration laws and to facilitate eligible voter registration.  See Pl. Opp. at 25.  The Plaintiffs argue that New Mexico's third-party voter-registration law creates an obstacle to the full purposes and objectives of Congress in passing the NVRA.  See Transcript of Hearing at 82:3-8 (taken Oct. 13, 2009)("Hearing Tr.")(Brenner).[1]

The Plaintiffs also contend that they have sufficiently stated claims under the New Mexico Constitution.  They argue that Article II, Section 8 extends beyond the act of casting a ballot and

---

[1] The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

extends to other parts of the election process, such as voter registration.  See Pl. Opp. at 28 (citing Perkins v. Lucas, 246 S.W. 150 (Ky. 1922)).  The Plaintiffs also argue that their free speech rights and associational rights under Article II, Section 17 of the New Mexico Constitution, and their rights under the First Amendment of the United States Constitution are co-extensive and should both be analyzed under the Anderson standard.  See Pl. Opp. at 5 n.3.

The Plaintiffs further argue that they have adequately alleged that the training requirements imposed by the County Clerks violate the non-delegation doctrine of the New Mexico Constitution, because such delegations must be clearly circumscribed and because the training at issue is not dictated by § 1-4-49 or the rules promulgated thereunder by the Secretary.  See Pl. Opp. at 32.

At the hearing, Scott Fuqua, attorney for the Secretary, conceded that the Court's ruling on the preliminary injunction is not dispositive of any issue in the motion to dismiss.  See Hearing Tr. at 7:10-14(Court, Fuqua).  Mr. Fuqua also conceded that the First Amendment protects the incidental speech that occurs when the Plaintiffs speak with people registering, however, Mr. Fuqua maintains that there is no clear message conveyed in the act of registering voters and thus that is not speech which the First Amendment protects.  See id. at 9:14-17, 12:8-25 (Court, Fuqua).

In regards to the four challenged portions of § 1-4-49, Charles Borden, the Plaintiffs' attorney, argued that the Court should apply strict scrutiny because the political conduct at issue is so intertwined with protected speech.  See id. at 29:19-30:16 (Borden).  With regards to whether § 1-4-49 puts an undue burden on the Plaintiffs and whether the assessment of that question is one of law or fact, Mr. Fuqua argued that, of the four challenged prongs of § 1-4-49,  the Court does not need to allow for factual development on the registration and manner in which fines are imposed. See  id. at 45:17-21 (Fuqua).   Mr. Fuqua conceded, however, that there may be factual determinations necessary regarding the burden that the fifty-form-limit and forty-eight-hour-return

-7-

requirements in § 1-4-49 causes.  See id. at 47:8-11 (Fuqua).  Both parties conceded at the hearing

that the Court may make a legal determine whether there is an additional right of registration which

the First Amendment protects, without the need for further factual development.  See id. at 25:6-26:4

(Court, Borden); id. at 26:7-11 (Court, Fuqua).  Both parties also conceded at the hearing that a jury

demand has not been made in this matter.  See id. at 41:8-12 (Court, Fuqua); id. at 51:25-52:1

(Borden).  Mr. Fuqua further conceded that, if the Court waits for further factual determinations with

regards to the First Amendment claims, it would need to do the same thing for the New Mexico

Constitutional claims.  See id. at 97:15-18 (Fuqua).  Mr. Borden argued that substantial factual

development about the collective burden that the requirements of § 1-4-49 put upon the Plaintiffs

will be necessary.  See id. at 55:16-21 (Borden).

On the issue whether § 1-4-49 is vague or overbroad, both parties conceded that the

determination is purely legal and not factual.  See id. at 60:21-61:1 (Borden); id. at 61:18-62:2

(Fuqua).  The Plaintiffs argue that the term "assist" in § 1-4-49 is vague and open to multiple

meanings.  See Pl. Opp. at 23 n. 13; Hearing Tr. at 68:18-69:15 (Borden).  The Plaintiffs also argue

that it is vague how they are supposed to comply with the statute's forty-eight-hour-delivery

requirement.  See Pl. Opp. at 24; Hearing Tr. at 70:11-71:16 (Borden).

On the issue of the training requirement and non-delegation, Mr. Fuqua conceded that any

burden caused by the training requirement would also require some factual development.  See

Hearing Tr. at 49:17:21 (Fuqua).  He also stated that "it's a little odd that the training requirement

doesn't appear in the statute and that the training requirement doesn't appear in anything that the

Secretary of State has promulgated, in any rules or regulations, but there doesn't seem to be any

question that the County Clerks do in fact require that training."  Hearing Tr. 100:15-20 (Fuqua).

Mr. Fuqua conceded that, if the argument the Plaintiffs are making is that the County Clerks should

not be imposing a training requirement because it has no basis in either the statute or rules and regulations promulgated by the Secretary, then the appropriate relief would be to enjoin the County Clerks from having a training requirement. <u>See</u> <u>id.</u> at 102:5-10 (Fuqua). He clarified, however, that the Plaintiffs have not asked for injunctive relief, but rather contend that the requirement is an unconstitutional delegation of authority by the Secretary and noted that the County Clerks are not parties to this action. <u>See</u> <u>id.</u> at 102:14-22 (Fuqua). The Plaintiffs maintain that the County Clerks are the Secretary's agents and that she has the power to restrain them. <u>See</u> <u>id.</u> at 110:4-7 (Brennan). Both parties concede that the Court may decide the issues of non-delegation and due process without further factual development. 114:7-115:3 (Court, Brennan, Fuqua).

## LAW REGARDING PRELIMINARY INJUNCTIONS

A preliminary injunction motion is a request for an "extraordinary remedy," <u>Greater Yellowstone Coalit. v. Flowers</u>, 321 F.3d 1250, 1256 (10th Cir. 2003), namely, to restrict the parties from altering the status quo until the merits of their disputes may be resolved, <u>see</u> <u>Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC</u>, 562 F.3d 1067, 1070-71 (10th Cir. 2009). The court's inquiry on such a motion requires, among other things, review of the likelihood of the movant's success on the merits, which necessitates an assessment of the facts underlying the movant's claims. <u>See</u> <u>Resolution Trust Corp. v. Cruce</u>, 972 F.2d 1195, 1198 (10th Cir. 1992); <u>Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.</u>, 805 F.2d 351, 354-55 (10th Cir. 1986). A preliminary injunction requires the court to make predictions about the plaintiff's likelihood of success. "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" <u>Attorney Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 776 (10th Cir. 2009)((quoting <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981)).

## LAW REGARDING MOTIONS TO DISMISS

"[T]he standard on a motion to dismiss is quite different from the standard for granting a preliminary injunction." Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs, No. 07-CV-2243, 2007 WL 4591845, at * 13 (E.D.N.Y. Dec. 26, 2007).  In contrast to a motion for a preliminary injunction, a motion to dismiss requires that the court determine, while accepting all facts pled in the complaint as true and granting all reasonable inferences from the pleadings in favor of the plaintiff, whether the complaint states a cause of action for which relief can be granted.  See Park Univ. Enters., Inc. v. Am. Cas. Co., 442 F.3d 1239, 1244 (10th Cir. 2006). This standard remains intact even after the Supreme Court of the United States' recent decisions on the pleading requirements of rule 8.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1276 (10th Cir. 2009)("Even after Twombly, the factual allegations need only contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'")(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Thus, a motion to dismiss does not ask the court to analyze the plaintiff's likelihood of success on the merits; rather, the court must find only a reason to believe that the plaintiff has a "reasonable likelihood of mustering factual support for the claims," Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007), and that their claims are "'plausible,'" Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1276 (10th Cir. 2009)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

A motion to dismiss is a request to dismiss a case before discovery has taken place and thus permits only an assessment whether a complaint is sufficient on its face.  In adjudicating a motion to dismiss, a court may neither grant the motion because it believes it is unlikely the plaintiff can

prove the allegations, see Robbins v. Oklahoma, 519 F.3d 1242, 1246 (10th Cir. 2008), nor may it

"weigh potential evidence that the parties might present at trial" in assessing the motion's merit,

Duran v. Carris, 238 F.3d 1268, 1270 (10th Cir. 2001)(quoting Sutton v. Utah State Sch. for the

Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999)).

## LAW REGARDING CONSTITUTIONAL CHALLENGES TO STATE ELECTION LAWS

Increasingly, challenges to voting procedures have taken center stage in voter-related

litigation.  The Supreme Court has stated that, "as a practical matter, there must be a substantial

regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos,

is to accompany the democratic process."  Storer v. Brown, 415 U.S. 724, 730 (1974).  See

Timmons v. Twin Cities Area New Parties, 520 U.S. 351, 358 (1997)(holding "that States may, and

inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and-

campaign-related disorder.").  The Supreme Court has noted, however, that state voting laws,

"whether [they] govern[] the registration and qualification of voters, the selection and eligibility of

candidates, or the voting process itself, inevitably affects -- at least to some degree -- the

individual's right to vote and his right to associate with others for political ends."  Burdick v.

Takushi, 504 U.S. 428,433 (1992)(quoting Anderson v. Celebrezze, 460 U.S. at 788).

### 1.    Levels of Scrutiny and the Anderson v. Celebrezze Test.

When the constitutionality of a law is challenged, the allocation of the burden of proof

depends on the level of judicial scrutiny that a plaintiff's claims invoke.  Under rational-basis

review, courts presume the constitutionality of a law and will sustain the law if the statute is

rationally related to a legitimate state interest.  See Kimel v. Florida Bd. of Regents, 528 U.S. 62,

84 (2000); Seegmiller v. LaVerkin City, 528 F.3d 762, 771-72 (10th Cir. 2008)("Absent a

-11-

fundamental right, the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest."). The individual challenging the statute's constitutionality bears the burden of proving that the statute is not rationally related to a legitimate state interest. Under intermediate scrutiny, the State must articulate an important state interest, and the court must determine whether the law is narrowly tailored to serve the important state interest. See United States v. O'Brien, 391 U.S. 367, 376-77 (1968). Under strict scrutiny, the State must assert a significant and compelling state interest, and the law must be narrowly tailored to serve that compelling state interest. See Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 45 (1983); Dias v. City & County of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009)("If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest.").

Although state voting laws create barriers for citizens, the Supreme Court has found that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." Burdick v. Takushi, 504 U.S. at 433. Instead of applying strict scrutiny to all state election laws which create a burden on voters, the Supreme Court in Anderson v. Celebrezze set forth a two-step process to evaluate the constitutionality of challenged election laws. The Supreme Court stated:

> Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interest, it also must consider the extent to which those

-12-

interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson v. Celebrezze, 460 U.S. at 789 (internal citations omitted).[2]  In Anderson v. Celebrezze, the Supreme Court held that an Ohio statute, which imposed a statutory early-filing deadline for independent candidates, was an unconstitutional burden on the voting and associational rights of an independent candidate's supporters and was not justified by Ohio's asserted interest in political stability.  See 460 U.S. at 805-06.  In Burdick v. Takushi, the Supreme Court  applied the Anderson v. Celebrezze test to determine whether Hawaii's voting law prohibiting write-in voting infringed upon Hawaii citizens' rights under the First and Fourteenth Amendments.  See 504 U.S. at 434.  The Supreme Court explained:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.  Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."  Norman v. Reed, 502 U.S. 279, 289 (1992).  But when a state election law provision imposes only "reasonable non discriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interest are generally sufficient to justify" the restrictions.  Anderson [v. Celebrezze], 460 U.S. at 788; see also id., at 788-89, n. 9.  We apply this standard in considering petitioner's challenge to Hawaii's ban on write-in ballots.

Burdick v. Takushi, 504 U.S. at 434.  Applying the Anderson v. Celebrezze standard, the Supreme Court in Burdick v. Takushi found that, "in light of the adequate ballot access afforded under Hawaii's election code, the State's ban on write-in voting imposes only a limited burden on voters'

---

[2] The Supreme Court noted that, although the decision in Anderson v. Celebrezze is based on the First and Fourteenth Amendments, it relied on the analysis from prior election cases resting on the Equal-Protection Clause of the Fourteenth Amendment, which identified the First-and-Fourteenth-Amendment rights implicated by restrictions on voting-rights and considered the degree to which the State's restrictions furthered legitimate state interests.  See Anderson v. Celebrezze, 460 U.S. at 788 n.7.

rights to make free choices and to associate politically through the vote."  504 U.S. at 438-39. Because the Supreme Court found that Hawaii's voting law created only a slight burden, "the State need not establish a compelling interest to tip the constitutional scales in its direction."  Id. at 439. Hawaii justified the write-in prohibition because it "avoid[ed] the possibility of unrestrained factionalism at the general election" and was "necessary to guard against party raiding."  Id. at 439 (internal citations and quotations omitted).  The Supreme Court held that Hawaii's interests were legitimate and outweighed the burden imposed on Hawaii's voters, and therefore the voting law was constitutional.  See id. at 441.

The Supreme Court recently applied the Anderson v. Celebrezze test in Crawford v. Marion County Election Board, 128 S. Ct. 1610 (2008), to determine the constitutionality of an Indiana voting law requiring voters to produce valid photographic identification at the polls before being allowed to vote.  Justice Stevens, in announcing the judgment of the Court upholding the voting law, and delivering an opinion that Chief Justice Roberts and Justice Kennedy joined, referred to the Anderson v. Celebrezze test as a "balancing approach."  128 S. Ct. at 1616 ("In later election cases we have followed Anderson's balancing approach.").[3]  Indiana asserted several state interests that justified its voting law -- deterring and detecting voter fraud, modernization of election procedures, and safeguarding voter confidence -- which Justice Stevens characterized as "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral

---

[3] Notably, Justice Stevens supported this proposition by citing Norman v. Reed, 502 U.S. 279 (1992) -- a case that dealt not with a right to vote, but with "the constitutional right of citizens to create and develop new political parties . . . [, which] derives from the First and Fourteenth Amendments."  Crawford v. Marion County Election Bd., 128 S. Ct. at 1616 (citing Norman v. Reed, 502 U.S. at 288).  Thus, the Court will apply the Anderson v. Celebrezze test to New Mexico's third-party voter-registration law even when the asserted right derives from some other source other than the right to vote.

process." 128 S. Ct. at 1616.  Justice Stevens acknowledged that "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."  Id. at 1619.  He also expressed that "the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process."  Id.  Considering the Indiana voting law's broad application to all Indiana voters, the Supreme Court concluded that it imposed only a limited burden on voters' rights and the "precise interests" of the State were sufficient to defeat the facial constitutional challenge.  Id. at 1623 (quoting Burdick v. Takushi, 504 U.S. at 434).

Justice Scalia, joined by Justice Thomas and Justice Alito, filed a separate concurrence in which he argued that Anderson v. Celebrezze is not a balancing test.  See Crawford v. Marion County Election Board, 128 S. Ct. at 1624 (Scalia, J. concurring).  Scalia argued that, "[a]lthough the opinion in Burdick [v. Takushi] quoted Anderson [v. Celebrezze], Burdick forged Anderson's amorphous 'flexible standard' into something resembling an administrable rule" which created a "two-track approach" to evaluating voting laws.  128 S. Ct. at 1624.  According to Justice Scalia, under the two-track approach, a court should first determine the severity of the burden that an election law places on First-Amendment rights.  If the burden is severe, the court applies strict-scrutiny.  See 128 S. Ct. at 1624.  If the burden is non-severe and non-discriminatory, the court applies a "deferential 'important regulatory interests' standard."  Id. (quoting Burdick v. Takushi, 504 U.S. at 433-34).  Justice Stevens, writing for the Court, responded to Justice Scalia's approach, stating: "To be sure, Burdick rejected the argument that strict scrutiny applies to all laws imposing a burden on the right to vote; but in its place, the Court applied the 'flexible standard' set forth in Anderson.  Burdick surely did not create a novel 'deferential important regulatory interests standard.'" 128 S. Ct. at 1616 n.8.

-15-

The United States Court of Appeals for the Tenth Circuit has characterized the Anderson v. Celebrezze test as a "highly fact specific inquiry." Libertarian Party v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007). The Tenth Circuit recently applied the Anderson v. Celebrezze test, as articulated in the lead opinion of Crawford v. Marion County Election Board, in determining whether a city voting law in Albuquerque, New Mexico, violated the equal-protection clause of the United States constitution. See ACLU of N.M. v. Santillanes, 546 F.3d 1321 (10th Cir. 2008)("As the Supreme Court recently confirmed in Crawford, the appropriate test when addressing an Equal Protection challenge to a law affecting a person's right to vote is to 'weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule.'")(quoting Crawford v. Marion County Election Bd., 128 S. Ct. at 1616). The Tenth Circuit found that the United States District Court for the District of New Mexico correctly identified the Anderson v. Celebrezze test, which the Tenth Circuit characterized as "the intermediate scrutiny standard established in Burdick v. Takushi," as the proper standard of review for a constitutional challenge to the city voting law. ACLU of N.M. v. Santillanes, 546 F.3d at 1321.[4] The Tenth Circuit, however, found that the district court erred in its determination that the voting law imposed a significant burden on the right to vote. See id. at 1321-22. The Tenth Circuit found that the Albuquerque law was no more burdensome than the Indiana law the Supreme Court upheld in Crawford v. Marion County Election Bd. and that the district court had "placed too high a burden on the City to justify the law." ACLU of N.M. v. Santillanes, 546 F.3d at 1325.

---

[4] The Supreme Court in Burdick v. Takushi adopted the "flexible standard" set forth in Anderson v. Celebrezze and did not characterize the test as intermediate scrutiny, nor did it adopt the language used when applying intermediate scrutiny. 504 U.S. at 434. While there may be similarities between the Anderson v. Celebrezze test, which Burdick v. Takushi adopted, and intermediate scrutiny, the Court will use the Supreme Court's language in Anderson v. Celebrezze to analyze § 1-4-49 than to use the language of strict, intermediate, or rational-basis scrutiny.

2.     __Third-Party Voter-Registration Statutes and the__ Anderson v. Celebrezze __Test__.

The Supreme Court in Anderson v. Celebrezze stated that state-election codes regulating registration of voters may burden, at least to some degree, the individual's right to vote and his right to associate with others for political ends.  See 460 U.S. at 788.  Other courts have found that voter-registration regulations are "intertwined with speech and association," and that laws regulating voter registration are subject to scrutiny under the Anderson v. Celebrezze test.  League of Women Voters v. Cobb, 447 F. Supp. 2d 1314, 1332-34 (S.D. Fla. 2006).  See Project Vote v. Blackwell, 455 F. Supp. 2d 694, 701 (N.D. Ohio 2006);  Ass'n of Cmty. Orgs. for Reform Now v. Cox, No. 1:06-CV-1891, 2006 U.S. Dist. LEXIS 87080, at *15 (N.D. Ga. Sept. 27, 2006)("The Court's determination that the Anderson test applies in this case is consistent with the conclusions recently reached by other district courts analyzing the constitutionality of restrictions placed on private voter registration drives.").

In League of Women Voters v. Cobb, the plaintiffs challenged Florida's third-party voter-registration law holding third-party organizations strictly liable for prompt delivery of registration forms that the organizations collect.  See 447 F. Supp. 2d at 1322-23.  The plaintiffs argued that, because the third-party voter-registration law burdened their core political speech, the court should apply strict scrutiny.  The defendants argued that the Anderson v. Celebrezze test is used only in ballot-access cases, and that the court should apply rational-basis review.  The Southern District of Florida rejected both arguments, and determined that the third-party voter-registration law was "most appropriately viewed as an election regulation" and thus the Anderson v. Celebrezze test applied.  League of Women Voters v. Cobb, 447 F. Supp. 2d at 1332 n.21.

In applying the Anderson v. Celebrezze test, the Southern District of Florida found that Florida had an important state interest in ensuring that the failings of third-parties did not strip

Florida citizens of their right to vote; however, the court found that Florida did not state an adequate justification for exempting political parties from the third-party voter-registration law.  <u>See</u> 447 F. Supp. 2d at 1336-37.  The court also found that Florida's interests in ensuring that all voter registrations were properly and timely submitted, in holding third-party organizations accountable for the voter-registrations they collect, and in preventing fraud were "indisputably important", however, in its preliminary injunction opinion, the Southern District of Florida found that Florida's Secretary of State had not demonstrated how the third-party voter-registration law's penalties and exclusion of political parties advanced Florida's interests, or why such provisions were necessary. <u>See</u> 447 F. Supp. 2d at 1339.  The court did not discuss whether a ten-day deadline was burdensome; rather the court focused on the severity of the fines imposed.  <u>See</u> <u>id.</u> at 1338-39.  Applying the <u>Anderson v. Celebrezze</u> test, "balancing Defendants' asserted interests against the character and magnitude of the constitutional burdens the new Law imposes," the Southern District of Florida held that the third-party voter-registration law was unconstitutional.  447 F. Supp. 2d at 1338-39 ("While the Court is extremely reluctant to set aside an enactment of the Legislature, given the magnitude of Plaintiffs' First Amendment freedoms at stake in this case, the Third-Party Voter Registration Law's civil penalties scheme and exclusion of political parties is unconstitutional.").

In 2007, the Florida legislature altered the challenged third-party voter-registration statute, rendering the plaintiffs' complaint moot.  See <u>League of Women Voters v. Cobb</u>, No. 06-21265, Order Granting Defendants' Motion to Dismiss for Lack of Jurisdiction and Dismissing Case as Moot, filed April 24, 2008 (Doc. 83).  The new law reduced the fines, implemented a $1000.00 cap on the amount of fines levied against a third-party registration organization, removed the exception for political parties, and waived the fine upon a showing that failure to deliver voter-registration applications promptly was based upon force majeure or impossibility.  See <u>League of Women</u>

Voters v. Browning, 575 F. Supp. 2d 1298, 1304 (S.D. Fla. 2008).  The Southern District of Florida

again applied the Anderson v. Celebrezze test to the amended law because the court determined that

the amended law constituted an "election regulation."  League of Women Voters v. Browning,

575 F. Supp. 2d at 1319.  The Southern District of Florida rejected an application for a preliminary

injunction against the amended law and refused to declare the amended law unconstitutional.  See

League of Women Voters v. Browning, 575 F. Supp. 2d at 1323.

In Project Vote v. Blackwell, the plaintiffs challenged an Ohio third-party voter-registration

law subjecting voter-registration workers to felony charges if registration forms are not returned to

an appropriate state agency within ten days of being collected.  See 455 F. Supp. 2d at 699.  The

Northern District of Ohio found that, to determine whether a preliminary injunction was appropriate,

the court had to determine the proper level of scrutiny, and stated:

> This is because under Anderson v. Celebrezze, 460 U.S. 780 (1983), this Court must
> determine the character and magnitude of the asserted constitutional injury and then
> weigh that against the State's articulated justifications for the burdens causing that
> injury.  Id. at 789.  If the burden on constitutional rights is severe, the Court must
> employ strict scrutiny.  If the burden is less substantial, the inquiry may be more
> relaxed.  Id.

455 F. Supp. 2d at 701.[5]  The district court determined that "intermediate scrutiny" was appropriate

because, "while the interests impacted by the regulations are critical First Amendment rights, the

burden imposed upon them by the regulations -- though substantial . . . -- are not likely properly

---

[5] The Northern District of Ohio cited Anderson v. Celebrezze for the proposition that, if the
burden is severe, strict scrutiny applies.  The Supreme Court, however, did not come to that
conclusion in Anderson v. Celebrezze.  The Supreme Court made that distinction in Burdick v.
Takushi, 504 U.S. at 434 (citing Norman v. Reed, 502 U.S. at 289).  See also Clingman v. Beaver,
544 U.S. 581, 586-87 ("Regulations that impose severe burdens on associational rights must be
narrowly tailored to serve a compelling state interest.  However, when regulations impose lesser
burdens, a State's important regulatory interests will usually be enough to justify reasonable,
nondiscriminatory restrictions.") (internal citations and quotation marks omitted).

-19-

characterized as 'severe.'"  455 F. Supp. at 701.

In Association of Community Organizations for Reform Now v. Cox, the plaintiffs challenged a voter-registration law proscribing acceptance of completed voter-registration forms unless the registration applicant sealed his or her own registration form before submitting it to a third-party.  See 2006 U.S. Dist. LEXIS 87080, at *7.  The plaintiffs challenged the law as violating their First-Amendment rights and contended that it should be subject to strict scrutiny.  See 2006 U.S. Dist. LEXIS 87080, at *16 n.1.  The Northern District of Georgia rejected the plaintiffs' argument: "This situation . . . is not one in which 'a State's election law directly regulates core political speech . . . .'  Buckley v. Am. Const. Law Found., Inc., 525 U.S. 182 (1999).  The Regulation does not directly prohibit participation in the political process but has only a tangential effect."  2006 U.S. Dist. LEXIS 87080, at *16 n.1.  The district court stated that "[t]he Supreme Court has repeatedly held that courts should analyze constitutional challenges to a state's election laws pursuant to the framework established in Anderson v. Celebrezze."  The district court therefore found that the law regulating the manner in which private parties conduct voter-registration drives was "most appropriately construed as an election law," and the district court thus applied the Anderson v. Celebrezze test.  See 2006 U.S. Dist. LEXIS 87080, at *15.

## RELEVANT FIRST-AMENDMENT LAW REGARDING VOTER REGISTRATION

To undertake the Anderson v. Celebrezze analysis, a court must first determine whether the challenged law implicates the plaintiffs' constitutional rights.  The Northern District of Ohio found that "[t]he interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society."  Project Vote v. Blackwell, 455 F. Supp.2d at 707.  Here, the Plaintiffs argue that NMSA 1978, § 1-4-49 imposes an undue burden on their First-Amendment rights.  Specifically, the Plaintiffs contend that

-20-

voter-registration drives constitute three types of rights that the First Amendment protects: (i) expressive conduct; (ii) core political speech; and (iii) associational rights.  The Plaintiffs argue that "[e]ach of these First Amendment rights are well established in Supreme Court and Tenth Circuit case law, and therefore subject to the <u>Anderson</u> framework."  Pl. Opp. at 6.

      **1.**     **<u>Expressive Conduct.</u>**

The First Amendment protects political expression manifested through conduct, as well as through speech.  <u>See</u> <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989); <u>United States v. O'Brien</u>, 391 U.S. 367, 376 (1968)("[W]hen speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.").  To determine whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, courts look to whether there was (i) intent to convey a particularized message; and (ii) a great likelihood that those who viewed the conduct would have understood the message.  <u>See</u> <u>Texas v. Johnson</u>, 491 U.S. at 404.

That the person engaging in the expressive conduct intends to convey a particularized message requires that the person is attempting to express a point of view, but the activities that the Supreme Court has deemed to constitute expressive conduct exemplifies that the range of activities which fall into expressive conduct is broad: (i) burning a flag to express general displeasure with the policies of a presidential administration, <u>see id.</u> at 405-06; (ii) wearing black armbands to protest American military activity, <u>see</u> <u>Tinker v. Des Moines Indep. Comm. Sch. Dist.</u>, 393 U.S. 503, 505 (1969); (iii) conducting a sit-in to protest segregation, <u>see</u> <u>Brown v. Louisiana</u>, 383 U.S. 131, 141-42 (1966); (iv) wearing American military uniforms in a dramatic presentation to criticize involvement in Vietnam, <u>see</u> <u>Schacht v. United States</u>, 398 U.S. 58, 62 (1970); (v) picketing about a wide variety

of causes, see, e.g., Amalgamated Food Employees Union v. Logan Valley Plaza, 391 U.S. 308, 313-14 (1968); United States v. Grace, 461 U.S. 171, 176 (1983); (vi) contributing money to a political campaign, see Buckley v. Valeo, 424 U.S. 1, 19 (1976); and (vii) dancing in the nude to express an erotic message, see Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565 (1991).  Expressive conduct need not be targeted at any particular audience, be it for the flag burner, the protester, the nude dancer, or the political contributor; they do not pre-determine who will be a witness to the promulgation of their ideas.  See id. at 409 (finding that a flag with a peace symbol displayed outside an apartment window was protected expressive conduct even though the "stipulated facts fail to show that any member of the general public viewed the flag").

The Supreme Court has noted, "the government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."  R.A.V. v. St. Paul, 505 U.S. 377, 422 (1992)(quoting Texas v. Johnson, 491 U.S. at 406).  See United States v. O'Brien, 391 U.S. 367 (1968).  The Tenth Circuit has held that "[t]he intermediate scrutiny standard of [United States v.] O'Brien applies to laws that restrict 'expressive conduct' such as flag burning, nude dancing, or sitting at a segregated lunch counter."  Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1102 (10th Cir. 2006)(en banc), cert. denied., 127 S. Ct. 1254 (2007).

**2.      Core Political Speech.**

The Supreme Court's First Amendment decisions have created a rough hierarchy in the constitutional protection of speech.  See R.A.V. v. St. Paul, 505 U.S. at 422.  "Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all."  Id.  Laws that restrict core political speech are subject to "exacting scrutiny" -- even if they leave citizens with "other means to disseminate their ideas."  Meyer v.

Grant, 486 U.S. 414, 420, 424 (1988).  See Initiative & Referendum Inst. v. Walker, 450 F.3d at 1099.

The Supreme Court has indicated that certain acts are so intertwined with speech that it is impossible for the government to regulate the conduct without burdening the speech.  See Meyer v. Grant,  486 U.S. at 422; Schaumberg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980). In Meyer v. Grant and in Schaumberg v. Citizens for a Better Environment, the Supreme Court found that certain activities, such as circulating a petition or soliciting charitable contributions, necessarily "involve a variety of speech interests -- communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes -- that are within the protection of the First Amendment."  Meyer v. Grant, 486 U.S. at 422 (quoting Schaumberg v. Citizens for a Better Env't, 444 U.S. at 632).  The Supreme Court recognized that, as a practical matter, it was impossible to regulate such activities without affecting the associated speech and vice versa, and therefore held in Schaumberg v. Citizens for a Better Environment that a legislature must give "due regard" to "the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease."  444 U.S. at 632.

In Meyer v. Grant, the Supreme Court struck down a law restricting petition-circulating activity because the Supreme Court found that the restriction necessarily burdened the speech associated with the petition-circulating activity, and the State of Colorado failed to show a compelling justification for the burden.  See 486 U.S. at 428.  The Supreme Court applied strict scrutiny because the law restricted political expression in two ways:

First, it limits the number of voices who will convey appellees' message and the

hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

Id. at 422-23.  See also Krislov v. Rednour, 226 F.3d 851, 866 (7th Cir. 2000)(stating that "circulating nominating petitions [for political candidates] necessarily entails political speech"); Toledo Area AFL-CIO Council v. Pizza, 154 F.3d 307, 316 (6th Cir. 1998).  "Having decided to confer the right, the State was obligated to do so in a manner consistent with the Constitution because . . . this case involves core political speech." Meyer v. Grant, 486 U.S. at 420 (internal quotations omitted).

        **3.**     **Expressive Association**.

"[P]olitical belief and association constitute the core of those activities protected by the First Amendment." Elrod v. Burns, 427 U.S. 347, 359 (1976).  An organization's attempt to broaden the base of public participation in and support for its activities is conduct "undeniably central to the exercise of the right of association." Tashjian v. Republican Party of Conn., 479 U.S. 208, 214-15 (1986).  The Supreme Court has consistently held that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958); Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973)(stating that "[t]here can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendment"). See NAACP v. Button, 371 U.S. 415, 430 (1963)(stating that "there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity."); Bates v. Little Rock, 361 U.S. 516, 522-23 (1960)(stating that "[l]ike freedom of

speech and a free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government  based upon the consent of an informed citizenry.").  The Supreme Court has recognized that abridgment of the right of association, even if unintended, may inevitably flow from varied forms of governmental action.  See NAACP v. Alabama ex rel. Patterson, 357 U.S. at 461.

        **4.**        **Permissible Regulations of Speech.**

A state may constitutionally regulate the time, place, and manner of an organization's speech.  See Burson v. Freeman, 504 U.S. 191, 196-97 (1992)(stating that "the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.")  The federal courts have upheld laws that require groups to obtain permits or licenses before gathering, marching, or protesting in public.  See, e.g., Cox v. New Hampshire, 312 U.S. 569, 576 (1941)(upholding a New Hampshire law criminalizing parades or marches conducted without a permit); Poulos v. New Hampshire, 345 U.S. 408 (1953)(upholding the same law against a challenge by a group holding a religious meeting in a public park); Stonewall Union v. City of Columbus, 931 F.2d 1130, 1137 (6th Cir. 1991)(upholding an ordinance requiring groups to pay a fee and to obtain a permit before conducting a parade).  When the limitation on expressive activity is content-neutral, the law is subject to intermediate, not strict, scrutiny.  See Turner Broad. Sys., Inc. v. FTC, 512 U.S. 622, 635 ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny.").

        **5.**        **The First Amendment and Third-Party Voter-Registration Regulations.**

The Southern District of Florida, in League of Women Voters v. Cobb, determined that the third-party voter-registration law issue before the court was "analogous to that in Meyer v. Grant,"

because the law "reduce[d] the total quantum of speech." 447 F. Supp. 2d at 1332. The court stated:

> There is no dispute that Plaintiffs, all of whom are dedicated to increasing voter registration and voting, have shut down their voter registration drives because of the Law's heavy, strict, and joint and several liability penalties. This has, in turn, reduced the quantum of political speech and association, as the Plaintiffs all testified that as part of their voter registration drivers, they persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions.

447 F. Supp. 2d at 1333. The court rejected the defendants' argument that the collection and submission of voter registration applications regulates only conduct, and not the speech accompanying such conduct. The court found the plaintiffs' voter-registration activities were similar to the door-to-door charitable solicitations at issue in Village of Schaumburg v. Citizens for a Better Environment, which the Supreme Court held were worthy of First-Amendment protection, because the communication of ideas and the advocacy of causes accompanied the charitable solicitations. See 444 U.S. at 632. The Northern District of Florida found that, "[b]ecause the collection and submission of voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way." League of Women Voters v. Cobb, 447 F. Supp. 2d at 1334. The court also found that "the First Amendment protects the instant Plaintiffs' right to select what they believe to be the most effective means of conducting their voter registration drives to ensure their voices are heard in the political process." Id. Finally, the Southern District of Florida determined that the third-party voter-registration law discriminated against third-party organizations not associated with political parties. See id. at 1335.

In Project Vote v. Blackwell, the Northern District of Ohio, in its decision to grant a preliminary injunction enjoining the defendants from enforcing the third-party voter-registration

law, found that the third-party voter-registration law implicated the First Amendment, stating:

> After reviewing all the briefs submitted by the various parties, and following careful consideration of the relevant case law, the Court is satisfied that participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment. These rights belong to -- and may be invoked by -- not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls. See, e.g., Williams v. Rhodes, 393 U.S. 23, 30 (1968)(Court must guard against impingement on different, though overlapping kinds of rights -- "the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.").

455 F. Supp. 2d at 700-01.[6]  In an order reaffirming its preliminary injunction decision, the Northern District of Ohio again rejected any argument that voter-registration activities do not implicate First Amendment interests and entered a declaratory judgment that the challenged provisions of the Ohio Revised Code, as well as its accompanying regulations and administrative practices, violated the First and Fourteenth Amendments and the NVRA, and the court permanently enjoined the defendants from enforcing those provision. See Project Vote v. Blackwell, No. 1:06 cv 1628, Order at 8, filed February 11, 2008 (Doc. 59).

---

[6] The Norther District of Ohio court in Project Vote v. Blackwell reserved a full discussion of the legal underpinnings of its conclusion "for its upcoming ruling on Defendants' pending Motion to Dismiss."  455 F. Supp. 2d at 701 n.5.  The defendants' motion to dismiss, however, termed and was never re-filed.  As the district court noted in its Order filed February 11, 2008, "the Court's anticipated opportunity to address the issue in greater detail never came to fruition."  Project Vote v. Blackwell, No. 1:06 cv 1628, Doc. 59 at 6.  Because the defendants did not file a reply brief responding to the cases that the plaintiffs cited in their response to the motion to dismiss, which stood for the proposition that the right to vote is a fundamental right which extends to voter-registration activity, the court stated: "For this reason alone, the Court is not inclined to articulate, research and analyze an issue the Defendants seemingly have abandoned. . . . As it did before previously rejecting Defendants' argument that no First Amendment interest is implicated here, the Court again has reviewed the relevant case law and again reaches the conclusion that the Defendants are wrong on this point." Id. at 7, 8.

## THE NATIONAL VOTER REGISTRATION ACT

The NVRA, which Congress enacted in 1993, requires States to provide simplified systems for registering to vote in federal elections.  The States must provide a system for voter registration by mail, see 42 U.S.C. § 1973gg-4, a system for voter registration at various state offices (including those that provide "public assistance" and those that provide services to people with disabilities), see § 1973gg-5, and a system for voter registration on a driver's license application, see § 1973gg-3. The NVRA specifies various details about how these systems must work, including, for example, the type of information that States can require on a voter registration form.  see §§ 1973gg-3(c)(2), 1973gg-7(b).  It also imposes requirements about just when, and how, States may remove people from the federal voter rolls.  See §§ 1973gg-6(a)(3)-(4).  The NVRA adds that it does not "supersede, restrict or limit the application of the Voting Rights Act of 1965," and that it does not "authorize or require conduct that is prohibited by the Voting Rights Act of 1965."  § 1973gg-9(d).

### 1.      The NVRA's Objectives.

The NVRA has four stated objectives :

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. § 1973gg(b).  The NVRA is concerned not only with enhancing voter registration and participation, but also with protecting the overall integrity of the electoral process and the accuracy of voter registration rolls.  See Crawford v. Marion County Election Bd., 128 S. Ct. at 1617 ("In the

[NVRA], Congress established procedures that would both increase the number of registered voters and protect the integrity of the electoral process.").  The NVRA sets forth that "Congress finds that the right of citizens of the United States to vote is a fundamental right" and "it is the duty of the Federal, State, and local governments to promote the exercise of that right."  42 U.S.C. § 1973gg(a).

       2.     **The NVRA and Voter Registration.**

Under the NVRA, a federal mail voter-registration form was developed for elections for federal office.  See 42 U.S.C. § 1973gg-7(2).   The NVRA requires that states make the federal voter-registration forms "available for distribution," 42 U.S.C. § 1973gg-4(b), that the states accept and use those forms, see id. § 1973gg-4(a), and that any state-created voter-registration forms made available in addition to the federal form conform to certain statutory requirements, see id. §§ 1973gg-4(a)(2), 1973gg-7(b).  The state-made forms must include on their face "such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.  See 42 U.S.C. § 1973gg-7(b)(1).  Finally, the NVRA requires that the state ensure that any eligible applicant is registered to vote in an election "in the case of registration my mail . . . if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election," 42 U.S.C. § 1973gg-6(a)(1)(B), and "in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election,"  42 U.S.C. § 1973gg-6(a)(1)(D)

**LAW REGARDING PREEMPTION**

Article VI, Clause 2, of the Constitution provides that the laws of the United States "shall

be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the

Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  Consistent with the Supremacy Clause, the

Supreme Court has "long recognized that state laws that conflict with federal law are 'without

effect.'"  Altria Group, Inc. v. Good, 129 S. Ct. 538, 543 (2008)(quoting Maryland v. Louisiana, 451

U.S. 725, 746 (1981)).  The Supreme Court has summarized the situations in which preemption is

likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether
> Congress' command is explicitly stated in the statute's language or implicitly
> contained in its structure and purpose. Absent explicit pre-emptive language, we
> have recognized at least two types of implied pre-emption: field pre-emption, where
> the scheme of federal regulation is so pervasive as to make reasonable the inference
> that Congress left no room for the States to supplement it, and conflict pre-emption,
> where compliance with both federal and state regulations is a physical impossibility,
> or where state law stands as an obstacle to the accomplishment and execution of the
> full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992) (citations omitted).  Preemption

may be express or implied, and implied preemption may be found where a federal regulatory scheme

is so pervasive as to occupy the entire field (field preemption), and where compliance with both the

federal scheme and state law is physically impossible, or where state law thwarts the purposes of

the federal scheme (conflict preemption).  See id.  When faced with express preemption -- where

a statute expressly states that it preempts certain areas of state law -- a court must determine the

scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485

(1996)(stating that "the purpose of Congress is the ultimate touch-stone in every pre-emption

case.").  "Congress may indicate pre-emptive intent through a statute's express language or through

its structure and purpose."  Altria Group, Inc. v. Good, 129 S. Ct. at 543.  When the text of a

preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the

reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).

Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).   "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."  Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

The Plaintiffs have alleged a claim of obstacle preemption, arguing that New Mexico's third-party voter-registration law creates an obstacle to the NVRA's full purposes.  The Supreme Court, in the past, found that implied preemption may take the form of "obstacle" preemption.[7]  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)(holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law.").  The Supreme Court instructed that in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it."  Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988).  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  The reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute."  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).

In 2000, the Supreme Court decided Geier v. American Honda Motor Co., 529 U.S. 861

---

[7]"Obstacle" preemption has also been referred to as the "doctrine of frustration-of-purposes."  Geier v. Am. Honda Motor Co., 529 U.S. 861, 908 n. 22 (2000)(Stevens, J., dissenting).

(2000), which held, in a 5-to-4 vote, that claims that a car was defective because it lacked an airbag were pre-empted by a federal regulation that permitted, but did not require, airbags to be installed in passenger vehicles.  <u>See</u> 529 U.S. at 874.  The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective.   And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted."  529 U.S. at 886. Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle preemption.  He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

<u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court, however, has now begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations.  In 2002, the Supreme Court issued a unanimous decision in <u>Sprietsma v. Mercury Marine</u>, 531 U.S. 57, rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard.   In 2008, in <u>Altria Group, Inc. v. Good</u>, the Supreme Court rejected the plaintiffs' obstacle-preemption claim that Maine's Unfair Practices Act was implicitly pre-empted by a similar federal act, the Federal Cigarette Labeling and Advertising Act, because it presented an obstacle to the Federal Trade Commission.  <u>See</u> 129 S. Ct. at 551.  Most recently, in <u>Wyeth v. Levine</u>, 129 S. Ct. 1187 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in <u>Geier v. American Honda Motor Co.</u>, rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption.  <u>See</u> <u>Wyeth v.</u>

Levine, 129 S. Ct. at 1203 (holding that "it is not impossible for Wyeth to comply with its state and

federal law obligations and that Levine's common-law claims do not stand as an obstacle to the

accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act].").  In so

ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. American Honda Motor

Co. to its facts, finding that the decision in that case was based on the "complex and extensive"

history of the substantive regulation at issue.  129 S. Ct. at 1201.  The Supreme Court rejected

obstacle preemption, asserting that, "[i]f Congress thought state-law suits posed an obstacle to its

objectives, it surely would have enacted an express pre-emption provision at some point during the

FDCA's 70-year history."  Wyeth v. Levine, 129 S. Ct. at 1200.  Justice Stevens quoted Justice

O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989):

"The case for federal pre-emption is particularly weak where Congress has indicated its awareness

of the operation of state law in a field of federal interest, and has nonetheless decided to stand by

both concepts and to tolerate whatever tension there is between them."  Wyeth v. Levine, 129 S. Ct.

at 1200 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption was Justice

Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit
> endorsement of far-reaching implied pre-emption doctrines.  In particular, I have
> become increasingly skeptical of this Court's "purposes and objectives" pre-emption
> jurisprudence.  Under this approach, the Court routinely invalidates state laws based
> on perceived conflicts with broad federal policy objectives, legislative history, or
> generalized notions of congressional purposes that are not embodied within the text
> of federal law.  Because implied pre-emption doctrines that wander far from the
> statutory text are inconsistent with the Constitution, I concur only in the judgment.

129 S. Ct. at 1205 (Thomas, J., concurring in the judgment).  Justice Thomas stressed his

concern:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

129 S. Ct. at 1207.  Justice Thomas emphasized that, when analyzing the pre-emptive effect of federal statutes or regulations, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution.  Id. at 1207-08 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption.  See Wyeth v. Levine, 129 S. Ct. at 1195 n.3.  "In areas of traditional state regulation, [the court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)(internal quotation marks omitted). If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences LLC, 544 U.S. at 449.  See Wyeth v. Levine, 129 S. Ct. at 1195; Cipollone v. Liggett Group, Inc., 505 U.S. at 518.

## RELEVANT LAW REGARDING THE NEW MEXICO CONSTITUTION

The Plaintiffs, in their Amended Complaint, contend that NMSA 1978, § 1-4-49 violates two provisions of the New Mexico Constitution: (i) Article II, § 17, which is analogous to the First Amendment of the United States Constitution; and (ii) Article II, § 8, which provides: "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."

The Supreme Court of New Mexico has found that it has the power to "provide more liberty

-34-

than is mandated by the United States Constitution." State v. Gomez, 122 N.M. 777, 782, 932 P.2d

1, 6 (1997). The Supreme Court of New Mexico's applies the interstitial approach to interpreting

the New Mexico Constitution. See id. at 783, 932 P.2d 7.

> Under the interstitial approach, the court asks first whether the right being asserted
> is protected under the federal constitution. If it is, then the state constitutional claim
> is not reached. If it is not, then the state constitution is examined. A state court
> adopting this approach may diverge from federal precedent for three reasons: a
> flawed federal analysis, structural differences between state and federal government,
> or distinctive state characteristics.

State v. Gomez, 122 N.M. at 783, 932 P.2d 7 (internal citations omitted).

1.      The "Free and Open Elections" Clause.

The Supreme Court of New Mexico directly addressed an alleged violation of Article II, § 8

in Gunaji v. Macias, 130 N.M. 734, 31 P.3d 1008 (2001), which involved a dispute arising out of

an election in which an incorrect ballot face was being used in one of the voting machines. See 130

N.M. at 736, 31 P.3d at 1010. The Supreme Court of New Mexico, finding no precedent of its own,

looked to an analogous "free and equal" election clause in the Kentucky state constitution that

established the "fundamental principle that an election is only 'free and equal' if the ballot allows

the voter to choose between the lawful candidates for that office" and found that "the same principle

should guide [the court's] interpretation of the 'free and open' clause of article II, section 8." Gunaji

v. Macias, 130 N.M. at 742, 31 P.3d at 1016. The Supreme Court of New Mexico held that errors

by the County Clerk on ballots, including omission of a candidate's name from the ballot, amounted

to a constitutional violation and rejected the votes in the affected precinct. See id.

In People's Constitutional Party v. Evans, 83 N.M. 303, 491 P.2d 520 (1971), the Supreme

Court of New Mexico found that a requirement that a minority party obtain signatures endorsing that

party from at least three percent of the electorate before the party could be placed on the ballot did

not violate the free-and-open-elections provision of Article II, § 8, because the State had a legitimate interest in trying to determine good faith on the part of electors who sign nominating petitions, and in assuring at least a modicum of support for a political party and its nominees whose names were placed on the election ballot.  See People's Constitutional Party v. Evans, 83 N.M. at 305-07, 491 P.2d at 522-24 (stating "[f]ree and open elections do not require a total lack of restraint on the number of political parties and nominees entitled to placement on the ballot.").  While the New Mexico jurisprudence demonstrates that Article II, § 8 is concerned with avoiding errors and fraud in the administration of elections, none of the jurisprudence speaks to the state's ability to regulate third-party voter registration.

### 2.    New Mexico Constitutional Principle of Non-Delegation.

The New Mexico Constitution provides for the separation of powers in Article III, § 1,[8] and it is this principle of separation of powers and the limitations on the legislature's ability to transfer its power to other departments that is the foundation for the New Mexico constitutional principle of non-delegation.  See Cobb v. State Canvassing Bd., 140 N.M. 77, 88, 140 P.3d 498, 509 (2006). "The nondelegation doctrine limits, but does not completely prevent, the [l]egislature from vesting a large measure of discretionary authority in administrative officers and bodies."  Id.  Though the legislature may not abdicate general law-making powers, "it may authorize others to do things which

---

[8] Article III, § 1 of the New Mexico Constitution states:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.

N.M. Const. art. III, § 1.

it might properly do, but which it cannot conveniently or advantageously perform." State v. Spears, 57 N.M. 400, 405-06, 259 P.2d 356, 360 (1953).

"The Legislature may not vest unbridled or arbitrary authority in an administrative body, . . . and must provide reasonable standards to guide it." Cobb v. State Canvassing Bd., 140 N.M. at 89, 140 P.3d at 510 (citing City of Santa Fe v. Gamble-Skogmo, Inc., 73 N.M. 410, 417, 389 P.2d 13, 18 (1964)).  The Supreme Court of New Mexico has found proper delegation of legislative authority "where administrative discretion occurs within a governmental scheme, policy, or purpose." Cobb v. State Canvassing Bd., 140 N.M. at 89, 140 P.3d at 510 (citing State v. Spears, 57 N.M. at 406, 259 P.2d at 360).  The Supreme Court of New Mexico advises, "It is not what has been done but what can be done under a statute that determines its constitutionality." State ex rel. Schwartz v. Johnson, 120 N.M. 820, 825, 907 F.2d 1001, 1006 (1995).

The Supreme Court of New Mexico has put forth the essential inquiry for determining whether New Mexico's constitutional non-delegation doctrine has been violated:

> [T]he constitutionality of a delegation is determined on the basis of the scope of the power delegated and the specificity of the standards to govern its exercise.  When the scope increases to immense proportions . . . the standards must be correspondingly more precise.  The essential inquiry is whether the specified guidance sufficiently marks the field within which the administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will.

State ex rel. Schwartz v. Johnson, 120 N.M. at 825, 907 P.2d at 1006 (internal quotations and citations omitted).  In State v. Spears, the defendant, who faced charges for engaging in business as a real estate broker without a license, challenged the constitutionality of the legislature's delegation to the New Mexico Real Estate Board to accept real estate licenses and to develop a qualifying examination to determine an applicant's qualifications. See 57 N.M. at 403-04, 259 P.2d at 359-60. The Supreme Court of New Mexico found that the legislature's delegation of power to the New

Mexico Real Estate Board was constitutional because New Mexico law explicitly provided for the appointment of a board and committed to it the power to make and enforce any and all rules and regulations to carry out the provisions of the law as well as permitted written examinations to determine qualifications of applicants. See State v. Spears, 57 N.M. at 403-04, 259 P.2d at 359-60. Because the board's statutorily authorized actions did not "involve the exercise of primary and independent discretion, but other determin[ations] with[in] defined limits, and subject to review, [of] some fact upon which the law by its own terms operates, such regulation or action" was constitutional. Id. at 406, 259 P.2d at 360.

In Cobb v. State Canvassing Board, the Supreme Court of New Mexico examined whether the State Canvassing Board could establish a policy regarding the cost to be charged to a candidate who requests a recount in an election. See 140 N.M. at 89, 140 P.3d at 510. While the case was on appeal, the New Mexico Legislature amended the state election law to condition any recount on a deposit of the full estimated costs of that recount. See Cobb v. State Canvassing Board, 140 N.M. at 79, 140 P.3d at 500. The Supreme Court of New Mexico found that the Legislature had failed to provide the State Canvassing Board with adequate standards to guide its discretion and held that the amendment was an unconstitutional delegation of legislative authority. See id. at 90, 140 P.3d at 511. The Supreme Court of New Mexico noted that the State Canvassing Board is not legislatively directed to develop standards for elections, and contrasted the Board with the Secretary of State, stating: "[W]hile the Election Code does allow the Secretary of State to make rules and regulations to carry out the purpose of the Election Code, NMSA 1978 § 1-2-1 (1979), the State Canvassing Board's action are explicitly statutorily provided for by the Legislature." Cobb v. State Canvassing Bd., 140 N.M. at 89, 140 P.3d at 510.

## ANALYSIS

The Secretary has moved to dismiss the Plaintiffs' Amended Complaint in its entirety for failure to state a cause of action upon which relief can be granted. After careful consideration of the Plaintiffs' pleadings, the Court concludes that the Secretary has not offered an adequate basis for all of the relief that she requests. The Court finds that the Plaintiffs have plead sufficient allegations of fact to establish that New Mexico's third-party voter-registration law implicates their First-Amendment rights and have adequately alleged that those rights were burdened. The Plaintiffs have also alleged sufficient facts to establish that the third-party voter-registration law burdens their rights under Article II, § 17 of the New Mexico Constitution. As a matter of law, the Court finds that NMSA 1978, § 1-4-49 is not void for vagueness or unconstitutionally overbroad, and therefore grants the Secretary's motion to dismiss the Plaintiffs' facial challenges. The Court also finds that the NVRA does not preempt § 1-4-49, nor does the law violate Article II, Section 8 of the New Mexico Constitution. Finally, the Court finds that the New Mexico Election Code includes a requirement that County Clerks train and educate registration agents, and therefore the Court will dismiss the Plaintiffs' claims that the training requirement violates the New Mexico constitutional principle of non-delegation and the due process claim. The Court, therefore, will deny the Secretary's motion in part and grant it in part.

## I.   THE COURT'S PRIOR DENIAL OF THE PLAINTIFFS' PRELIMINARY INJUNCTION DOES NOT COMPEL A DISMISSAL FOR FAILURE TO STATE A CLAIM.

The Secretary makes repeated reference to the Court's conclusions in its order denying the Plaintiffs' preliminary injunction request. See Def.'s Motion at 1, 3, 12, 14, 20. The Secretary's principal argument in her brief is that the Court's denial of the Plaintiffs' motion for preliminary injunction compels a dismissal of the First Amended Complaint under rule 12(b)(6). At the hearing,

however, the Secretary conceded that the Court's preliminary injunction ruling is not dispositive of

any issue in the motion to dismiss.  See Hearing Tr. at 7:10-14 (Court, Fuqua).

Two standards that are substantively different govern the two proceedings.  The Court's prior

findings thus do not permit it to dispose of the Complaint.  In short, the Plaintiffs' burden at this

stage is, in some respects, lighter than at the previous proceedings.

**II.      THE COURT WILL APPLY THE <u>ANDERSON V. CELEBREZZE</u> ANALYSIS TO EVALUATE PLAINTIFFS' FIRST-AMENDMENT CHALLENGE TO NEW MEXICO'S THIRD-PARTY VOTER-REGISTRATION LAW.**

The Plaintiffs contend that, because the challenged third-party voter-registration law burdens

fundamental rights, the Court should subject their First-Amendment claims to strict scrutiny rather

than to the <u>Anderson v. Celebrezze</u> analysis.  The Secretary argues that election-law regulations

which burden First-Amendment rights are evaluated under the <u>Anderson v. Celebrezze</u> framework.

<u>See</u> Def.'s Mot. at 4.  In their Opposition Brief, the Plaintiffs state that, because of the Secretary's

assertion that <u>Anderson v. Celebrezze</u> controls, and because they have pled valid First Amendment

claims under even the more relaxed <u>Anderson v. Celebrezze</u> analysis, they too use the <u>Anderson v.</u>

<u>Celebrezze</u> framework for the purpose of their opposition while reserving the right to renew their

argument regarding strict scrutiny in the future.  During the hearing on the motion, however, the

Plaintiffs renewed the argument that strict scrutiny applies, urging the Court to follow the precedent

set by <u>Village of Schaumburg v. Citizens for a Better Environment</u>, 444 U.S. at 637, <u>Meyer v. Grant</u>,

486 U.S. at 422-23, and <u>Buckley v. Am. Constitutional Law Found., Inc.</u>, 525 U.S. 182, 195-97

(1999).

Despite the Plaintiffs' willingness to assume that the <u>Anderson v. Celebrezze</u> analysis applies

here, the Court does not believe that it has the option to assume the analysis.  If the Court finds that

the <u>Anderson v. Celebrezze</u> analysis applies, but rules against the Plaintiffs in its application of the

Anderson v. Celebrezze analysis, the Plaintiffs could renew their request for strict scrutiny on appeal.  Thus, the Court would not have had the opportunity to decide whether New Mexico's third-party voter-registration law is constitutional using what may be the correct constitutional analysis that the Plaintiffs advance.  Accordingly, the Court believes that it must, to property address the Plaintiffs' claims, first decide whether strict scrutiny or some other analysis applies to the constitutional challenge to § 1-4-49.

The line of cases the Plaintiffs cite as standing for the proposition that the Court should apply strict scrutiny are distinguishable from the requirements set forth in § 1-4-49.  The cases cited by the Plaintiffs involved direct prohibitions and limitations on the number of people with whom the plaintiffs in those cases could engage in speech.  While § 1-4-49 may pose some procedural hurdles for those wishing to engage in third-party voter registration, the comparison to Buckley v. Am. Constitutional Law Found., Inc., Meyer v. Grant, and Village of Schaumburg v. Citizens for a Better Environment does not have a sound basis.

In Meyer v. Grant, the Supreme Court applied strict scrutiny to a state regulation prohibiting organizations from paying individuals to circulate petitions for a ballot initiative to amend the state's constitution.  The Supreme Court determined that

> refusal to permit appellees to pay petition circulators restrict[ed] political expression in two ways: [by] limit[ing] the number of voices who [conveyed the] appellees' message and . . . mak[ing] it less likely that appellee [would] garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

486 U.S. at 422-23.  The statute at issue in Meyer v. Grant directly regulated the conditions under which the plaintiffs could interact with members of the public regarding an issue of political concern.   In contrast to the law in Meyer v. Grant, § 1-4-49 does not directly limit the number of voices with which the Plaintiffs may speak.  Though § 1-4-49 may diminish the Plaintiffs' pool of

potential volunteers to those willing to bear some nominal risk of liability for non-compliance with the law, it does not rise to the level of the burden that the ban in Meyer v. Grant imposed.

In Village of Schaumburg v. Citizens for a Better Environment, the Supreme Court applied heightened constitutional scrutiny to a statute that prohibited door-to-door or on-street solicitation of contributions by charitable organizations which did not use at least seventy-five percent of their receipts for what were deemed to be charitable purposes.  See 444 U.S. at 639.  As in Meyer v. Grant, the statute in Village of Schaumburg v. Citizens for a Better Environment placed specific preconditions on plaintiffs' exercise of their First Amendment rights.  Although the sharing of ideas and advocacy of causes communicated during the solicitations may be similar to the communications that third-party voter-registration organizations have with potential voters, § 1-4-49 does not impose a similar prohibition upon the Plaintiffs.

Crawford v. Marion County Election Board suggests that the line of cases the Plaintiffs advance does not provide the proper analysis for the constitutionality of voter-registration activities.  The Anderson v. Celebrezze analysis provides a more appropriate framework.  See League of Women Voters of Fla. v. Browning, 575 F. Supp. 2d at 1319 (applying the Anderson v. Celebrezze analysis to Florida's amended third-party voter-registration law).  The lead opinion in Crawford v. Marion County Election Board follows the Anderson v. Celebrezze analysis and notes: "To be sure, Burdick [v. Takushi] rejected the argument that strict scrutiny applies to all laws imposing a burden on the right to vote; but in its place, the Court applied the 'flexible standard' set forth in Anderson." 128 S. Ct. at 1616 n. 8.  See Burdick v. Takushi, 504 U.S. at 438-39 (applying the Anderson v. Celebrezze analysis and declining to apply a heightened level of constitutional scrutiny to an electoral statute prohibiting the use of write-in ballots because, "in light of the adequate ballot access afforded under Hawaii's election code, the State's ban on write-in voting imposes only a limited

burden on voters' rights to make free choices and to associate politically through the vote."). Although Justice Scalia's concurring opinion takes issue with the description of the analysis under Anderson v. Celebrezze and Burdick v. Takushi as a "flexible standard" and a "balancing approach," the concurrence agrees that the proper standard for evaluating voting laws is to identify the burden and then, only if the burden is severe, to apply strict scrutiny. See 128 S. Ct. at 1624-25 (Scalia, J., concurring). Justice Scalia explained when he would find that a burden on the right to vote is severe:

> Ordinary and widespread burdens, such as those requiring "nominal effort" of everyone, are not severe. See [Clingman v. Beaver, 544 U.S. 581], at 591, 593-597 [(2005)]. Burdens are severe if they go beyond the merely inconvenient. See Storer v. Brown, 415 U.S. 724, 728-729 (1974)(characterizing the law in Williams v. Rhodes, 393 U.S. 23 (1968), as "severe" because it was "so burdensome" as to be "virtually impossible" to satisfy).

128 S. Ct. at 1624-25 (Scalia, J., concurring). The concurrence did not find the photograph-identification law to rise to the level of severe. Justice Souter's dissent, which Justice Ginsburg joined, as well as Justice Breyer's dissent, both embraced that the Anderson v. Celebrezze analysis is the appropriate standard for "voting-rights cases." 128 S. Ct. at 1627 (Souter, J. dissenting). Justice Souter wrote:

> Given the legitimacy of interests on both sides, we have avoided pre-set levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue. And whatever the claim, the Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State's reasons for imposing those precise burdens.

Id. at 1628. Justice Breyer, in his dissenting opinion, wrote:

> In determining whether this statute violates the Federal Constitution, I would balance the voting-related interests that the statute affects, asking whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative).

-43-

128 S. Ct. at 1643 (Breyer, J. dissenting)(internal citation and quotation omitted).

Moreover, since this Court's preliminary injunction opinion, the Tenth Circuit has followed the Anderson v. Celebrezze analysis that Justice Stevens used in his plurality opinion in Crawford v. Marion County Election Board.  See ACLU of N.M. v. Santillanes, 546 F.3d at 1325.  The Court finds, in light of both the Supreme Court and the Tenth Circuit's recent embrace of Anderson v. Celebrezze's analysis in evaluating voting-rights laws, it is the appropriate standard of review for evaluating the Plaintiffs' challenge to § 1-4-49.

## III.   THE PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT NEW MEXICO'S THIRD-PARTY VOTER-REGISTRATION LAW CREATES BURDENS ON THEIR FIRST-AMENDMENT RIGHTS.

The Plaintiffs contend that they have clearly stated a valid First Amendment claim.  For the Plaintiffs' First-Amendment claims to survive the Secretary's motion to dismiss, they need to allege only that the challenged law burdened their First-Amendment rights and that a legitimate state interest cannot justify those burdens.  The Plaintiffs have pled facts sufficient to support their First-Amendment claims.  Accordingly, the Court will deny the Secretary's motion to dismiss the First-Amendment claims.

### A.   THE PLAINTIFFS' VOTER-REGISTRATION ACTIVITY IMPLICATES THEIR FIRST-AMENDMENT RIGHTS.

At the preliminary-injunction hearing, the Plaintiffs, through different counsel than they have now, did not strongly argue that voter registration itself was protected by the First Amendment. Indeed, they conceded the State had no obligation to provide them with any right to register voters. See American Assoc. of People with Disabilities, et al. v. Herrera, 580 F. Supp. 2d at 1210.  At that time, the Plaintiffs concentrated on the speech associated with the registration.  See id. at 1230. Now, however, the Plaintiffs emphasize that the act of registering voters itself is protected speech.

-44-

See Am. Complaint ¶ 101, at 33.  Both parties concede that the existence of a First-Amendment right which voter registration implicates is a question of law the Court can address in this motion.

The Plaintiffs' contend that their voter-registration activity plainly implicates their First-Amendment rights because voter-registration activities constitute expressive conduct as well as core political speech, and also implicates the First Amendment's protection of the Plaintiffs' freedom of association.  The Plaintiffs set forth in the Amended Complaint that their volunteer voter-registration activities implicate the First Amendment both in the act of registering people to vote, see Am. Complaint ¶101, at 33, and the incidental speech in which the Plaintiffs engage alongside the act of registration, see Am. Complaint ¶105, at 34. The Court finds that the Plaintiffs have pled sufficient factual allegations to state a claim that the challenged laws violate their First Amendment rights.

The Plaintiffs specifically allege that volunteer voter-registration drives involve expressive conduct, see Am. Complaint ¶¶ 100-102, at 33-34, the voter-registration activities are intertwined with core political speech regarding the importance of participating in the democratic process, see Am. Complaint ¶¶ 103-107, at 34-35, and that the challenged law, regulations, and requirements impact their ability to associate with potential voters, its own members engaging in registration activities, and prospective volunteers, see Am. Complaint ¶¶108-113, at 35-36. The Plaintiffs allege that the State may not unduly burden expressive conduct, core political speech, and expressive association that are linked with third-party voter registration.  According to the Plaintiffs, volunteer voter-registration drives "represent a paradigmatic example of conduct implicating First Amendment rights." Pl. Opp. at 14.  The Plaintiffs argue that regulating the Plaintiffs' voter-registration activity therefore cannot help but impact the Plaintiffs' First-Amendment rights.

1.       **The Plaintiffs' Voter-Registration Activity Implicates Expressive Conduct.**

The Plaintiffs allege that the act of helping citizens to register to vote is, in itself, expressive conduct protected under the First Amendment. The Plaintiffs plead in the Amended Complaint that the act of voting and helping others to vote sustains democracy, and promotes the capacity of voters to shape the composition and direction of their government. See Am. Complaint ¶ 2, 101, at 1-2, 33. The Plaintiffs contend that helping a potential voter to register during their voter-registration drives is the most effective means by which to express the message that voting is important. See Am. Complaint ¶ 101, at 33. The Court agrees that voter-registration activities are important means by which to facilitate expansion of the political franchise and also have practical significance.

The First Amendment protects political expression manifested through conduct, as well as through speech. See Texas v. Johnson, 491 U.S. 397, 406 (1989)(holding that the burning of an American flag is conduct "sufficiently imbued with elements of communication to implicate the First Amendment.")(internal citation and quotation omitted); United States v. O'Brien, 391 U.S. 367, 376 (1968)("[W]hen speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."). To determine whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, courts look to whether there was: (i) intent to convey a particularized message; and (ii) a great likelihood that those who viewed the conduct would have understood the message. See Texas v. Johnson, 491 U.S. at 404.

Accepting all facts pled in the complaint as true and granting all reasonable inferences from the pleadings in favor of the Plaintiffs, see Park Univ. Enters., Inc. v. Am. Cas. Co., 442 F.3d at

1244, the Court finds that the Plaintiffs, in their First Amended Complaint, have met both prongs of the expressive-conduct standard and have, accordingly, stated a First-Amendment expressive-conduct claim. The Plaintiffs' public endeavors to assist people with voter registration are intended to convey a message that voting is important, that the Plaintiffs believe in civic participation, and that the Plaintiffs are willing to expend the resources to broaden the electorate to include allegedly under-served communities. The Court believes that those observing the Plaintiffs' efforts are likely to understand this message. The Secretary concedes that "[t]he efforts of third party voter registration agents such as the Plaintiffs are typically motivated by the desire to positively impact our civil and political landscape." Def.'s Motion at 1.

The Secretary asserts that the Secretary's voter-registration activity cannot constitute expressive conduct because such activity is (i) "ministerial," and ministerial acts cannot constitute expressive conduct; and (ii) not truly communicative in nature. Def.'s Motion at 5, 6. Neither of these assertions persuade the Court that the Plaintiffs are not engaging in expressive conduct when registering voters. Conduct, such as facilitating prospective voters to register, may have a ministerial component, and yet acquire First-Amendment protection when done in a setting or manner in which the message becomes apparent. See Spence v. Washington, 418 U.S. 405, 409-10 (1974)(finding that an upside-down American flag with a peace symbol hung out a dormitory-room window was expressive conduct, and stating that "the nature of appellant's activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression."). Volunteers actively aiding in voter-registration activities are distinct from a person picking up a registration form from a box at the post-office or local library, and changes the manner and setting in which prospective voters register. Rather than lacking communicative force, efforts to register people to vote communicates a message that

democratic participation is important.  See P. Seeger & B. Reiser, Everybody Says Freedom: A History of the Civil Rights Movement in Songs and Pictures at 121 (1989)(stating that voter registration "became the base of the civil rights movement -- affirming that you are a citizen, that government is for you and by you, and that you can hold anyone you elect accountable to you."). While the message that voter registration has value may not resonate with everyone, the Court does not think the act has no communicative value.

The Court notes that the choice to not register to vote also conveys political expression -- for some not registering is a "form of private and public protest," and for others it is a reflection of their disenchantment and skepticism that "the political process is responsive to their needs."  Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. at 195-97.  See Dixon v. Maryland, 878 F.2d 776, 782 (4th Cir. 1989)(holding that a person has a right not to vote as an expression of dissatisfaction with the choices given).  Given that voter registration is a communicative avenue, one way to counter the message of those who oppose the democratic process is to participate in and persuade others to engage in voter registration.  Cf. Johnson v. Texas, 491 U.S. at 419-20 ("We can imagine no more appropriate response to burning a flag than waiving one's own, no better way to counter a flag burner's message than by saluting the flag that burns . . .").  In short, to participate in voter registration is to take a position and express a point of view in the ongoing debate whether to engage or to disengage from the political process.  The Court concludes that the act of voter registration is expressive conduct worthy of First-Amendment protection.  See Preminger v. Peake, 536 F.3d 1000, 1007 (9th Cir. 2008)(observing that "voter registration is speech protected by the First Amendment").

2.     <u>Some Incidental Speech is Intertwined with Plaintiffs' Voter-Registration Activity</u>.

The Plaintiffs also allege that their volunteer voter-registration activities are inherently intertwined with their protected core political speech, such that the State cannot regulate the activity without affecting the related speech interests as well.  <u>See</u> Am. Complaint ¶ 104, at 34.  The Plaintiffs contend that the communicative interactions with prospective voters is similar to that in <u>Meyer v. Grant</u>.  They contend that assisting and promoting voter registration shares the same attributes as circulating a petition or soliciting charitable contributions, because each activity is an endeavor that "of necessity involve[s] both the expression of a desire for political change and a discussion of the merits of the proposed change."  <u>Meyer v. Grant</u>, 486 U.S. at 421.  The Secretary contends that the challenged law does not burden the Plaintiffs' speech because they are free to engage whomever they choose in such conversations separate and apart from helping a person register to vote.  <u>See</u> Motion at 6.

The Court, in its decision to deny the Plaintiffs request for a preliminary injunction, found that the Plaintiffs engage in incidental speech when engaging in political conversations with prospective voters.  <u>See</u> <u>American Assoc. of People with Disabilities v. Herrera</u>, 580 F. Supp. 2d at 1229.  At the hearing, Mr. Fuqua, on behalf of the Secretary, conceded that the First Amendment protects the incidental speech that occurs when the Plaintiffs speak with people registering.  <u>See</u> Tr. at 9:14-17, 12:8-25 (Court, Fuqua).  Although the Court continues to believe that the speech which accompanies the Plaintiffs' voter-registration activities is incidental, and that the impact New Mexico's third-party voter-registration law has upon that speech is more indirect and attenuated than the burdens imposed by statutes like the one in <u>Meyer v. Grant</u>, the Court nevertheless finds the First Amendment protects such incidental speech.

The incidental speech in which the Plaintiffs engage while registering voters is no less protected because it is possible to engage in such conversations separate and apart from helping a person register to vote.  The Supreme Court stated in <u>Meyer v. Grant</u>: "That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of the First Amendment protection."  486 U.S. at 424.  <u>See</u> <u>Spence v. Washington</u>, 418 U.S. 405, 411 (1974)(stating that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.")(quoting <u>Schneider v. State</u>, 308 U.S. 147, 163 (1939)).  The First Amendment protects not only the Plaintiffs' right to engage in incidental speech with prospective voters, but also their right to do so while engaging in the act of registration.  <u>See</u> <u>Meyer v. Grant</u>, 486 U.S. at 424 ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

### 3.    The Plaintiffs' Voter-Registration Activity Implicates Expressive Association.

The Plaintiffs also contend that volunteer voter-registration drives impact associational rights under the First Amendment by providing the participating organizations with a platform to associate both with potential new members and with potential new registrants.  The Plaintiffs' Amended Complaint alleges two associational interests on which the challenged law impinges: (i) associating with prospective members and volunteers; and (ii) associating with voters.  The freedom of association not only encompasses the right to associate with others, but also the right to choose how one associates with others.  <u>See</u> <u>Boy Scouts of Am. v. Dale</u>, 530 U.S. 640, 653 (2000)("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.").  The Secretary does not

contest that the Plaintiffs have an associational interest in engaging prospective members or voters. The Court finds that the Plaintiffs have sufficiently pled that voter registration implicates expressive association. See American Assoc. of People with Disabilities v. Herrera, 580 F. Supp. 2d at 1229 ("Organized voter-registration activities necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register.").

> **B.    WHETHER THE PLAINTIFFS' FIRST-AMENDMENT RIGHTS WERE BURDENED BY NEW MEXICO'S THIRD-PARTY VOTER-REGISTRATION LAW IS A FACTUAL DETERMINATION NOT SUITABLE FOR RESOLUTION ON A MOTION TO DISMISS.**

Under the Anderson v. Celebrezze test, the Court must resolve the Plaintiffs' constitutional challenge to NMSA 1978, § 1-4-49 by first considering the character and magnitude of the asserted injury to the Plaintiffs' First-Amendment rights and then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. See Anderson v. Celebrezze, 460 U.S. at 789.

The United States Constitution does not compel the State to provide for third-party registration. At the preliminary injunction hearing, the Plaintiffs, through different counsel than they have now, conceded that a third party (non-governmental agency or official) does not have a constitutional right to register voters. See American Assoc. of People with Disabilities, et al. v. Herrera, 580 F. Supp. 2d at 1210. Thus, New Mexico would not violate the Constitution if it prohibited third-party registration entirely and instead required all citizens to register only with government officials. It seems logical that, if New Mexico need not permit third-party registration at all, it can place reasonable restrictions when permitting third-party registration. In other words, the greater power -- to prohibit all third-party registration -- includes the lesser power -- to regulate third-party registration.

The Supreme Court has upheld this notion in regulating commercial speech. See Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328, 345-46 (stating that "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling."). The Supreme Court has rejected this analysis, however, when core political speech is severely burdened. In Meyer v. Grant, a case arising from the Tenth Circuit, the Supreme Court found: "Having decided to confer the right [for citizens to place propositions on the ballot through an initiative process], the State was obligated to do so in a manner consistent with the Constitution because, unlike Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328 (1986), which involved only commercial speech, this case involves 'core political speech.'" Meyer v. Grant, 486 U.S. at 420. The Supreme Court adopted the Tenth Circuit's analysis, stating:

> Posadas is inapplicable to the present case for a more fundamental reason -- the speech restricted in Posadas was merely "commercial speech which does 'no more than propose a commercial transaction. . . .'" Posadas[ de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. at 339](quoting Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)). The Supreme Court has "consistently distinguished between the constitutional protection allowed commercial as opposed to noncommercial speech." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 504-05 (1981). "The Constitution 'accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.'" Posadas[ de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. at 349](Brennan, J., dissenting) (quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 64-65 (1983). Here, by contrast, the speech at issue is "at the core of our electoral process and of the First Amendment freedoms," Buckley, 424 U.S. at 39 (quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968) -- an area of public policy where protection of robust discussion is at its zenith.

Meyer v. Grant, 486 U.S. at 425 (quoting Grant v. Meyer, 828 F.2d 1446, 1456-57 (10th Cir. 1987)).

Meyer v. Grant involved direct prohibitions and limitations on the number of people with whom the plaintiffs in those cases could engage in speech and directly regulated the conditions under which the plaintiffs could interact with members of the public regarding an issue of political

concern.  Section 1-4-49 does not directly limit the number of voices with which the Plaintiffs may

speak.  On its face, the New Mexico statute does not regulate, abridge, limit, or penalize speech in

any way.  It does not require a third-party registration agent to speak with prospective voters, nor

does it preclude such speech. While § 1-4-49 may pose some procedural hurdles for those wishing

to engage in third-party voter registration, the Court believes that the regulations are important to

promote important State interest.  The Court also continues to believe, as it did when deciding the

motion for a preliminary injunction, that it is unlikely that the Court will conclude that § 1-4-49

imposes a severe burden on the Plaintiffs' First-Amendment rights and is unconstitutional.

The Court cannot fairly and precisely assess whether the burdens imposed on the Plaintiffs

by § 1-4-49 are massive or minimal or something in between without a careful review of the facts.

The Secretary has denied the Plaintiffs' allegations and therefore disagrees with those allegations.

Moreover, the Secretary conceded at the hearing on this motion that there may be factual

determinations necessary regarding at least some of the burdens § 1-4-49's requirements impose,

specifically with regard to the burden that the fifty-form limit and the forty-eight hour return

requirements impose.  The Secretary suggests that the Court decide, as a matter of law, whether the

other requirements -- the registration requirement and the fines and penalties -- impose an undue

burden, but Plaintiffs explain that, although each requirement taken separately may not be

particularly burdensome in isolation, the allegation is that the four requirements in the aggregate

impose an undue burden on the Plaintiffs' First-Amendment rights.  The Court agrees with the

Plaintiffs, that the Court cannot easily parse out, and should not parse out § 1-4-49's four

requirements, but ultimately must address the burdens the law poses collectively.  The Court should

not resolve these factual disputes on a motion to dismiss, but rather will allow the Plaintiffs' claims

that § 1-4-49 burdens their First-Amendment rights to go forward to allow for further factual

development.

For the Plaintiffs' First-Amendment claims to survive the Secretary's motion to dismiss, they need to allege only that the challenged law burdened their First-Amendment rights and allege that a legitimate state interest cannot justify those burdens.   The Amended Complaint satisfies both requests.  The Amended Complaint pleads sufficient facts contending that several aspects of the challenged law, individually and collectively, have hampered and even halted the Plaintiffs' voter-registration activities.   The Amended Complaint alleges that neither of the State's purported rationales for the challenged law -- protecting against voter fraud and ensuring completed voter registration forms are returned -- provide sufficient justification for the burdens on the Plaintiffs' voter-registration activities.

### 1.      The Complaint Sufficiently Alleges that the Challenged Law Burdens the Plaintiffs' Voter-Registration Activities.

The Plaintiffs allege that the challenged laws burden their ability to conduct volunteer voter-registration activities and that the burden has resulted in the Plaintiffs ceasing such efforts. See Am. Complaint ¶ 5, at 3.  In response, the Secretary largely argues that the burden imposed by the challenged laws are minimal or non-existent, and that the State's interests are substantial and therefore capable of justifying the burdens.  The Court cannot, however, properly weigh those factual determinations on a motion to dismiss.  The State cannot only assert that the burdens are minimal to defeat the Plaintiffs' claim at this stage in the litigation; rather, the State needs to prove that the burdens are justified.

### 2.      The Court Cannot Determine at this Stage of the Proceedings Whether There is an Adequate Justification for the Burdens that the Challenged Law Imposes.

The State also cannot only assert that its interests in regulating third-party voter registration

-54-

are important.  If these allegations were sufficient to justify burdens on First-Amendment rights, the protection against restrictions on First-Amendment rights would be weakened.  See Heideman v. S. Salt Lake City, 348 F.3d 1182, 1197 (10th Cir. 2003)("The burden of proof is on the government to 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'")(quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994)).  In sum, the Plaintiffs' allegations suffice to state a claim that the challenged law is unconstitutional.  The Amended Complaint adequately alleges that the challenged law violates the Plaintiffs' constitutional rights to free speech and expressive association.  Because the Plaintiffs have sufficiently pled that the challenged law abridges their First-Amendment rights, the Court will deny the Secretary's motion to dismiss those claims.

### C.    THE CHALLENGED LAWS ARE NOT UNCONSTITUTIONALLY VAGUE OR OVERBROAD.

The Plaintiffs also argue that the challenged laws are unconstitutionally vague and overbroad on their face.  In contrast to the Plaintiffs' argument in support of their as-applied First-Amendment claims, the Plaintiffs concede in their brief that the vague and overbroad arguments are legal in nature.[9]  In the hearing, both the Plaintiffs and the Secretary agreed that the determination of vagueness and overbreadth is legal and not factual.  Thus, the Court believes it can resolve this claim

---

[9] In the Plaintiffs' brief, they urge the Court to deny the motion to dismiss on the facial claim because they assert the factual development of the as-applied First-Amendment claims "might shed additional light on the scope of the challenged law (thus affecting the overbreadth analysis), as well as the confusion in applying it (thus affecting the vagueness inquiry)."  Pl. Opp. at 23 n. 12.  It may be that factual discovery will reveal facts that the Plaintiffs can use to strengthen their facial challenge, but at present, they have apparently offered all they have as allegations in their Amended Complaint.  The State is entitled to a ruling as a matter of law when they move for it if the allegations do not state a claim for which relief can be granted.  If, at some later point, the Plaintiffs uncover facts that casts the Court's legal decision on the facial challenge into doubt, the Plaintiffs can move the Court to reconsider its legal ruling based on the subsequently uncovered facts.

on the motion to dismiss.

In the First-Amendment context, the Plaintiffs "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). The burden for sustaining a facial challenge is very high, and the Supreme Court in recent years has become increasingly skeptical of facial challenges that require the Court to consider hypothetical scenarios involving parties not before the court and to decipher the full meaning and effect of a statute without a chance for its effect to be developed on a case-by-case basis. See, e.g., Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 ("Facial challenges are disfavored."); Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1623 (2008)(finding the evidence in the record insufficient to support a facial challenge to statute requiring voters to present photographic identification); Gonzales v. Carhart, 127 S. Ct. 1610, 1639 (2007)(holding that the Supreme Court will no longer allow facial challenges to statutes regulating abortion).

Recently, however, the Supreme Court decided to "invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated." Citizens United v. FEC, No. 08-205, 2010 U.S. LEXIS 766, at *45-46 (Jan. 21, 2010). In Citizens United v. FEC, the Supreme Court considered both a facial challenge and an as-applied challenge to 2 U.S.C. § 441b, a federal law which prohibits corporations and unions from using their general treasury funds to make independent expenditures for speech advocating the election or defeat of a political candidate, even though the plaintiff stipulated to the dismissal of its facial challenge. See 2010 U.S. LEXIS 766, at *34. The Supreme Court found that, "even if a party could somehow waive a facial challenge while preserving an as-applied challenge,

that would not prevent the Court from . . . addressing the facial validity of § 441b in this case."  Id.

The Supreme Court held that its previous decision in Austin v. Michigan State Chamber of

Commerce, 494 U.S. 652 (1990) is overruled, and held § 441b facially invalid.  Justice Stevens, in

a vigorous dissent, noted that "This Court has repeatedly emphasized in recent years that facial

challenges are disfavored."  2010 U.S. LEXIS 766, at *150 (Stevens, J., dissenting)(citations and

quotation omitted).  He argues that the majority's conversion of the plaintiff's as-applied challenge

into a facial challenge was "in defiance of this principle," and that the majority relied on a

non-existent record and speculation when deciding that the statute impermissibly burdened the

First-Amendment rights of all corporations and unions.  Id., at *152.

      In the wake of Citizens United v. FEC, it is unclear to the Court whether the Supreme Court

will return facial challenges to the forefront of its approach to constitutional review.  The decision

in Citizens United v. FEC, however, does not suggest that the burden of demonstrating facial

invalidity has been diminished, but rather cautions that the Court should not dismiss a facial

challenge merely because it is disfavored.

      **1.**        **NMSA 1978, § 1-4-49 is not Unconstitutionally Vague on its Face.**

      The Plaintiffs contend that the Court should deny the motion to dismiss their claim that

NMSA 1978, § 1-4-49 is void for vagueness.  The Plaintiffs argue that § 1-4-49 is unconstitutionally

vague in its application to any person who "assist[s] persons to register," because it fails to provide

an individual of ordinary intelligence with meaningful guidance as to what activities are subject to

the law, who is subject to its pre-registration and training requirements, and who is subject to the

fines.  See Pl. Response at 30.  The Plaintiffs contend that the law encourages "arbitrary and

discriminatory enforcement."  Pl. Response at 30.  The Plaintiffs also argue that the Secretary's

explanations of the law's requirements in her pleadings and in the hearings before the Court

highlight § 1-4-49's ambiguity.  See Pl. Response at 31 n.14.

The Secretary argues that "assist," as the term is used, contemplates something more than providing a prospective voter with a registration form.  Motion at 17.  The Secretary contends:

> If Plaintiffs provide substantive assistance to a voter in completing a voter registration form, they have assisted that voter for purposes of Section 1-4-49(A). More importantly, if a third party voter registration agent takes physical custody of a completed registration form, whether that agent assisted in its completion or not, the agent is then responsible for ensuring that the form is timely submitted to the appropriate election official.

Motion at 17-18.  At the hearing, Mr. Fuqua argued that "it's not hard to look at this statute and figure out when it is that the conduct of a third-party voter registration agent is somehow implicated."  Tr. at 65:5-7 (Fuqua).  He used the forty-eight-hour requirement as an example, explaining that common sense dictates that, if the prospective voter does not give the form over to the third-party agent, it would be illogical to hold that person liable for turning over the form, because the agent never took possession of the form.  See Tr. at 65:13-25 (Fuqua).

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)). The Court finds that § 1-4-49's language, on its face, provides the proper amount of information and clarity for a person of ordinary intelligence to understand the conduct the statute encompasses.  To "assist" a voter is a concept of plain import and while the Plaintiffs may speculate about possible misinterpretations of the term, the plain meaning of the statute is clear -- assisting a prospective voter means something more than handing over a voter registration form and walking away.  The word contemplates something more substantial; most importantly, taking possession of the

-58-

completed form and ensuring that it is handled properly.  The Court will not invalidate the

challenged law merely because the Plaintiffs can speculate different ways to interpret the term assist.

See Washington State Grange v. Washington State Republican Party, 552 U.S. at 450 ("Claims of

facial invalidity often rest on speculation," and consequently "raise the risk of premature

interpretation of statutes on the basis of factually barebones records."). The Court, therefore, grants

the Secretary's motion to dismiss with regards to the Plaintiffs' claim that the challenged law is void

for vagueness.

### 2.      NMSA 1978, § 1-4-49 is not Overbroad on its Face.

Further, the Plaintiffs argue that the challenged law is overbroad because it "reaches a

substantial amount of constitutionally protected conduct." Hoffman Estates v. Flipside, Hoffman

Estates, 455 U.S. 489, 494 (1982).  Specifically, the Plaintiffs contend that the challenged  law is

overbroad on its face because: (i) there is no legitimate state interest in requiring individuals to

pre-register with the State, disclose their affiliations, and submit to mandatory in-person training;

and (ii) there is no legitimate state interest in subjecting individuals to the forty-eight-hour

requirement when they assist a prospective voter filling out a registration form, but do not take

custody of the completed form.  See Amended Complaint ¶ 122 at 39.

In her motion to dismiss, the Secretary quoted from the Court's preliminary injunction

decision:

> With respect to overbreadth: the law has a wide legitimate sweep, because it reaches
> conduct properly subject to restriction.  Significantly, the law is silent on speech
> content, and leaves associational conduct and other First Amendment conduct largely
> untouched.  In sum, § 1-4-49's terms are discernible and reach only that conduct
> properly subject to restriction.

American Assoc. of People with Disabilities, et al. v. Herrera, 580 F. Supp. 2d at 1241.  At the

hearing, Mr. Fuqua argued that the language of § 1-4-49 has not changed since the Court determined

in its preliminary injunction ruling that the Plaintiffs' overbreadth challenge fails as a matter of law and that there is "simply no reason for the Court to deviate from that opinion."  Tr. at 62:16-17 (Fuqua).

The Supreme Court recognizes a "type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional." Washington State Grange v. Washington State Republican Party, 552 U.S. at 449, n. 6 (2008)(internal quotation marks omitted).  See United States v. Williams, 128 S. Ct. 1830, 1838 (2008)(stating that "a statute is facially invalid if it prohibits a substantial amount of protected speech.").  As the Court previously found in its preliminary injunction opinion, § 1-4-49 does not, on its face, prohibit or restrict First-Amendment speech, conduct, or association.  The Court remains convinced, and the Plaintiffs have not persuaded the Court otherwise, that § 1-4-49's terms are discernible and reach only that conduct properly subject to restriction.  "[W]here conduct and not merely speech is involved, [the Supreme Court] believe[s] that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Hill v. Colorado, 530 U.S. at 732 (quoting Broadrick v. Oklahoma, 413 U.S. at 612); Crawford v. Marion County Election Bd., 128 S. Ct. at 1623 ("A facial challenge must fail where the statute has a plainly legitimate sweep.")(internal quotation and citation omitted).  Even if, as applied, the challenged laws affect some speech, the Court cannot say that the facial interpretation of § 1-4-49 prohibits any protected speech.  It certainly does not prohibit a substantial amount of protected speech.  The Plaintiffs may be able to demonstrate how their ability to register or engage in incidental speech was burdened, but the challenged law does not outright prohibit First Amendment speech or conduct.  The Plaintiffs can still register and talk to prospective voters if they desire.  The Court, therefore, grants the Secretary's motion to dismiss with regards to

the Plaintiffs' claim that the challenged law is facially unconstitutional because it is overbroad.

> **D.    THE PLAINTIFFS HAVE SUFFICIENTLY PLED THAT THE CHALLENGED LAW VIOLATES ARTICLE II, SECTION 17 OF THE NEW MEXICO CONSTITUTION.**

Article II, Section 17 is analogous to the Free Speech Clause of the First Amendment of the United States Constitution, but is framed in the affirmative rather than prohibitive terms.  Compare N.M. Const. art. II, § 17 ("Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."), with U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech; or of the press, or the right of the people peaceably to assemble.").  The Supreme Court of New Mexico has previously held that "applicable precedents have determined that the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions . . . ." State v. Randleman, 134 N.M. 744, 760, 82 P.3d 554, 570 (2003).  See Temple Baptist Church, Inc. v. City of Albuquerque, 98 N.M. 138, 146, 646 P.2d 565, 573 (1982)(applying federal analysis and citing federal case law in discussing content-neutral regulations of speech).

The Plaintiffs allege that New Mexico's third-party voter-registration law and regulations unduly chill and burden their speech and association in violation of Article II, Section 17.  See Amended Complaint ¶ 154, at 45.  The Plaintiffs argue that, because their free speech and associational rights under the New Mexico Constitution, Article II, Section 17, are co-extensive with their rights under the United States Constitution, the Court should analyze both the Plaintiffs' United States and New Mexico free-speech and associational rights claims under the Anderson v. Celebrezze test.  See Pl. Opp. at 5 n. 3.  The Court agrees and therefore finds that, because the protections of the federal and state constitutions are the same, the Court will deny the Secretary's

motion to dismiss the Article II, Section 17 claim of the Amended Complaint for the same reasons it has denied the motion to dismiss the Plaintiffs' First-Amendment as-applied claims.

## IV.   THE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THAT THE NVRA PREEMPTS THE CHALLENGED THIRD-PARTY VOTER-REGISTRATION LAW.

The Plaintiffs have also pled that the NVRA preempts the challenged third-party voter-registration law. The Plaintiffs contend that New Mexico's third-party voter-registration law creates an obstacle to effectuating Congress' goals in enacting the NVRA. Specifically, the Plaintiffs contend that the law's requirements of pre-registering with the State and attending training obstructs private-registration agents' attempts to broadly disseminate and process voter forms. The Plaintiffs argue that the NVRA's legislative history shows that Congress intended to remove barriers such as state registration and certification that impede the general availability of registration opportunities to potential voters.

The Supreme Court has instructed that there is a presumption against preemption, and if confronted with two plausible interpretations of a state statute, the Court should accept the interpretation that disfavors preemption. See Bates v. Dow Agrosciences, LLC, 544 U.S. at 449; Cipollone v. Liggett Group, Inc., 505 U.S. at 516; Wyeth v. Levine, 129 S. Ct. at 1195 n.3. Obstacle preemption occurs where a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373. The Supreme Court's recent line of cases rejecting implied preemption challenges, and specifically obstacle-preemption challenges, signals to the Court that the burden of showing that a state statute stands as an obstacle to Congress' objectives is high. See Wyeth v. Levine, 129 S. Ct. at 1203; Altria Group, Inc. v. Good, 129 S. Ct. at 551; Spreitsma v. Mercury Marine, 531 U.S. at 57.

A plain reading of the NVRA and NMSA 1978, § 1-4-49 reveals no explicit conflict between the federal statute and the state law.   The NVRA contains no language stating that it expressly preempts state voting registration requirements.   To the contrary, the plain text of the NVRA expresses a desire to function alongside state voter-registration requirements, stating:

> Except as provided in subsection (b) of this section, notwithstanding any other Federal or State law, <u>in addition to any other method of voter registration provided for under State law</u>, each State shall establish procedures to register to vote in elections for Federal office --
>
> > (1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 1973gg-3 of this title;
> >
> > (2) by mail application pursuant to section 1973gg-4 of this title; and
> >
> > (3) by application in person --
> >
> > > (A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and
> > >
> > > (B) at a Federal, State, or non-governmental office designated under section 1973gg-5 of this title.

42 U.S.C. § 1973gg-2(a) (emphasis added).  The NVRA explicitly provides for state regulations for voter registration.  The Court believes § 1-4-49 fits squarely within the NVRA's acknowledgment that states may have their own voting regulations.   The Court finds that the NVRA does not explicitly preempt § 1-4-49.

Nor does the Court find that the NVRA implicitly preempts § 1-4-49.  The Plaintiffs quote from the legislative history of the NVRA to illustrate Congress' purposes and objectives.  <u>See</u> 139 Cong. Rec. E17-03 (1993)(Rep. Swift)("This is a bill which will break down those formal last barriers to full citizen participation in our democratic society.")).  The Court does not find, however, that § 1-4-49 presents an obstacle to the purposes and objectives suggested by the legislative history. Rather, the Court finds that § 1-4-49 comports with Congress' expressed objectives.  The NVRA's

stated goals include not only a generalized purpose of increasing voter participation, but also protecting the overall integrity of the electoral process and the accuracy of voter-registration rolls. See 42 U.S.C. § 1973gg(b).  New Mexico's third-party voter-registration law arises from a desire to protect the process of voter registration from fraud and error, which directly aligns with the NVRA's stated objective to protect the integrity of the electoral process and ensure that accurate and current voter-registration rolls are maintained, see 42 U.S.C. § 1973gg(b), and nothing in the NVRA, nor in the legislative history suggests that preventing fraud must be subordinated to the interest of increasing voter participation.   Moreover, § 1-4-49's alleged negative impact is debatable, considering that compliance with the law helps ensure that voter-registration forms are properly completed, turned in, and recorded, and thus prevents the loss of voters whose forms were mishandled or misplaced.  § 1-4-49's intent is to make certain that every registered voter is able to vote, not to depress eligible voter registration or voter turnout.

The Court is also cognizant of Justice Thomas' recent concurring opinion in Wyeth v. Levine, in which he expressed that "Congressional and agency musings . . . do not pre-empt state law under the Supremacy Clause."  129 S. Ct. at 1207.  The Plaintiffs urge the Court to find that §1-4-49 causes an obstacle to Congress' purposes in the NVRA by citing to statements made by congressional representatives in the legislative hearings on the NVRA.  See Pl. Response at 34. Justice Thomas stresses that "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue," and the Court finds no indication in the text of the NVRA that it was intended to supercede or frustrate state voting laws.  The Court, therefore, grants the Secretary's motion to dismiss the Plaintiffs' claim that § 1-4-49 violates the NVRA.

V.   **THE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THAT THE CHALLENGED LAW VIOLATES ARTICLE II, § 8 OF THE NEW MEXICO CONSTITUTION.**

Article II, Section 8 of the New Mexico Constitution provides that "[a]ll elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." N.M. Const. art. II, § 8. The Plaintiffs' Amended Complaint alleges that § 1-4-49 imposes severe financial and administrative burdens on the Plaintiffs and limits the Plaintiffs' ability to participate in free and open elections. The Plaintiffs state the burdens on speech that § 1-4-49 imposes causes the public to receive less information about current political issues and fewer opportunities to associate with the Plaintiffs and others in meaningful efforts to affect governmental decision-making. See Amended Complaint ¶¶ 149-150, at 44-45. The Secretary argues that the Plaintiffs have confused a potential restriction on political speech with the guarantee of free and open elections.

The Court agrees with the Secretary that the Plaintiffs have conflated their free-speech claims with a claim under Article II, Section 8. The Plaintiffs cite to the Supreme Court of New Mexico's decision in Gunaji v. Macias, which referenced a decision by the Kentucky Court of Appeals, which in turn stated: "[N]o election can be free and equal . . . if any substantial number of persons entitled to vote are denied the right to do so." 130 N.M. at 742, 31 P.3d at 1016 (quoting Wallbrecht v. Ingram, 164 Ky. 463, 175 S.W. 1022, 1026-27 (1915)). In Gunaji v. Macias, the Supreme Court of New Mexico determined that Article II, Section 8 of the New Mexico Constitution is violated if a voter is unable to choose between lawful candidates because of an error in the ballot. See 130 N.M. at 742, 31 P.3d at 1016. The Supreme Court of New Mexico's holding in Gunaji v. Macias did not extend beyond the act of voting itself and did not address either registering voters or whether Article II, Section 8 extends to protect third-parties aiding others in

-65-

registering to vote.  The Plaintiffs' reliance on the cited statement is not enough to support a claim under Article II, Section 8 of the New Mexico Constitution.

Moreover, the Court finds the holding in <u>People's Constitutional Party v. Evans</u>, 83 N.M. 303, 491 P.2d 520, instructive in the scope of the protection that Article II, Section 8 affords.  In <u>People's Constitutional Party v. Evans</u>, the Supreme Court of New Mexico addressed whether signature requirements for candidates violated Article II, Section 8, and held that the requirements did not violate the free-and-open-elections provision because the State had a legitimate interest in the requirement.  <u>See</u> 83 N.M. at 305-07, 491 P.2d at 522-24.  The Supreme Court of New Mexico stated that "[f]ree and open elections do not require a total lack of restraint on the number of political parties and nominees entitled to placement on the ballot."  <u>Id.</u>  This precedent of the Supreme Court of New Mexico supports the notion that the New Mexico Legislature may pass laws which are designed to preserve the integrity of the voting process and such laws do not implicate the free-and-open-election clause.  Like the restrictions regarding candidate signatures, NMSA § 1-4-49 is intended to preserve the integrity of the voting process.  The Court does not find that § 1-4-49 implicates Article II, Section 8 and will therefore grant the Secretary's motion to dismiss that claim.

## VI.   THE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THAT THE TRAINING REQUIREMENT IMPOSED BY THE INDIVIDUAL COUNTY CLERKS CONSTITUTES A VIOLATION OF NEW MEXICO'S CONSTITUTIONAL PRINCIPLE OF NON-DELEGATION.

The Plaintiffs allege that the training requirements imposed by the New Mexico County Clerks on third-party voter-registration agents violates the New Mexico constitutional principle of non-delegation.  The Plaintiffs contend that the training requirement is standardless and ad-hoc, because neither the text of § 1-4-49 nor the implementing regulations in 1.10.25.7-10 NMAC require

the training.  The Plaintiffs also contend that only the Secretary of State has the power to develop standards for elections and that she may not delegate that power to the County Clerks.  Because the County Clerks, and not the Secretary, require that third-party registration agents participate in training before they can complete the pre-registration process, the Plaintiffs contend that the training requirement violates the New Mexico constitutional principle of non-delegation.  The Secretary argues that the Plaintiffs have not asserted any prohibition against one executive agent delegating authority to another, nor have the Plaintiffs asserted the extent of the Secretary's delegated authority or the County Clerks delegated authority which they have allegedly overstepped.  The Secretary urges the Court to dismiss the Plaintiffs' non-delegation claim because the Amended Complaint does not set forth in sufficient detail the reasons why the delegation is excessive.

The Plaintiffs rely on Cobb v. New Mexico Canvassing Board, which prevents the New Mexico Legislature from vesting a large measure of discretionary authority in administrative agencies and bodies.  See 140 N.M. at 88, 140 P.3d at 509.  The Plaintiffs argue that the Secretary has given her clerks "unbridled discretion to concoct training programs" that neither statute nor regulation dictates.  In the hearing on this motion, Mr. Fuqua on behalf of the Secretary explained that Secretary's office believes the training is a good idea.  See Hearing Tr. at 107:6-19 (Fuqua).

Because the Court finds that there is statutory authority in the New Mexico Election Code for the education and training of registration officers by County Clerks, see NMSA § 1-2-2I, and because the Secretary has designated the County Clerks as agents in the carrying out of NMSA § 1-4-49, the Court finds that the training requirement is not a violation of non-delegation and will grant the Secretary's motion to dismiss Count VI of the Amended Complaint.

## A.   THE NEW MEXICO LEGISLATURE VESTS THE POWER OF DEVELOPING ELECTION STANDARDS IN THE SECRETARY OF STATE.

The Secretary of State is the chief election officer of New Mexico.  See NMSA 1978, § 1-2-1A.  The Secretary must: (i) obtain and maintain uniformity in the application, operation, and interpretation of the New Mexico Election Code; (ii) make rules and regulations pursuant to the provisions of, and necessary to carry out the purposes of, the Election Code, and must furnish to the County Clerks copies of such rules and regulations; and (iii) enforce the provisions of the Election Code.  See NMSA 1978, § 1-2-1A(1)-(3).  The Secretary must also advise the County Clerks "as to the proper methods of performing their duties prescribed by the Election Code," NMSA 1978, § 1-2-2D, is responsible "for the education and training of county clerks regarding elections," NMSA 1978, § 1-2-2G, and must "assist the county clerks in the education and training of registration officers, in the recruitment and training of poll workers and other election workers and in the certification of the presiding judges of the precinct boards," NMSA 1978, § 1-2-2I.

The Secretary gives instructions and guidelines to the County Clerks.  See, e.g., League of Women Voters v. Herrera, 145 N.M. 563, 567, 203 P.3d 94, 98 (2009)("The Secretary's guidelines, styled Instruction 2008-10, were attached to the Secretary's August 22, 2008 memo to the County Clerks, titled "Absentee and Provisional Ballots, What Constitutes a Vote?"  Instruction 2008-10 lays out detailed guidelines for determining what kinds of ballot marks should, and should not, constitute a legal vote . . . .).   In League of Women Voters v. Herrera, the Supreme Court of New Mexico held that the Secretary must enforce not only a provision in the New Mexico Election Code as written but also must enforce her interpretations of the provision, which the County Clerks carried out.  See, e.g., League of Women Voters v. Herrera, 145 N.M. at 570, 203 P.3d at 101 (ordering the Secretary to enforce election provision NMSA 1978, § 1-9-4.2 "as written and as interpreted by the

-68-

Secretary's guidelines.").

In the administrative code provisions on NMSA 1978, § 1-4-49, issued by the Office of the Secretary, the County Clerks are designated agents of the Secretary of State, and answer directly to the Secretary on election-related matters.  See § 1.10.25.10 NMAC. Though the Plaintiffs rely on Cobb v. New Mexico Canvassing Board to argue that the Secretary may not delegate to her clerks, the case does not stand for that proposition.   Instead, the Supreme Court of New Mexico distinguishes between the fact that "the Election Code does allow the Secretary of State to make rules and regulations to carry out the purposes of the Election Code," and the Canvassing Board, whose actions are explicitly controlled by statute, which permits the Board to meet to conduct the canvass, see NMSA 1978, § 1-13-15, to issue certificates of elections or nominations, see NMSA 1978, § 1-13-16, to examine election returns, see NMSA 1978, § 1-13-18, and to conduct ministerial oversight over approving canvassing of votes, see id.  The Supreme Court of New Mexico noted that "[t]he State Canvassing Board, however, is not legislatively directed to develop standards for elections."  Cobb v. New Mexico Canvassing Bd., 140 N.M. at 90, 140 P.3d at 511. The case does not stand for the proposition the Plaintiffs' plead in their Amended Complaint, that the Secretary may not delegate powers of developing standards for elections.

The Supreme Court of New Mexico has found proper delegation of legislative authority "where administrative discretion occurs within a governmental scheme, policy, or purpose."  Cobb v. New Mexico Canvassing Bd., 140 N.M. at 89, 140 P.3d at 510.  The Court must look at the scope of the power delegated and the specificity of the standards.  See State ex rel. Schwartz v. Johnson, 120 N.M. at 825, 907 P.2d at 1006.  Like the Real Estate Board in State v. Spears, which the Legislature granted the power to make and enforce any and all rules and regulations to carry out the provisions of the law, see 57 N.M. at 404-04, 259 P.2d at 359-60, the Secretary of State is granted

the power to "make rules and regulations pursuant to the provision of, and necessary to carry out the purposes of, the Election Code and shall furnish to the county clerks copies of such rules and regulations," NMSA 1978, § 1-2-1(A)(2).  The Secretary has administrative discretion to regulate the provisions of the election laws, like § 1-4-49, and may pass on that discretion to her agents, the County Clerks.  Specifically, NMSA 1978, § 1-4-49C states: "The secretary of state may issue rules to ensure the integrity of the registration process."  According to the Plaintiffs' Amended Complaint, the County Clerks have used the training as a mechanism to communicate the severity of the law and potential consequences of non-compliance.  See Amended Complaint ¶ 25, at 10.  Taking the allegations in the Amended Complaint as true, the Court does not see how training that instructs on the election-registration law goes outside the bounds of the governmental scheme, policy, and purpose the New Mexico Election Code intends to achieve.

**B.     THE NEW MEXICO ELECTION CODE CONTEMPLATES THAT THE COUNTY CLERKS WILL TRAIN THIRD-PARTY REGISTRATION OFFICERS.**

The Plaintiffs' argue that the New Mexico County Clerks have imposed ad-hoc training requirements on third-party voter-registration agents, "which have neither basis in the statutes or regulations of the challenged law," and that the requirement is a violation of New Mexico's constitutional non-delegation doctrine.  Pl. Response at 38.  The Plaintiffs argue that the Legislature did not delegate to the County Clerks the authority to impose training requirements on third-party voter-registration agents.  See Pl. Response at 39.  The Secretary concedes and the Court agrees that the language of § 1-4-49 does not state that training is required.  The New Mexico Election Code, however, clearly indicates that the County Clerks are responsible for the education and training of registration officers.  In NMSA 1978, § 1-2-2I, the Secretary of State is instructed that she must "assist the county clerks in the education and training of registration officers."  The Plaintiffs may

argue that third-party registration agents are not "registration officers."  According to the New Mexico Administrative Code provisions regarding third-party registration agents, however, "registration agent" is also known as "registration official."  1.10.25.7(C) NMAC.  The Court finds, therefore, that "training of registration officers" encompasses third-party registration agents.

It is also significant that NMSA 1978, § 1-2-2I does not specify in what way the Secretary must assist in the training and education.  The Plaintiffs question the Secretary's failure to provide the County Clerks with specific instructions regarding the training.  See Pl. Response at 40.  The Court, notes, however, that the lack of a requirement of specific instructions may have been a conscious decision by the New Mexico Legislature, because other provisions of the Election Code require the Secretary to provide training manuals.  See, e.g., NMSA 1978, §1-2-4 (requiring the Secretary to provide precinct boards training manuals).  The Legislature has also indicated that tailoring training to each county is permissible.  See NMSA 1978, § 1-2-4 2007 Amendment (permits the Secretary to provide separate manuals for voting systems to each county, or if a single training manual is in a loose-leaf binder, sections of the voting system used in a given county may be inserted in the manual for that county).  Moreover, the Supreme Court of New Mexico, in League of Women Voters v. Herrera,, stated that "there must be some room for discretion by local officials in order to guard against disenfranchisement."  145 N.M. at 567, 203 P.3d at 98.

Because the training of registrations agents is not ad hoc, but rather a requirement set forth in the New Mexico Election Code, and because the Secretary has the authority to delegate the training to the County Clerks, the Plaintiffs have not asserted a valid claim that the training requirement violates New Mexico's constitutional principle of non-delegation.  The Court, therefore, dismisses Claim VII.

**VII.   THE PLAINTIFFS' CLAIM THAT THE COUNTY CLERKS' TRAINING REQUIREMENT VIOLATES THE DUE-PROCESS CLAUSE ALSO FAILS.**

The Plaintiffs allege in their Amended Complaint that when the Secretary purportedly authorized the County Clerks to require training for third-party registration agents and exercised unconstrained discretion in exempting organizations from the strictures of NMSA 1978, § 1-4-49, the Secretary has violated and is violating the Plaintiffs' right to procedural due process.  See Amended Complaint ¶ 166, at 47.  At the hearing on this motion, Guy G. Brennan, on behalf of the Plaintiffs, stated: "Our due process claim is very simple . . . . [O]ur central point is that the training requirement is being imposed without any process whatsoever."  Hearing Tr. at 113:19-24 (Brennan).  The Plaintiffs contend that, under the Supreme Court's precedent in United States v. Locke, 471 U.S. 84 (1985), they are due some process.  See Pl. Opp. at 34-35 (citing United States v. Locke, 471 U.S. at 108).  The Supreme Court, in United States v. Locke, stated:

> The starting point for any due process analysis must be the presumption that in altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.

United States v. Locke, 471 U.S. 84, 108 (1985)(citations omitted).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Morrisey v. Brewer, 408 U.S. 471, 481 (1972).  See Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 895 (1961)("Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.").  The Plaintiffs have pled that, because the third-party voter-registration law

does not explicitly dictate the training requirement, they have been denied the legislative process. See Bi-Metallic Co. v. Colo. State Bd. of Equalization, 239 U.S. 441, 445 (1915)(noting that legislative action does not require individualized notice and opportunity to be heard, but only if "proper state machinery has been used."). The Secretary contends that the Plaintiffs' due process claim fails as a matter of law because they have not described the process they are due. The Plaintiffs respond that the United States Constitution demands that, at a minimum, the process due is the procedural protection of the ordinary legislative process.

The New Mexico Election Code explicitly requires the Secretary to assist the County Clerks in the education and training of registration agents. See NMSA 1978, § 1-2-2I. The extension of registration-agent training to third-party registration agents is the logical extension of the requirement set forth by the New Mexico Legislature. The Secretary has not, therefore, "sanction[ed] the County Clerks' erratic and unpredictable treatment of Plaintiffs' voter-registration activities." Am. Complaint ¶ 166, at 47. Because the training requirement for registration agents is part of the New Mexico Election Code, the State of New Mexico has not denied the Plaintiffs legislative process, and the Court therefore grants the Secretary's motion to dismiss and dismisses the Plaintiffs' due-process claim.

**IT IS ORDERED** that Defendant's Motion to Dismiss is denied in part and granted in part. The Court grants the Defendant's Motion to Dismiss Plaintiffs' Count II, Count III, Count IV, Count VI, and Count VII. The Court denies the Defendant's Motion to Dismiss Plaintiffs' Count I and Count V.

_____
UNITED STATES DISTRICT JUDGE

-73-

*Counsel*:

Edward Ricco
Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Albuquerque, New Mexico

-- and --

Edward D. Hassi
O'Melveny & Myers LLP
New York, New York

-- and --


Charles E. Borden
Guy G. Brenner
O'Melveny & Myers LLP
Washington, D.C.

     *Attorneys for the Plaintiffs*


Scott Fuqua
  Assistant Attorney General
Office of the New Mexico Attorney General
Santa Fe, New Mexico

     *Attorneys for the Defendant*