**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

AMERICAN ASSOCIATION OF PEOPLE )
WITH DISABILITIES, FEDERATION OF )
AMERICAN WOMEN'S CLUBS )
OVERSEAS, INC., NEW MEXICO PUBLIC )
INTEREST RESEARCH GROUP )
EDUCATION FUND, and SOUTHWEST )
ORGANIZING PROJECT, )
                                 )     No. CIV 08-00702 JOB
          Plaintiffs, )
                                 )
       v. )
                                 )
MARY HERRERA, in her capacity as )
Secretary of State, )
                                 )
          Defendant. )

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS........................................................................... ix

STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE.................... 1

INTRODUCTION............................................................................................. 14

STANDARD OF REVIEW ................................................................................ 15

ARGUMENT .................................................................................................... 16

    I.     PLAINTIFFS' VOTER REGISTRATION ACTIVITIES CONSTITUTE PROTECTED FIRST AMENDMENT ACTIVITY ....................................... 18

    II.    THE SECRETARY CANNOT MEET HER BURDEN TO SHOW THE STATE HAS A LEGITIMATE AND SUFFICIENT INTEREST IN THE CHALLENGED LAW ............................................................................ 20

        A.    The Secretary Bears The Burden To Provide Evidence Showing The Challenged Law Is Necessary To Advance A Legitimate State Interest................................................................................... 21

        B.    The Secretary Cannot Show The Challenged Law Is Necessary To Advance The State's Asserted Interests In Preventing Fraud And Protecting The Franchise.................................................... 22

            1.    The Secretary Cannot Show The Challenged Law Is Necessary In Light Of The Preexisting State Regime That Detected And Deterred Fraud ..................................... 23

            2.    The Secretary Cannot Show The Challenged Law Is Necessary To Protect The Voter Franchise ............................. 27

            3.    The Secretary Cannot Justify The Law's Civil And Criminal Penalties, Which, Like The Law's Substantive Requirements, Are Not Necessary To Advance A Legitimate And Sufficient State Interest ................................... 30

        C.    The Secretary Cannot Show The Training Requirement Or The 50-Form Limit — Which Do Not Address Concerns Regarding Fraud Or Protecting The Franchise — Are Necessary To Advance A Legitimate State Interest ..................................................... 32

    III.   THE SECRETARY CANNOT MEET HER BURDEN TO SHOW THE STATE'S ASSERTED INTERESTS OUTWEIGH THE BURDENS IMPOSED UPON PLAINTIFFS ........................................................... 35

## TABLE OF CONTENTS

**Page**

A.   The Secretary Cannot Justify Burdening Plaintiffs With A Vague And Uncertain Law ................................................................................ 36

B.   Plaintiffs' Evidence Proves Beyond Genuine Dispute That The Secretary Has Not Justified The Burdens Imposed By The Challenged Law ................................................................................ 38

1.   The 48 Hour Requirement Unjustifiably Burdens Plaintiffs' Ability To Conduct Volunteer-Run Voter Registration Activities ................................................................................ 38

2.   The 50-Form Limit Burdens Plaintiffs' First Amendment Rights And Does Not Serve A Legitimate Or Sufficient State Interest ................................................................................ 40

3.   The Registration And Training Requirements Unjustifiably Burden Plaintiffs' Ability To Recruit Volunteers ...................... 41

4.   The Challenged Law's Penalties Impose Severe And Unnecessary Threats To The Limited Resources Of Plaintiffs And Their Volunteers ................................................ 42

CONCLUSION ........................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*19 Solid Waste Dep't Mechs. v. City of Albuquerque*,
   156 F.3d 1068 (10th Cir. 1998)................................................................... 15, 16

*Am. Ass'n of People with Disabilities v. Herrera*,
   690 F. Supp. 2d 1183 (D.N.M. 2010)........................................................... passim

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ..................................................................................... passim

*Ass'n of Cmty. Orgs. for Reform Now v. Cox*,
   No. 1:06-CV-1891, 2006 U.S. Dist. LEXIS 87080 (N.D. Ga. Sept. 28, 2006) ................ 23, 24

*Buckley v. Am. Constitutional Law Found.*,
   525 U.S. 186 (1999) .................................................................................... 23, 24, 35

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000) .................................................................................... 22, 23

*Citizens United v. FEC*,
   130 S. Ct. 876 (2010)................................................................................... 22

*Cotham v. Garza*,
   905 F. Supp. 389 (S.D. Tex. 1995).............................................................. 33

*Crawford v. Marion County Election Bd.*,
   553 U.S. 181 (2008) .................................................................................... 16, 35

*Harapat v. Vigil*,
   676 F. Supp. 2d 1250 (D.N.M. 2009)........................................................... 16

*Invisible Empire Knights of Ku Klux Klan v. City of West Haven*,
   600 F. Supp. 1427 (D. Conn. 1985) ............................................................. 32, 33

*Iowa Socialist Party v. Nelson*,
   909 F.2d 1175 (8th Cir. 1990)...................................................................... 33

*League of Women Voters of Fla. v. Cobb ("LWVF I")*,
   447 F. Supp. 2d 1314 (S.D. Fla. 2006)......................................................... 30, 39

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*League of Women Voters of Florida v. Browning ("LWVF II")*,
575 F. Supp. 2d 1298 (S.D. Fla. 2008) ....................................................39, 40, 42

*Libertarian Party of Ohio v. Blackwell*,
462 F.3d 579 (6th Cir. 2006) ................................................................ 22

*McConnell v. FEC*,
540 U.S. 93 (2003) ................................................................................ 22

*Meyer v. Grant*,
486 U.S. 414 (1988) ........................................................................16, 19, 21

*Miller ex rel. S.M. v. Bd. of Educ.*,
455 F. Supp. 2d 1286 (D.N.M. 2006) ................................................. 15

*NAACP v. Alabama*,
357 U.S. 449 (1958) ............................................................................ 41

*NAACP v. Button*,
371 U.S. 415 (1963) ........................................................................ 34, 36

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) ........................................................................ 22, 24

*Norman v. Reed*,
502 U.S. 279 (1992) ............................................................................ 21

*Project Vote v. Blackwell*,
455 F. Supp. 2d 694 (N.D. Ohio 2006) ............................................... 41

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986) ........................................................................ 33, 34

*Thomas v. Int'l Bus. Machs.*,
48 F.3d 478 (10th Cir. 1995) .......................................................... 16, 29

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ....................................................................21, 32, 35

*Village of Schaumburg v. Citizens for Better Env't*,
444 U.S. 620 (1980) ............................................................................ 26

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Vitkus v. Beatrice Co.*,
  11 F.3d 1535 (10th Cir. 1993) ........................................................................... 16

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) ............................................................................................... 20

### Federal Statutes

26 U.S.C. § 501 .................................................................................................... 1, 2

### State Constitutions

Ark. Const. amend. 51 § 9 .................................................................................... 30

Ark. Const. amend. 51 § 15 .................................................................................. 30

New Mexico Const. art. II, § 17 ....................................................................... 16, 41

### State Statutes and Regulations

Cal. Elec. Code. § 2138 ........................................................................................ 32

Cal. Elec. Code. § 18103 ...................................................................................... 32

Colo. Rev. Stat. Ann. § 1-2-701 .......................................................................... 31

Colo. Rev. Stat. Ann. § 1-2-702 .......................................................................... 31

Conn. Gen. Stat. Ann. § 9-23g ....................................................................... 31, 32

Del. Code Ann. tit. 15, § 2060 ............................................................................. 31

Del. Code Ann. tit. 15, § 2063 ............................................................................. 31

Fla. Stat. Ann. § 97.0575 ..................................................................................... 31

10 Ill. Comp. Stat. § 5/4-6.2 ................................................................................ 31

10 Ill. Comp. Stat. § 5/5-16.2 .............................................................................. 31

10 Ill. Comp. Stat. § 5/6-50.2 .............................................................................. 31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Ill. Admin. Code tit. 26 § 207.50 ........................................................................... 31

Ill. Admin. Code tit. 26 § 216.70 ........................................................................... 31

Kan. Stat. Ann. § 25-2421a .................................................................................... 31

La. Rev. Stat. Ann. § 18:1461 ................................................................................ 31

Md. Code Regs 33.05.03.06 ................................................................................... 31

Minn. Stat. Ann. § 201.061 .................................................................................... 31

Minn. Stat. Ann. § 201.27 ...................................................................................... 31

Mo. Ann. Stat. § 115.203 ....................................................................................... 31

Mo. Ann. Stat. § 115.205 ....................................................................................... 31

Mo. Ann. Stat. § 115.637 ....................................................................................... 31

Mont. Code Ann. § 13-2-110 ................................................................................. 31

Neb. Rev. Stat. § 32-306 .................................................................................. 31, 32

Neb. Rev. Stat. § 32-311 ........................................................................................ 31

N.M. Stat. Ann. 1978, § 1-12-9 ............................................................................... 6

N.M. Stat. Ann. 1978, § 1-20-3 ........................................................................... 6, 24

N.M. Stat. Ann. 1978, § 1-20-8 ............................................................................... 6

N.M. Stat. Ann. 1978, § 1-20-9 ............................................................................... 6

N.M. Stat. Ann. 1978, § 1-20-15 ............................................................................. 6

N.M. Stat. Ann. 1978, § 1-20-22 ............................................................................. 6

N.M. Stat. Ann. 1978, § 1-4-49 ....................................................................... passim

N.M. Stat. Ann. 1978, § 3-8-75 ............................................................................... 6

## TABLE OF AUTHORITIES
(continued)

Page(s)

N.M. Stat. Ann. 1978, § 3-8-79 ........................................................................ 6

N.M. Stat. Ann. 1978, § 31-19-1 ....................................................................... 4

1.10.25.7-10 NMAC ........................................................................................... 3

1.10.25.8 NMAC ................................................................................................ 3

1.10.25.8-9 NMAC ............................................................................................. 3

1.10.25.10 NMAC ............................................................................................... 3

N.C. Gen. Stat. Ann. § 163-82.6 ...................................................................... 31

Ohio Rev. Code Ann. § 3503.29 ....................................................................... 31

Ohio Rev. Code Ann. § 3599.11 ....................................................................... 31

Okla. Stat. Ann. tit. 26, § 4-112 ....................................................................... 31

Or. Rev. Stat. Ann. § 247.012 .......................................................................... 31

Or. Rev. Stat. Ann. § 247.171 .......................................................................... 31

S.D. Codified Laws § 12-4-3.2 ......................................................................... 31

Tex. Elec. Code Ann. §§ 13.031 ...................................................................... 31

Tex. Elec. Code Ann. §§ 13.033 ...................................................................... 31

Tex. Elec. Code Ann. § 13.042 ........................................................................ 31

Tex. Elec. Code Ann. § 13.043 ........................................................................ 31

Utah Code Ann. § 20A-2-301 ........................................................................... 31

Va. Code Ann. § 18.2-11 .................................................................................. 31

Va. Code Ann. § 24.2-1002.01 ......................................................................... 31

Wash. Rev. Code 29A.08.115 .......................................................................... 31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

W. Va. Code § 3-2-10.................................................................................... 31

## Rules of Procedure

Fed. R. Civ. P. 56 ....................................................................................... 15

D.N.M.LR-Civ. 10.5 ............................................................................... 2, 14

## Other Authorities

Isaac Ehrlich & Richard A. Posner, *An Economic Analysis of Legal Rulemaking*,
  3 J. Legal Stud. 257 (1974)...................................................................... 36

Ehud Guttel & Alon Harel, *Uncertainty Revisited: Legal Prediction and Postdiction*,
  107 Mich. L. Rev. 467 (2008).................................................................. 36

# TABLE OF ABBREVIATIONS

**Cole Decl.**

Declaration of Leighanne Cole, Field Director, New Mexico Public Interest Research Group ("NMPIRG") Education Fund, Inc. (attached to Declaration of Charles E. Borden as Ex. 5)

**Def.'s Interrog. Resp.**

Defendant's Objections and Answers to Plaintiffs' First Set of Interrogatories (attached to Declaration of Charles E. Borden as Ex. 19)

**Dickson Decl.**

Declaration of James Dickson, Vice President for Organizing and Civic Engagement, American Association of People with Disabilities ("AAPD") (attached to Declaration of Charles E. Borden as Ex. 1)

**Dominguez Dep.**

Deposition of Larry Dominguez, Bureau of Elections Coordinator, State of New Mexico (attached to Declaration of Charles E. Borden as Ex. 10)

**Fraher Decl.**

Declaration of Katryn E. Fraher, Member and Coordinator, Students for New Mexico Public Interest Research Group ("NMPIRG") (attached to Declaration of Charles E. Borden as Ex. 3)

**Fulgenzi Dep.**

Deposition of Kelli Fulgenzi, Bureau of Elections Administrator, State of New Mexico (attached to Declaration of Charles E. Borden as Ex. 18)

**Herrera Dep.**

Deposition of Mary Herrera, Secretary of State, State of New Mexico (attached to Declaration of Charles E. Borden as Ex. 7)

**Jimenez Dep.**

Deposition of Mario Jimenez, Chief Deputy County Clerk for Doña Ana County  (attached to Declaration of Charles E. Borden as Ex. 15)

## TABLE OF ABBREVIATIONS
### (continued)

**Lamb Dep.**

Deposition of Denise Lamb, Chief Deputy Clerk for Santa Fe County (attached to Declaration of Charles E. Borden as Ex. 8)

**Laederich Decl.**

Declaration of Lucy Stensland Laederich, U.S. Liaison for Federation of American Women's Overseas, Inc. ("FAWCO") (attached to Declaration of Charles E. Borden as Ex. 2)

**Oliver Dep.**

Deposition of Maggie Toulouse Oliver, Bernalillo County Clerk (attached to Declaration of Charles E. Borden as Ex. 11)

**Rodela Dep.**

Deposition of Maria Elena Rodela, Bureau of Elections Chief for Rio Arriba County (attached to Declaration of Charles E. Borden as Ex. 14)

**Rodriguez Decl.**

Declaration of Robert Rodriguez, Executive Director, SouthWest Organizing Project ("SWOP") (attached to Declaration of Charles E. Borden as Ex. 6)

**SOS**

Document Production of the Defendant, Mary Herrera, Secretary of State (attached to Declaration of Charles E. Borden as Exs. 16 & 17)

**Shaw Dep.**

Deposition of Jess Douglas Shaw, Chief Deputy Clerk for Chaves County (attached to Declaration of Charles E. Borden as Ex. 9)

**TABLE OF ABBREVIATIONS**
(continued)

**Tessneer Decl.**

Declaration of Jamison Tessneer, former Campus Organizer, Students for New Mexico Public Interest Research Group ("NMPIRG") (attached to Declaration of Charles E. Borden as Ex. 4)

**Trujillo Dep.**

Deposition of Don Francisco Trujillo, Deputy Secretary of State, State of New Mexico (attached to Declaration of Charles E. Borden as Ex. 12)

**Vildasol Dep.**

Deposition of Manuel Vildasol, Administrator for the New Mexico Secretary of State's Office (attached to Declaration of Charles E. Borden as Ex. 13)

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

The following material facts, which are not in genuine dispute, entitle Plaintiffs to summary judgment.

### A.    Plaintiffs' Protected First Amendment Activities

1.    Plaintiff American Association of People With Disabilities ("AAPD") is a 26 U.S.C. § 501(c)(3) organization that accomplishes its mission of ensuring self-sufficiency and political empowerment for disabled Americans, including those in New Mexico, by registering its own members to vote and also by running comprehensive, large-scale voter-registration programs through coalitions of state-specific disability organizations.  (Dickson Decl. ¶¶ 3-4, 9, 10, 13-14, 17-18.)

2.    Plaintiff Federation of American Women's Clubs Overseas, Inc. ("FAWCO"), a 26 U.S.C. § 501(c)(3) organization, is an international confederation that is entirely volunteer-run. FAWCO assists its member organizations in registering their own members to vote from abroad and in conducting voter-registration drives for American citizens, including citizens of New Mexico, in the foreign countries in which they operate.  (Laederich Decl. ¶¶ 6, 9-10, 12, 21.)

3.    Plaintiff New Mexico Public Interest Research Group Education Fund ("NMPIRG Education Fund") is a 26 U.S.C. § 501(c)(3) organization incorporated in New Mexico and headquartered in Albuquerque.  (Fraher Decl. ¶ 2.)  Students for New Mexico Public Interest Research Group ("Students for NMPIRG") is a student group at the University of New Mexico ("UNM") that has conducted issue-oriented campaigns both on its own and as part of the NMPIRG and the NMPIRG Education Fund.  (Id. ¶¶ 2, 6.)  Such campaigns include the "New Voters Project," a nonpartisan voter registration campaign organized by the "Student PIRGs," a

national federation of Student PIRG organizations across the country.  (*Id.* ¶¶ 5, 10-12

(describing voter registration campaigns); Tessneer Decl. ¶¶ 4-8 (same); New Voters Project

Campaign Kit Fall 2006 (Cole Decl., Tab 3, AAPD0000285-AAPD0000340);  New Voters

Project Campaign Kit Fall 2008 (Cole Decl., Tab 4, AAPD0000346-AAPD0000407)[1];

Democracy Alliance Report Form Data from 2004 (Cole Decl., Tab 1, AAPD0000171-

AAPD0000172) (NMPIRG registered 29,951 persons to vote in New Mexico in 2004).).

     4.    Plaintiff South West Organizing Project ("SWOP") is a 26 U.S.C. § 501(c)(3)

organization incorporated in New Mexico with approximately 600 members, primarily people of

color with low-to-moderate incomes, across New Mexico.  (Rodriguez Decl. ¶ 5.)  SWOP

accomplishes its mission of empowering underserved communities by educating, organizing,

developing leadership in these communities, and, since 1983, registering community members to

vote through volunteer-driven voter registration drives.  (*Id.* ¶¶ 6, 9-15, 19-21.)

     5.    By assisting their fellow citizens with voter registration, Plaintiffs intend to convey

a clear message that they believe in democracy and in civic participation, and anyone who

observes their efforts would likely understand that message.  (Dickson Decl. ¶¶ 9, 14, 20-21;

Laederich Decl. ¶¶ 19-20; Fraher Decl. ¶¶ 12-13; Tessneer Decl. ¶¶ 8, 10; Rodriguez Decl. ¶¶ 6,

13-14, 23; 1000 Seed Spring Voter Drive (Rodriguez Decl., Tab 1, AAPD0000484) (presenting

educational materials distributed during SWOP voter registration drives).)  Plaintiffs have found

that helping a voter to register is the most effective means to express Plaintiffs' message.

(Tessneer Decl. ¶ 8; Fraher Decl. ¶ 12.)

---

[1]    The exhibits at Tabs 3 and 4 of the Cole Declaration exceed the 50-page limit set by D.N.M.LR-Civ. 10.5.  Opposing counsel has, pursuant to the rule, consented to an enlargement of the length limit.

6.    Plaintiffs' voter-registration activities are the most effective means for Plaintiffs to (i) persuade their fellow citizens of the importance of civic participation, the legitimacy of the democratic process, and voting; and (ii) engage in nonpartisan discussions with voters about political issues.  (Dickson Decl. ¶ 21; Laederich Decl. ¶¶ 10, 19; Fraher Decl. ¶¶ 12-14; Tessneer Decl. ¶¶ 8-10; Cole Decl. ¶ 14; Rodriguez Decl. ¶¶ 13-14, 19-23.)

7.    Plaintiffs' voter-registration activities provide the most effective means for Plaintiffs to associate with: (i) potential voters, who, by registering through a third-party organization, choose to associate themselves with that organization; (ii) their own members; and (iii) prospective new members and volunteers.  (Dickson Decl. ¶¶ 13, 20-21; Cole Decl. ¶ 15; Fraher ¶¶ 12, 15; Rodriguez Decl. ¶¶ 13, 18, 21.)

**B.    The Challenged Law**

8.    In 2005, New Mexico enacted the challenged statute, N.M. Stat. Ann 1978, § 1-4-49, which has been implemented through administrative regulation 1.10.25.7-10 NMAC and the administrative practice of New Mexico County Clerks acting on behalf of the Defendant (collectively "the challenged law").

(a)  Section 1-4-49(a) of the New Mexico Statutes requires registration agents who are acting on behalf of a nongovernmental organization to "assist persons to register to vote" to register with the Secretary of State and disclose identifying information before assisting another to register.  N.M. Stat. Ann. 1978, § 1-4-49(a); 1.10.25.8-9 NMAC.

(b)  Registration forms, which bear a traceable number, are to be distributed in quantities of no more than 50 per organization or individual at any one time.  1.10.25.8(c) NMAC; *id.* 1.10.25.10(b).

(c)  There is a 48 hour deadline for a third-party registration organization to "deliver or mail a certificate of registration to the secretary of state or county clerk" following "its completion by the person registering to vote."  N.M. Stat. Ann. 1978, § 1-4-49(b).

(d) Although neither the statute nor regulations provide for it, County Clerks, acting as agents of the Defendant, have imposed a training requirement for all registration agents. (Herrera Dep. 78:11-24.)

(e)  The penalties for a violation of the law include (i) up to 6 months imprisonment and $500 in fines for an intentional violation, *see* N.M. Stat. Ann. 1978, § 1-4-49(d); *id.* § 31-19-1; (ii) civil fines of $250 per violation, *id.* § 1-4-49(e); and (iii) strict civil liability for organizations with respect to violations by an officer or employee with "decision-making authority involving . . . voter-registration activities," *id.* § 1-4-49(d).

9.    Officials disagree about the substantive requirements of the law.

(a)  Officials disagree about whether "assistance" includes picking up a form, handing it to another person, physically helping another person fill out the form, or answering questions about it.  (*Compare* Herrera Dep. 108:3-109:5, Lamb Dep. 68:23-69:2, *and* Shaw Dep. 142:9-15 *with* Dominguez Dep. 117:1-10 *and* Oliver Dep. 200:19-22.)

(b)  Officials disagree whether giving "one-time" or limited assistance — for example, to family members — requires preregistration.  (*Compare* Oliver Dep. 118:9-19, 120:2-13 *with* Trujillo Dep. 79:8-21, Vildasol Dep. 124:16-125:17, Rodela Dep. 52:4-53:2 *and* Herrera Dep. 107:17-109:10.)

(c)  Officials disagree about whether (i) even 50 forms may be given (*compare* Vildasol Dep. 74:13-15 *with* Rodela Dep. 31:10-13), and (ii) more than 50 forms may be given (*compare*

Herrera Dep. 96:17-25, Shaw Dep. 133:5-9, *and* Jimenez Dep. 158:4-9 *with* Trujillo Dep. 66:9-67:2, Oliver Dep., 203:4-19, 204:2-5, Lamb Dep. 80:17-81:5, *and* Shaw Dep. 134:3-135:2.)

(d)  Officials disagree about (i) whether the 48 hour deadline begins to toll when the registration agent receives the forms from the county clerk or when the registrant completes the form (*compare* Jimenez Dep. 145:20-21 *and* Vildasol Dep. 94:3-10 *with* Rodela Dep. 65:9-14); (ii) whether, and when, forms may be mailed (*compare* Herrera Dep. 86:14-87:1; Jimenez Dep. 140:7-19 *with* Shaw Dep. 203:2-204:5, Lamb Dep. 75:17-21, Dominguez Dep. 115:18-22, SOS 23, *and* Rodela Dep. 55:5-56:20); and (iii) whether the 48 hour requirement continues to apply when the potential voter retains the form (*compare* Herrera Dep. 90:2-7 *and* Oliver Dep. 192:18-23 *with* Vildasol Dep. 104:7-14 *and* Jimenez Dep. 172:4-11.).

(e) Officials disagree about (i) whether training is mandatory (*compare* Herrera Dep. 76:6-13 *with* Jimenez Dep. 128:1-23 *and* Lamb Dep. 46:19-47:2); (ii) whether citizens abroad may receive remote training (*compare* Herrera Dep. 82:1-14 *and* Trujillo Dep. 114:25-115:13); and (iii) the length of training that is necessary (*see, e.g.*, Lamb Dep. 48:23-24 (training is 10 minutes); Herrera Dep. 65:18-66:11 (training is 20-30 minutes); Oliver Dep. 104:21-25 (training is 45-90 minutes); Dominguez Dep. 110:8-24 (training is 120 minutes).).

**C.**   **The State's Interest In The Challenged Law**

10.   Defendant proffers that the challenged law addresses voter fraud and encourages accurate and timely submission of voter registration forms.  (Herrera Dep. 91:17-23, 132:4-9.)

*Voter Fraud*

11.   The State already has in place systems that are designed to prevent (and that have prevented) voter registration fraud, including laws criminalizing voter fraud.  *See* N.M. Stat.

Ann. 1978, §§ 1-12-9 (fraudulent and double voting), 1-20-3 (registration offenses), 1-20-8 (false voting), 1-20-9 (falsifying election documents), 1-20-15 (conspiracy to violate Election Code), 1-20-22 (violation of Election Code), 3-8-75 (false voting; falsifying election documents; false swearing), 3-8-79 (conspiracy to violate Municipal Election Code).  In addition, a statewide on-line database allows County Clerks to determine what other county the registrant was previously registered in (if any), and to compare the registrant's Social Security number, address, name, and date of birth against database entries.  (Oliver Dep. 38:15-39:3, 41:15-42:5, 44:21-45:2, 48:11-15; 49:2-21, 50-52; Jimenez Dep. 38:15-40:9, 112:8-20; Lamb Dep. 27:4-21.)

12.    Indeed, the Defendant was unable to identify any evidence of any instance of proven voter registration fraud in New Mexico prior to enactment of the challenged law. (Herrera Dep. 133:13-23.)

13.    Similarly, the Defendant was unable to identify any evidence of any instance of proven voter registration fraud in New Mexico since the enactment of the challenged law. (Herrera Dep. 135:11-14 (Defendant is not "aware" of instances of voter registration fraud), 135:20-22 (Defendant "read in the paper" that ACORN agent may have engaged in fraud).)

*Completion And Submission Of Voter Registration Forms*

14.    The Defendant has not presented evidence that third-party voter registration organizations have systematically disenfranchised voters by failing to turn in registration forms. (Herrera Dep. 45-49; *see also* Dominguez Dep. 78:13-17.)  Since the enactment of the challenged law, the Defendant has opened only one file based upon a formal complaint about a third party organization, which involved an alleged failure to turn in forms within the 48 hour deadline.  (SOS 164-86.)

15.    Neither the Defendant nor County Clerks acting on her behalf hold third-party voter registration agents responsible for the accuracy of information on a voter registration form. (Fulgenzi Dep. 138:5-25; Vildasol Dep. 134:5-11.)

16.    Inaccurate or incomplete forms may be earmarked or rejected by County Clerks as problematic.  (Oliver Dep. 48-51.)  In addition, accurate information is necessary so that the County Clerks can mail a voter's information card to the voter.  (Lamb Dep. 98:21-24 (noting that voter card was mailed to home of registrant).)

17.    As long as a registration form is submitted prior to the registration deadline for an election, the registrant is entitled to vote in that election.  (Herrera Dep. 95:2-19.)

*State Interest In Specific Requirements*

18.    The Defendant asserts that the purpose of the 48 hour return requirement is to ensure that voters are not disenfranchised by a registration agent's failure to return completed forms prior to the registration deadline.  (Herrera Dep. 91:15-23.)

19.    The Defendant has no process in place to monitor compliance with a 48 hour requirement, and often the Defendant and many County Clerks do not check to see if the form was returned within the 48 hour deadline.  (Dominguez Dep. 82:21-83:9 (discussing Secretary's practice); Herrera Dep. 117:20-118:23 (agreeing that officials may ignore "technical violation[s]" of deadline); Oliver Dep. 165:4-166:19 (discussing County Clerks' practice); Lamb Dep. 64:16-65:9 (same).)

20.    The purpose of the 50-form limit is to control the Defendant's printing costs. (Herrera Dep. 102:13-18.)

21.   The Defendant could control the costs of printing forms by permitting registration agents to print state forms from the Internet.  (Herrera Dep. 104:1-105:20.)  In addition, the Defendant has recently created new, "cheaper versions" of the forms.  (*Id.* 147:23-149:12.)

22.   The purpose of the training requirement is to make agents aware of the law's requirements and penalties and to encourage agents to act professionally.  (Herrera Dep. 78:11-24; Jimenez Dep. 126:14-24; Oliver Dep. 143:21-144:23.)

**D.**    **The Burdens Imposed By The Challenged Law**

*Vagueness And Uncertainty*

23.   The vagueness of the challenged law imposes significant compliance costs on the Plaintiffs' expressive and associational activities.  (*See infra* Statement of Facts ("SOF") ¶ 9 (describing vagueness and uncertainty of challenged law).)  The vague law makes planning and implementing a significant registration drive more difficult, makes it more difficult for Plaintiffs to identify what they can do in helping others to vote, and deters prospective volunteers because of the threat of criminal penalties.  (Dickson Decl. ¶¶ 26-29; Rodriguez Decl. ¶¶ 34-35.)

*Pre-Registration, Training, And Disclosure Requirements*

24.   The pre-registration, training, and disclosure requirements have made it difficult for NMPIRG to recruit casual or spontaneous volunteers, who have been indispensable to its voter registration efforts.  (Fraher Decl. ¶ 17; Tessneer Decl. ¶¶ 12-13.)  The challenged law requires even casual volunteers to register and attend training.  (Fraher Decl. ¶¶ 17-18.)  The registration and training location is difficult to reach from the UNM's campus (*id.* ¶ 19a), the scheduled trainings are held at inconvenient times and locations (*id.* ¶¶ 19a-c), and on certain occasions when students attended the training sessions, the County Clerk's office canceled the session after

8

determining that there were not enough attendees (*id.* ¶¶ 19b, 19d; Tessneer Decl. ¶¶ 12a, 12b.)
Under these conditions, few of the casual volunteers on whom NMPIRG relies are willing or
able to register and attend training.  (Fraher Decl. ¶ 19f; Tessneer Decl. ¶ 12c.)  As a result
NMPIRG has been unable to recruit as many volunteers or to register as many voters as it once
had.  (Fraher Decl. ¶ 20.)  NMPIRG has attempted to use unregistered volunteers to walk around
campus and bring prospective voters to a table where a certified student could register them, but
this process has proven ineffective.  (*Id.* ¶ 21; Tessneer Decl. ¶ 14.)

     25.    SWOP depends on volunteers to undertake organized registration drives.
(Rodriguez Decl. ¶¶ 7, 16.)  In 2004 SWOP relied on approximately 100 volunteers for its voter
registration drive.  (*Id.* ¶ 15.)  SWOP was informed that because of the challenged law,
volunteers would have to attend a scheduled training session before they could register voters.
(*Id.* ¶ 33.)  The training sessions last more than an hour, are frequently held at times and in places
that are inconvenient for SWOP members, are intimidating, and have discouraged SWOP
members from wanting to register voters.  (*Id.* ¶ 35).  Among other things, SWOP members have
been told that if the individual voter registration numbers did not match up with the specific
serial numbers on the forms that they were given, "really bad things would happen" in the form
of penalties.  (*Id.*)  Since the challenged law was enacted, SWOP has significantly reduced its
voter registration activity, in part because dramatically fewer workers and volunteers are willing
to register voters.  (*Id.* ¶¶ 26-29, 35.)  The registration and training requirements also prevent
SWOP volunteers from spontaneously registering friends, family, and neighbors.  (*Id.* ¶¶ 17, 43.)

     26.    As a result of the challenged law's onerous registration and training requirements,
AAPD has not attempted to organize a coalition of organizations to conduct a voter registration

drive in New Mexico.  (Dickson Decl. ¶¶ 29, 34.)  Many AAPD volunteers do not wish to be identified as disabled or publicly associated with a disability-rights organization and therefore are unable to act as third-party voter registration agents in New Mexico.  (*Id.* ¶ 32.)  It is also prohibitively difficult for volunteers of AAPD's coalition groups to attend in-person trainings, because the majority of the volunteers are disabled and lack adequate transportation.  (*Id.* ¶ 31.)

28.    FAWCO volunteers live overseas and cannot feasibly appear at a County Clerk's office to register or to attend training.  (Laederich Decl. ¶ 25.)  As a result, FAWCO has advised its volunteers to stop registering voters from New Mexico.  (*Id.* ¶ 22; Email from Mary Stewart Burgher, Laederich Decl., Tab A, AAPD0000033-AAPD0000040.)

*50-Form Limit*

28.    The challenged law's 50-form limit has reduced the number of voters to whom NMPIRG has provided registration assistance.  (Fraher Decl. ¶ 22.)  During voter registration drives in 2005 and 2006, NMPIRG routinely ran out of registration forms and had to suspend its registration operations, turning away prospective voters, until it could perform quality control measures and go to the Clerk's Office to get more forms.  (*Id.* ¶ 23.)  One NMPIRG organizer attempted to alleviate this burden by returning forms on behalf of other volunteers but was told by staff at the County Clerk's office that he could not do so.  (Tessneer Decl. ¶ 18.)  Although waivers of the 50-form limit may be granted, it is very difficult to plan a large-scale drive based upon the expectation a waiver will occur.  (Fraher Decl. ¶ 23.)

29.    The 50-form limit has presented a burden to SWOP because it would be impossible to engage in a large scale voter registration drive with the limited number of forms allowed and

to coordinate the process of separately collecting, checking, ordering and returning all 50 forms of each volunteer.  (Rodriguez Decl. ¶¶ 39, 42).

*48 Hour Return Requirement*

30.    To accommodate its members' and clients' disabilities and maintain a process of quality control, AAPD coalition members ask volunteers to mail registration forms to disabled voters, and then ask the voters to mail the forms back to the organizations for quality control. (Dickson Decl. ¶ 30.)  AAPD has no way of assuring that this cycle could be completed within 48 hours, and therefore has decided not to establish a coalition to run voter registration in New Mexico.  (*Id.* ¶¶ 29, 34, 38.)

31.    Because FAWCO's volunteers are located overseas, FAWCO has concluded it could not comply with the 48 hour requirement, and therefore has advised its volunteers not to register New Mexico voters.  (Laederich Decl. ¶ 22.)

32.    Volunteers for NMPIRG understood that the voter registration forms had to be physically in the Clerk's office within 48 hours and NMPIRG informed its members in May of 2006 that the forms "MUST be in within 48 hours of being filled out"; therefore volunteers take forms to the County Clerk's office within 48 hours of completion. (Cole Decl., Tab 5, AAPD0000225-AAPD0000227.)

33.    During its 2006 registration drive NMPIRG had to devote so much effort to delivering forms to the clerk's office before the 48 hour deadline that it had no time to train other volunteers to phone-bank.  (Fraher Decl. ¶ 26.)  Volunteers gathered the forms, checked that they had all been turned in and filled out properly, and ordered them sequentially for return to the clerk's office.  (*Id.* ¶ 25.)  This process was necessary to ensure that NMPIRG complied with the

law, particularly the 48 hour requirement, and to ensure that NMPIRG's message about the importance of voting was not undermined by a voter being turned away at the polls because of mistakes connected with a registration form. (*Id.*) The quality control process was time consuming, making it extremely difficult to collect a large number of forms and return them to the County Clerk's Office within 48 hours. (*Id.* ¶ 25.)

34.    Potential student-volunteers for NMPIRG's voter registration campaigns have been unwilling to participate because they are concerned with the criminal penalties that can be imposed if they commit a technical violation of the law and because they would have to miss class or extracurricular activities to carry completed forms to the County Clerk's office within the 48 hour deadline. (Fraher Decl. ¶ 27.)

35.    SWOP has not undertaken a voter registration campaign in part because it would be infeasible for SWOP to conduct quality control and simultaneously to comply with the 48 hour requirement. (Rodriguez Decl. ¶¶ 41-42.) SWOP's message of empowerment through voting would be wasted if a voter it had registered were turned away from the polls; therefore, prior to the challenged law's enactment, SWOP performed quality control to prevent late, incomplete, incorrect, or lost registrations. *(Id.* ¶ 25.) Under the challenged law, SWOP would have to conduct quality control to ensure that it did not violate the 48 hour requirement by inadvertently failing to turn in forms. (*Id.* ¶¶ 41-42.) But conducting quality control during large voter registration drives has taken SWOP more than 48 hours. (*Id.* ¶ 42.) Because of this, it would be extremely difficult for SWOP to meet the 48 hour requirement. (*Id.*)

36.    SWOP can no longer safely permit its volunteers to turn over forms to potential registrants to mail in themselves because of the risk that SWOP will be penalized if registrants

do not mail the form in within 48 hours.  (Rodriguez ¶ 40.)  This makes it more difficult for

SWOP to register voters.  (*Id.*)  In 2004, SWOP registered approximately 1,932 people.  By

comparison, SWOP has helped to register fewer than 100 prospective New Mexico voters since

New Mexico's third-party voter registration law took effect.  (*Id.* ¶ 11.)

     *Penalties*

     37.   FAWCO has advised its volunteers to cease registering New Mexico voters because

the organization has a modest annual budget of $45,000, which would be quickly drained by

fines under the penalty provisions of New Mexico's law.  (Laerderich Decl. ¶¶ 9, 24-25.)

     38.   SWOP does not plan to hold registration drives because of the challenged law, but

would hold such drives were the law repealed or invalidated.  (Rodriguez Decl. ¶¶ 30-31, 44.)

     39.   Both AAPD and its potential coalition partners are under-funded and have decided

not to attempt a registration campaign in New Mexico because they cannot risk their resources

on the fines that could result if mistakes were made.  (Dickson Decl. ¶¶ 27-29, 38.)

     40.   NMPIRG volunteers and members have been and continue to be deterred from

conducting voter registration activities by the civil and criminal penalties imposed by the

challenged law, especially those associated with the 48 hour requirement.  (Fraher Decl. ¶ 28

(describing interaction with frightened volunteer); Tessneer Decl. ¶¶ 22-23.)  NMPIRG members

have been told that if a third-party voter registration agent lost one form or did not return all

forms within 48 hours, then the third-party voter registration agent would be guilty of a felony.

(Fraher Decl. ¶ 19e.)

## **INTRODUCTION**

Democracy thrives when all citizens — including the downtrodden, the disenfranchised, and the underrepresented — have an equal opportunity to voice their views by voting.  With the aid of volunteers, Plaintiffs stretch their limited resources to help underrepresented communities find their voices by registering to vote.  Thus, Plaintiffs not only expand the franchise, but also communicate the simple yet vital messages that all citizens should be empowered to participate in the political process and that democracy withers without widespread civic participation.

The First Amendment protects the voter registration activities that communicate Plaintiffs' message.  Helping others to vote is not only the most effective means of conveying the message that voting matters, but it also promotes the discussion of political issues and allows Plaintiffs to associate with their fellow citizens.  Accordingly, Plaintiffs' volunteer voter registration activity falls squarely within the First Amendment's protections of the freedom of speech and association.

Although New Mexico is prohibited from unnecessarily burdening Plaintiffs' First Amendment rights, that is precisely what New Mexico has done through the challenged law. Plaintiffs lack the means to comply with the State's myriad restrictions on their voter registration activities.  Therefore, rather than expose themselves and their volunteers to significant civil and criminal penalties, Plaintiffs have severely restricted or stopped helping others to register to vote. As a result, underserved New Mexicans — including minorities, the poor, citizens living abroad, young people, and the disabled — are more likely to remain underserved and uninvolved in the democratic process.

Under *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), the Secretary bears the burden

to provide evidence that the challenged law is necessary to advance a legitimate and sufficient state interest — but, after an extensive opportunity for discovery, she simply cannot meet this burden.  She asserts that New Mexico's preexisting election law regime did not adequately deter and detect voter registration fraud or ensure third-party registration organizations timely submitted accurate forms.  But the Secretary bases these claims on a handful of examples of alleged problems that cannot justify the challenged law in general, much less as it is applied to Plaintiffs, which the Secretary concedes are "reputable organization[s]" (Def.'s Mot. to Dismiss 11 (Dkt. 78) (filed 08/21/09)).  Indeed, the undisputed evidence shows the challenged law is an unnecessary addition to the preexisting regime and actually undermines the State's interest in protecting the franchise.  Therefore, the Secretary cannot meet her burden of justifying the challenged law's severe and detrimental impact on Plaintiffs' constitutionally-protected conduct. This Court should grant Plaintiffs' motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When the moving party bears the burden of proof on an issue, he or she "must show that the record as a whole satisfies each essential element of his or her case . . . in such a way that no rational trier of fact could find for the non-moving party."  *Miller ex rel. S.M. v. Bd. of Educ.*, 455 F. Supp. 2d 1286, 1314 (D.N.M. 2006) (internal citations omitted); *see 19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071 (10th Cir. 1998).  Once the movant meets its initial burden the nonmoving party must establish as to every "dispositive matter[] for which it carries the burden of proof" that there is sufficient evidence for a fact-finder to reasonably find in its favor.

*Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).  Where, as here, the law requires a

showing of state interest, the government must provide specific evidence of a state interest

sufficient to create a genuine issue of fact.  *See 19 Solid Waste Dep't Mechs.*, 156 F.3d at 1073

(affirming a summary judgment ruling against the state under the Fourth Amendment where the

state failed to make "threshold showing" of state interest).  To meet its burden, the government

cannot "repeat[] conclusory opinions, allegations unsupported by specific facts, or speculation,"

*Harapat v. Vigil*, 676 F. Supp. 2d 1250, 1258 (D.N.M. 2009) (internal quotation marks omitted),

and the "content or substance" of any evidence it offers "must be admissible" at trial, *Thomas v.

Int'l Bus. Machs. ("IBM")*, 48 F.3d 478, 485 (10th Cir. 1995).

## ARGUMENT

The First Amendment brooks no burden upon protected speech unless the State

sufficiently justifies the burden.[2]  *See Meyer v. Grant*, 486 U.S. 414, 426 (1988); *see also

Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion)

("However slight [the] burden may appear, . . . it must be justified by relevant and legitimate

state interests 'sufficiently weighty to justify the limitation.'").  To determine whether the State

has justified burdening First Amendment activities, *Anderson* directs a court to balance the "the

character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to

vindicate" against "the precise interests put forward by the State as justifications for the burden

imposed by its rule."  460 U.S. at 789.  In all cases a court must consider not only "the

legitimacy and strength of [the State's] interests," but also "the extent to which those interests

---

[2]        Plaintiffs also challenge New Mexico's law under the analogous state provision, Article II,
§ 17 of the New Mexico Constitution.

make it *necessary* to burden the plaintiff's rights." *Id.* (emphasis added).

Plaintiffs are entitled to summary judgment under the *Anderson* balancing test because the Secretary cannot show the challenged law is necessary to advance any legitimate and sufficient state interest.[3] The First Amendment protects Plaintiffs' voter registration activities because they symbolically affirm Plaintiffs' belief in participatory democracy, are inextricably intertwined with Plaintiffs' core political speech, and enable Plaintiffs to associate with potential voters and volunteers. The Secretary cannot burden Plaintiffs' protected activity without adequate justification. But she cannot show that the State's asserted interests in addressing fraud and protecting the franchise justify the requirements of the challenged law in general, much less as the law is applied to Plaintiffs. Plaintiffs are entitled to summary judgment on that basis, regardless of the severity of the burden imposed by the challenged law.

In addition, Plaintiffs are entitled to summary judgment because the undisputed evidence shows the State's asserted interests cannot outweigh the burdens the challenged law imposes upon third party organizations in general or upon Plaintiffs in particular. Because various state and county officials interpret the challenged law inconsistently, voter registration organizations face increased compliance costs in the form of an uncertain regime.[4] The Secretary cannot justify the compliance costs this uncertainty creates, nor can she justify the onerous requirements of the challenged law. Even if, however, the Secretary could justify those requirements with

---

[3]     This Court has held *Anderson* balancing applies to Plaintiffs' First Amendment claims. Plaintiffs prevail under that framework. Because, however, the challenged law burdens fundamental rights, Plaintiffs believe strict scrutiny applies and reserve the right to renew that argument in the future.

[4]     Plaintiffs' motion for reconsideration of the dismissal of their void-for-vagueness challenge is pending and, to the extent a motion for summary judgment is necessary if the Court grants the motion for reconsideration, Plaintiffs reserve the right to make such a motion.

respect to some voter registration organizations, she cannot justify them as applied to Plaintiffs. As volunteer run organizations with limited resources, Plaintiffs have reasonably ceased or severely curtailed their voter registration activities in response to the challenged law.  The State cannot justify the crippling compliance costs of the uncertain and onerous regime it has imposed upon Plaintiffs.  Accordingly, Plaintiffs are entitled to summary judgment.

## I.    PLAINTIFFS' VOTER REGISTRATION ACTIVITIES CONSTITUTE PROTECTED FIRST AMENDMENT ACTIVITY.

By engaging in volunteer voter registration drives, Plaintiffs help underrepresented groups participate in the political process and express Plaintiffs' belief in that process; engage other citizens in protected political speech on the importance of voting and the pressing issues of the day; and associate with potential voters, members, and volunteers.  In denying the Secretary's motion to dismiss, this Court held that Plaintiffs had sufficiently alleged that their voter registration activities are protected expressive conduct, intertwined speech-and-conduct, and expressive association.  *See Am. Ass'n of People with Disabilities v. Herrera ("AAPD")*, 690 F. Supp. 2d 1183, 1218-19 (D.N.M. 2010).  Because the undisputed evidence establishes Plaintiffs' factual allegations, this Court should hold that Plaintiffs' voter registration activities implicate those First Amendment protections.

*First*, Plaintiffs' public voter registration drives are protected expressive conduct.  (*See* Pls.' Opp. to Def.'s Mot. to Dismiss (Dkt. 81) 7-11 (filed 09/16/09).)  Plaintiffs reach out to underrepresented communities not only to help them register to vote, but also to persuade them to vote.  The undisputed evidence shows that when Plaintiffs help minorities, impoverished groups, young people, citizens living abroad, and disabled persons register to vote, they

necessarily communicate the simple but too often ignored message that empowerment begins at the ballot box.  (SOF ¶ 5.)  As the executive director of SWOP has noted, Plaintiffs' message remains potent in light "of the history of the struggle to obtain the right to vote" in underserved communities.  (Rodriguez Decl. ¶ 23; *see also* SOF ¶ 6.)  This evidence establishes that Plaintiffs' work of helping others to vote expresses a clear message — that "voting is important, and that the Plaintiffs believe in civic participation, and that the Plaintiffs are willing to expend the resources to broaden the electorate to include allegedly under-served communities" — and that anyone "observing Plaintiffs' efforts [is] likely to understand the message."  *AAPD*, 690 F. Supp. 2d at 1216.  Accordingly, the First Amendment protects Plaintiffs' expressive conduct.

*Second*, the First Amendment protects Plaintiffs' voter registration activities because New Mexico cannot regulate those activities without burdening Plaintiffs' political speech.  (*See* Pls.' Opp. to Def.'s Mot. to Dismiss 11-14.)  This Court held Plaintiffs' factual allegations sufficed to show the challenged law necessarily burdened Plaintiffs' ability to persuade others that voting is important and to discuss the issues of the day.  *AAPD*, 690 F. Supp. 2d at 1217. The undisputed evidence shows that Plaintiffs' message rings hollow if Plaintiffs cannot help others register to vote (SOF ¶ 6), and that Plaintiffs lose a unique opportunity to engage others in political conversations when they cannot do so while helping them to register to vote (*id.*). Plaintiffs cannot effectively persuade their fellow citizens to register to vote without facilitating the voter registration process itself, just as a charity cannot effectively persuade others to donate without providing the means to do so, or a person circulating a petition cannot effectively persuade others to sign it without offering the petition itself for signature.  *See Meyer*, 486 U.S. at 424.  In addition, Plaintiffs check registration forms for completeness and accuracy in order to

ensure their message remains persuasive; a voter turned away from the polls because of an incomplete or inaccurate form is less likely to accept Plaintiffs' message of empowerment. (SOF ¶¶ 33, 35.) The First Amendment protects both Plaintiffs' speech and the conduct inextricably intertwined with that speech's effectiveness. *AAPD*, 690 F. Supp. 2d at 1217.

     *Third*, the undisputed evidence shows Plaintiffs' volunteer voter registration drives implicate the right to associate with others and to choose how one does so. *See AAPD*, 690 F. Supp. 2d at 1218; (Pls.' Opp. to Def.'s Mot. to Dismiss 14-16). Plaintiffs empower members of underserved communities not only by assisting them to register to vote, but also by inviting them to help Plaintiffs to convey the importance of voting to other citizens. (SOF ¶ 7.) And Plaintiffs' voter registration activities also provide Plaintiffs the most fruitful platform for interacting with prospective voters. (*Id.*) Thus, Plaintiffs' associational interest in interacting with prospective members, volunteers, and voters is intertwined with their message of empowerment. This Court should hold the First Amendment protects both Plaintiffs' expressive conduct and their expressive association.

## II.    THE SECRETARY CANNOT MEET HER BURDEN TO SHOW THE STATE HAS A LEGITIMATE AND SUFFICIENT INTEREST IN THE CHALLENGED LAW.

     Plaintiffs believe that "no right is more precious in a free county than that of having a voice" in the election of one's representatives, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), and the First Amendment protects Plaintiffs' efforts to promote this essential right for all New Mexicans. As discussed *infra* Part III, the law has severely burdened Plaintiffs by forcing them to cease or substantially to curtail their voter-registration activities. Every law, however, that burdens protected speech must be supported by a legitimate and "sufficiently weighty" interest in

light of "the extent to which" that interest "make[s] the burden ***necessary***." *Timmons v. Twin*

*Cities Area New Party*, 520 U.S. 351, 358-59 (1997) (emphasis added) (quoting *Norman v. Reed*,

502 U.S. 279, 288-89 (1992)).  Accordingly, regardless of the magnitude of the burden, a

plaintiff may prevail under the *Anderson* balancing test when the undisputed facts show the

challenged law is not necessary to advance a legitimate state interest.

      The Secretary lacks the evidence needed to show the challenged law advances interests

that are sufficiently weighty to justify even a minimal burden upon any third-party voter

registration organization.  And because Plaintiffs bring an as-applied challenge, the Secretary

must show the State has a legitimate and sufficient interest in burdening Plaintiffs, which are

volunteer-driven, resource-limited and undisputedly "reputable" organizations.  (*See* Def.'s Mot.

to Dismiss 11.)  But the Secretary has no evidence Plaintiffs present the problems the challenged

law purportedly addresses.  Accordingly, Plaintiffs are entitled to summary judgment.

      **A.**    **The Secretary Bears The Burden To Provide Evidence Showing The**
           **Challenged Law Is Necessary To Advance A Legitimate State Interest.**

      The State bears the burden to provide evidence the challenged law is necessary to

advance a legitimate and sufficient state interest, and must do more than merely "assert that its

interests in regulating third-party voter registration are important." *AAPD*, 690 F. Supp. 2d at

1220; *see also Meyer*, 486 U.S. at 426.  If the State could meet its burden by merely *alleging* that

a problem *may* exist, then the "protection against restrictions on First-Amendment rights would

be weakened." *AAPD*, 690 F. Supp. 2d at 1220.  Instead, the First Amendment requires the State

to produce evidence that establishes the "recited harms are real, not merely conjectural." *Id.*

(internal quotation marks omitted).

Indeed, the State must show the challenged law directly advances the asserted state interest. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000); *see Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593-95 (6th Cir. 2006). To determine whether the State has met its burden, a court must examine the specific "aspect of [the interest] addressed by" the challenged law. *Cal. Democratic Party*, 530 U.S. at 584. The State's burden will be greater where the asserted interests lack facial plausibility. *See McConnell v. FEC*, 540 U.S. 93, 144 (2003) (Stevens, J., and O'Connor, J.) (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000)), *overruled in part on other grounds Citizens United v. FEC*, 130 S. Ct. 876, 913 (2010). For these reasons, the State cannot merely recite that its law addresses highly significant values in the abstract. Instead, the State must show, on the "circumstances of the case," its law directly advances a legitimate and sufficient state interest. *See Cal. Democratic Party*, 530 U.S. at 584.

**B.**      **The Secretary Cannot Show The Challenged Law Is Necessary To Advance The State's Asserted Interests In Preventing Fraud And Protecting The Franchise.**

The Secretary asserts two general interests in the challenged law: deterring and punishing voter fraud and protecting the franchise by ensuring voters can vote in elections for which they have tried to register. She has not, however, provided evidence that either "recited harms [is] real, not merely conjectural." *AAPD*, 690 F. Supp. 2d at 1220 (internal quotation marks omitted). To the contrary, the undisputed facts show that the Secretary's asserted interests are conjectural and the challenged law is unnecessary. Accordingly, the Secretary cannot justify the challenged law's substantive requirements and substantial penalties.

### 1. The Secretary Cannot Show The Challenged Law Is Necessary In Light Of The Preexisting State Regime That Detected And Deterred Fraud.

The Secretary first asserts that prevention of voter registration fraud justifies the requirements of the challenged law, but she lacks the requisite evidence to substantiate this fear of fraud. *See AAPD*, 690 F. Supp. 2d at 1220. Voter registration fraud consists of either the deliberate submission of false voter registration forms or the deliberate failure to turn-in a voter's completed registration form. Because New Mexico already had laws in place to criminalize both types of voter registration fraud, the Secretary must show the challenged law is a *necessary* addition to those laws. *See Anderson*, 460 U.S. at 789 (court must examine "precise interest" offered by State); *see also Cal. Democratic Party*, 530 U.S. at 584 (court must examine "aspect" of interest "addressed by law"); *Buckley v. Am. Constitutional Law Found. ("ACLF")*, 525 U.S. 186, 192, 204 (1999) (judgment whether challenged law is "warranted by the state's interests" is "informed by other means [the State] employs to accomplish its regulatory purposes"); *Ass'n of Cmty. Orgs. for Reform Now v. Cox*, No. 1:06-CV-1891, 2006 U.S. Dist. LEXIS 87080, at *19-*21 (N.D. Ga. Sept. 28, 2006) (State must show why existing laws are insufficient to advance State's asserted interest). According to the Secretary, the challenged law — particularly the pre-registration and disclosure requirement — is necessary because it allows the State to track forms and thus to detect fraud. (Herrera Dep. 132:14-25.) Therefore, in order to show the challenged law is a necessary addition to the preexisting regime, the Secretary would need evidence that, prior to the law's enactment, eligible voters were disenfranchised because of fraud, and the State could not detect who perpetrated that fraud. But the Secretary has no such evidence.

The State's preexisting regime, which criminalizes voter registration fraud, is on its face

sufficient to combat such fraud.  (*See* SOF ¶ 11.)  Section 1-20-3(B) of the New Mexico Statutes

makes "falsifying any information on the certificate of registration" a fourth degree felony.  And

Section 1-20-9(D) criminalizes deliberate "suppression" of a registration record.  Moreover, the

State and County Clerks can check applications for registration against statewide databases.  (*Id.*)

As one official described, the State maintains a "statewide system [cataloguing voter registration

information electronically] . . . to prevent voter fraud.  So, [a person] cannot attempt to register in

one county and turn around and register in another county."  (Jimenez Dep. 26:19-24.)  On its

face, this regime is sufficient to deter and punish voter registration fraud.  It is implausible for

the Secretary to claim otherwise; therefore, she must produce evidence the State's preexisting

criminal laws and statewide database have proven inadequate.  *See Shrink Mo.*, 528 U.S. at 391;

*ACLF*, 525 U.S. at 192, 204; *Cox*, 2006 U.S. Dist. LEXIS 87080, at *19-*21.

     There is, however, no evidence that the criminal laws and statewide database are

inadequate.  The Secretary offers three *allegations* of voter registration fraud prior to enactment

of the challenged law, but none show the preexisting regime was insufficient.

     *First*, the Secretary alleges ACORN committed fraud in 2004 by registering a 14-year old

to vote.  (Def.'s Interrog. Resp. 8.)  But that alleged incident did not even involve voter

registration fraud.  According to the former State Election Director, ACORN did not commit

fraud, because the "young man looked older than he was" and ACORN's action neither violated

New Mexico's anti-fraud statute, N.M. Stat. Ann. 1978, § 1-20-3, nor would it have violated the

challenged law.  (Lamb Dep. 98:7-100:5.)

     *Second*, the Secretary alleges that in 2004 the Republican Party turned in registration

forms with mismatched names and Social Security numbers (Herrera Dep. 44:2-9), but she does

not give any indication that the party's action involved fraud rather than a simple mistake. Indeed, although the Secretary (then Clerk of Bernalillo County) turned the forms over to the U.S. Attorney (*id.*), there is no evidence that the U.S. Attorney conducted an investigation, much less found that fraud had occurred.

*Third*, the Secretary alleges that in 1999 persons associated with the Libertarian Party defrauded voters into switching their party affiliation. (Defs.' Interrog. Resp. 8.) Again, however, the Secretary has not offered any evidence of a finding of fraud in that case. (*See* Lamb Dep. 105:19-108:25.) Instead, the undisputed fact, offered by the former Director of Elections, is that the alleged actions of Libertarian Party were not evidence of a systematic problem, but rather "egregious exceptions" to the rule that registration organizations acted properly. (*Id.* 108:24-25.) In any event, moreover, the State was able to identify the alleged perpetrator under the preexisting election law regime. Indeed, the alleged fraud in that case — switching a voter's party affiliation — is easily traced; the Secretary can simply check the voter's present party in order to identify the likely culprit.

In sum, the State has no evidence its preexisting regime failed to deter and detect voter registration fraud. The Secretary's three examples of alleged fraud in violation of the preexisting laws do not show those laws failed adequately to address such fraud. Indeed, if undetected fraud were a problem, then one would have expected the challenged law to have revealed a significant number of instances of it. But since 2005 the Secretary has not processed one — not even one — formal complaint regarding voter fraud relating to third-party registration organizations. Nor has she identified any instances of proven fraud since 2005. (SOF ¶¶ 12-13; Def.'s Interrog. Resp. 7 (referring to "several forms" from ACORN in 2008 that "raised red flags," but indicating

Defendant has no evidence that fraud was proven).)  Accordingly, the Secretary has no evidence that would show that a problem that did not exist prior to the law's enactment is now a problem justifying maintaining the law today.

Moreover, a handful of allegations of fraud by ACORN and the Libertarian Party do not give the State a reason to impose the onerous requirements of the challenged law upon Plaintiffs, which are volunteer-driven, nonpartisan, and, as the Secretary concedes, reputable, third-party registration organizations.  (*See* Def.'s Mot. to Dismiss 11.)  Just as the First Amendment did not allow the Village of Schaumburg to "lump" legitimate charitable organizations with "those that in fact are using the charitable label as a cloak for profitmaking," *Village of Schaumburg v. Citizens for Better Env't,* 444 U.S. 620, 637 (1980), the First Amendment bars the State of New Mexico from conflating Plaintiffs with ACORN and the Libertarian Party.  Partisan and paid third-party registration organizations may have incentives to commit voter fraud.  For example, political parties have reasons, such as ease of access to the ballot, to misrepresent how many voters are members of their party.  Agents working for paid third-party registration organizations can increase their pay by increasing the number of forms they turn in, which creates an incentive to complete forms with fictional information rather than to work to register as many real persons as possible.  By contrast, Plaintiffs' mission is simply to promote democracy by encouraging voter registration on a nonpartisan basis.  (SOF ¶¶ 1-7.)  Voters do not register as members of Plaintiff organizations, nor do Plaintiffs' unpaid volunteers have an incentive to fill-out forms with fictional information.  Although the State might prospectively limit the activities of any third-party voter-registration organization found to have committed fraud, it has no evidence that

justifies the blanket burdens imposed by the challenged law.[5]

In sum, without evidence of a systemic problem of voter registration fraud not addressed by existing law, the State has no legitimate and sufficient interest in imposing additional burdens through the challenged law on that basis.

### 2.  The Secretary Cannot Show The Challenged Law Is Necessary To Protect The Voter Franchise.

The State's second asserted interest is in protecting voters' ability to vote in an election for which they have tried to register.  Protecting the right to vote in an election requires that third-party voter registration organizations ensure that registration forms are (1) accurate and complete and (2) submitted prior to the deadline for registering for an election (*see* Herrera Dep. 95:2-7).  In order to show the challenged law is necessary to protect the franchise, the Secretary would need to show it is necessary to advancing the State's interests in accuracy and timeliness. But the undisputed evidence shows the challenged law is unnecessary and actually undermines the State's interests in accurate and timely submission of registration forms.

*Accurate Completion of Forms.*  As an initial matter, the Secretary has not asserted that the challenged law advances the State's interest in ensuring forms are completed accurately. (*See* Def.'s Mot. to Dismiss 12.)  The challenged law on its face does nothing to ensure accurate completion of registration forms, and the Secretary and County Clerks generally do not hold registration agents responsible for the accuracy of information on voter registration form.  (*See* SOF ¶ 15.)

In fact, the statute actually undermines the State's interest in accuracy.  Prior to the law's

---

[5]     As the Deputy Secretary of State recognizes, there is no state interest in imposing criminal penalties unless there has been a "constant pattern" of misconduct.  (Trujillo Dep. 75:4-25.)

enactment, Plaintiffs performed quality control to ensure the forms were filled out correctly. This quality control enables Plaintiffs to reduce the risks of disenfranchisement in several ways. For example, accurate completion of forms is necessary to ensure the State does not earmark or reject the registration form as problematic.  (SOF ¶ 16.)  In addition, accurate completion of forms ensures the State mails the voter's information card to the correct address.  (*Id.*)

The challenged law, however, undermines voter registration organizations' important role in ensuring accurate completion of forms by hindering or preventing quality control efforts.  For example, Plaintiffs are volunteer-run organizations, and they do not have the staff necessary to conduct quality control during significant registration campaigns while submitting forms within the 48 hours required by law.  (SOF ¶¶ 33, 35.)  And the challenged law's criminal and civil penalties encourage hurried submission of forms rather than thorough quality checks for accuracy.  Even if a voter registration organization assists a voter months before an election — at which point there is ample time to conduct quality control — the challenged law requires almost immediate submission of that voter's registration form.  Although the Secretary asserts the challenged law protects the franchise, it ultimately undermines it.  Such a law cannot be "necessary" to serve a legitimate State interest.  *See Anderson*, 460 U.S. at 789.

*Timely Submission of Forms*.  The Secretary has no reason to assume, and no evidence to show, that third party organizations will deliberately not turn in completed registration forms. Indeed, because Plaintiffs' mission is to expand the franchise, they have every incentive to submit forms in a timely fashion.  It would be implausible for the Secretary to claim that the challenged law is necessary to ensure that third party organizations do not deliberately suppress voter registration forms.

Moreover, the Secretary has little or no evidence of voter disenfranchisement due to third party organizations that negligently failed to submit forms. To meet her burden, the Secretary refers to two allegations of disenfranchisement resulting from the failure of the Democratic Party and Rock the Vote to submit forms. (Def.'s Interrog. Resp. 8-9.) The only support for these allegations are two hearsay statements, attributed by the former Director of Elections to persons speaking on behalf of, or about, the Democratic Party and Rock the Vote, that the organizations had mistakenly failed to submit registration forms during the 2000 and 2004 elections respectively. (Lamb Dep. 94:16-97:15.) But the Secretary cannot offer hearsay evidence to show disenfranchisement occurred, *IBM*, 48 F.3d at 485, and these two alleged instances do not establish a pattern of disenfranchisement that would justify enactment of the challenged law.[6]

In addition, the undisputed facts show that the requirements of the challenged law are unnecessary to ensure timely submission of registration forms. There is no evidence a tight 48 hour deadline is necessary to ensure submission of forms prior to the registration deadline for an election. (*See* Report of Donald P. Green 7 (Dkt. 15-4) (filed 08/11/08) ("if the objective [of the 48 hour deadline] is to ensure that people . . . are registered in time for the election, the imposed deadline is needlessly restrictive").) And apparently even the Secretary believes the 48 hour deadline is unnecessary because she generally does not monitor compliance with the requirement. (SOF ¶ 19.) If the 48 hour deadline served a state interest, then one would expect those charged with enforcing it would regularly do so. Instead, as the Secretary acknowledges,

---

[6]     The Secretary also refers to an incident involving two voters in Doña Ana County in 2008 (Def.'s Interrog. Resp. 9), but this alleged incident, which occurred subsequent to the enactment of the challenged law, cannot show a pattern of disenfranchisement justifying the law's enactment.

she "didn't pick" the 48 hour requirement and does not believe enforcing the requirement is necessary to ensure that an individual's "vote would count."[7]   (Herrera Dep. 92:14, 95:15.)

      **3.**    ***The Secretary Cannot Justify The Law's Civil And Criminal Penalties,
Which, Like The Law's Substantive Requirements, Are Not Necessary
To Advance A Legitimate And Sufficient State Interest.***

The Secretary can neither justify imposing the substantive requirements of the challenged law nor the heavy and easily triggered penalties for violation of those requirements.  New Mexico law already has an extensive system for preventing deliberate voter registration violations.  (SOF ¶ 11).  The Secretary has put forward no evidence showing that additional penalties are necessary to address any problem among voter registration organizations in general.  Moreover, she cannot justify the penalties as applied to Plaintiffs.  Non-profit voter registration organizations have limited resources, and the Secretary has provided no reason for imposing liability for technical violations that is ruinous rather than liability that merely encourages compliance.  *See League of Women Voters of Fla. v. Cobb ("LWVF I")*, 447 F. Supp. 2d 1314, 1338 (S.D. Fla. 2006) ("Given that third party voter registration organizations are often non-profit and have limited budgets, it is unclear why such steep fines are necessary to promote Defendants' stated interests.").  This is particularly so in light of the penalties' application to the challenged law's 48 hour return requirement, which imposes potentially ruinous liability for a

---

[7]      If anything, the challenged law undermines the State's interest in timely submission of forms. The law discourages submission of registration forms by encouraging registration agents not to deliver forms outside the tight 48 hour deadline, given the threat of criminal and civil penalties.  Indeed, a good faith effort by organizations to protect the franchise by turning forms in after the 48 hour requirement may be the only way a violation would ever be revealed to the State, as illustrated by the one complaint file Secretary has opened regarding a registered third-party organization.  (SOF ¶ 14.)

mere handful of forms turned in late.[8]  Such a tight deadline is not necessary to protect the

franchise; all that is required is that organizations return forms prior to the deadline for

registering for an election.  The law's penalty provisions therefore are unnecessary and, if

anything, deter voter registration organizations from registering others to vote.

Evidence from other States underscores the lack of justification for the challenged law.

Only twelve States require registration of third-party organizations.[9]  While several impose

freestanding deadlines for the return of forms,[10] only nine enforce their submission deadlines

through criminal penalties, almost all of which are misdemeanors.[11]  Only two other States have

---

[8]      The court in *LWVF I* held that a law imposing a $250 fine for forms turned in late was
unconstitutional — and that law was more lenient than the challenged law, as it imposed the fine only if
the forms had not been turned in within *ten days*, not 48 hours.  *See LWVF I*, 447 F. Supp. 2d at 1322,
1338 ("Defendants have not provided any evidence much less an explanation for the necessity for the
amount of fines" imposed by the law.).

[9]      *See* Colo. Rev. Stat. Ann. § 1-2-701(1); Del. Code Ann. tit. 15, § 2060; Fla. Stat. Ann.
§ 97.0575(1); 10 Ill. Comp. Stat. §§ 5/4-6.2, 5/5-16.2, & 5/6-50.2; Ill. Admin. Code tit. 26 § 207.50; Md.
Code Regs. 33.05.03.06(B); Mo. Ann. Stat. § 115.205; Neb. Rev. Stat. §§ 32-305, -311; Ohio Rev. Code
Ann. § 3503.29(B); *see also id.* § 3503.14(E); Okla. Stat. Ann. tit. 26, § 4-112; Or. Rev. Stat. Ann.
§ 247.171; Tex. Elec. Code Ann. §§ 13.031(a) & 033(a); W. Va. Code § 3-2-10(b).

[10]     *See* Ark. Const. amend. 51 § 9(c)(2); Colo. Rev. Stat. Ann. § 1-2-702(2); Conn. Gen. Stat. Ann.
§ 9-23g(b); Del. Code Ann. tit. 15, § 2063(b)-(c); Fla. Stat. Ann. § 97.0575(3); 10 Ill. Comp. Stat. §§ 5/4-
6.2(c), 5/5-16.2(c), & 5/6-50.2(c); Ill. Admin. Code tit. 26 § 216.70(a); La. Rev. Stat. Ann.
§ 18:1461(A)(23); Minn. Stat. Ann. § 201.061(1); Mo. Ann. Stat. § 115.203(4); Mont. Code Ann. § 13-2-
110(2); Neb. Rev. Stat. § 32-306; Ohio Rev. Code Ann. § 3599.11(B)(2)(a), (C)(2); Or. Rev. Stat. Ann.
§ 247.012(2); S.D. Codified Laws § 12-4-3.2; Tex. Elec. Code Ann. § 13.042; Va. Code Ann. § 24.2-
1002.01; Wash. Rev. Code 29A.08.115; W. Va. Code § 3-2-10(k).

[11]     *See* Ark. Const. amend. 51 § 15(c) (misdemeanor); La. Rev. Stat. § 18:1461(B) (misdemeanor for
first offense); Minn. Stat. Ann. § 201.27(3) (felony); Mo. Ann. Stat. § 115.203(5) (misdemeanor (*see* Mo.
Rev. Stat. § 115.637)); Ohio Rev. Code Ann. § 3599.11 (felony or misdemeanor depending upon variety
of factors); S.D. Codified Laws § 12-4-3.2 (misdemeanor); Tex. Elec. Code Ann. § 13.043
(misdemeanor); Va. Code Ann. § 24.2-1002.01 (misdemeanor); W. Va. Code § 3-2-10(k) (misdemeanor).
Three other states impose criminal penalties for failing to submit forms by the registration deadline for
elections.  *See* N.C. Gen. Stat. Ann. § 163-82.6(a)-(a1); Utah Code Ann. § 20A-2-301(7)(b); Kan. Stat.
Ann. § 25-2421a.

adopted a voter registration law that requires forms be returned within 48 hours of completion.[12] (*See* Report of Donald P. Green 7 (48 hour requirement "is one of the shortest in the nation").) And neither of these States imposes civil or criminal penalties for the violation of their deadlines. Yet New Mexico insists it has adopted a tailored response to a common problem.   If that were correct, then one would expect other States that have considered and enacted voter registration laws to have adopted similar regimes with myriad requirements and penalties.   None have.

C.   **The Secretary Cannot Show The Training Requirement Or The 50-Form Limit — Which Do Not Address Concerns Regarding Fraud Or Protecting the Franchise — Are Necessary To Advance A Legitimate State Interest.**

Perhaps recognizing the asserted interests are insufficient to justify the challenged law, the Secretary does not attempt to defend the training requirement or the 50-form limit on the grounds of fraud or protecting the franchise.  (SOF ¶¶ 20, 22.)  But the specific interests the Secretary asserts in defense of the those rules are far from "sufficiently weighty to justify" burdening Plaintiffs' First Amendment rights.  *Timmons*, 520 U.S. at 358-59.

*The Training Requirement.*   According to the Secretary and the County Clerks, the State's interests in requiring in-person training are to (1) make agents aware of the law's requirements and its penalties and (2) encourage agents to act professionally.  (SOF ¶ 22.)  The Secretary has no explanation why informing organizations about the law requires in-person training of each individual volunteer.  Mailing the information or posting it online would serve the same purpose.  And the challenged law does not direct the Secretary to police

---

[12]       *See* Conn. Gen. Stat. Ann. § 9-23g(b) (requiring "immediate" return); Neb. Rev. Stat. § 32-306 (requiring return at end of next business day after completion).  California's regime requires return or mailing of forms "within three days . . . of receipt from a voter," Cal. Elec. Code § 2138, and makes a knowing or negligent violation of this requirement a misdemeanor punishable by up to a $1,000 fine, *id.* § 18103.  Although California's regime is less draconian than New Mexico's, it is also an outlier.

"professionalism" (or even use the term), nor does the Secretary have evidence of a systemic lack of professionalism among third-party organizations, much less among Plaintiffs, which she has conceded are "reputable organization[s]." (Def.'s Mot. to Dismiss 11.)

*The 50-Form Limit.* Similarly, the State's asserted interests in the 50-form limit are not supported by evidence. The 50-form limit purportedly is a cost-savings measure. (SOF ¶ 20.) But the State cannot unnecessarily select expensive forms and then invoke that decision to justify burdening Plaintiffs' First Amendment rights. "In order fully to preserve and protect the people's right to be informed, it is society that should bear the expense, however great, of guaranteeing that every idea . . . has an opportunity to present itself in the marketplace of ideas." *Invisible Empire Knights of Ku Klux Klan v. City of West Haven*, 600 F. Supp. 1427, 1434 (D. Conn. 1985). Accordingly, the Secretary cannot invoke mere cost to justify burdening protected voter registration activities. *See id.* ("The city's interest in recouping the costs of its already existing duty of protecting its citizens in the exercise of their constitutional rights cannot justify the massive burden § 5L imposes upon those rights."); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217-18 (1986) ("[T]he State could not forever protect the two existing major parties from competition solely on the ground that two major parties are all the public can afford[.]" (citing *Anderson*, 460 U.S. 780)); *Iowa Socialist Party v. Nelson*, 909 F.2d 1175, 1180-1181 (8th Cir. 1990) ("the state's administrative and financial burden alone would not be sufficient to justify infringing . . . associational rights"); *Cotham v. Garza*, 905 F. Supp. 389, 399 (S.D. Tex. 1995) ("the possibility of future increases in the cost of administering elections" is insufficient "to justify an infringement on First Amendment rights"). Although the State may take administrative costs into account, it cannot design a system that discriminates against

Plaintiffs' First Amendment rights and then justify the discrimination based upon cost. *See Tashjian*, 479 U.S. at 218. If the Secretary is to justify the 50-form limit, then she must show the expensive forms she has chosen are necessary to advance a legitimate and sufficient state interest — for example, protecting the franchise. But the Secretary has no such evidence.

In any event, the Secretary's asserted interest fails on its own terms. The Secretary has admitted that she could eliminate costs to the State by permitting registration agents to print the state forms from the Internet; the Secretary also has found a "cheaper" method for printing the forms. (SOF ¶ 21.) The Secretary has not provided evidence the cheaper forms would impose a financial burden on the State, or would undermine the franchise. The State has unnecessarily chosen costly forms, and cannot now invoke cost to burden Plaintiffs' First Amendment rights.

* * *

There are good reasons the First Amendment requires adequate justifications for prophylactic rules. First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society," *NAACP v. Button*, 371 U.S. 415, 433 (1963), and their infringement may, as here, impinge upon other fundamental rights such as the right to vote. By unnecessarily burdening Plaintiffs' protected activities, New Mexico has raised the risk that the populations Plaintiffs serve will not have their voices heard in the political process.

The Secretary cannot justify burdening Plaintiffs' constitutionally-protected efforts to expand the franchise. Indeed, the Secretary has no evidence that existing laws were inadequate to address the State's asserted interests. And they also show the challenged law is not necessary, and indeed undermines, the State's interest in protecting the franchise. Moreover, there is no evidence that Plaintiffs cause the problems the State hopes to address through the challenged

law.  An unnecessary law, designed to alleviate a conjectural harm, cannot be "sufficiently

weighty to justify" burdening First Amendment rights.  *See Crawford*, 553 U.S. at 190.

## III.   THE SECRETARY CANNOT MEET HER BURDEN TO SHOW THE STATE'S ASSERTED INTERESTS OUTWEIGH THE BURDENS IMPOSED UPON PLAINTIFFS.

Even assuming the Secretary had offered evidence that the challenged law advances a

legitimate and sufficient state interest, she would still need to show that the asserted interest

justifies burdening third party voter registration organizations with the requirements of the

challenged law.  When an election law imposes a severe burden upon protected speech, the State

can meet its burden to show a "sufficiently weighty" interest only by showing that its law is

narrowly tailored to advance a compelling interest.  *Timmons*, 520 U.S. at 358-59.  And the State

may justify lesser burdens only upon a showing the challenged law is necessary to advance a

legitimate and sufficient state interest.  *See Crawford*, 553 U.S. at 190-91.

The undisputed facts demonstrate the challenged law's various and uncertain restrictions

upon any third party registration organization are unjustified.  Moreover, it is not enough for the

Secretary to justify those burdens in general.  Rather, she must justify forcing Plaintiffs to stop or

severely to restrict their protected activities.  For First Amendment purposes, no burden is greater

than one that forces persons to cease or severely to curtail their protected political speech.  *See*

*ACLF*, 525 U.S. at 192 & n.12 (restriction that "significantly inhibit[s] communication with

voters about proposed political change" imposes severe burden).  Here, the undisputed facts

demonstrate that the challenged law's various restrictions collectively impose this severe burden

upon Plaintiffs.  *See AAPD*, 690 F. Supp. 2d at 1219-1220 ("the Court . . . ultimately must

address the burdens the law poses collectively").  Plaintiffs also present undisputed evidence that

the challenged laws are vague, and that their uncertain application to Plaintiffs' activities makes Plaintiffs' compliance with the challenged laws all the more difficult.  And, as discussed *supra* Part II.B, the Secretary has offered no evidence that Plaintiffs present the problem the challenged law purportedly addresses.  In sum, the Secretary cannot justify applying the challenged law to Plaintiffs and thus crippling their protected First Amendment activity.

A. **The Secretary Cannot Justify Burdening Plaintiffs With A Vague And Uncertain Law.**

The Secretary cannot adequately justify creating an uncertain law when burdening First Amendment activities.  In order to give First Amendment activities "breathing space to survive, government may regulate in the area only with narrow specificity."  *NAACP*, 371 U.S. at 433.  New Mexico has not created a clear and narrow regime, as revealed by the Plaintiffs' unrebutted evidence that the officials charged with implementing N.M. Stat. Ann. 1978, § 1-4-49 cannot agree upon its meaning, or upon the proper application of their own regulations.  (SOF ¶ 9(a)-(e).)  Even if this uncertainty is insufficient to make out a facial void-for-vagueness challenge, it creates serious compliance costs for the volunteer-driven and resource-limited Plaintiff organizations in this suit.  *See* Ehud Guttel & Alon Harel, *Uncertainty Revisited: Legal Prediction and Postdiction*, 107 Mich. L. Rev. 467, 481 (2008) (uncertainty creates "significant" compliance costs for regulated parties); Isaac Ehrlich & Richard A. Posner, *An Economic Analysis of Legal Rulemaking*, 3 J. Legal Stud. 257, 263 (1974) ("If [a criminal statute], because of its uncertain scope, *might* be applied to the expression of ideas itself, that expression becomes burdened by an expected punishment cost.").  *Whatever* the State's interest in the law's provisions, the Secretary cannot justify the *extent* to which the vague terms in these provisions

make it difficult for Plaintiffs to comply with them.  Accordingly, *Anderson*, which instructs the Court to consider the "extent to which" the state's interests *"make it necessary"* to burden Plaintiffs' rights, 460 U.S. at 789, calls for the conclusion that the vague terms of the challenged law unconstitutionally burden plaintiffs with unnecessary compliance costs.

The vagueness of the challenged law increases Plaintiffs' compliance costs in several ways.  *First*, Plaintiffs cannot with reasonable diligence know what conduct triggers the law.  No definition in a New Mexico statute, regulation, or agency practice defines what it means to "assist" with voter registration, *see* N.M. Stat. Ann. 1978, § 1-4-49, and state and county officials have widely varying interpretations of the term (*see* Pls.' Mem. in Supp. of Mot. for Recons. 6-8 (Dkt. 96) (filed 03/05/10)).  *Second*, the vagueness of the term "assist" is compounded by the vague nature of the 48 hour requirement itself.  The Secretary and the County Clerks have inconsistently interpreted the 48 hour requirement (SOF ¶¶ 9(d)), making it impossible for Plaintiffs to know when or if they will be violating the law, and, given the logistical hurdles imposed by some of these interpretations, how much time the Plaintiffs have to return the forms at all.  (*Id.*  ¶¶ 30-36).  This makes it difficult for Plaintiffs to plan and implement voter registration drives.  *Third*, the challenged law's penalty provisions are vague.  They do not specify what constitutes a triggering "violation."  The challenged law also provides for a $5,000 "cap" on liability per "civil action," N.M. Stat. Ann. 1978, § 1-4-49(e), but does not clearly limit the number of civil actions that the state may file against a person or organization.  Organizations and volunteers face the possibility of significant fines, with unclear limits, for technical violations of the statue.  Not surprisingly, Plaintiffs have ceased or seriously curtailed their protected voter-registration activities in the face of the hopeless muddle created by the

challenged law.  (SOF ¶ 23.)

The Secretary cannot justify these burdens by reference to the State's asserted interests in the challenged law.  Those interests do not make a vague and uncertain regime necessary. Accordingly, the burdens created by the challenged law's vague terms fail under *Anderson*.

**B.    Plaintiffs' Evidence Proves Beyond Genuine Dispute That The Secretary Has Not Justified The Burdens Imposed By The Challenged Law.**

The challenged law imposes a series of burdensome requirements that operate together to curtail Plaintiffs' protected activities.  As described below, the severe burdens to Plaintiffs outweigh the State's insubstantial interests in the challenged law.

**1.    *The 48 Hour Requirement Unjustifiably Burdens Plaintiffs' Ability To Conduct Volunteer-Run Voter Registration Activities.***

The challenged law's requirement that forms be returned to the Secretary within 48 hours imposes severe burdens on Plaintiffs' ability to engage in their protected activities.  Plaintiffs' volunteers do not simply collect registration forms and deliver them directly to the state.  Instead, Plaintiffs subject the forms to a quality review process.  (SOF ¶¶ 29, 32-36.)  In this process, Plaintiffs' volunteers return the forms from the field to a processing location, where Plaintiffs review each form to ensure that it has been completed correctly and ensure that no forms are missing.  (*Id.* ¶¶ 29, 33, 35).  Conducted with even minimal diligence and accuracy this process takes several days during high-registration periods.  (*Id.* ¶ 35.)

Far from a mere administrative task, the Plaintiffs' quality reviews are integral to their protected activities.  As an initial matter, Plaintiffs must conduct the reviews to ensure they and their volunteers are complying with the 48 hour requirement itself.  (*Id.* ¶¶ 33, 35.)  The quality review is also an important part of the Plaintiffs' protected activities themselves.  In registering

voters, Plaintiffs seek to convey the message that civic participation is important and that citizens who may feel unimportant in society can be empowered by voting.  (SOF ¶¶ 6-7.)  If one of these newly-registered voters is turned away at the polls because of technical mistakes on the voter's registration form, the force of Plaintiffs' message is greatly diminished and their expressive efforts largely wasted.  (*Id.* ¶¶ 33, 35.)  Plaintiffs' quality review process helps prevent such mistakes, thereby ensuring that their message remains persuasive.  (*Id.*)

In short, the nature of Plaintiffs' protected activities makes the quality review process a necessity.  At the same time, however, the 48 hour requirement makes such a review process extremely difficult.  The quality review process can take several days during voter registration drives and requires the help of many volunteers.  (*Id.* ¶¶ 33, 35.)  Organizations contemplating a voter registration drive are thus placed in an impossible position:  on the one hand, they can insist on a review process and risk violating the 48 hour deadline *en masse* — thereby risking extensive civil fines (along with criminal sanctions for "intentionally" violating the deadline, *see* N.M. Stat. Ann. 1978, § 1-4-49(D)).  On the other, they can eliminate the quality review process, which will expose them to fines when individual forms go missing, and undermine their message of voter empowerment when new registrants are turned away at the polls because of technical errors on their registration forms.  Thus, the law's requirements impose formidable barriers to conducting a voter registration drive; indeed, the district court in *LWVF I*, 447 F. Supp. 2d 1314, ruled unconstitutional an even more relaxed law that imposed a $250 penalty for forms that were not returned within *ten* days, not 48 hours.[13]

_____

[13]     Afterwards the Florida legislature reduced the fine $50 per form and imposed a cap of $1,000 per calendar year.  *League of Women Voters of Florida v. Browning ("LWVF II")*, 575 F. Supp. 2d 1298,

In the face of these burdens, the Secretary has produced no evidence to justify the 48 hour requirement.  Unlike a deadline requiring forms be submitted prior to an election, the 48 hour requirement is not necessary to protect a voter's right to participate in an election.  *See supra* Part II.B.2.  In light of the formidable burdens that the 48 hour requirement *does* impose, it fails the test set out in *Anderson*.

> **2.      The 50-Form Limit Burdens Plaintiffs' First Amendment Rights And Does Not Serve A Legitimate Or Sufficient State Interest.**

The 50-form limit has made it difficult for Plaintiffs to conduct significant voter registration drives.  Voter registration forms must be picked up at the clerk's office, but Plaintiffs and many of their volunteers lack easy access to transportation. (SOF ¶¶ 24-26, 28.)  What is more, some clerks require the volunteer to return all 50 forms, in person, before 50 new forms will be issued.  (*Id.* ¶ 28.)  As a result, voter registration drives — to the extent that one Plaintiff, NMPIRG, still conducts them — have become stop-and-go affairs where the entire organization must sometimes suspend its activities while new forms are procured from a clerk's office.  (*Id.*)  This reduces the number of voters that an organization would otherwise be able to register, and makes large-scale voter registration uncertain and ineffective.  Waivers to the 50-form limit are sometimes granted but such waivers are made at a clerk's discretion.  (*Id.* ¶ 9(c).)  But large-scale voter registration drives require planning, and Plaintiffs are unable to organize such drives on the assumption that a waiver will be granted.  (*Id.* ¶ 28.)

The undisputed evidence shows the burden of the 50-form limit is not necessary to

---

1305, 1322 (S.D. Fla. 2008).  Given these reduced penalties, the court upheld the law.  *Id.* at 1322.  *LWVF II* does nothing to undermine the relevance of the holding in *LWVF I* — especially as the challenged law here is even *more* severe than the law struck down in *LWVF I*, since it imposes a $250 fine for forms turned in after *48* hours, not ten days.

advance the State's asserted interest in costs.  There are less expensive means of meeting the

demand for forms, as the Secretary has conceded.  *See supra* Part II.C.  This is fatal to the

Secretary's argument the State's interest in cost justifies crippling voter registration drives.

> ### 3.     *The Registration And Training Requirements Unjustifiably Burden Plaintiffs' Ability To Recruit Volunteers.*

The challenged law's registration and training requirements have made it difficult or

impossible for Plaintiffs to field volunteers.  (SOF ¶¶ 24-27.).  The law also compels voter

registration agents to disclose their affiliated organizations, thus deterring volunteers, such as

those affiliated with AAPD, who are unwilling publicly to disclose their affiliation with a

disability rights group for fear of discrimination.  (*Id.* ¶ 26.)[14]  In addition, the training sessions

are frequently held at inconvenient times and locations, and often do more to intimidate than to

inform.  (*Id.* ¶¶ 24-27.)  The burdens caused by registration and training have made it impossible

for NMPIRG to recruit the casual volunteers on which it relied in the past (*id.* ¶ 24), and the

logistical burdens imposed by the requirements, among other things, led SWOP to conclude that

fielding volunteers would be impossible.  (*Id.* ¶ 25).[15]  These requirements fail *Anderson*

balancing because the Secretary has put forward no evidence to justify these burdens, especially

when more convenient means, such as online training, apparently would be just as effective at

advancing the State's asserted interest.  *See supra* Part II.B-C.

---

[14]     Compelling persons to disclose their organizational affiliation direct impacts the associational rights of both the volunteers and Plaintiffs.  *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

[15]     As the court noted in *Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006), training requirements that require such travel impose particular burdens on people of modest means who "lack . . . access to transportation to get to a location" that offers training.  *Id.* at 704; *see also id.* at 705 n.9.

### 4.   The Challenged Law's Penalties Impose Severe And Unnecessary Threats To The Limited Resources Of Plaintiffs And Their Volunteers.

Plaintiffs, their members, and volunteers do not have significant monetary resources, and thus face significant difficulty overcoming the logistical hurdles created by the challenged law. (SOF ¶¶ 37-40.)  The monetary penalties established by the challenged law therefore impose formidable burdens on both Plaintiffs and their members.  By its terms, the challenged law imposes criminal penalties for intentional violations, N.M. Stat. Ann. 1978, § 1-4-49(d), and strict-liability civil fines of $250 for "each violation," *id.* § 1-4-49(e).  This is to say nothing about the uncertain nature of the law's "cap," which limits fines to $5,000 per civil action, but does not limit the number of civil actions that may be filed against an organization. *Id.*[16]  And as explained above, the 48 hour requirement is extremely difficult for organizations conducting voter registration drives to meet consistently, despite their best efforts.  Plaintiffs, who seek to conduct voter registration drives, therefore face the likelihood that they will run afoul of the law, and that they and their volunteers will be exposed to ruinous liability.

The Secretary has provided no evidence that these significant penalties are justified in general, much less as applied to Plaintiffs.  *See supra* Part II.B.3.  Therefore, like the law's substantive requirements, its penalty provisions must fail the *Anderson* balancing test.

### CONCLUSION

Plaintiffs do not help others to register to vote for reasons of profit or politics.  To the contrary, Plaintiffs are nonpartisan volunteer organizations that believe civic participation is

---

[16]      By contrast, the penalties upheld in *LWVF II* created a definite cap, by limiting the amount of fines that could be imposed on a voter registration organization *per calendar year*.  *LWVF II*, 575 F. Supp. 2d at 1304; *id.* at 1322 (upholding revised law because penalties per violation had been reduced and "*[m]ore importantly*, [the law] substantially reduces the total exposure [facing Plaintiffs] . . . by imposing a $1,000 *annual cap* on the amount of fines that may be imposed" (emphases added)).

important and that all citizens should enjoy equal access to the ballot box.  And therefore Plaintiffs make strenuous efforts to reach out to those least likely to participate in the democratic process, not only to help them register to vote, but also to persuade them that voting matters. Democracy thrives and depends on such efforts.

Yet, notwithstanding the lack of evidence of any significant problem and the Secretary's concession that Plaintiffs are reputable organizations, the State has burdened Plaintiffs' efforts to expand civic participation.  As a result, underserved New Mexicans are more likely to remain outside the democratic process.  The undisputed evidence shows the Secretary cannot justify undermining the franchise under the auspices of protecting it.

For the foregoing reasons, Plaintiffs move this Court under Rule 56 for summary judgment that the challenged law violates the First and Fourteenth Amendments to the United States Constitution and Article II, § 17 of the New Mexico Constitution.

Dated: July 2, 2010

Respectfully Submitted,
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
   s/ Edward Ricco
By _____
   Edward Ricco
P.O. Box 1888
Albuquerque, NM 87103
Telephone: (505) 765-5900
ericco@rodey.com

Edward D. Hassi
O'Melveny & Myers LLP
Times Square Tower

7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
thassi@omm.com

Charles E. Borden
Guy G. Brenner
O'Melveny & Myers LLP
1625 Eye Street N.W.
Washington, DC 20006-4001
Telephone: (202) 383-5300
cborden@omm.com
gbrenner@omm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on July 2, 2010, I filed the foregoing electronically through the CM/ECF system, which caused parties or counsel in this matter to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

    s/ Edward Ricco

By_____

    Edward Ricco